Documentary Evidence
Part 3 of 3

DECLARATION OF JYOTI MITTAL

1  TANJA L. DARROW, Bar No. 175502
   tdarrow@littler.com
2  LITTLER MENDELSON, P.C.
   633 West 5th Street
3  63rd Floor
   Los Angeles, CA  90071
4  Telephone:  213.443.4300
   Facsimile:   213.443.4299
5
   JYOTI MITTAL, Bar No. 288084
6  jmittal@littler.com
   LITTLER MENDELSON, P.C.
7  2049 Century Park East
   5th Floor
8  Los Angeles, CA  90067
   Telephone:  310.553.0308
9  Fax No.:   310.553.5583

10 Attorneys for Defendants
   STARBUCKS CORPORATION D/B/A
11 STARBUCKS COFFEE COMPANY (erroneously
   named as STARBUCKS CORPORATION and
12 STARBUCKS COFFEE COMPANY as separate
   entities)
13

14              UNITED STATES DISTRICT COURT

15             CENTRAL DISTRICT OF CALIFORNIA

16 KEVIN BRISCOE,                    Case No.  2:17-cv-04832-JAK (JPRx)

17              Plaintiff,           ASSIGNED TO HON. JOHN A.
                                     KRONSTADT
18 v.
                                     **DECLARATION OF JYOTI**
19 STARBUCKS COFFEE COMPANY;         **MITTAL IN SUPPORT OF**
   and DOES 1-20; Inclusive,         **DEFENDANT STARBUCKS**
20                                   **CORPORATION'S MOTION FOR**
                                     **SUMMARY JUDGMENT OR, IN**
21              Defendants.          **THE ALTERNATIVE, PARTIAL**
                                     **SUMMARY JUDGMENT**
22
                                     Date:       July 16, 2018
23                                   Time:       8:30 a.m.
                                     Courtroom:  10B
24
                                     Trial Date:  None set
25                                   Complaint Filed:  August 9, 2016 (Los
                                     Angeles County Superior Court)
26

27

28

LITTLER MENDELSON, P.C.
633 West 5th Street
63rd Floor
Los Angeles, CA 90071
213.443.4300

## DECLARATION OF JYOTI MITTAL

I, Jyoti Mittal, hereby declare and state as follows:

1.      I am an attorney with the law firm of Littler Mendelson, a Professional Corporation, counsel for Defendant Starbucks Corporation "Starbucks" in the above entitled matter.  The following facts are within my personal knowledge, and if called as a witness, I would competently testify thereto.

2.      I am duly licensed to practice law in the State of California and before the United States District Court for the Central District and am responsible for representing Starbucks in this action.  Except where otherwise indicated, all of the information contained herein is based upon my personal knowledge and if called and sworn as a witness, I could and would competently testify thereto.

3.      On January 30, 2018, and March 13, 2018, Tanja L. Darrow, the Shareholder on this matter, took the deposition of Plaintiff Kevin Briscoe.  Attached hereto as **Exhibit A** is a true and correct copy of relevant excerpts of Kevin Briscoe's Deposition, Volumes I and II, taken on January 30, 2018, and March 13, 2018.

4.      On March 20, 2018, Mr. Briscoe's lead counsel, Alvin L. Pittman, took the deposition of Angela Rivers.  Attached hereto as **Exhibit B** is a true and correct copy of relevant excerpts of Angela Rivers' Deposition taken on March 20, 2018.

5.      On April 4, 2018, I sent an email and letter to Mr. Briscoe's counsel, Mr. Pittman and Phillip A. Bucknor, Jr., in an attempt to meet and confer regarding Starbucks' motion for summary judgment, the substance of Mr. Briscoe's claims and Starbucks' position regarding the lack of merit of those claims.  I also asked counsel, for a time to meet and confer regarding the issues. Mr. Briscoe's counsel failed to respond.  Attached hereto as **Exhibit C** is a true and correct copy of this email exchange and the attached correspondence.

6.      On April 17, 2018, I sent another letter and email to Mr. Briscoe's counsel requesting that to meet and confer regarding Starbucks' motion for summary judgment. Mr. Briscoe's counsel failed to respond. Attached hereto as **Exhibit D** is a

LITTLER MENDELSON, P.C.
633 West 5th Street
63rd Floor
Los Angeles, CA 90071
213.443.4300

1   true and correct copy of this email exchange and the attached correspondence.

2          7.     Mr. Briscoe did not include bates numbers on his document productions;

3   for identification purposes, we have appended a footer reflecting the production date

4   and specific page number of the relevant production.

5          Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury, under

6   the laws of the United States, that the foregoing is true and correct, and that this

7   declaration was executed on May 21, 2018, at Los Angeles, California.

8

9                                                    JYOTI MITTAL

10  Firmwide:154739342.1 055187.1066

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

1               UNITED STATES DISTRICT COURT

2               CENTRAL DISTRICT OF CALIFORNIA

3

4   KEVIN BRISCOE,                    )
                                      )
5             Plaintiff,              )
                                      )
6        vs                          )Case No.
                                      ) 2:17-cv-04832-JAK (JPRx)
7   STARBUCKS COFFEE COMPANY, and    )
    DOES 1-20; Inclusive,            ) Volume I - Pages 1-193
8                                     )
              Defendants.             )
9   _____ )

10

11

12

13

14

15

16        DEPOSITION OF:     KEVIN NEAL BRISCOE

17        DATE:JANUARY 30, 2018

18        LOCATION:          LOS ANGELES, CA

19

20

21

22

23

24  MARY E. PIERCE, CSR 6143

25  JOB NO.:  18-020

PANTERA COURT REPORTERS                    panterareporters@msn.com
714-964-6200

```
 1                UNITED STATES DISTRICT COURT

 2               CENTRAL DISTRICT OF CALIFORNIA

 3

 4   KEVIN BRISCOE,                 )
                                    )
 5            Plaintiff,            )
                                    )
 6       vs                         )Case No.
                                    ) 2:17-cv-04832-JAK (JPRx)
 7   STARBUCKS COFFEE COMPANY, and  )
     DOES 1-20; Inclusive,          )
 8                                  )
              Defendants.           )
 9   _____)

10

11

12

13

14
          Videotaped deposition of KEVIN NEAL BRISCOE,
15        the Plaintiff herein, Volume I, taken on behalf
          of the Defendants, at 10:40 a.m., Tuesday,
16        January 30, 2018, at 633 W. 5th Street,
          63rd Floor, Los Angeles, California, before
17        Mary E. Pierce, CSR 6143, a Deposition Officer.

18

19

20

21

22

23

24

25
```

KEVIN BRISCOE vs STARBUCKS COFFEE
BRISCOE, KEVIN  on 01/30/2018

1

2    APPEARANCES OF COUNSEL:

3

4    For the Plaintiff:

5         LAW OFFICE OF ALVIN L. PITTMAN
          By:  ALVIN L. PITTMAN, Esq.
6         9841 Airport Boulevard
          Suite 412
7         Los Angeles, CA  90045

8

9

10   For the Defendants:

11        LITTLER MENDELSON, P.C.
          By:  TANJA L. DARROW, Esq.
12        and  JYOTI MITTAL, Esq.
          633 W. 5th Street
13        63rd Floor
          Los Angeles, CA  90071

14

15

16

17   Videographer:

18        GARY WADE, Wade Enterprises
          (714) 634-8211

19

20

21   Also Present:

22        RICHARD LOPEZ, Esq., Starbucks Corporation
          ANGELA RIVERS

23

24

25

KEVIN BRISCOE vs STARBUCKS COFFEE
BRISCOE, KEVIN  on 01/30/2018

```
 1    quick?

 2         THE VIDEOGRAPHER:  We're going off the video

 3    record.  The time is approximately 11:09 a.m.

 4              (Brief recess.)

 5         THE VIDEOGRAPHER:  We are back on the video

 6    record.  Time is approximately 11:10 a.m.

 7         Q.    BY MS. DARROW:  Okay.  So you mentioned just

 8    a second ago that you had communicated to your girlfriend

 9    that you believe that you were treated differently than

10    other employees.  Can you identify any specific employees

11    that you're referring to or do you just mean in general?

12         A.    Sure.

13         Q.    Okay.  Who were you referring to?

14         A.    Several members on the team that I was on at

15    Starbucks.

16         Q.    Okay.

17         A.    Specifically Barb Holdgrafer.

18         Q.    I know you're about to give me a list, and I

19    want to make sure that I'm spelling everyone's name

20    correctly.  So can you spell Bob's last name for me,

21    please?

22         A.    With all due respect, I'm not going to

23    butcher her name, so I'll --

24         Q.    Phonetically, what is it again?

25         A.    Barbara Holdgrafer.  Barb Holdgrafer.
```

KEVIN BRISCOE vs STARBUCKS COFFEE
BRISCOE, KEVIN   on 01/30/2018

1        Q.    Barbara, not Bob?

2        A.    Barb.  We called her Barb, you know.  I'm

3    assuming it's Barbara.

4        Q.    Okay.  Anyone else?

5        A.    Yes.  Kevin Dockery.

6        Q.    Do you know how to spell Kevin's last name?

7    You said "Dockery"?

8        A.    Dockery.

9        Q.    Okay.  Do you know how to spell it?

10       A.    I don't want to try to butcher it.

11       Q.    Anybody else?

12       A.    Donna Hernandez.

13       Q.    I think I know that one.  At least the

14   spelling anyway.

15             Anybody else?

16       A.    Tammy Hereford.

17       Q.    Can you pronounce the last name for me

18   again?

19       A.    Hereford, H-e-r-e --

20       Q.    Anybody else?

21       A.    Ashley Larson.

22       Q.    Anybody else?

23       A.    Dave Lisuk.

24       Q.    Do you know how to spell Dave's last name?

25       A.    I do not.

1        Q.    Anybody else?

2        A.    Deanna Pusatier.

3        Q.    Do you know how to spell Deanna's last name?

4        A.    I do not.

5        Q.    Can you pronounce it again for me then?

6        A.    Deanna Pusatier.

7        Q.    All right.  Anybody else that you believe

8    you were treated differently from?

9        A.    Leah Bernard.

10       Q.    Anyone else?

11       A.    That's all I can think of at the moment.

12       Q.    Okay.  So how is it you believe that you

13   were treated differently from the names that you just

14   listed for me?

15       A.    There are many instances.  I can go down a

16   long laundry list, but there are many instances where I

17   would do the same work or just as good as work as they

18   would have done, and they would get credit for it.  I

19   wouldn't.

20       Q.    Okay.

21       A.    Or I --

22       Q.    Let's go down the list.

23       A.    Sure.

24       Q.    So tell me how you were treated differently

25   from Barbara Holdgrafer.

KEVIN BRISCOE vs STARBUCKS COFFEE
BRISCOE, KEVIN on 01/30/2018

```
 1        A.    Barb Holdgrafer was, I would say, chosen

 2   regularly to lead the team, for example, AOP pillar leads

 3   and assignments that we would have on the team, was

 4   chosen to do that on a more regular basis than someone

 5   like myself that had equal to or even more skills than

 6   that individual.

 7              When it would come to presentation, when it

 8   would come to meetings in the board room when we would

 9   have our team meetings, I would be treated differently

10   than that person.  I would be cut off from speaking.

11              If Barb would speak or talk about something,

12   she wouldn't get cut off.  And that would go for many

13   members on the team.  That would be Donna Hernandez,

14   Kevin Dockery, Erica Hernandez.

15              Several of those team members, I would do

16   the same type work or even better work.  They would be

17   elevated.  Deanna Pusatier is very new to our team and

18   immediately was being elevated to do things that I

19   attempted to do or would try to do or know that I could

20   do and execute and wasn't even given that opportunity.

21        Q.    Let's -- anything else?

22        A.    There's a lot of things, but, you know, I

23   can try -- I would like a sheet of paper.  I probably

24   could -- probably a little more specific if I had

25   something to write on.
```

1    Q.    I'm happy to provide you with a piece of

2  paper --

3    A.    No problem.

4    Q.    -- to assist you.

5          But let me go down the list.  We were

6  talking about Barb Holdgrafer.  So why don't you -- well,

7  why don't we take a moment, and you can -- if you can

8  tell me what you -- how you were treated differently from

9  other employees.

10   A.    So with respect to Barb, there was a couple

11  of occasions when there was the ability to apply for TLA

12  role as regional director.

13   Q.    What's "TLA"?

14   A.    Temporary lead assignment.

15   Q.    So you have to remember, I know that this is

16  a Starbucks case, and I may be familiar with the

17  acronyms.  Maybe our judge is not going to be as familiar

18  with the acronyms.  So you're going to have to tell me

19  what all the acronyms mean.

20          So "TLA" means what?

21   A.    Temporary lead assignment.

22   Q.    Okay.  And so you were telling me the story

23  of how Barb Holdgrafer was what with the TLA?  What was

24  the relationship with the TLA?

25   A.    She was afforded the opportunity to do a TLA

```
 1    as a regional director.

 2         Q.    What does that mean, "given an opportunity

 3    to do a TLA"?

 4         A.    An opportunity to present itself to fill a

 5    role as a temporary assignment in the vacancy of someone

 6    not being in a role.

 7               So, for example, if Angela Rivers, my

 8    manager, was vacant, a TLA would be posted to fill in for

 9    that position.

10         Q.    Okay.

11         A.    Okay?

12         Q.    So it's a management position, but on a

13    temporary basis; would that be correct?

14         A.    Yes.

15         Q.    Okay.

16         A.    At an elevated level.

17         Q.    Okay.

18         A.    Higher than current level.

19         Q.    Do you have to apply for a TLA role?

20         A.    There is an interview process, I believe.  I

21    believe you have to raise your hand and indicate that

22    you're interested.  There is a process that -- from my

23    understanding, that you go through saying that you --

24    there is a scale that the individuals are placed on, the

25    team members, to say you're ready or you're not ready or
```

1   these type of things.

2        Q.    Okay.

3        A.    So it's determined that way.

4        Q.    Okay.

5        A.    So you're afforded the opportunity to say

6   yea or nay.

7        Q.    So how do you apply for a TLA role?

8        A.    You let your manager and you let Human

9   Resources know.

10       Q.    Is there any more formality to it than that

11  where you have to go online and submit a résumé or

12  anything like that?

13       A.    I wasn't afforded the opportunity, so I

14  don't know.  I wasn't given the chance.  I don't know if

15  you have to go online or not.  That I don't know.  I know

16  you have to let them know.  They tell us that there's a

17  TLA opportunity, do I have to go online, I don't know if

18  I have to go online or not.

19       Q.    So someone has to tell you -- so a TLA role

20  is not something that's posted for everybody?

21       A.    No, it is posted.  It is posted.

22       Q.    Okay.

23       A.    But I don't know if you have to go online

24  and apply.  That I don't know.

25       Q.    So if you see that -- I mean, you know --

KEVIN BRISCOE vs STARBUCKS COFFEE
BRISCOE, KEVIN  on 01/30/2018

```
 1    your performance evaluation?

 2         A.    I have no idea.

 3         Q.    Do you know if anyone else expressed any

 4    interest in that TLA position?

 5         A.    Sure.  Barb Holdgrafer did specifically.  I

 6    do know that.

 7         Q.    How do you know that?

 8         A.    She told me.

 9         Q.    Anybody else?

10         A.    Not that I can remember.

11         Q.    All right.  Have you ever seen Barb

12    Holdgrafer's résumé?

13         A.    No.

14         Q.    Have you ever seen any documents from her

15    employee file?

16         A.    No.

17         Q.    Do you know how long she's been with

18    Starbucks?

19         A.    More than ten years.  I don't know.  Maybe

20    more than 15.

21         Q.    Did you ever supervise Barbara Holdgrafer?

22         A.    No.

23         Q.    Did Barb Holdgrafer ever supervise you?

24         A.    No.

25         Q.    Anyone else that you are aware of that had
```

1          A.     There were many instances, countless

2   instances, when I was treated unfairly for my performance

3   and for my work, for the work that I've done and for the

4   work that I did, the results that I got.

5               You know -- you know, I clearly -- I clearly

6   remember talking with Angela and Sarah Rogers

7   specifically about when we -- when this coaching and this

8   performance issue came up, it went from my inability to

9   communicate with Angie.  It started out there.

10              Then all of a sudden it went from my work

11  habits, and then it went to something -- it went through

12  this path, and I don't know when it started, you know.  I

13  have no idea when it started.  I've never had these type

14  of things to happen prior, so it was very, very weird for

15  me.  So I think the assessment was unfair.

16         Q.     So when your manager offers you an

17  opportunity and a suggestion for how to apply for a

18  position that replaces them, do you think you know better

19  than they do?

20         A.     No.  I wouldn't say I think I know better.

21         Q.     When you were first hired by Starbucks, did

22  you interview for the position?

23         A.     Sure, yes.

24         Q.     Who did you interview with?

25         A.     Angela Rivers, Mike Steed.  There was a

1    recruiter, which was Dustin Low.

2         Q.    Tell me that name again.

3         A.    Dustin Low.

4         Q.    Who offered the position to you at

5    Starbucks?

6         A.    Dustin Low by way, I guess, of Angela

7    Rivers.

8         Q.    So she interviewed you.  As far as you know,

9    is she the one that suggested that you be hired?

10        A.    As far as I know.

11        Q.    And "she," I'm referring to Angela Rivers.

12        A.    Yes.

13        Q.    When you interviewed with Miss Rivers, did

14   you interview with her one on one, or were there other

15   people in the room?

16        A.    There were other people, that I can

17   remember.  There was someone there.

18        Q.    Was it a telephonic or in-person interview?

19        A.    In-person.

20        Q.    Who else was in the room?

21        A.    The first time I met Angela Rivers was with

22   her and Mike Steed, which was -- at the time Mike Steed

23   was a district manager on Angela Rivers' team.

24        Q.    What's his race?

25        A.    I believe he's white.

KEVIN BRISCOE vs STARBUCKS COFFEE
BRISCOE, KEVIN  on 01/30/2018

1          Q.    What was your team called?

2          A.    I don't remember.  It wasn't called

3     anything.  I don't know.  Region -- I don't know.

4     Region 9 or -- I can't remember the region number.

5          Q.    They were all DMs?

6          A.    Yes.

7          Q.    Who reported to Angela Rivers?

8          A.    Yes.

9          Q.    Do you know who she reported to at the time?

10          A.    At the time, was Lisa Compton.  When I first

11     came on the team, it was a guy by the name of Mark

12     Crummett, which I believe hired Angela Rivers, and then

13     shortly after that Mark took an assignment I think

14     somewhere and went to Seattle or something, and then it

15     was Lisa Compton.

16          Q.    Okay.  What's the race of Dave Costa?

17          A.    Dave is white.

18          Q.    Matt I think you told me is white.  What's

19     the race of Linda Boiswick?

20          A.    White.

21          Q.    The race of Leslie Nelson?

22          A.    Black.

23          Q.    The race of Leah Bernard?

24          A.    Black.

25          Q.    The race of Donna Hernandez?

KEVIN BRISCOE vs STARBUCKS COFFEE
BRISCOE, KEVIN  on 01/30/2018

```
 1   least maybe weekly or biweekly depending on the need and

 2   what we were working on.

 3        Q.    So given the frequency of group meetings and

 4   then team meetings, it would seem to me that

 5   communication was pretty vital and important to

 6   Starbucks.  Would you agree with that?

 7        A.    Sure, yes.

 8        Q.    And so everybody on your team and everyone

 9   in your group would have to be able to communicate

10   effectively with one another.  Would you agree with that?

11        A.    Yes.

12        Q.    How often would you communicate with your

13   manager, Angela Rivers?

14        A.    It varied.  It could be by email.  It could

15   be by phone.  It could be in a team meeting.  So there

16   wasn't necessarily -- there was -- we -- there was a

17   monthly connection usually by phone.  There were field

18   visits that was usually calendared monthly.

19             So the connection or the attempt to

20   communicate with Angela Rivers was regular.

21        Q.    Did you discuss your personal life with

22   Miss Rivers?

23        A.    No.

24        Q.    Did Miss Rivers discuss her personal life

25   with you?
```

1      A.    She's in accounting.

2      Q.    Now, you said you don't have any children;

3   right?

4      A.    Do not.

5      Q.    Okay.  Have you ever had any children?

6      A.    No.

7      Q.    It's kind of a tricky question because

8   sometimes people have children that have deceased, so I

9   have to ask.

10          You told me the name of your father.  Is

11   your mother still alive?

12      A.    Yes.

13      Q.    What is her name?

14      A.    Bernice Briscoe.

15      Q.    Are your parents still together?

16      A.    Yes.

17      Q.    Where do they reside?

18      A.    Little Rock, Arkansas.

19      Q.    What's their address?

20      A.    3105 Marshall Street.

21      Q.    Do you provide financial support for your

22   parents?

23      A.    No.

24      Q.    Do you have any siblings?

25      A.    One sister.

KEVIN BRISCOE vs STARBUCKS COFFEE
BRISCOE, KEVIN  on 01/30/2018

```
 1          Q.    Older or younger?

 2          A.    Older.

 3          Q.    And what's your sister's name?

 4          A.    Karen.

 5          Q.    What's her last name?

 6          A.    Briscoe.

 7          Q.    How old is Karen?

 8          A.    Karen is two years older than me, so that

 9   makes her 53.

10          Q.    Have you had any communication with Karen

11   Briscoe regarding any of the claims that you have against

12   Starbucks?

13          A.    No, I have not.

14          Q.    Any particular reason why or why not?

15          A.    Just hasn't come up.

16          Q.    So prior to you joining Starbucks, did you

17   know anybody that worked there?

18          A.    Did I know -- yes.

19          Q.    Who did you know?

20          A.    That -- wait a minute.  That worked there

21   currently, I did not.  That used to work there, maybe I

22   did --

23          Q.    Who?

24          A.    -- but not currently.

25                I knew of Tom Ferguson.  I knew of Greg
```

KEVIN BRISCOE vs STARBUCKS COFFEE
BRISCOE, KEVIN  on 01/30/2018

1          A.     No.

2          Q.     Did you agree to the terms that are outlined

3    in the offer letter?

4          A.     Yes.

5          Q.     And did you accept the position that was

6    being offered to you that's outlined in the offer letter?

7          A.     Yes.

8          Q.     Upon your hire, did you receive any further

9    documentation, such as a handbook, policies and

10   procedures, things of that nature?

11         A.     Yes.

12         Q.     Tell me as best you can recall and as

13   specifically you can recall what you received.

14         A.     I believe received -- receiving a handbook.

15   I believe I recall receiving information on the stock

16   plan.  Think I -- at some point, I received the job

17   description.

18         Q.     A written job description?

19         A.     I think so.

20         Q.     Anything else?

21         A.     That's all I can remember at the moment.

22         Q.     And these were documents that were given to

23   you upon your first day of hire?

24         A.     Yes.

25         Q.     Did you review that handbook that was given

1    to you?

2         A.    Yes.

3         Q.    And when I say "review it," did you read it?

4         A.    Yes.

5         Q.    Have you read it more than once?

6         A.    No.

7         Q.    But you at least read it once; right?

8         A.    Yes.

9         Q.    Same thing with the stock plan.  You read

10   that?

11        A.    Yes, I glanced at it, sure.

12        Q.    And the job description, did you read that?

13        A.    Yes.

14        Q.    Did you receive any training or orientation

15   upon your hire?

16        A.    Yes.

17        Q.    All right.  With regards to the handbook,

18   describe it to me.  What did it look like?

19        A.    Starbucks logo on the front, said "Partner

20   Handbook," I believe.

21        Q.    Okay.

22        A.    I don't remember the exact title.  And

23   inside it had the Starbucks mission statement, had points

24   of contact, what you do as an employee if you need to

25   reach out to someone.  Just those basic sort of things

1  that I could remember.

2         Q.    Okay.  How thick was it?

3         A.    It wasn't very thick.  It was -- I don't

4  know how many pages it was, but it wasn't, like, a thick

5  book.  It was relatively thin size.  I don't know.  Maybe

6  the size of a magazine maybe.

7         Q.    Okay.

8         A.    A thin magazine, something like that.

9         Q.    Understood.

10        Easy to read?

11        A.    Pretty much, sure.

12        Q.    Did you have any questions about it?

13        A.    I don't recall having questions.

14        Q.    Did you feel like if you did have any

15  questions about it there was someone that you could pose

16  those questions to?

17        A.    Yes.

18        Q.    Did you sign an acknowledgement or some

19  document acknowledging your receipt of the handbook and

20  that you had read and understood it?

21        A.    I believe so.

22        Q.    Were you given more than one handbook during

23  your employment with Starbucks?

24        A.    It's possible.  I don't really remember.

25        Q.    You don't have a specific recollection of

1    that?

2         A.    I don't.

3         Q.    Okay.  And you talked earlier about a

4    portal?

5         A.    Yes.

6         Q.    Is that a computer that you'd have to go to?

7         A.    It's a site.

8         Q.    A site you can go to?

9         A.    Yeah.

10        Q.    And you can access from any computer or --

11   or a specific computer?

12        A.    Well, you'd have to have your password and

13   credentials in order to access that site.

14        Q.    Okay.  Was the handbook available to you on

15   that portal, as well?

16        A.    Sure.

17        Q.    In addition to a hard copy?

18        A.    Yes.

19        Q.    When you believe that you were being treated

20   unfairly at Starbucks, did you go back to reference any

21   portions of the employee handbook?

22        A.    I don't recall doing that.

23        MS. DARROW:  We're gonna mark as Defendant's

24   Exhibit No. 2 the acknowledgement of Mr. Briscoe signed

25   and dated on September 3rd, 2011.

```
 1              (The document referred to was marked as
 2         Defendant's Exhibit 2 and is annexed hereto.)
 3         Q.    BY MS. DARROW:  Take your time and review
 4    the document.  When you've completed your review, look up
 5    and I'll ask you a few questions about it.
 6         A.    Do I get to keep these copies?
 7         Q.    You can if you want to.
 8         A.    Just curious.
 9         Q.    They're in the record.
10              So would it be accurate to say that you have
11    reviewed what's been marked as Defendant's Exhibit No. 2?
12         A.    Yes.
13         Q.    Okay.  What's your understanding as to what
14    it is?
15         A.    It's my acknowledgement of receiving -- it
16    says -- my Partner Acknowledgement, which we call at
17    Starbucks employees partners.  I can't tell that it's the
18    handbook acknowledgement, but it looks like it is.  It's
19    kind of vague.  It's not clear to read, but it's
20    definitely my signature here, Partner Acknowledgement.
21         Q.    Okay.  And that is definitely your
22    signature?
23         A.    Yes.
24         Q.    Okay.  And did you sign the acknowledgement
25    because you had indeed received and read the employee
```

KEVIN BRISCOE vs STARBUCKS COFFEE
BRISCOE, KEVIN  on 01/30/2018

1    handbook?

2          A.    Yes.

3          Q.    Okay.  I want to know about your training

4    and orientation when you joined the company.  So I -- you

5    did receive some training; right?

6          A.    Yes.

7          Q.    Okay.  Because Starbucks does things

8    differently from other companies that you've worked for;

9    would that be accurate?

10         A.    There's similarities and there's

11   differences.

12         Q.    Okay.  And part of the training is to

13   acclimate yourself with what those differences are,

14   correct, learn the Starbucks way?

15         A.    Learn the Starbucks way.

16         Q.    Okay.  And tell me about your initial

17   training when you joined Starbucks, who did it and when

18   and where.

19         A.    My initial training began in a restaurant in

20   Hollywood.  It was in-store training.

21         Q.    So they start off with in-store training.

22   So before you even start working or before you start

23   doing district manager stuff you have to do training;

24   would that be accurate?

25         A.    In-store training.

1          Q.     Where does that training take place?

2          A.     My training took place in the Los Angeles

3     area, primarily out of the Burbank office and in the

4     field.

5          Q.     Have you told me everything that you can

6     recall about the licensed store DM training that you

7     received?

8          A.     That I could remember at the moment.

9          Q.     Were you given any documents during that

10    training?

11         A.     I'm sure -- I'm sure I was.  I don't

12    remember what they were.

13         Q.     All right.  So you do the in-store training

14    for eight weeks, the licensed store DM training for two

15    to four weeks.  Any additional training --

16         A.     No.

17         Q.     -- that you haven't told me about?

18         A.     No.

19         Q.     And to the extent that you were given any

20    documents and asked to sign them, you wouldn't sign a

21    document without reading it, would you?

22         A.     Primarily, no.

23         Q.     What does "primarily" mean?

24         A.     Usually not.

25         Q.     At any time that you were employed at

 1   Starbucks, did Starbucks give you any documents that you

 2   just signed without reading?

 3        A.    No.

 4        Q.    Okay.  You didn't have a contractual

 5   relationship with Starbucks, did you?

 6        A.    Contractual relationship?

 7        MR. PITTMAN:  Objection.  Calls --

 8        Q.    BY MS. DARROW:  You didn't sign any contract

 9   with Starbucks, did you?

10        MR. PITTMAN:  Objection.  Calls for a legal

11   conclusion.

12        MS. DARROW:  You can answer.

13        MR. PITTMAN:  To the extent that the question

14   seeks facts and you have facts you can answer that, but

15   you're not to try and be a lawyer.

16        THE WITNESS:  I don't recall ever receiving a

17   contract.

18        Q.    BY MS. DARROW:  As far as you knew,

19   Starbucks could terminate your employment for any lawful

20   reason; correct?

21        A.    Can you repeat?  I didn't hear everything.

22        Q.    As far as you understood, Starbucks could

23   terminate your employment for any lawful reason; correct?

24        MR. PITTMAN:  Objection.  Same objection.  Legal

25   conclusion, and the witness is a fact witness, not a

KEVIN BRISCOE vs STARBUCKS COFFEE
BRISCOE, KEVIN  on 01/30/2018

1   legal witness.  So asking him about lawful reasons is a

2   mixed question at best.

3        Q.    BY MS. DARROW:  You can answer the question,

4   Mr. Briscoe.

5        A.    I know in the employment offer letter, it

6   indicates you can be terminated at will.  That's what I

7   recall.

8        Q.    Okay.  Using your understanding of what "at

9   will" meant as it was outlined in your offer letter, what

10  did you think that meant?

11       A.    Meaning has to be for lawful reasons.

12       MS. DARROW:  I'm going to mark as Defendant's

13  Exhibit No. 3 Starbucks Anti-Retaliation Policy.  It's

14  Bates labeled STAR 514.  It's a one-page document.

15            Take your time and review the document.

16  When you're done look up, and I'll ask you a few

17  questions about it.

18            (The document referred to was marked as

19        Defendant's Exhibit 3 and is annexed hereto.)

20       Q.    BY MS. DARROW:  You've completed your review

21  of Defendant's Exhibit No. 3?

22       A.    Yes.

23       Q.    Have you seen this document before today?

24       A.    I believe so.

25       Q.    And what's your understanding as to what it

KEVIN BRISCOE vs STARBUCKS COFFEE
BRISCOE, KEVIN  on 01/30/2018

1    is?

2         A.    That this is Starbucks' Anti-Retaliation

3    Policy.

4         Q.    Okay.  And so you knew that Starbucks had a

5    policy prohibiting retaliation?

6         A.    Yes.

7         MS. DARROW:  I'm going to mark as Defendant's

8    Exhibit No. 4 Starbucks' policy with respect to Global

9    Business Ethics, Bates labeled STAR 1055 through 1056.

10   It's a two-page document.

11              Take your time and review the document.

12   When you've completed your review, look up and I'll ask

13   you a few questions about it.

14              Sorry about that.

15              (The document referred to was marked as

16          Defendant's Exhibit 4 and is annexed hereto.)

17         THE WITNESS:  Okay.

18         Q.    BY MS. DARROW:  All right.  Do you recognize

19   the document that's been marked as Defendant's Exhibit

20   No. 4?

21         A.    I've seen it before.

22         Q.    Okay.  And what's your understanding as to

23   what it is?

24         A.    That Starbucks has an ethics policy and they

25   abide by it.

 1          Q.     It is the same.

 2          A.     Okay.  Cool.  Okay.

 3          Q.     So now I have to bring my glasses from now

 4   on.

 5                 All right.  So when you acknowledged your

 6   receipt of the Partner Guide, is this the document now

 7   that has been marked as Defendant's Exhibit No. 5?  Is

 8   this the Partner Guide that you received?

 9          A.     Probably so.

10          Q.     Okay.  When you say "probably," it's --

11          A.     I don't remember exact, but I'm sure it was.

12          Q.     Okay.

13          A.     Yeah.

14          Q.     You have no reason to dispute that the

15   Partner Guide that's been marked as Defendant's Exhibit

16   No. 5 is indeed a true and correct copy --

17          A.     Sure.

18          Q.     -- of the Partner Guide that was given to

19   you; is that right?

20          A.     Yes.

21          MS. DARROW:  All right.  Now we're gonna mark as

22   Defendant's Exhibit No. 6 the Business Ethics and

23   Compliance policies and procedures of Starbucks, also

24   marked as confidential, Bates labeled STAR 523 through

25   535.

```
 1              (The document referred to was marked as

 2         Defendant's Exhibit 6 and is annexed hereto.)

 3         MR. LOPEZ:  Just so the record is clear, that

 4    document you just handed him is actually titled the

 5    "Standards of Business Conduct."

 6         MS. DARROW:  Okay.  Thank you.

 7              (Reporter clarification.)

 8         MS. DARROW:  For right now we're not going to seal

 9    them.  That's what you needed to know?

10         THE REPORTER:  Yeah.

11         Q.    BY MS. DARROW:  Have you reviewed the

12    Standards of Business Conduct of Starbucks?

13         A.    I think I received it.

14         Q.    When you say you think you received it, you

15    received it upon your hire at Starbucks?

16         A.    Yes.

17         Q.    Is that right?

18         A.    Yes.

19         Q.    Okay.  And you understood that Starbucks has

20    a policy that promotes diversity; correct?

21         A.    Yes.

22         Q.    And you also understand that Starbucks has

23    specific guidelines for voicing concerns; is that right?

24         A.    Yes.

25         Q.    So any partner at Starbucks, at least
```

```
 1    according to its policies and procedures, can voice

 2    concerns about anything; is that right?

 3         A.    Yes.

 4         Q.    And Starbucks also has written procedures

 5    addressing its reporting structures; is that right?

 6         A.    Reporting structure, what do you mean?

 7         Q.    How do you report something if you have an

 8    issue with --

 9         A.    Yes.

10         Q.    -- anything.

11         A.    Yes.

12         Q.    Okay.  Where is that?

13               So if you look at the Partner Guide,

14    Starbucks even has a section dedicated to how to

15    effectively communicate with one another; isn't that

16    right?

17         A.    Okay.  Yes.

18         Q.    How did you become familiar with the

19    Starbucks mission?

20         A.    I learned it in my new hire training in my

21    onboarding.

22         Q.    During your employment with Starbucks, did

23    anyone express to you the importance of Starbucks

24    adhering to its mission?

25         A.    Not that I remember.
```

```
 1         Q.    In the -- I've been calling it a Starbucks

 2   handbook, but Starbucks calls it a Starbucks guide.

 3   There's a section on how we communicate that you said you

 4   were familiar with, and there's also a section referring

 5   to conflict resolution.  Are you familiar with that?

 6         A.    I've glanced at it here since you provided

 7   it.

 8         Q.    And I see that there's a telephone number

 9   that every Starbucks partner or Starbucks employee can

10   use to express any concerns that they may have.

11               Are you familiar with that?

12         A.    I've never used that number.

13         Q.    You've anticipated my second question, but

14   my first question was were you familiar with the number?

15         A.    Not necessarily.

16         Q.    But you got the Partner Guide; right?

17         A.    Sure, yes.

18         Q.    But you never used the telephone, the

19   conflict resolution number, did you?

20         A.    No.

21         Q.    At no time during your employment?

22         A.    No.

23         Q.    Any particular reason why or why not?

24         A.    I just talked directly to my manager and

25   Partner Resources.
```

1       Q.    Okay.  And there's also a process at

2  Starbucks that's available to all of its partners that if

3  they have any concerns about any of their policies or

4  practices, they can submit a mission review, like a card.

5            Are you familiar with that process?

6       A.    No.

7       Q.    It's in the Partner Guide.  Have you ever

8  submitted a card or submitted anything on a portal to

9  express any concerns about the mission --

10      A.    No.

11      Q.    -- review?

12      A.    No.

13      Q.    Any particular reason why or why not?

14      A.    No.

15      Q.    And the help line that Starbucks offers to

16 all of its employees and partners is available 24 hours a

17 day and seven days a week.  Were you aware of that?

18      A.    No, I was not.

19      Q.    Any particular reason why not?

20      A.    I've typically -- no.  I just wasn't

21 familiar with it, and Partner Resources has always said

22 come to them.  The managers always said come to them,

23 so...

24      Q.    All right.  So when you first started

25 working for Starbucks, your immediate supervisor and the

KEVIN BRISCOE vs STARBUCKS COFFEE
BRISCOE, KEVIN   on 01/30/2018

1        A.      Initially, Mark Crummett.   And that was when

2   I first joined she reported to Mark Crummett.   Second was

3   Lisa Compton.   Third was Matt Green.   Then again Mark

4   Crummett.

5        Q.      He came back?

6        A.      Yes.

7        Q.      Anybody else?

8        A.      That's all that I know.

9        Q.      So why do you think that things changed with

10   regards to your working relationship with Angela Rivers

11   after your third year at Starbucks?

12        A.      I don't know why things changed.

13        Q.      Your race didn't change, did it?

14        A.      No, my race did not change.

15        Q.      Do you believe anybody -- well, let me ask

16   you this.   Do you believe Angela Rivers discriminated

17   against you in some way?

18        A.      Yes.

19        Q.      Do you believe anybody else at Starbucks

20   discriminated against you in some way?

21        A.      No.

22        Q.      Do you believe anybody else besides Angela

23   Rivers mistreated you in some way at Starbucks?

24        A.      I think Sarah Rogers and Heidi Sundquist.

25        Q.      Can you spell that last name for me?

KEVIN BRISCOE vs STARBUCKS COFFEE
BRISCOE, KEVIN on 01/30/2018

```
 1        A.    I don't want to try and do that.

 2        Q.    Or pronounce it again.

 3        A.    Sundquist.

 4        Q.    I know the name.

 5        MR. LOPEZ:  Want me to spell it for the record?

 6        MS. DARROW:  No.

 7        Q.    BY MS. DARROW:  All right.  And when you

 8   believe Miss Rivers discriminated against you, do you

 9   think it was based upon something specific?

10        A.    I don't know.  I asked that question myself

11   and couldn't get an understanding why I started getting

12   this treatment.  So I don't know why.

13        Q.    Did you think it was because of your race?

14        A.    I do.

15        Q.    Why?

16        A.    I do.  Other employees that were non-black

17   weren't being treated the way that I was being treated.

18        Q.    Sorry.  I'm -- I can't see now.

19              Who specifically are you referring to?

20        A.    Barb Holdgrafer, Deanna Pusatier, Kevin

21   Dockery, Tammy Hereford, Ashley Larson, Erica Hernandez.

22        Q.    Anybody else?

23        A.    Donna Hernandez.

24        Q.    So let's go down the list one by one.

25              Have you ever seen the résumés of -- I know
```

KEVIN BRISCOE vs STARBUCKS COFFEE
BRISCOE, KEVIN  on 01/30/2018

1    you haven't seen the one for Barb Holdgrafer; correct?

2         A.    No, I have not seen it.

3         Q.    All right.  And how about of Deanna

4    Pusatier?

5         A.    No.

6         Q.    Kevin Dockery?

7         A.    No.

8         Q.    Donna Hernandez?

9         A.    No.

10        Q.    Tammy Hereford?

11        A.    No.

12        Q.    Ashley Larson?

13        A.    No.

14        Q.    Erica Hernandez?

15        A.    No.

16        Q.    Do you know the qualifications of the

17   employees that I just listed?

18        A.    Do I know the qualifications?

19        Q.    Yes, sir.

20        A.    No, I don't.

21        Q.    Do you know what experiences -- what job

22   experiences they had prior to them joining Starbucks?

23        A.    Well, many of the individuals that you've

24   named have been long-term employees of Starbucks.

25        Q.    Okay.

KEVIN BRISCOE vs STARBUCKS COFFEE
BRISCOE, KEVIN  on 01/30/2018

```
 1        A.    15 plus years.  So they've been a store
 2  manager and then maybe a district manager, and that's
 3  pretty much it.
 4        Q.    Okay.  Well, I didn't mention them.  You
 5  mentioned them.  So Barb Holdgrafer, was she a long-term
 6  employee?
 7        A.    Yes.
 8        Q.    I think you told me earlier you believe
 9  she's been about there 15, 20 years before you got there;
10  right?
11        A.    Yes.
12        Q.    How about Deanna Pusatier?
13        A.    Long term.  I don't know the length of time.
14        Q.    When you say "long term," what do you mean?
15  More than ten years?
16        A.    More than -- more than eight years probably.
17        Q.    And how about Kevin Dockery, was he a
18  long-term employee?
19        A.    Yes.
20        Q.    How long was he there before you got there?
21        A.    I don't know.
22        Q.    Your best estimate?
23        A.    I don't know.
24        Q.    Okay.  Donna Hernandez?
25        A.    Long term.
```

KEVIN BRISCOE vs STARBUCKS COFFEE
BRISCOE, KEVIN  on 01/30/2018

1          Q.    Tammy Hereford?

2          A.    Long term.

3          Q.    Ashley Larson?

4          A.    Not as long.  Maybe -- she came to the brand

5     after me, so year and a half, two years possibly.

6          Q.    How about Erica Hernandez, was she a

7     long-term employee?

8          A.    No.

9          Q.    Did you say Ashley Larson was Caucasian?

10         A.    Yes.

11         Q.    And Erica Hernandez, was she Caucasian?

12         A.    I believe she's Hispanic.

13         Q.    Looking at the racial makeup of the people

14    that were on your team, would you agree that it's pretty

15    racially diverse?

16         A.    I don't know.  I hadn't thought about it.  I

17    hadn't thought about whether or not how diverse the team

18    is.

19         Q.    As you sit here today, have you given --

20    give it some thought now.

21         A.    It's majority white.

22         Q.    Would you agree that it's a diverse group

23    though?

24         A.    There is diversity on the team.

25         Q.    In terms of race and any other protected

KEVIN BRISCOE vs STARBUCKS COFFEE
BRISCOE, KEVIN  on 01/30/2018

```
1    categories -- actually, I shouldn't say "protected

2    categories."  In terms of race and any other

3    characteristics, such as people being gay or lesbian,

4    things of that nature?

5         A.    I don't know people's sexual preference.

6         Q.    Do you know what efforts were made by

7    Miss Rivers to ensure a diverse team that she worked

8    with?

9         A.    No.

10        Q.    So the only reason that you believe that you

11   were treated unfairly on the basis of race is because of

12   the treatment of folks that were not African-American; is

13   that right?

14        A.    Yes.

15        Q.    Okay.

16        A.    That is not the only reason, but yes, I did

17   state that.

18        Q.    What other reasons were there?

19        A.    Well, I'm the only black male licensed store

20   district manager in Southern California.

21        Q.    Why do you believe that's significant?

22        A.    I didn't necessarily say it was significant.

23   You know, that was very different.

24        Q.    There were black females on your team, as

25   well; correct?
```

1      A.    Yes.

2      Q.    More than one?

3      A.    Yes.

4      Q.    Do you know of any other African-Americans

5  in management positions at Starbucks?

6      A.    Yes.

7      Q.    Who?

8      A.    Chris Carr.  These are very senior level

9  individuals.  Chris Carr.  At the time, Joe Thornton.

10  Michael Conway.  Those are the individuals that I know

11  off the top of my head that I can think of.

12      Q.    You said they were "very senior."  What do

13  you mean by that?

14      A.    Senior VP and above level.

15      Q.    What was Chris Carr?

16      A.    At the time, he was vice president of

17  licensed stores.  I don't know his exact title, but he

18  ran the licensed store business unit.

19      Q.    You said "at the time," so has that changed?

20      A.    At the time I was employed.

21      Q.    Oh, I see.

22            Okay.  Do you know if he's still there?

23      A.    Is he still with the company or is he still

24  running licensed stores?

25      Q.    Is he still with the company?

1        A.    I believe so.

2        Q.    And is Joe Thornton still with the company?

3   I don't know if I asked you that.

4        A.    I don't think so.

5        Q.    And what was his position?  I think you told

6   me earlier.

7        A.    He was a vice president, I believe, I

8   believe at one point.

9        Q.    How about Michael Conway?

10        A.    He was the senior leader that supported

11   business development or business solutions, let's just

12   say.

13        Q.    Okay.  Tell me specifically how you were

14   treated differently from Barb Holdgrafer.

15        A.    There were countless events that my work was

16   measured differently than --

17        Q.    You have to tell me specifically what you're

18   referring to.

19        A.    We supported different accounts.  I had a

20   very diverse portfolio of accounts which range from

21   airport to grocery, hotels, college and universities.  So

22   my portfolio was formal complex.  The work product that I

23   produced in that work group was somewhat different than

24   Barb's.  However, I didn't get that reward or recognition

25   or elevation that Barb received.

1      Q.     What makes you think that?

2      A.     Because it happened.  It happened

3  continuously.

4      Q.     What recognition are you referring to that

5  Barb got that you didn't?  Especially given that you were

6  doing different things.

7      A.     The recognition to be looked upon at a TLA

8  for regional director.  The elevation of actually being

9  nominated multiple time for DM of the quarter.  I think I

10  was maybe -- I was a nominee maybe once early on.

11         The supervision that she was awarded to try

12  and help supervise other people on the team.

13      Q.     I don't know what that means.

14      A.     Well, Angela gave her authority to lead

15  people on the team.  So, for example, she would be the

16  individual that would hand out assignments or would

17  follow up on Angie's behalf or all those sort of things.

18      Q.     What specifically are you talking about?

19  Because you're talking in general terms.  So is there a

20  specific instance that you're referring to?

21      A.     Sure.  With all of our AOP pillar leads,

22  Barb would be the person that would actually be the one

23  to coordinate the whole entire meeting, and there are

24  instances when I have wanted to do that, and I've even

25  asked to do more on the team and wasn't awarded that.

1    Many examples.

2          Q.    Well, you'll have to tell me what they are.

3          A.    Sure.  Deanna Pusatier.

4          Q.    Now, I'm talking about Barb right now.

5          A.    Okay.  Barb Holdgrafer.  So as I said, Barb

6    was awarded a lot of opportunities that I wasn't awarded.

7          Q.    Tell me specifically what you're referring

8    to.

9          A.    So if we were talking about how to manage a

10   DSV in a meeting, in a group setting, I could describe

11   how I'd manage the DSV, I would be cut off during the

12   meeting by Angela.

13              Barb would describe how she does the DSV.

14   It's relatively the same.  It's not that hard to do it,

15   but Barb would be awarded to do that.  She would be

16   elevated as the example, whereas I could articulate the

17   same thing, present it the same way, get the same results

18   or even better, and I'm not awarded that same benefit.

19         Q.    You think talking at a meeting is an award

20   of a benefit?

21         A.     It's not necessarily just talking and award,

22   talking at a meeting being an award.  The manager

23   provides that perception to individuals outside of our

24   team to elevate specific individuals based on her

25   assessment.

KEVIN BRISCOE vs STARBUCKS COFFEE
BRISCOE, KEVIN  on 01/30/2018

1        Q.    I'm asking you about what happened at Vons.

2   I'm not asking you about an email.

3        A.    Well, I did not do anything --

4        MR. PITTMAN:  Stop.

5             Can you read the question that Counsel asked

6   previously?  The last question.

7             (Record read as follows:

8             "Q.   Was there a communication

9        criticizing your communication or your

10        ability to communicate effectively at a

11        Vons store?")

12        MR. PITTMAN:  So that's the question.  Answer that

13   question if you can.

14        THE WITNESS:  So Angela Rivers said that there was

15   my inability to communicate, but I don't recall there --

16   anything coming from Vons indicating that.

17        Q.    BY MS. DARROW:  There wasn't an incident at

18   Vons?

19        A.    No, there was not an incident.

20        Q.    And that's your story --

21        A.    Yes, it is.

22        Q.    -- there wasn't an incident at the store?

23        A.    Yes.

24        Q.    Now, what happened at Marriott?

25        A.    Yes.  So I conducted a normal visit at

```
 1    Marriott, and during the visit the store was out of

 2    supplies.  When a store is out of supplies and it's

 3    unavailable, they are required to receive a

 4    noncompliance.

 5              So at that time, I asked was the product

 6    available.  The manager did not have the product

 7    available.  They went to the back.  Couldn't find any

 8    product.  The manager was upset when they couldn't find

 9    any product, knowing that that is a noncompliance.

10              At that time, I went and I got the

11    supervisor that supports that individual, came back and

12    explained to them you're missing the product, it's a

13    noncompliance, what do you guys want to do.

14              The manager was upset.  The manager goes and

15    tells the -- I guess the GM of the hotel, comes back, and

16    I explained to them what happened, and they -- the

17    manager indicated, oh, the manager is upset, the manager

18    is crying because they're out of product.

19              And I asked the supervisor can you explain

20    to your manager what happened?  And he explained what

21    happened, yep, we are out of the product, it's a problem,

22    we're out of the product and it is a noncompliance.

23              So we had a DSV.  It's outlined in the visit

24    document.  I signed the document.  They signed the

25    document.  That was the end of the visit.
```

```
 1            Shortly after that I get a phone call from
 2   my BDM that also supports that account and indicated that
 3   they were upset about not having the supplies and they
 4   were upset about it.  I'm like, okay, I don't know what
 5   to do.
 6            So then shortly after that, Angela calls me.
 7   Angela Rivers calls me and says, "Kevin, Marriott."
 8            I said, "Yes, absolutely.  Visit happened,
 9   visit took place, they were out of product, I didn't do
10   anything that I wouldn't ordinarily do, conduct a visit
11   as I'm supposed to."
12            And she said, "I totally can see it, I
13   totally understand.  What happened?"
14            Said, "I didn't do anything inappropriate.
15   I didn't do anything to berate the manager.  I didn't do
16   anything wrong."  It's all in the visit.
17       Q.   You didn't think you did anything wrong?
18       A.   I did not.
19       Q.   But Marriott disagreed with you; isn't that
20   right?
21       A.   So can I finish?
22       Q.   Can you answer my question?
23       MR. PITTMAN:  Argumentative.
24       MS. DARROW:  Okay.
25       MR. PITTMAN:  Who is Marriott?
```

KEVIN BRISCOE vs STARBUCKS COFFEE
BRISCOE, KEVIN  on 01/30/2018

1      Q.    What was your explanation as for the fact

2   that the drinks were not being done properly?

3      A.    They may need more practice, just as any

4   other barista would, especially on a new opening, and

5   they were -- the baristas that were there that day were

6   handicapped baristas, meaning they had -- they were

7   slower.  I don't know exactly what their handicap was,

8   but they were certified and could make drinks correctly.

9   But could they use more practice?  And that's what I

10   communicated.

11      Q.    I'm sure there are countless baristas that

12   may suffer from some type of disability.  Are there some

13   accommodations that are made in the training with respect

14   to baristas that need some type of special accommodation,

15   maybe more training or additional time in training?

16      A.    Well, I don't recall there being any special

17   conditions in addition to the training plan, you know, to

18   accommodate that.

19      Q.    Okay.  And you said that there was a -- a

20   Marriott employee -- well, I just want to make sure I

21   understand the story.  Did you say a Marriott employee

22   told you -- went to Hawaii and said that the whole story

23   was made up?

24      A.    That is correct.  So there was a supervisor

25   that worked at the LAX Marriott, transferred to Hawaii

```
 1   IN THE STATE OF CALIFORNIA      )
                                     )  ss.
 2   COUNTY OF ORANGE                )

 3

 4          I, MARY E. PIERCE, CSR 6143 and Deposition

 5   Officer in the State of California, do hereby certify

 6   that prior to being examined, the witness in the

 7   foregoing deposition was duly sworn to testify the truth,

 8   the whole truth, and nothing but the truth;

 9          That the testimony of the witness and all

10   objections made at the time of the examination were

11   recorded stenographically by me;

12          That the foregoing is a true record of the

13   testimony and all objections made at the time of the

14   examination.

15          Pursuant to Rule 30(e) of the Federal Rules of

16   Civil Procedure, an offer was made for review and

17   signature by the witness on page 191.

18          IN WITNESS WHEREOF, I have subscribed my name

19   this 9th day of February, 2018.

20

21

22          _____
            Deposition Officer in and for the
23                    State of California

24

25
```

                                                            193



Confidential

Defendant's Exhibit   2

Witness: Kevin Briscoe
Date: 1/30/2018

Mary E. Pierce
CSR 6143



| GOVERNANCE TOOL: Anti-Retaliation Policy | POLICY NUMBER: PGC:PRO:2008:03.00 |
|---|---|
| AUTHOR: Partner Resources | PAGE 1 OF 1 |
| APPROVED BY: Policy Governance Council | EFFECTIVE DATE: November 6, 2008 |

**Starbucks Policy Office**

# Anti-Retaliation Policy

## INTRODUCTION

One of Starbucks Coffee Company's guiding principles is to provide a great work environment and to treat each other with respect and dignity. The Anti-Retaliation Policy upholds this guiding principle by helping to ensure that any partner who raises concerns or questions regarding a potential violation of any Starbucks policy is treated with respect when raising such concerns.

## PURPOSE AND SCOPE

The purpose of this Policy is to prohibit conduct that would be considered retaliation in violation of Starbucks guiding principles and applicable law, and to raise awareness about such conduct to help discourage it. This Policy and the associated governance tools define retaliation and provide guidance about conduct that would be considered retaliation. The associated Complaint Procedure outlines the complaint process.

This Policy applies to all Starbucks partners. No one is expected to participate in or tolerate any conduct prohibited by this Policy while at work or while engaged in company business. Failure of partners to comply will result in appropriate disciplinary action.

## POLICY STATEMENT

Starbucks strictly prohibits retaliation against any partner who, in good faith, reports potential violations of Starbucks Equal Employment Opportunity (EEO) Policy, Anti-Harassment Policy, Standards of Business Conduct and/or any other Starbucks policies or applicable laws. Retaliation is prohibited against any partner who raises concerns or questions regarding a potential violation of any Starbucks policy or applicable law that he or she reasonably believes to have occurred, or for testifying, assisting or participating in any manner in any investigation, regardless of the outcome of the investigation.

Starbucks partners are also prohibited from retaliating against job applicants or former partners who have reported potential violations or who have participated in an investigation, whether the potential violation occurred at Starbucks or another employer.

## ASSOCIATED GOVERNANCE TOOLS

- Equal Employment Opportunity (EEO) Policy
- Anti-Harassment Policy
- Anti-Retaliation Standard
- Anti-Harassment Standard
- Anti-Harassment / Anti-Retaliation Complaint Procedure
- Standards of Business Conduct

**Defendant's Exhibit   3**

Witness: Kevin Briscoe
Date: 1/30/2018

Mary E. Pierce
CSR 6143

## REVISION HISTORY

| Document Version | Date | Description of Revisions |
|---|---|---|
| 1.0 | November 6, 2008 | Final version approved by Policy Governance Council |

For Internal Use Only

Confidential



# Business Ethics and Compliance

Standards of Business Conduct

Defendant's Exhibit  6

Witness  Kevin Briscoe
Date  1/30/2018

Mary E. Perez

STAR 0000523

# About the Standards of Business Conduct

Starbucks empowers all partners to make decisions that impact our reputation.

Individual actions at work shape how the world views Starbucks, which is why it's so important that we each take responsibility for Our Starbucks Mission and acting ethically in all situations.

The *Standards of Business Conduct* support the Global Business Ethics Policy and provide an overview of some of the legal and ethical standards we are each expected to follow every day. If you are unsure of what to do in a situation, you have support. Speak with your manager, Partner Resources or Business Ethics and Compliance about your concerns.

Please read the *Standards* carefully at work. If you have any questions, refer to the "Asking for Guidance and Voicing Concerns" section of this booklet.

This information is available in accessible formats.
Contact diversity@starbucks.com for more information.

Our Starbucks Mission

To inspire and nurture the human spirit—one person, one cup, and one neighborhood at a time.

STAR 0000527

# Contents

**Introduction**

Message from Howard Schultz ............................................. 2
Asking for Guidance and Voicing Concerns ............................. 4
Anti-Retaliation Policy ................................................. 4

**Workplace Environment**

How We Treat One Another ............................................... 5
How We Treat Our Customers ............................................. 5
Diversity ............................................................... 6
Workplace Health, Safety and Security .................................. 6
Starbucks Quality and Customer Protection ............................. 7
Substance Abuse and Weapons ........................................... 7
Wage and Hour Rules .................................................... 8

**Business Practices**

Compliance with Laws and Regulations ................................. 10
International Business ................................................ 10
Interaction with the Government ...................................... 11
Sales Practices and Advertising ...................................... 12
Fair Competition ..................................................... 12
Conflicts of Interest ................................................ 14
Gifts and Entertainment .............................................. 16
Securities ........................................................... 17
Intellectual Property and Proprietary Information .................... 19
   Confidential Information ....................................... 19
   Other Intellectual Property .................................... 20
   Use and Retention of Company Records ........................... 21
Books and Records .................................................... 22
Financial Accounting, Internal Controls and Auditing Matters ......... 22

**Community Involvement**

Environmental Mission Statement ...................................... 23
Environmental Commitment ............................................. 23
Personal Activities .................................................. 23
Political Activities ................................................. 24
Public Relations ..................................................... 24

**Resources**

Frequently Asked Questions ........................................... 25
Ethical Decision-Making Framework .................................... 27
Contact Information .................................................. 28

Confidential

STAR 0000529

Dear Fellow Partner:

Starbucks is the premier roaster and retailer of specialty coffee in the world and has become a truly global brand. From the beginning, we have recognized that you, our partners, are critical to our continued success. Starbucks reputation for the finest coffee in the world, legendary customer service and the highest integrity is the direct result of our collective efforts. We are all caretakers of Starbucks reputation. How we conduct our business and how we treat others—our fellow partners, customers, communities, suppliers and shareholders—will continue to determine how the world views Starbucks.

> "Starbucks reputation for the finest coffee in the world, legendary customer service and the highest integrity is the direct result of our collective efforts."

Each of us is personally responsible for supporting our core values, which require compliance with the law as well as ethical conduct. We have issued the *Standards of Business Conduct* to restate our longstanding commitment to uphold that responsibility and to provide guidance to our partners.

As we move forward, the *Standards* will help ensure that our values continue to be reflected in each Starbucks store and business activity. A commitment to integrity, acting honestly and ethically, and complying with the letter and intent of the law are critical to our continued success.

Thank you for your partnership.

Warm regards,

Howard Schultz
chairman, president and
chief executive officer

Confidential

STAR 0000531

## Asking for Guidance and Voicing Concerns

Starbucks core values require compliance with the law, as well as ethical conduct. If you feel these standards have not been met, need access to policies, or have any questions, please ask for guidance or voice your concerns by contacting any of the following resources:

- Your manager or skip-level manager
- Your Partner Resources representative
- Business Ethics and Compliance

Please use one of the methods below to reach Business Ethics and Compliance. (See "Contact Information" on back inside cover for details.)

The Business Conduct Helpline is a free phone number, which you may use to ask questions or raise concerns. The Helpline is available 24 hours a day, seven days a week, and an interpreter can be made available upon request.

The Business Conduct Webline is an online tool that serves as another way for partners to ask for guidance or voice concerns.

Your concerns will be taken seriously, and all information provided to the Helpline or Webline will be treated in a confidential manner. Please be aware that information provided to Business Ethics and Compliance is directed to the United States. Every reasonable effort will be made to protect the security of any personal data collected and to avoid unauthorized use or disclosure of such data. Questions or concerns may be submitted to the Helpline or Webline anonymously.

Anti-Retaliation Policy: Starbucks does not tolerate retaliation against or the victimization of any partner who raises concerns or questions regarding a potential violation of the *Standards of Business Conduct* or any Starbucks policy that he or she reasonably believes to have occurred.

STAR 0000533

# Workplace Environment

## How We Treat One Another

Starbucks promotes equal opportunity in its hiring practices, makes recruiting decisions based solely on job-related criteria and does not use forced labor. When employing partners under the age of 18, managers must comply with all Starbucks-established or legally required limitations on minimum hiring age, hours and tasks performed by these partners to ensure any work performed does not hamper the child's education, health, safety, and mental or physical development.

At Starbucks we treat each other with respect and dignity. This means that all partners are entitled to work in an environment that is free of harassment, bullying and discrimination.

Harassment, bullying and discrimination take many forms, including:

- Unwelcome remarks, gestures or physical contact

- The display or circulation of offensive, derogatory or sexually explicit pictures or other materials, including by e-mail and on the Internet

- Offensive or derogatory jokes or comments (explicit or by innuendo)

- Verbal or physical abuse or threats

Q: One of my co-workers e-mailed an inappropriate joke to me and some teammates. I find it offensive, but I don't know if I should approach my co-worker with my concern. What should I do?

A: We each have an obligation to ensure that Starbucks is a great place to work for all partners, and offensive behavior such as this is not acceptable. If you feel uncomfortable speaking with your co-worker directly, contact your manager, Partner Resources or Business Ethics and Compliance.

## How We Treat Our Customers

Legendary customer service is a top priority at Starbucks. We strive to make every customer's experience pleasant and fulfilling, and we treat our customers as we treat one another, with respect and dignity. This means, for example, that we never harass or discriminate against our customers.

"We treat our customers as we treat one another, with respect and dignity."

Confidential

STAR 0000534

### Diversity

Starbucks actively creates and promotes an environment that is inclusive of all people and their unique abilities, strengths and differences, and promotes diversity as a strategic and competitive business advantage for the company.

> "We respect diversity in each other, our customers and suppliers and all others with whom we interact."

As we continue to grow, embracing diversity in every aspect of our business—from the way we work together to the way we procure goods and services—is vital to our long-term success. We respect diversity in each other, our customers and suppliers and all others with whom we interact. Our goal is to be the most inclusive company globally, working toward full equity, inclusion and accessibility for those whose lives we touch.

### Workplace Health, Safety and Security

Partners are expected to follow all safety rules and practices; cooperate with officials who enforce these rules and practices; take necessary steps to protect themselves and other partners; attend required safety training; and report immediately all accidents, injuries and unsafe practices or conditions.

In order to enhance workplace security, you should be familiar with and follow any work safety information and training provided to you.

> Q: Our work safety standards far exceed what is required by law where I work and our competitors only follow legal requirements. Shouldn't we do the same?
>
> A: No. We must adhere to our company safety policies. Starbucks is committed to providing partners with a safe and secure environment everywhere we operate, even if this means we exceed local requirements.

STAR 0000535

1                    UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3

4    KEVIN BRISCOE,                    )
                                       )
5              Plaintiff,              )
                                       )
6         vs                          )Case No.
                                       ) 2:17-cv-04832-JAK (JPRx)
7    STARBUCKS COFFEE COMPANY, and     )
     DOES 1-20; Inclusive,             ) Volume II -
8                                      )      Pages 194 - 315
                   Defendants.         )
9    _____)

10

11

12

13

14

15

16         DEPOSITION OF:    KEVIN NEAL BRISCOE

17         DATE:MARCH 13, 2018

18         LOCATION:         LOS ANGELES, CALIFORNIA

19

20

21

22

23

24   MARY E. PIERCE, CSR 6143

25   JOB NO.:  18-049

1               UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3

4  KEVIN BRISCOE,             )
                          )

5          Plaintiff,    )
                          )

6     vs                )Case No.
                         ) 2:17-cv-04832-JAK (JPRx)

7  STARBUCKS COFFEE COMPANY, and )
  DOES 1-20; Inclusive,     )

8                        )
          Defendants.    )

9  _____)

10

11

12

13

14

15     Continuation of the videotaped deposition

16     of KEVIN NEAL BRISCOE, the Plaintiff herein,

17     taken on behalf of the Defendants, at

18     10:32 a.m., Tuesday, March 13, 2018, at

19     633 W. Fifth Street, 63rd Floor, Los Angeles,

20     California, before Mary E. Pierce, CSR 6143,

21     a Deposition Officer.

22

23

24

25

KEVIN BRISCOE vs STARBUCKS COFFEE
BRISCOE, KEVIN  on 03/13/2018

1

2   APPEARANCES OF COUNSEL:

3

4   For the Plaintiff:

5        LAW OFFICE OF ALVIN L. PITTMAN
         By:  ALVIN L. PITTMAN, Esq.
6        9841 Airport Boulevard
         Suite 412
7        Los Angeles, CA  90045

8

9

10  For the Defendants:

11       LITTLER MENDELSON, P.C.
         By:  TANJA L. DARROW, Esq.
12       and  JYOTI MITTAL, Esq.
         633 W. 5th Street
13       63rd Floor
         Los Angeles, CA  90071

14

15

16

17  Videographer:

18       GARY WADE, Wade Enterprises
         (714) 634-8211
19

20

21

22

23

24

25

1    Rogers where I complained again about Angie's behavior,

2    and I asked Sarah why is Angie treating me this way.

3    She's falsely accusing me of things.  I'm getting all

4    this treatment.  I complained at that time.

5            And then I also complained again to Angie

6    and Heidi Sundquist.  Because Sarah Rogers stepped out of

7    position, Heidi Sundquist, HR person, came in, and I

8    complained to them together explaining and asking and

9    complaining why are these things happening, why am I

10   being treated this way.

11           So I hope I answered your question.

12       Q.    Why didn't you wait for the conclusion of

13   the investigation prior to resigning?

14       A.    I was offered a position at Jack-in-the-Box,

15   and I felt at that point I have exhausted everything that

16   I could possibly do.  I was pleading with not only Angie,

17   pleading with HR, can you all get to the bottom of this,

18   why am I getting this treatment.

19           I had nowhere else to turn.  I loved the

20   brand, didn't want to leave Starbucks, took a lot of

21   sacrifices to come to Starbucks.  So I didn't want to

22   leave.  So when that opportunity presented itself, I had

23   no choice but to take the opportunity.

24       Q.    When did you first apply for the position at

25   Jack-in-the-Box?

1    And I complained about these issues, so I had no intent

2    of leaving the company.  I didn't want to leave

3    Starbucks.

4         Q.    But you did.

5         A.    Yes, I did.

6         Q.    And when did you have that intent to leave

7    Starbucks?

8         A.    When they offered me a job, which was after

9    my interview, I don't know, mid July or something, first

10   part of July.

11        Q.    Weren't you told on June 10th that the

12   investigation was occurring?

13        A.    I don't remember if I was told on June 10th.

14        Q.    Would that surprise you to learn that you

15   were told the very next day that a third-party

16   investigator had been retained at your request?

17        A.    If I remember correctly, Karen Castro

18   responded the next day and indicated to me that the

19   business and ethics department would be contacting me,

20   and that is what she said in an email to me.  And shortly

21   thereafter, it wasn't immediately, I then got a phone

22   call from Emily Schultz.

23             So for -- to say that an investigation

24   started the very next day, I don't think that would be

25   accurate.

1       A.      No.

2       Q.      What iPhone did you have at the time?

3       A.      I had an iPhone 5, I believe it was.

4       Q.      Had you already resigned -- you hadn't

5   resigned your employment at the time you recorded,

6   obviously; right?  When you made those recordings, you

7   were still working for Starbucks; is that right?

8       A.      Yes.

9       Q.      Had you retained counsel by the time you had

10  made those recordings?

11      A.      No.

12      Q.      What iPhone was it that was stolen?

13      A.      It was an iPhone 5.  It was an old phone.

14  It was on its last leg.

15      Q.      Was the phone stolen after you had already

16  resigned, or was it before you had resigned?

17      A.      After.

18      Q.      No one told you to resign, did they?

19      A.      No.

20      Q.      Did anyone coerce you to resign?

21      A.      No.  I feel that I was forced to resign

22  based on all these actions that incurred to me.  I think

23  the retaliation was unbearable.  Left me no choice but to

24  resign.

25      Q.      Retaliation for what?

```
 1        A.    As I indicated in my three complaints to

 2   them, the actions, the discriminatory actions happening

 3   to me, and after complaining, I just got barraged with

 4   just retaliation from Angie.  Just I couldn't do my job.

 5   I couldn't send emails.  Visiting stores, she's

 6   indicating I can't do beverage routine, I can't do food

 7   warming.

 8              Just I couldn't do my job as a DM, and it

 9   was just she was feigning -- painting a picture of me

10   being inadequate as a district manager, and as I reported

11   those things, nobody did anything.  HR didn't do

12   anything.  Nobody took any action to look into whether or

13   not the validation of what she's indicating was correct.

14   So that actually is what led me to resign.

15        Q.    They hired a third-party investigator.  Do

16   you believe that that's not doing anything?

17        A.    I didn't receive any outcome from the

18   third-party investigator.

19        Q.    Because you resigned before the conclusion

20   was given to you; is that correct?

21        MR. PITTMAN:  Are you going to argue with the

22   witness or let him answer questions and get information?

23        Q.    BY MS. DARROW:  Answer my question,

24   Mr. Briscoe.

25        A.    Can you repeat the question?
```

KEVIN BRISCOE vs STARBUCKS COFFEE
BRISCOE, KEVIN  on 03/13/2018

1    years in a row.  Those roles, those leadership roles help

2    drive the business.

3              Did that, but got no reward for that,

4    received no elevation for advancement opportunity at all,

5    whereas other people on the team did less work.  They

6    didn't have the same type of portfolio that I had and

7    didn't receive -- and they received those opportunities,

8    got advancement.  They got elevated.

9         Q.   Who specifically are you referring to?

10        A.   Deanna Pusatier, she has been elevated.

11   Barb Holdgrafer.  She was elevated numerous times.  Kevin

12   Dockery, he got elevated to company operator.  Those are

13   all peers that were on my team that did not get the

14   results that I got, did not do the work that I did.

15        Q.   You said Deanna got elevated.  Elevated to

16   what?

17        A.   She is now at Seattle as a program manager.

18   So she left licensed store DM and got promoted and was

19   only on our team a short period of time.

20        Q.   Do you know when she got promoted?

21        A.   I don't know the time frame.

22        Q.   Do you know why she got promoted?

23        A.   I do not know why.

24        Q.   Have you ever seen her résumé?

25        A.   I have not seen her résumé.

KEVIN BRISCOE vs STARBUCKS COFFEE
BRISCOE, KEVIN  on 03/13/2018

1        Q.    You said Kevin Dockery got promoted?

2        A.    Yes.

3        Q.    Promoted to what?

4        A.    He is now running company-operated stores as

5   a district manager.

6        Q.    Do you know when that happened?

7        A.    I don't know the exact date, but it was, you

8   know -- I don't know the exact date.  I can't think of

9   those dates.  I don't want to give you a false date.

10       Q.    While you were employed?

11       A.    No, I think it was after.

12       Q.    Do you know why he got promoted?

13       A.    I do not.

14       Q.    Have you ever seen his résumé?

15       A.    I have not.

16       Q.    The program manager position that Deanna

17  Pusatier was elevated to, did you ever apply for that

18  position?

19       A.    No.

20       Q.    Any particular reason why not?

21       A.    I wasn't interested in going to Seattle.

22       Q.    The position that Kevin Dockery was elevated

23  to, did you apply for that position --

24       A.    No.

25       Q.    -- at any time during your employment?

1        A.    No.

2        Q.    Any reason why not?

3        A.    I wasn't interested.

4        Q.    I don't want to butcher Barbara's last name.

5   Can you tell me what her last name is?

6        A.    Holdgrafer.

7        Q.    You said she was elevated, as well?

8        A.    She did numerous TLA roles as a regional

9   director.

10       Q.    We talked about that the last session?

11       A.    Yes, we did.

12       Q.    Besides the TLA roles, anything else?

13       A.    That I was interested in or anybody else got

14   elevated?

15       Q.    Anybody else that got elevated.

16       A.    Those are the ones that I can recall.

17       Q.    Did Miss Rivers select you to be highlighted

18   in a partner appreciation week in 2015?

19       A.    Did she select me to be -- say that again.

20       Q.    To be highlighted in a partner appreciation

21   week in 2015.

22       A.    I don't think "highlighted" is the right --

23   I think everyone on the team received a coffee mug by

24   Angela.  She went around to everybody wherever they were

25   that particular day and gave them a mug and took a

KEVIN BRISCOE vs STARBUCKS COFFEE
BRISCOE, KEVIN  on 03/13/2018

```
 1   with him?

 2        A.    Fine.

 3        Q.    And how long did you work with him, if at

 4   all?

 5        A.    I don't know.  Year and a half.

 6        Q.    Did you get along with him?

 7        A.    Yes.

 8        Q.    Who is Kevin Ingelson, E-n-g-e-l-s-o-n?

 9        A.    District manager on our team.  Oh, I'm

10   sorry.  Kevin Ingelson.  I thought you said Kevin

11   Dockery.  Kevin Ingelson is a Vons manager for -- he's a

12   Vons district-type manager.  My apologies.  So many

13   Kevins.

14        Q.    I think I spelled his name with an E.  It's

15   with an I.

16        A.    Kevin Ingelson, yeah.

17        Q.    And how long did you work with him?

18        A.    I don't know.  Two years.  Two and a half

19   years maybe.

20        Q.    How would you describe your relationship

21   with him?

22        A.    Good.

23        Q.    Did you get along with him?

24        A.    Yes.

25        Q.    Who is Frank Sica, S-i-c-a?
```

1    A.    Frank Sica was -- I don't know his title,

2  but he was with the branded solutions department.

3    Q.    And he interviewed you; right?

4    A.    Well, I wouldn't say it was an interview.

5  We had a phone conversation about my interest in branded

6  solutions, but it was not an interview.

7    Q.    Is that the only communication you had with

8  him was during that phone call?

9    A.    Yes.

10    Q.    Who is John Warmke, W-a-r-m --

11    A.    John Warmke?

12    Q.    John Warmke.

13    A.    John Warmke is the manager for branded

14  solutions in the LA market.

15    Q.    Did you interview with him?

16    A.    Yes.

17    Q.    And how would you describe your relationship

18  with him?

19    A.    Fine.

20    Q.    And how would you describe your relationship

21  with Frank Sica?  I know you just had the one phone call.

22    A.    Yeah, that wasn't necessarily a

23  relationship.

24    Q.    Do you think Frank Sica had any reason to

25  dislike you?

1          A.     No.

2          Q.     Do you think Mr. Warmke had any reason to

3    dislike you?

4          A.     No, I don't think so, no.

5          Q.     How did your interview go with Mr. Warmke?

6          A.     Well, it was a short interview.  I thought

7    it went fine.  It was short.  It was maybe 25, 30

8    minutes.  I thought it went okay.  I don't think that

9    there was enough time during the interview for me to

10   illustrate how I would approach the business solution

11   role, specifically the sales side of the business,

12   because you got both.  You got sales and op.  So the

13   sales side.

14          So I don't think that there was opportunity

15   provided there, but it was a short, brief conversation

16   with him over the phone.

17          Q.     Who is Leslie Nelson?  That's the woman you

18   described earlier; right?

19          A.     She's a district manager on the team.

20          Q.     And how would you describe your relationship

21   with her?

22          A.     Fine.

23          Q.     How long did you work together?

24          A.     Three years ten months, the length of time I

25   was at Starbucks.

1          A.     Maybe two years.

2          Q.     Did you get along?

3          A.     Yes.

4          Q.     How would you describe your relationship

5     with him?

6          A.     It was fine.

7          MS. DARROW:  Madam court reporter, what exhibit

8     are we on?  Are we 9?

9          THE REPORTER:  9 would be next, yes.

10         MS. DARROW:  Thank you.

11              I'm going to mark as Exhibit No. 9 a

12    communication addressed to Mr. Briscoe dated March 30th,

13    2015, Bates labeled STAR 1211 through 1213.

14              (The document referred to was marked as

15         Defendant's Exhibit 9 and is annexed hereto.)

16         Q.     BY MS. DARROW:  When you've completed your

17    review, look up and let me know, and I'll ask you a few

18    questions about it.

19              You've completed your review --

20         A.     Yes.

21         Q.     -- of Exhibit No. 9?

22              Okay.  And that's a memo of performance

23    concerns and expectations that was given to you by

24    Miss Rivers?

25         A.     Yes.

1          Q.     Okay.

2          A.     And Sarah Rogers.

3          Q.     And Sarah Rogers.

4                 And is that one of the documents that -- you

5     didn't sign that document; is that right?

6          A.     That's correct.

7          Q.     Okay.  You refused to sign it?

8          A.     Yes.

9          Q.     Okay.  Do you know whose idea it was to

10    issue that performance concern and expectation memo to

11    you?

12         A.     I do not.

13         MS. DARROW:  We're going to mark as Defendant's

14    Exhibit No. 10 the performance improvement plan dated

15    June 4th, 2015, Bates labeled STAR 1269 through 1275.

16                Review that document.  I'll ask you just a

17    few questions about it.

18                (The document referred to was marked as

19         Defendant's Exhibit 10 and is annexed hereto.)

20         Q.     BY MS. DARROW:  You've completed your review

21    of what's been marked as Defendant's Exhibit No. 10?

22         A.     Yes.

23         Q.     And you recognize it as the performance

24    improvement plan that was issued to you; correct?

25         A.     Yes.

KEVIN BRISCOE vs STARBUCKS COFFEE
BRISCOE, KEVIN  on 03/13/2018

1          Q.    Who issued it to you?

2          A.    Angela Rivers.

3          Q.    And was it issued to you on or about

4     June 4th, 2015?

5          A.    Yes.

6          Q.    And do you know whose decision it was to

7     issue the performance improvement plan to you?

8          A.    No.

9          Q.    Do you know whose -- who drafted the

10    performance improvement plan?

11         A.    No.

12         Q.    Do you know who all had input with regards

13    to what was put in the performance improvement plan?

14         A.    No.

15         Q.    Do you know whose decision it was to issue

16    the performance improvement plan to you at all?

17         A.    No.

18         MS. DARROW:  We're gonna mark as Defendant's

19    Exhibit No. 11 an annual performance review of the

20    witness Bates labeled STAR 2524 through 2525.

21              (The document referred to was marked as

22         Defendant's Exhibit 11 and is annexed hereto.)

23         Q.    BY MS. DARROW:  Can I direct your attention

24    to the second page?  I am going to give you an

25    opportunity to review it.  On the second page, is that

1    your signature?

2         A.    Yes.

3         Q.    Okay.  You can go ahead and review it.

4               Have you completed your review of Exhibit

5    No. 11?

6         A.    Yes.

7         Q.    And it's your understanding that it's your

8    annual performance review?

9         A.    For 2013?

10        Q.    Yes.

11        A.    Yes.

12        Q.    Okay.  And who was your manager that issued

13   this performance evaluation to you?

14        A.    Angela Rivers.

15        Q.    Do you consider this -- how would you

16   characterize this performance review?  Was it good?  Bad?

17   Neutral?

18        A.    Well, it was -- it was a good review.  One

19   of the things I don't remember, I thought it was a meet

20   expectation.  I don't remember it being above

21   expectations.  That's the only thing that's vague in my

22   memory.

23        Q.    You thought the review was lower?

24        A.    I thought it was a meet expectations.

25   That's what I thought.  But -- I mean, I didn't have a

```
 1   copy of this.  I wasn't given a copy of this document, so

 2   I just don't remember it.  That's all.

 3       Q.    Okay.  And did you disagree with anything

 4   that Miss Rivers put in your evaluation that's been

 5   marked as Defendant's Exhibit No. 11?

 6       A.    No.

 7       MS. DARROW:  We're gonna mark as Defendant's

 8   Exhibit No. 12 another performance review, and this one

 9   is labeled STAR 2517 through 2520.  You can take your

10   time and review the document, and look up and I'll ask

11   you a few questions about it.

12           (The document referred to was marked as

13        Defendant's Exhibit 12 and is annexed hereto.)

14       Q.    BY MS. DARROW:  You've completed your

15   review?

16       A.    Yes.

17       Q.    We marked it as Defendant's Exhibit No. 12?

18   Okay.

19           And do you recognize Defendant's Exhibit

20   No. 12 as your annual performance review?

21       A.    Yes.

22       Q.    Did you sign it?

23       A.    Yes.

24       Q.    And is that your signature on the second

25   page?
```

KEVIN BRISCOE vs STARBUCKS COFFEE
BRISCOE, KEVIN  on 03/13/2018

1          A.     Yes.

2          Q.     And who is the manager that issued it to

3     you?

4          A.     Angela Rivers.

5          Q.     Okay.  And how would you characterize this

6     performance review, good, bad or neutral?

7          A.     Good.

8          Q.     Did you disagree with anything that

9     Miss Rivers put in this review?

10         A.     Nope.

11         MS. DARROW:  We're gonna mark as Exhibit No. 13 --

12    the short name of it is a "peer review."  It's called a

13    "KB Peer Survey," and it's Bates labeled STAR 352 through

14    357.  You can take your time and review that document,

15    and look up and I'll ask you a few questions about it.

16              (The document referred to was marked as

17          Defendant's Exhibit 13 and is annexed hereto.)

18         Q.     BY MS. DARROW:  Before you even look at it,

19    what's your understanding of what a peer review is?

20         A.     When your peers on your team give feedback

21    on you, peer review.

22         Q.     Did you provide feedback with regards to

23    other members of your team while you were employed at

24    Starbucks?

25         A.     No.

KEVIN BRISCOE vs STARBUCKS COFFEE
BRISCOE, KEVIN  on 03/13/2018

1           Q.     You didn't give feedback regarding

2     Miss Rivers?

3           A.     She's not a peer on my team.

4           Q.     Did you do some type of writing where you

5     reviewed Miss Rivers while you were employed at

6     Starbucks?

7           A.     There is a survey that we did on our

8     manager, yes.

9           Q.     And did you do one for Miss Rivers?

10          A.     Yes.

11          Q.     Okay.  You can review the document, and I'll

12    ask you a few questions about it.

13                 Okay.  Have you ever seen what's been marked

14    as Defendant's Exhibit No. 13 before?

15          A.     Yes.

16          Q.     And do you know whose idea it was that a

17    peer review be done with respect to you?

18          A.     It was discussed and talked about between

19    Sarah Rogers and myself.

20          Q.     So you knew it was being done; correct?

21          A.     Yes.

22          Q.     Okay.  And you agreed to it?

23          A.     Yes.  It was primarily my idea.

24    Secondarily, she supported it.

25          Q.     Okay. So you knew it was happening?  It

KEVIN BRISCOE vs STARBUCKS COFFEE
BRISCOE, KEVIN  on 03/13/2018

1    wasn't done behind your back or anything?

2         A.    No.

3         Q.    It was your idea?

4         A.    No.

5               Yes.  And to elaborate on that, she actually

6    was commendable that I would engage in this because this

7    is how you learn, and no one else was willing to do

8    something like this.

9         Q.    So you wanted feedback from someone other

10   than Miss Rivers; is that right?

11        A.    Not necessarily.

12        Q.    What was the purpose of you doing it?

13        A.    We look at different resources to help build

14   the development plan, and this was a way to approach

15   that.

16        Q.    And the peer review was done February of

17   2015; is that right?

18        A.    Think so.

19        Q.    Did the comments of your peers assist you in

20   any way with regards to you developing your plans at

21   Starbucks?

22        A.    Assist me?

23        Q.    Yes, sir.

24        A.    You know, I took them, absorbed them.  Did

25   they assist me?  I absorbed the feedback.  So, you know,

KEVIN BRISCOE vs STARBUCKS COFFEE
BRISCOE, KEVIN  on 03/13/2018

1    to say it assist me, I don't know how to really answer

2    that question, did it assist me.

3         Q.    What do you mean you "absorbed it"?

4         A.    I absorbed, listened to what my peers had to

5    say, what feedback they had and was cognizant of that as

6    I continued to do my job.

7         Q.    Did you make any adjustments in your

8    performance at all based on the review of your peers?

9         A.    If I felt I needed to make adjustments, I

10   made adjustments.

11        Q.    Do you have a conscious recollection or a

12   specific recollection of making any adjustments in

13   regards to your performance based on the review of your

14   peers?

15        A.    No.

16        Q.    Did you draft a development plan?

17        A.    No.

18        Q.    Any particular reason why or why not?

19        A.    We never got to that point.

20        Q.    Did anyone in HR or management follow up

21   with you in regards to what was said by your peers in the

22   peer review?

23        A.    I had a conversation, brief conversation

24   with Sarah and a conversation with Angie.

25        Q.    Two separate conversations?

KEVIN BRISCOE vs STARBUCKS COFFEE
BRISCOE, KEVIN  on 03/13/2018

1    that."  And that was the end of that conversation.

2         Q.    It was left up to you what to do with it?

3         A.    Yes.

4         MS. DARROW:  We're going to mark as Exhibit No. 14

5    -- I'm going to try to keep track now -- the Starbucks

6    Coffee Company Partner Guide.  I apologize it's not Bates

7    labeled, but it is pages -- there's a cover page, and

8    it's pages 19 through 26.

9              I think your counsel took your copy.  No,

10   that's her copy.  Mr. Pittman has both copies.

11        MR. PITTMAN:  I have two?

12        MS. DARROW:  Yes, sir.

13        MR. PITTMAN:  I thought it was a thick document.

14        MS. DARROW:  No, not at all.  That's okay.

15             You're messing up my routine.  I had it all

16   worked out where everybody got a copy.

17        MR. PITTMAN:  So I only let you get away with

18   this.  Your routine is flawed.

19        MS. DARROW:  It is not.

20             (The document referred to was marked as

21        Defendant's Exhibit 14 and is annexed hereto.)

22        MR. PITTMAN:  Now let me tell you how --

23        MS. DARROW:  You can tell me off the record.

24        Q.    BY MS. DARROW:  Do you recognize the

25   document that's been marked as Defendant's Exhibit

KEVIN BRISCOE vs STARBUCKS COFFEE
BRISCOE, KEVIN  on 03/13/2018

1          A.    I don't -- I don't have -- I don't see a

2    copy of it.

3          Q.    That wasn't my question.

4          A.    If I received an assessment with a document,

5    I would have signed it.

6          Q.    It's your testimony that you complained

7    regarding Angela Rivers' treatment of you.  Did you

8    specifically tell anyone that you believed that she

9    mistreated you based upon your race?

10         A.    I did, to Sarah on my one-on-one with her.

11         Q.    Sarah Rogers?

12         A.    Yes.

13         Q.    What do you think could have been done

14   better to prevent any alleged discrimination towards you?

15         A.    Well, I think if I would have been afforded

16   the opportunity such as the non-black district managers,

17   I would have been given the opportunity to advance my

18   career and given that support by Angela like she was --

19   like she gave to the other district managers, I wouldn't

20   have -- I don't think I've been treated that way.  I'd

21   feel differently.

22         Q.    Which one-on-one with Sarah Rogers did you

23   tell her that you believe that Angela Rivers' treatment

24   of you was based upon your race?

25         A.    We had a one-on-one at Starbucks in December

1    of 2014, I believe, and that was also one of the times

2    where I complained about the treatment.

3         Q.    No one else was present?

4         A.    No.

5         Q.    Did you record that conversation?

6         A.    I did.

7         Q.    Do you know if anyone was ever disciplined

8    as a result of the complaints that you made?

9         A.    I have no idea if Angela was disciplined for

10   the complaints that I made.   I have no idea.

11        Q.    Do you know if anything whatsoever was done

12   as a result of any of the concerns that you made other

13   than the investigation?

14        A.    My complaints, I don't feel my complaints

15   were addressed.

16        Q.    You wanted more than the investigation done?

17        A.    I wanted the retaliation and discrimination

18   to stop, and that's what I clearly communicated to Sarah

19   and to Heidi and to Angie.

20        Q.    We're going to mark as Defendant's Exhibit

21   No. 16 correspondence between the witness and Sarah

22   Rogers Bates labeled STAR 1884.   Do you recognize this

23   document, Mr. Briscoe?

24        A.    Yes, I do.

25              (The document referred to was marked as

KEVIN BRISCOE vs STARBUCKS COFFEE
BRISCOE, KEVIN  on 03/13/2018

1        A.    She said, "Kevin, you know, this is Angela's

2    perception of your -- or her assessment of your

3    performance, and while you may not like the feedback, but

4    this is what it is."

5              You know, you didn't get the sense they

6    wanted to evaluate what Angela was saying.

7        Q.    Anything else?

8        A.    No.

9        Q.    Have you incurred any medical expenses as a

10   result of conduct that you attribute to those three

11   individuals of Starbucks or anybody else at Starbucks?

12       A.    No.

13       Q.    What's your current salary at

14   Jack-in-the-Box?

15       A.    My current base salary is 120.

16       Q.    I apologize if I asked you this.  I didn't

17   see it in my notes at all.

18             What other benefits do you get from working

19   at Jack-in-the-Box?

20       A.    I get the possibility of getting an annual

21   bonus.

22       Q.    You haven't been there long enough to get a

23   bonus yet, have you?

24       A.    Yes.

25       Q.    Did you get a bonus this past year?

1  that?  Did I what?

2       Q.    Did you send any correspondence through a

3  personal email account?  I know you had a Starbucks

4  email, but I don't know if you have a personal email

5  account, which I don't care about it unless you sent

6  something --

7       A.    I did not communicate with my personal email

8  with Starbucks.

9       Q.    How about anything related to your

10  employment with Starbucks?

11       A.    No.

12       Q.    Are there any other documents you have that

13  you believe are relevant to your case that we have not

14  discussed?

15       A.    No.

16       Q.    Any other witnesses that you can identify

17  that may have some information regarding your claims that

18  you haven't told me about?

19       A.    I don't think so, no.

20       MS. DARROW:  Give me a minute to go through my

21  notes.  I think we're almost done.

22            What number are we on?

23       THE REPORTER:  45.

24       Q.    BY MS. DARROW:  We're going to mark as

25  Defendant's Exhibit No. 45 -- I believe this is your

```
 1    letter of employment from Jack-in-the-Box dated

 2    July 14th, 2015.  Is that correct?

 3         A.    Yes.

 4              (The document referred to was marked as

 5         Defendant's Exhibit 45 and is annexed hereto.)

 6         Q.   BY MS. DARROW:  All right.  Is this a true

 7    and correct copy of your congratulatory letter from

 8    Jack-in-the-Box?

 9         A.    Yes.

10         MS. DARROW:  Can we go off the record for a

11    minute?  I'm just going to go over my notes.

12         THE VIDEOGRAPHER:  We're going off the video

13    record.  Time is 2:19 p.m.

14              (Brief recess.)

15         THE VIDEOGRAPHER:  We're back on the video record.

16    Time is approximately 2:31.

17         MS. DARROW:  All right.  We're gonna mark as

18    Defendant's Exhibit No. 46 a string of communications

19    between Mr. Briscoe and Miss Rivers Bates labeled STAR

20    1940 through 1944.

21              (The document referred to was marked as

22         Defendant's Exhibit 46 and is annexed hereto.)

23         Q.   BY MS. DARROW:  Do you recognize the string

24    of communications, the attachment dated July 15, 2015?

25         A.    Yes.
```

IN THE STATE OF CALIFORNIA        )
                                  ) ss.
COUNTY OF ORANGE                  )


         I, MARY E. PIERCE, CSR 6143 and Deposition

Officer in the State of California, do hereby certify

that prior to being examined, the witness in the

foregoing deposition was duly sworn to testify the truth,

the whole truth, and nothing but the truth;

         That the testimony of the witness and all

objections made at the time of the examination were

recorded stenographically by me;

         That the foregoing is a true record of the

testimony and all objections made at the time of the

examination.

         Pursuant to Rule 30(e) of the Federal Rules of

Civil Procedure, an offer was made for review and

signature by the witness on page 311.

         IN WITNESS WHEREOF, I have subscribed my name

this 23rd day of March, 2018.


_____
Deposition Officer in and for the
State of California

315



To: Kevin Briscoe
From: Angie Rivers
Date: March 30, 2015
Subject: Performance Concerns & Expectations

Kevin,

The purpose of this memo is to provide feedback related to some trends in your performance over the last several months. Specifically, the feedback is related to two categories: Communication and Work Habits.

**Communication:** Over the past year I have received complaints from our Licensees related to your communication style.

Examples:
- Marriot LAX: the Licensed Venue Manager and Food & Beverage Director provided feedback that you used inappropriate tone and volume when coaching a Licensed Store Manager. The damage to the relationship with this licensee was so significant that they requested a new DM be assigned to the property.
- Ralphs: Licensed Venue Managers from both locations have elevated concerns about communication style, tone, and ineffective communication. A Ralphs leader has also shared that your tone and emotion in communications have impacted their willingness and ability to work effectively with you.
- Email communication is not thought through ahead of time. Emails often lack appropriate detail and analysis and don't the supply necessary information to inform the audience. This results in a lot of back and forth communication in order to solve problems vs. a more thoughtful and efficient communication approach.

**Work Habits:** We have had repeated conversations about your approach to your work routine and the accuracy of your work.

Work Routine/Calendar Issues:
- You did not notify Vons of change in Detailed Store Visit schedule on March 11th, resulting in the Licensed Store Manager wasting time preparing for the visit and waiting for you.
- After the March 11, 2015 complaint from Vons I made a specific request that you review your calendar for any other conflicts. As of March 18, 2015 calendar conflicts remained on calendar.
- You waited until Sunday, March 15th (the day before our scheduled meeting with Branded Solutions, which was scheduled for Monday March 16th) to notify us that you would not be attending, even though part of the agenda was related to your district.

Accuracy:
- There was inaccurate data about food performance (a key priority) on the store overview document that you prepared for a senior leadership tour in February. Food was shared as 19% of store sales despite food running 34-36% of store sales.
- During this tour, you also shared inaccurate scorecard information about the USC location. January's sales were stated as $40K which was an understatement of $54,000 dollars upon further review.
- In preparation for our March DM meeting, you again provided inaccurate trend data about this store's sales trend and did not factor in any of the above information to your analysis. You

**Defendant's Exhibit  9**

Witness: Kevin Briscoe
Date: 3/13/2018

Mary E. Pierce
CSR 6143

indicated that the shortfall at this account was due to an aggressive budget when the actual reason was the under-reported sales.

- January financial reports inaccurately stated that the LAX Terminal 2 Arrivals kiosk having $105,000 in sales despite the location being closed since October. DMs are responsible for reviewing financial results within 72 hours of reports being available and are responsible for problem-solving any data inaccuracies. You did not identify or elevate this issue.
- There has been a lack of consistent follow up on the action items communicated in Starbucks Operations Bulletins and formal licensee communications. Examples include:
  o Extension date for red cups (holiday promotion)
  o Winter 1 promotional information regarding pastry signage
  o HMSHost playbook expectations for completion
  o HMSHost labor guidelines
- You inaccurately assessed the skills of several new baristas at a new Residence Inn location, resulting in the need to re-train the baristas 3 days following the store opening at a significant cost to the licensee.
- During routine store visits there have been several observed gaps in your ability to identify unapproved items in the stores, such as parking signs at the Residence Inn and a charity donation container at an airport location.

Kevin, we have had several conversations about the above issues. I have asked you to be more transparent and proactive about scheduling conflicts. I have also coached you to slow down and be more thorough when responding to questions, investigating problems, or surfacing problems. Though you have made past commitments to reflect on these issues and work towards improvement, I continue to find examples that indicate otherwise. Below are the expectations for your work moving forward:

**Communication:**
- Regularly takes time to solicit and listen to customer feedback or concerns about stores, the district or the company; addresses questions and concerns
- Builds and maintains effective relationships with all store associates; demonstrates a balance between building relationships and getting the work done
- Communicates with team in a clear, concise and sincere manner
- Uses appropriate language and actively listens
- Understands the importance and impact of relationships
- Communicates district results to various groups using a variety of mediums (email, voicemail, memorandums, in meetings, on the phone)
- Treats all licensees fairly and equitably; consistently displays personal integrity and trust
- Diffuses rather than reflects others' emotions

**Work Habits:**
- Stays on top of changes in Starbucks products and services
- Accurately communicates changes to partners/customers
- Follows-up to ensure licensees receive timely updates and necessary information for new product launches/changes
- Prioritizes communications and ensures that appropriate, relevant information is shared with store management team
- Is able to articulate why a business decision was made and the root cause of issues that informed the decision
- Is able to analyze reports, identify trends and build plans to improve results; understands business tools and levers, and how these should be leveraged/prioritized
- Does not reinvent the process; leverages what is in place
- Focuses effort on what matters; adapts to shifting priorities
- Uses DM Approach and Calendaring Principles to schedule and prioritize time

This memo is intended to share my expectation that you improve your performance in these categories within the next 45 days. Lack of improvement may result in a formal Performance Improvement Plan.

_____

signature of preparer                                    date

_____

signature of recipient                                   date

STAR 0001213

v. 06.17.13

**Annual Performance Review Form**

Kevin b

## Review

**Throughout the year:** Collect feedback, as needed, and document examples of what was accomplished (results) – and how it was accomplished (behaviors) to streamline the annual review process.

Please reference results and behaviors to support your conversation.

### Accomplishments:

Kevin has led community efforts for region exceeding regional community service commitment for 2013. Kevin has also served as Playbook Lead and Playbook Seed DM for region.

Kevin has had exceptional sales, product revenue to goal variance and has had substantial improvement in OSAT but has not achieved 80% of portfolio

- OSAT goal 80 actual 76 35.3% of stores
- AHC goal 172K lbs actual 151K lbs  81% of stores
- Comp goal 9.5% actual 13.1% 80% of stores
- Sales goal 27.9M actual 29M 71.4% of stores
- PR  goal 3.7M actual 4.12M 77% of stores
- GM goal 3.3M actual 3.6M 71.4% of stores

Kevin has built and maintained relationships with several CO DM's, RD's and SM's this year and has become a requested partner in CO meetings. Kevin has also continued his relationship with Marcus Tom.

### Strengths:

Kevin has demonstrated strong partnerships with licensees and helped them prioritize business basics, operational standards, and is creating a service culture

•Develops Continuously – commits to action and champions company priorities, has worked tirelessly to improve operation at LAX, adjusted style and approach repeatedly, creates a case for change, gains buy in.

•Achieves Results – Helps stores focus on the most important thing and keeps the main thing, the main thing.

### Opportunities:

•WWWO – has broadened his leadership to peers (leading community, Playbook) and has. Kevin can do more work around adjusting for his audience – tends to talk like he thinks and repeats himself rather than adjusts – peers sometimes wonder if he's listening.  should continue to build strong and valuable 1st team relationships

•Leads Courageously – giving and receiving authentic feedback in a timely and meaningful way to peers, much like you do with licensees after building relationships that allow this investment in them as well as yourself should be a goal for 2014

## Rating

Select a rating based on what was accomplished and how it was accomplished from the scale below.

| Rating: | **Above Expectations** |
|---|---|

Defendant's Exhibit  11

Witness: Kevin Briscoe
Date 3/13/2018
Mary E. Pierce
CSR 9149

STAR 0002524

Annual Performance Review Form

## Rating Scale

| Must Improve | Meets Expectations | Above Expectations | Consistently Exceeds |
|---|---|---|---|
| Achievement of results is below expectations and/or achieved in a way that does not align with Starbucks competencies<br><br>Requires A Performance Improvement Plan | Achieves all or the majority of expected results in a way that aligns with Starbucks competencies | Consistently meets and often exceeds expected results in a way that aligns with Starbucks competencies | Consistently exceeds expected results in a way that aligns with Starbucks competencies and pushes the organization to the next level inspiring others to excel |

## Review Acknowledgement

| Partner Number | Partner Signature | Date | Manager Signature | Date |
|---|---|---|---|---|
| 1771757 | *John N. Emmell* | 10/7/13 | | 10/7/13 |

Partner signature acknowledges this review has been discussed and does not necessarily indicate the partner's agreement with its contents.

Annual Performance Review Form

v. 07.21.14

| Partner Name: | Kevin Briscoe | Partner Number: | |
|---|---|---|---|
| Position Title: | LS DM | Manager Name: | Angie Rivers |
| Fiscal Year: | FY14 | | |

## Review

Throughout the year: Collect feedback, as needed, and document examples of what was accomplished (results) – and how it was accomplished (behaviors) to streamline the annual review process.

Please reference results and behaviors to support your conversation.

### Accomplishments:

Business Pillar Lead overseeing first team activities to drive overall business resulting in strongest business performance in LS. Supported DM Approach, QASA, Peer Accountability, QBR and Monthly financial story telling. Coordinated with other pillar leads for business impact. Built stronger first team relationships – particularly with Dave, Ashley. Key participant in Tapingo project. Built effective partnership with BDM Karl. Supported open district.  USLT tour.  Evenings at LAX – partnered w CO to support training and successful operation

### Strengths:

Acheives Results – continuous improvement. Customer portfolio % increase +20%. Playbook focus, deployment focus, transfer of ownership focus. Asking powerful questions. Partnership with key decision makers.

Develops continuously – (others) Kevin has had focused energy on building stronger relationships with peers and spent field time with Erica, Deanna as well as focused time with Leah, Dave, Ashley, Leslie. These efforts have had significant impact on his ability to lead, support, contribute to individual development and strong first team environment .

### Opportunities:

WWWO- Continued focus on listening for understanding rather than listening to respond. Ensure you both understand and are understood.  Communication is key to success. Elevate store level issues where conflict or misunderstanding occurs. Ensure all relevant facts are shared and a  clear picture is painted of problems without rounds of follow up questions required to fully understand situation.  Take time to ask questions to ensure understanding on all sides. This will minimize opportunity to have integrity questioned.  Focus on team commitments and execute in manner agreed to (or influence commitment). Once aligned execute in accord with agreement.

## Rating

Select a rating based on what the  and how it was accomplished from the scale below.

| Rating: | Meets Expectations |
|---|---|

## Rating Scale

| Must Improve | Meets Expectations | Above Expectations | Consistently Exceeds |
|---|---|---|---|
| Achievement of results is below expectations and/or achieved in a way that does not align with Starbucks competencies | Achieves all or the majority of expected results in a way that aligns with Starbucks competencies | Consistently meets and often exceeds expected results in a way that aligns with Starbucks competencies | Consistently exceeds expected results in a way that aligns with Starbucks competencies and pushes the organization to the next level inspiring others to excel |

Defendant's  Exhibit  12

Witness:  Kevin Briscoe
Date  3/13/2018

STAR 0002517

Annual Performance Review Form

| Requires A Performance Improvement Plan | | | |
|---|---|---|---|
| | | | |

**Review Acknowledgement**

| 1771757 | _(signature)_ | 10/6/14 | _(signature)_ | _(date)_ |
|---|---|---|---|---|
| Partner Number | Partner Signature | Date | Manager Signature | Date |

Partner signature acknowledges this review has been discussed and does not necessarily indicate the partner's agreement with its contents.

Confidential

Starbucks Coffee Company:  Monthly Scorecard

CONFIDENTIAL (Internal Use Only)



Trended Performance

STAR 0002519

Starbucks Coffee Company: Monthly Scorecard

YTD (FY14 Avg)



STARBUCKS COFFEE COMPANY
PARTNER GUIDE

U.S. Store Version

A Guide to Your Partner Experience

Defendant's Exhibit  14

Witness:  Kevin Briscoe
Date  3/13/2018

Section 6

A partner who develops a close relationship with another partner that would violate this policy must notify his or her manager immediately.

## Harassment and Discrimination Prohibited

One of Starbucks Coffee Company's Guiding Principles is to *"provide a great work environment and to treat each other with respect and dignity."* Accordingly, Starbucks strictly prohibits discrimination, sexual harassment or harassment on the basis of race, color, national origin, religion, sexual orientation, physical or mental disability, age, veteran status, marital status or any other characteristic protected by applicable law.

This prohibition applies to all partners, vendors or customers. No partner is expected to tolerate any conduct prohibited by this policy from anyone while at work or while engaged in company business.

*Sexual harassment defined:* Sexual harassment prohibited by this policy includes any unwanted sexual advances, requests for sexual favors or visual, verbal or physical conduct of a sexual nature when:

• Submission to or rejection of such conduct is used as a basis for employment decisions affecting the partner; or

• Such conduct has the purpose or effect of unreasonably interfering with a partner's work performance or creating an intimidating, hostile or offensive working environment.

The following is a partial list of conduct that would be considered sexual harassment:

• Unwanted sexual advances or propositions

• Offering employment benefits in exchange for sexual favors

• Leering, making sexual gestures, displaying sexually suggestive objects or pictures, cartoons, calendars or posters

• Making or using derogatory comments, comments about a partner's body or dress, slurs, epithets or sexually suggestive jokes

• Written communications of a sexual nature distributed in hard copy or via a computer network, suggestive or obscene letters, notes or invitations

• Physical conduct such as unwanted touching, assault, impeding or blocking movements

• Making or threatening retaliation after a negative response to sexual advances or for reporting or threatening to report sexual harassment

Sexual harassment can occur between Starbucks partners of the same sex. It is unlawful for a male to be sexually harass either females or males, or for a female to sexually harass either males or females.

Starbucks prohibits acts of harassment that include, but are not limited to, the following examples:

• Threats, degrading comments, epithets or slurs

• Derogatory posters, photographs, cartoons, drawings or gestures

• Written communications that could offend individuals in a particular group, such as references to racial or ethnic stereotypes or caricatures

• Making or threatening retaliation for reporting or threatening to report harassment, or for participation in an investigation of a harassment complaint

## As a Starbucks Partner, It Is Your Responsibility To:

1. Treat others with respect and ensure to maintain a professional workplace

2. Understand Starbucks Anti-Harassment and Discrimination Policies, including the Complaint Procedure

3. Take immediate steps to end the offensive behavior by reporting that it does if comfortable doing so.

4. Immediately report your concerns to your manager, Partner Resources from a member of the Business Conduct Helpline at (800) 611-7792.

5. Apologize if you have offended someone.

19

FEBRUARY 2007

Complaint Procedure: A partner who believes he or she has been subjected to behavior prohibited by this policy should make his or her feelings known to the offending partner, if comfortable doing so. The partner must also immediately report the behavior, preferably in writing, to management as follows:

A store partner must report the offensive behavior immediately to the store manager, district manager, regional director or regional Partner Resources team member. The name and phone number of the appropriate Partner Resources team member may be obtained by calling the Partner Contact Center (PCC) at (866) 504-7368 Monday–Friday from 5 a.m. to 5 p.m. Pacific. If you already know the name of your district manager, regional director or Partner Resources team member, you may find his or her phone number in the online Bearbook. Partners may also call the Business Conduct Helpline at (800) 611-7792 to report offensive behavior.

If any partner becomes aware of harassing conduct engaged in or endured by a Starbucks partner, regardless of whether such harassment directly affects that partner, the partner should immediately report that information, preferably in writing, to the appropriate manager as indicated above.

Investigation and discipline: When Starbucks is made aware of a situation that may violate this policy, an immediate, thorough and objective investigation will be undertaken. Starbucks will protect the confidentiality of those involved to the extent possible, consistent with the need to investigate and resolve the complaint.

Appropriate action will be taken against any partner found to have engaged in prohibited harassment to ensure that the conduct will not reoccur. Appropriate action will be taken against any partner who makes any report of harassment in bad faith. A partner found in violation of this policy may be subject to corrective action, up to and including termination of employment. The type of corrective action taken will depend on the severity of the conduct, as well as any other factors presented.

Starbucks strictly prohibits any form of retaliation against any partner for reporting harassment in good faith, for using this Complaint Procedure or for filing, testifying, assisting or participating in any matter or any investigation.

Starbucks will not tolerate any behavior prohibited by this policy and does not consider such behavior within the course and scope of employment, nor is such conduct authorized by Starbucks. Partners, including managers, may be held personally liable for actions that violate this policy.

Drugs and Alcohol

Starbucks partners are prohibited from any involvement with alcohol, drugs or any other substance that may impair work performance or the ability to professionally represent Starbucks. Specifically, this policy forbids working while under the influence of alcohol or drugs and prohibits the use, sale, manufacture, possession or illegal distribution of alcohol, illegal drugs or controlled substances on company premises, while conducting company business or during working time. For purposes of this policy, working time includes meal and rest breaks. Furthermore, partners are strictly prohibited from reporting to work under the influence of alcohol, illegal drugs or controlled substances not in accord with a valid prescription. Partners who are taking prescription drugs that may affect their performance should also discuss their situation with their manager prior to working.

The only exceptions to this policy are for moderate use of alcohol as may be appropriate when entertaining business associates or in similar social settings related to company business. Even in those limited circumstances, partners must remain professional at all times or risk corrective action.

Corrective action, including termination, will be taken against any partner who violates this policy. Excessive use of alcohol off-duty or off-duty drug activity may affect Starbucks image and thus may also result in disciplinary action. Starbucks reserves the right to deal with each case in its discretion, in accord with the specific circumstances involved. This may include requiring the partner to participate in, and satisfactorily complete, a treatment program.

If you have a problem with drugs or alcohol, you are encouraged to speak with your manager so that Starbucks can assist you in obtaining help.

Weapons

Starbucks strictly prohibits partners from possessing any weapon in a Starbucks store or on Starbucks property. For purposes of this policy, a

weapon is broadly defined to include a firearm, knife, baseball bat or as otherwise provided by the criminal code of any jurisdiction in which Starbucks does business.

## Workplace Violence

Starbucks does not tolerate violence or threats of violence in the workplace. Violence or a threat of violence may be defined as the use of physical force or a display of behavior or use of words that causes another person to believe that he or she is in imminent harm. Any partner who engages in workplace violence may be subject to immediate termination from employment.

If a partner observes a display of workplace violence, the partner should immediately inform his or her store manager, district manager or Partner Resources team member or call the Business Conduct Helpline at (800) 611-7792.

## Video and Audio Recording

Starbucks installs security cameras in the stores for partner and customer safety and to monitor activities involving cash. Partners should be aware that these security cameras will capture video and/or audio recordings.

## Register Operation and Customer Transactions

All partners are required to conduct themselves with the utmost honesty and integrity. This principle applies primarily when engaging in any transaction involving a customer of Starbucks and particularly when engaging in transactions involving the exchange of Starbucks product or merchandise for cash, coupons or gift certificates. Each partner will be held responsible for each transaction conducted at the cash register till assigned to him or her, including all transactions that take place, counting cash and balancing the till. Depending on one's position, a partner may additionally be responsible for accessing the store safe and preparing bank deposits.

The following rules apply to all partners:

• Ring into the cash register all customer transactions and provide all customers receipts for their purchases, never void a legitimate customer transaction.

• Leave the register on the "Begin Transaction Screen" prior to leaving the cash register unattended.

• Keep your till secure; do not share your cash register password or your till with any other partner.

• Deposit into the cash drop box assigned to the register all bills equaling or exceeding $20, as well as any smaller bills when their numbers become excessive.

• Balance your till at the end of your shift; consistent overages and shortages are not acceptable.

• Secure the store safe at all times.

• It's against Starbucks policy to give away free beverages, product or merchandise to family or friends.

• Do not misuse Starbucks coupons, service recovery coupons, gift certificates or Starbucks Cards.

• Do not misuse the "Partner Beverage" transaction. This is meant solely to process a beverage for a partner who works with you in your store only. You cannot use it for your own drink, for a customer or for any other reason.

• Adhere to the partner discount policy at all times.



Section 6

## Serving Customers with Disabilities

Starbucks goal is to provide the *Starbucks Experience* to as many people as possible. Many of our customers are persons with disabilities. To ensure that they will be able to enjoy the full *Starbucks Experience*, each partner should do the following.

*Store access:* Each store should have the appropriate number of wheelchair accessible tables inside and outside the store. Wheelchair accessible tables should be clear for customer use and not used for other purpose, such as merchandise display. The appropriate amount of clearance around the tables must also be maintained. Partners should make sure that the store pathways are clear for travel by wheelchair users and other customers with mobility impairments. Do not place chairs, trash cans, boxes, etc. on ramps, in hallways or in front of bathrooms or exits.

*Drink service:* A drink served to a customer using a wheelchair should be easily reached by the customers. Therefore, the partner should deliver the drink to the customer at the register counter or directly to his or her table. A partner should also offer to assist wheelchair users with their condiments if the condiment bar is difficult to reach.

*Service animals:* Service animals that assist persons with disabilities are allowed in Starbucks stores. Service animals include seeing-eye dogs or other animals trained to alert persons with hearing impairments. A partner should politely ask a customer with an animal to leave the animal outside the store, unless the customer informs the partner that the animal is a service animal. In that situation, no further questions may be asked of the customer, even if the animal does not have a harness or otherwise appears to be a service animal. The partner must not ask: for proof that the customer is disabled or that the animal is trained. Nonetheless, the customer will be responsible for the service animal's care and supervision while in Starbucks. A service animal may be excluded from the store only if its behavior poses a direct threat to the health or safety of others.

## Corrective Action

Corrective action communicates to the partner that performance problems exist or that the partner is engaging in unacceptable behavior. The intent of corrective action is to give the partner a reasonable opportunity to re-establish an acceptable level of performance or behavior.

Corrective action may take the form of a verbal warning, a written warning, demotion, suspension or termination from employment. The form of corrective action taken will depend on the seriousness of the situation and the surrounding circumstances. The evaluation of the seriousness of the infraction and the form of the corrective action taken will be within the sole discretion of the manager. There is no guarantee that a partner will receive a minimum number of warnings prior to termination of employment or that corrective action will occur in any set manner or order.

In cases of serious misconduct, immediate termination from employment may be warranted. Examples of serious misconduct include, but are not limited to:

- Violation of safety and/or security rules
- Theft or misuse of company property or assets
- Fabrication or misrepresentation of any company document
- Violation of Starbucks drug and alcohol policy
- Possession or use of firearms or other weapons on company property
- Harassment or abusive behavior toward partners, customers or vendors
- Violence or threatened violence
- Insubordination (refusal or repeated failure to follow directions)
- Violation of any other company policy

22

FEBRUARY 2017

STARBUCKS PARTNER GUIDE — U.S. STORES, VERSION 4

# Section 8

## How We Communicate

Starbucks' reputation for integrity flows from our steadfast commitment to our Core Values and Guiding Principles found in the Mission Statement. Starbucks depends on its partners to ensure that those Guiding Principles are upheld in every facet of our business. For this reason, the company highly values the views of our partners.

Several resources are available to our partners for communicating their concerns, providing input about our business practices and reporting matters that fail to uphold the company's legal and ethical objectives.

## Communicating with Your Manager

Starbucks has created a vital learning community for the sharing of talents, skills, knowledge and personal qualities. We strive to enrich our understanding and culture by focusing on a shared mission and value system. The essence of management development and training is supported by Starbucks acknowledgment that our managers and partners are the company's finest assets.

The most important working relationship you will have at Starbucks is the one between you and your manager. Your manager will support you so that you can effectively perform your job. In order to support you, however, your manager needs to know of your concerns or questions. If you have any questions, concerns or suggestions regarding your position and responsibilities, discuss them with your manager. If your manager is unable to assist you, you may refer your questions or concerns to your district manager or to your Partner Resources team member.

## Problem Solving

Starbucks endorses an atmosphere of mutual respect and support. If a partner experiences a disagreement or conflict with another partner, the partner should first discuss the problem with the other partner and make every effort to resolve it in a respectful manner. If unsuccessful, the partner should seek the store manager's assistance in resolving the matter respectfully and professionally.

The following chart is provided as a reference guide when resolving disputes. Alternatively, partners may call the Business Conduct Helpline at (800) 611-7792 to report concerns or ask for guidance.

## Resolving Disputes

The partner discusses the conflict or problem
directly with the other partner

if
unsuccessful

The partner discusses the matter with the store manager

if
unsuccessful

The partner discusses the matter with the district manager

if
unsuccessful

The partner discusses the matter with a
Partner Resources team member

Reports of comments (without names), along with the responses, are made accessible to executives and managers throughout the company to enhance their awareness of partner ideas and concerns.

## Business Conduct Helpline

The Business Conduct Helpline has been established to answer partners' questions about legal or ethical issues at work, to clarify the Standards of Business Conduct and to provide partners yet another means to report any potential wrongdoing. Matters reported through the Helpline may include any form of harassment or discrimination; safety and security violations; violations of wage and hour laws; health code issues; situations involving illegal drugs, substance abuse, weapons or violence; instances of improper conduct; or potential violations of other policy or our Guiding Principles. Partners may remain anonymous when calling the Helpline.



All concerns reported to the Helpline will be taken seriously and treated in a confidential manner. Starbucks does not tolerate retaliation against any partner who, in good faith, raises concerns or questions regarding a potential violation of Starbucks policy.

More information about Starbucks Standards of Business Conduct or the Business Conduct Helpline is found in the Standards of Business Conduct brochure you received when hired.

## Emergency Communication Hotline

Starbucks has established an Emergency Communication Hotline. This toll-free telephone number is (800) 923-BEAN or (800) 923-2326. By calling this number, a partner may receive local or regional information that may impact store operations, such as information about severe weather conditions and procedures during emergency situations. All partners are encouraged to use this emergency call-in number if you are unable to reach your store manager or district manager.

26

## Mission Review

Mission Review encourages Starbucks partners throughout the company to express views on whether our policies and practices are consistent with Starbucks Mission Statement and Guiding Principles. Mission Review submission cards are available at all work locations.

Completed comment cards sent to the Mission Review team are forwarded to the partner(s) directly involved in the product or program or in making the very decision your specific comment addresses. While it is possible to make an anonymous submission, including your name and work location will assure you receive a direct response to your comment (usually within 20 business days).



Product 1

No 6.

July 14, 2015

Kevin Briscoe
3520 Wellington Road
Los Angeles CA 90016

Dear Kevin:

Congratulations! On behalf of Jack in the Box Inc. and it's Brands ("Company"), we are pleased to confirm our offer of employment to you for the position of Franchise Business Consulting Director (FBC), in the Franchise Operations Department, reporting to Shane Paul. Your anticipated first day of work is August 10, 2015.

*Base Compensation* – Your bi-weekly salary will be 4,615.39, which is equivalent to $120,000 annually.

*Annual Incentive* – As an FBC, you are eligible to participate in the annual Performance Incentive Plan for Jack in the BoxFBCs with a target incentive in fiscal 2016 of 25% of base salary, up to a maximum of 50% of base salary.. Based on your hire date, you will be able to participate in the Staff Performance Incentive Plan for Fiscal Year 2016, which will begin on September 28, 2015. You will be eligible to participate in the FBC incentive plan beginning in Fiscal Year 2016, which will begin on September 28, 2015.

*Restricted Stock Units* – Subject to Board approval, and typically granted each November, you will be eligible to receive a long-term incentive award with a current target value of $20,000 at grant. The award is made in the form of restricted stock units (RSUs) that vest 33% per year over 3 years from the date of grant, subject to the terms and provisions of the 2004 Stock Incentive Plan and award agreement. Your rights pursuant to an award under the Plan are subject to the specific terms of the Plan and grant agreement, and your entitlement to rights under the Plan and agreement may be limited.

*Deferred Compensation Program* – As a highly compensated employee, you are also eligible to participate in the Executive Deferred Compensation Plan (EDCP) which is a non-qualified, pre-tax deferred compensation plan. Participants may contribute up to 50% of base salary and 85% of annual incentive in whole percentages. The Company matches 100% of the first 3% of deferred salary and 3% of deferred annual incentive.

*Allowances* – Under the current program, you will be eligible to receive an annual car allowance of $9,300.00 with a gas card for business travel use, and an annual communications allowance of $2,400.00. The car allowance and communication allowance will be paid on a bi-weekly basis.

WWW.JACKINTHEBOX.COM
858 571 2121
9330 BALBOA AVENUE SAN DIEGO, CA 92123-1516

in the box

Defendant's Exhibit 45

Witness: Kevin Briscoe
Date: 3/13/2018

Mary E. Pierce
CSR 6143

Kevin Briscoe
Page 2 of 3

*Health Benefits* – You will be eligible to participate in the Jack in the Box health plans effective the 1st day of the calendar month coincident with or following 30 days of service, which includes medical, dental, and vision plans. These plans are contributory on a pre-tax basis and provide several choices of coverage for you and your family.

*Vacation* – As part of the leadership team, you will not accrue vacation. Time off may be taken consistent with the needs of the business and the expectations of your supervisor.

*Sick Pay* – In accordance with our Sick Pay Policy, you will receive 6 days of sick pay each year, which may be carried over each year to a maximum of 60 days. Sick pay accrues bi-weekly beginning from your start date.

*Other Paid Time Off* – Company observed holidays, Floating Holidays, Jury Duty, and Bereavement Leave.

*Other Rewards* – Tuition Reimbursement, Employee Assistance Program and Life/Disability programs.

All programs described in this offer letter are subject to change, and are not guaranteed in any way. To the extent the terms of any plan or policy differ from what is in this letter, the plan or policy will determine the right and the amount of any benefits

*Orientation* – You will be receiving via mail a New Hire Orientation packet. Please review and bring these completed employment forms with you on your start date, Monday, August 10, 2015. Please arrive at the Corporate Support Center (CSC) lobby located at 9330 Balboa Avenue at 8:30am and inform the front desk that you are there for New Hire Orientation. Your employment forms will be collected and your photo will be taken for your employee identification badge. ➔ Please Note: On your start date you will need to bring original documentation with you that will be used to complete section 2 of the form I9.

*Employment Conditions:*

This offer is contingent upon our receipt and verification of various pre-employment screening elements including, but not limited to: educational record as you have stated on your application and/or resume; background check results; and references. You will be notified once we have successfully completed all components of the pre-employment process.

Jack in the Box Inc. requires as a condition of employment that new employees agree to keep certain business information confidential, and also to submit most employment disputes to binding arbitration. As part of your orientation, you will be required to sign our Confidentiality Agreement and Dispute Resolution Agreement.

WWW.JACKINTHEBOX.COM.

856 571 2121

in the box

9330 BALBOA AVENUE SAN DIEGO, CA 92123-1516

Kevin Briscoe
Page 2 of 3

You should also know that it is the policy of Jack in the Box Inc. that the employment relationship is one of "at will." This simply means that either party – you or the Company – may terminate the employment at any time, with or without cause. The only exception is if the President of the company agrees in writing that you may only be terminated for cause.

Your signature below will be your acknowledgement that you have read, understood and agree to the above information, including that you are an "at will" employee. Please sign and return this copy within 48 hours. Please contact Mark Morgan at mark.morgan@jackinthebox.com or (858) 571-2324 should you have any questions.

We look forward to welcoming you to the team. Again, congratulations!

Sincerely,

*Cari Buckman*

Cari Buckman
Sr. Manager, Talent Strategy & Acquisition

Acknowledged by: _____     Date 7/15/15
                     Kevin Briscoe

WWW.JACKINTHEBOX.COM

858.571.2121

9330 BALBOA AVENUE SAN DIEGO, CA 92123-1516

# EXHIBIT B

1              UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3

4    KEVIN BRISCOE,                ) Case No.: 2:17 cv-04832
                                   ) JAK (JPRx)
5           Plaintiff,             )
                                   )
6           vs.                    )
                                   )
7    STARBUCKS COFFEE COMPANY,     )
     AND DOES 1 THROUGH 20,        )
8    INCLUSIVE,                    )
                                   )
9           Defendants.           )
     _____)

10

11

12          DEPOSITION OF ANGELA MARIE RIVERS

13                    VOLUME I

14

15            Tuesday, March 20, 2018

16                  10:14 a.m.

17

18         205 South Broadway, Suite 200

19         Los Angeles, California 90012

20

21

22   REPORTED BY:
     Angela M. Albarez
23   CSR No. 4344, CSR, RPR
     JOB NO. 143758
24

25

```
 1    APPEARANCES:

 2    For Plaintiff:

 3        LAW OFFICES OF ALVIN L. PITTMAN
          BY:  ALVIN L. PITTMAN, ESQ.
 4        5901 West Century Boulevard, Suite 412
          Los Angeles, California 90045
 5        (310) 337-3077

 6

      For Defendants:
 7
          LITTLER MENDELSON, P.C.
 8        BY:  TANJA L. DARROW, ESQ.
                 - and -
 9            JYOTI MITTAL, ESQ.
          633 West Fifth Street, 63rd Floor
10        Los Angeles, California 90071
          (213) 443-4240
11               - and -
          STARBUCKS COFFEE COMPANY
12        BY:  RICHARD P. LOPEZ, ESQ.
          17700 Newhope Street, Suite 200
13        Fountain Valley, California 92708
          (714) 885-3959
14

15    Also Present:

16        KEVIN BRISCOE

17

18

19

20

21

22

23

24

25
```

REQUEST FOR JUDICIAL NOTICE

TANJA L. DARROW, Bar No. 175502
tdarrow@littler.com
LITTLER MENDELSON, P.C.
633 West 5th Street
63rd Floor
Los Angeles, CA 90071
Telephone: 213.443.4300
Facsimile: 213.443.4299

JYOTI MITTAL, Bar No. 288084
jmittal@littler.com
LITTLER MENDELSON, P.C.
2049 Century Park East
5th Floor
Los Angeles, CA 90067
Telephone: 310.553.0308
Fax No.: 310.553.5583

Attorneys for Defendant
STARBUCKS CORPORATION D/B/A
STARBUCKS COFFEE COMPANY (erroneously
named as STARBUCKS CORPORATION and
STARBUCKS COFFEE COMPANY as separate
entities)

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN BRISCOE,<br><br>                  Plaintiff,<br><br>v.<br><br>STARBUCKS COFFEE COMPANY;<br>and DOES 1-20; Inclusive,<br><br>                  Defendants. | Case No. 2:17-cv-04832-JAK (JPRx)<br><br>ASSIGNED TO HON. JOHN A. KRONSTADT<br><br>**DEFENDANT STARBUCKS CORPORATION'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>Date:        July 16, 2018<br>Time:        8:30 a.m.<br>Courtroom:  10B<br><br>Complaint Filed: August 9, 2016 (Los Angeles County Superior Court)<br>Trial Date: None Set |

**TO PLAINTIFF KEVIN BRISCOE AND HIS ATTORNEYS OF RECORD:**

Defendant Starbucks Corporation ("Starbucks") respectfully requests that pursuant to Federal Rule of Evidence 201(d), this Court take judicial notice of the following documents in support of Starbucks' in Support of its Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment:

1. A print-out of Starbucks' Mission Statement found on its website (https://www.starbucks.com/about-us/company-information/mission-statement. A true and correct copy of the Mission Statement is attached hereto as Exhibit A.

Starbucks contends judicial notice of its Mission Statement, and the facts contained therein, is proper pursuant to Federal Rule of Evidence 201(b), which allows the Court to take notice of adjudicative facts that are not subject to reasonable dispute because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b)(2); *see also United States v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980) (court may take judicial notice of facts "not subject to reasonable dispute in that [they are] . . . capable of accurate and ready determination by sources whose accuracy cannot reasonably be questioned"). Courts may take judicial notice of information published on websites. *See Wible v. Aetna Life Ins. Co.*, 375 F. Supp. 2d 956, 965 (C.D. Cal. 2005) (granting request for judicial notice of pages from the website www.amazon.com, and a page from the website of the American Academy of Allergy Asthma & Immunology); *County of Santa Clara v. Astra USA, Inc.*, 401 F. Supp. 2d 1022, 1024 (N.D. Cal. 2005) (granting request for judicial notice of information posted on a Department of Health and Human Services website).

2. The Complaint filed on August 20, 2010, in *Briscoe v. DPMS, Inc. et al*, Case No. C 10-02532, filed in the County of Contra Costa. A true and correct copy of the Complaint is attached hereto as Exhibit B.

Starbucks contends that judicial notice of the *DPMS, Inc.* Complaint, and the facts contained therein, is proper because the Court may properly take judicial notice

LITTLER MENDELSON, P.C.
633 West 5th Street
63rd Floor
Los Angeles, CA 90071
213.443.4300

1   of court records and pleadings, and other facts not subject to reasonable dispute and

2   which are either "generally known" in the community or "capable of accurate and

3   ready determination by reference to sources whose accuracy cannot be reasonably

4   questioned." *See* Federal Rules of Evidence Rule 201(b).

5

6   Dated:   May 21, 2018

7

8                           */s/ Jyoti Mittal*

                               TANJA L. DARROW

9                         JYOTI MITTAL

                           LITTLER MENDELSON, P.C.

10                      Attorneys for Defendant

                        STARBUCKS CORPORATION d/b/a

11                    Starbucks Coffee Company

                      (erroneously named as STARBUCKS

12                    CORPORATION and Starbucks Coffee

                    Company as separate entities)

13

   Firmwide:154825948.1 055187.1066

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    about BDM.  Sorry.

2              MR. PITTMAN:  A promotion, period, was my

3    last question.

4        Q    Ever give him anything that would constitute

5    feedback relative to actions you'd undertaken to

6    assist him in gaining a promotion?

7        A    I -- I would imagine I have, yeah.

8        Q    Okay.  As you sit here today, can you

9    identify any document of any type that constitutes

10   feedback that you've given Mr. Briscoe relative to his

11   pursuit of a promotional opportunity within Starbucks?

12             MS. DARROW:  Compound and vague.

13             You can answer.

14             THE WITNESS:  I'm not sure.  I -- I can

15   think of a couple different opportunities there have

16   been for Kevin, and I can't say for sure whether

17   there's any document issued.

18   BY MR. PITTMAN:

19       Q    Did you ever give him any document that

20   constitutes feedback from your efforts to support him

21   in seeking a promotion?

22       A    Not that I can think of.

23       Q    As part of your promotional process back in

24   2011 through 2015, there was a procedure for interview

25   and feedback.  Is that true?

1          MS. DARROW:  Vague and lacks foundation.

2          THE WITNESS:  Yeah.  I can't say that I

3  would know what the hiring protocol would be for any

4  of the other roles, because I wouldn't have been the

5  hiring manager.

6  BY MR. PITTMAN:

7     Q     Well, you were involved, you said, in

8  assisting some Caucasians in pursuit of promotion;

9  correct?

10         MS. DARROW:  Objection.  Misstates her

11  testimony.

12         THE WITNESS:  I was involved in supporting

13  my partners --

14  BY MR. PITTMAN:

15    Q     Okay.

16    A     -- in exploring things within the company.

17    Q     Your partners were district managers,

18  weren't they, ma'am?

19    A     Yes, but that wasn't your question.

20    Q     Okay.  Your partners -- you were involved in

21  assisting some Caucasian district managers in pursuing

22  promotions; correct?

23         MS. DARROW:  Objection.  Misstates her

24  testimony.

25         THE WITNESS:  Yes.

1   STATE OF CALIFORNIA      )
                             )
2   COUNTY OF LOS ANGELES  )

3

4           I, Angela M. Albarez, CSR 4344, Certified

5   Shorthand Reporter, do hereby certify:

6           That prior to being examined, the witness

7   named in the foregoing deposition was by me duly

8   sworn;

9           That said deposition was taken down by me in

10  shorthand at the time and place therein named and

11  thereafter transcribed under my direction;

12          I further certify that I am neither counsel

13  for, nor related to, any party to said proceedings,

14  not in any way interested in the outcome thereof.

15          I declare under penalty of perjury under the

16  law of the State of California that the foregoing is

17  true and correct.

18

19  Dated: April 3, 2018

20

21

22  _____

    Angela M. Albarez

23  CSR No. 4344, CSR, RPR

24

25

# EXHIBIT C

**Littler Mendelson, PC**
633 West 5th Street
63rd Floor
Los Angeles, CA  90071

April 4, 2018

Jyoti Mittal
213.443.4224 direct
213.443.4300 main
213.947.1651 fax
jmittal@littler.com

**VIA EMAIL (OFFICE@APITTMAN-LAW.COM)**
**CONFIRMED VIA OVERNIGHT MAIL**

Alvin L. Pittman
Law Offices of Alvin L. Pittman
9841 Airport Boulevard, Suite 412
Los Angeles, CA 90045

Re:    Briscoe v. Starbucks

Dear Mr. Pittman:

Please be advised that Starbucks Corporation ("Defendant") intends to file a Motion for Summary Judgment, or Partial Summary Judgment, in the above-referenced matter, pursuant to Federal Rule of Civil Procedure 56.  This letter shall serve as Defendant's attempt to meet and confer with Plaintiff Kevin Briscoe ("Plaintiff") under Central District Local Rule 7-3 concerning its anticipated motion.

In this regard, Plaintiff asserts the following alleged claims for relief against Defendant: (1) Employment Discrimination [RACE] (Gov. Code § 12940 et seq.); (2) Retaliation for Opposition to Unlawful Discrimination (Gov. Code § 12940 et seq.); and (3) Constructive Wrongful Termination in Violation of Public Policy (Unfair Competition).

As set forth below, Defendant seeks summary judgment as to each and every one of these alleged claims, on the grounds that there is no genuine dispute of material fact and that Defendant is entitled to judgment as a matter of law.

    1.    Plaintiff complains the following actions constituted race discrimination: (1) he was denied the position of Business Development Manager in the Branded Solutions Department and he was not granted an interview for the 2015 posting of Business Development Manager in the Branded Solutions Department; (2) the conduct of Angela Rivers towards him and eventual issuance of the PIP in June 6, 2015 was motivated by discriminatory animus; and (3) Briscoe was "forc[ed]" to quit his employment with Starbucks.  Plaintiff's claim fails, however, because Plaintiff cannot articulate a *prima facie* case of discrimination.  Plaintiff cannot show that (1) he was subjected to an adverse employment action; (2) he was damaged; and (3) the circumstances surrounding the adverse employment action suggest discrimination. *Mixon v. Fair Employment and Housing Com.* 192 Cal. App. 3rd 1306, 1318 (1987); *see also Guz v. Bechtel National, Inc.*, 24 Cal. 4th 317, 355 (2000).  First, denial of the Business Development Manager Position is not an adverse employment action.  Second, Plaintiff has

Alvin Pittman
April 4, 2018
Page 2

nothing but his own abject speculation that that Rivers' coaching sessions, and the PIP were discriminatory, which is woefully insufficient to establish a triable issue of fact.  *See, e.g.*, *King v. United Parcel Svc.*, 152 Cal. App. 4th 426, 433-34 (2007).

Furthermore, the facts establish Defendant's decision to provide Plaintiff coaching and put him on a PIP were based upon legitimate, non-discriminatory reasons – Plaintiff exhibited endemic performance deficiencies including complaints from Licensee Partners.  *See Guz*, 24 Cal. 4th at 355-56.

Finally, Plaintiff does not have evidence that Defendant's reasons were pretextual.  To survive summary judgment, Plaintiff "must produce 'specific, substantial evidence of pretext.'"  *Wallis v. J.R. Simplot Co.*, 26 F. 3d 885, 890 (9th Cir. 1994).  Plaintiff is unable to meet this burden.

      2.     Plaintiff's second cause of action for retaliation fails as a matter of law.  To establish a *prima facie* case of retaliation, Plaintiff must show (1) he engaged in a "protected activity," (2) Starbucks subjected him to an adverse employment action, and (3) a causal link existed between the protected activity and Starbucks' action.  *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal. 4th 1028, 1042.  Once an employee establishes a *prima facie* case, the employer is required to offer a legitimate, non-retaliatory reason for the adverse employment action.  *Id.* If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation "drops out of the picture," and the burden shifts back to the employee to prove intentional retaliation.  *Id.*

Here, Briscoe had not experienced any perceivable adverse employment action other than the PIP – which was warranted (and not actually reinstated at the time of his resignation).  Additionally, while Plaintiff complained he had concerns about Rivers' management style in December 2014, he did not complain that she was discriminating against him – and he ignores that he had been coached for the same performance deficiencies for years when the coaching was escalated in 2014 and 2015.  Furthermore, as articulated above, Defendant had a legitimate reason for coaching Plaintiff and placing him on a PIP.  Finally, Plaintiff ignores he *resigned* for a higher paying job.  Thus, this claim necessarily fails.

      3.     In his third cause of action, Plaintiff contends he was constructively wrongfully terminated in violation of public policy.  However, Plaintiff's wrongful termination claim also fails because it is premised entirely on his underlying FEHA claims, which themselves fail, as explained above.  *See TRW Inc. v. Super. Ct. (Ma)*, 25 Cal. App. 4th 1834 (1994).  Accordingly, Plaintiff's claim for wrongful termination should be dismissed along with his other purported claims.

      4.     Finally, even if he could somehow prevail on any of his substantive claims, which he cannot, Plaintiff would be unable to recover punitive damages in this case.  Rather, California Civil Code section 3294 would only permit the potential imposition of punitive damages if Plaintiff can prove, with clear and convincing evidence, that (1) an officer, director

Alvin Pittman
April 4, 2018
Page 3

of managing agent of Defendant acted with oppression, fraud or malice or that (2) an officer, director or managing agent of Defendant had advance knowledge of the unfitness of an employee who engaged in such conduct, or that (3) an officer, director or managing agent authorized or ratified such conduct.  Here, Plaintiff is completely unable to demonstrate that Defendant engaged in any conduct involving oppression, fraud or malice—let alone that any such alleged misconduct was on the part of an officer, director or managing agent of Defendant.  Specifically, Plaintiff's supervisor, Angela Rivers, was not an officer or director and was not a managing agent because she did not have a position with the requisite discretionary authority over corporate policies to qualify her as a corporate officer and director.  Thus, punitive damages are not recoverable in this case as a matter of law.

For these reasons, we request that Plaintiff immediately dismiss his claims in this case and/or stipulate to the entry of judgment in Defendant's favor.  If, however, Plaintiff will not voluntarily dismiss this case immediately, pursuant to Local Rule 7-3, we seek to engage you in a conference to discuss Defendant's anticipated summary judgment motion and Plaintiff's response.

After you have received and reviewed this letter, please email me to arrange a time in the very near future for us to engage in an in-person meeting in our Century City office to discuss this matter further.  In particular, I am available on **April 5, and April 6, 2018**.

Sincerely,

Jyoti Mittal

JM

Firmwide:153841244.1 055187.1066

# EXHIBIT D



Littler Mendelson, PC
633 West 5th Street
63rd Floor
Los Angeles, CA 90071

Jyoti Mittal
213.443.4224 direct
213.443.4300 main
213.947.1651 fax
jmittal@littler.com

April 17, 2018

**VIA EMAIL (OFFICE@APITTMAN-LAW.COM)**
**CONFIRMED VIA OVERNIGHT MAIL**

Alvin L. Pittman
Law Offices of Alvin L. Pittman
9841 Airport Boulevard, Suite 412
Los Angeles, CA 90045

Re:     Briscoe v. Starbucks

Dear Mr. Pittman:

As stated in my correspondence dated April 4, 2018, Starbucks Corporation ("Defendant") intends to file a Motion for Summary Judgment, or Partial Summary Judgment, in the above-referenced matter, pursuant to Federal Rule of Civil Procedure 56. This correspondence constitutes Defendant's second attempt to meet and confer with you pursuant to Local Rule 7-3, *as you failed to respond to my April 4 letter*.

As previously indicated, Defendant seeks summary judgment as to each and every one of Plaintiff Kevin Briscoe's ("Plaintiff") alleged claims, on the grounds that there is no genuine dispute of material fact and that Defendant is entitled to judgment as a matter of law. For the reasons outlined in my April 4 meet and confer letter, we request that Plaintiff immediately dismiss his claims in this case and/or stipulate to the entry of judgment in Defendant's favor. If, however, Plaintiff will not voluntarily dismiss this case immediately, pursuant to Local Rule 7-3, we seek to engage you in a conference to discuss Defendant's anticipated summary judgment motion and Plaintiff's response.

At this point, you have already failed to meet and confer with us in the ten-day time period prescribed by Local Rule 7-3 (April 14, 2018). In an effort to avoid unnecessary motion practice, kindly advise us by no later than **5:00 p.m.** on **Thursday, April 19, 2018** whether or not Plaintiff will comply with the above request.

littler.com

Alvin Pittman
April 17, 2018
Page 2

After you have received and reviewed this letter, please email me to arrange a time in the very near future for us to engage in an in-person meeting to discuss this matter further.   In particular, I am available on **April 25, 2018**, before or after Ms. Rogers' deposition.

Sincerely,

Jyoti Mittal

JM

Firmwide:154084148.1 055187.1066

FedEx.

Shipping    Tracking    Printing Services    Locations    Support



WZ AVXA

TRK#
[291]  7720 2239 5424

WED - 18 APR 10:30A
PRIORITY OVERNIGHT

90045
CA-US    LAX

TO  ALVIN L. PITTMAN, ESQ.
LAW OFFICES OF ALVIN L. PITTMAN
9841 AIRPORT BLVD., SUITE 412

LOS ANGELES CA 90045
(310) 337-3077
REF 0561B 1086
DEPT

ORIGIN ID:CBA   (310) 553-0308
LITTLER MENDELSON, P.C.
2049 CENTURY PARK EAST,, 5TH FLOOR

LOS ANGELES, CA 90067
UNITED STATES US

BILL SENDER

SHIP DATE 17APR18
ACTWGT 0.00 LB
CAD: 101316685/NET3960

552J1/9132/DCA5

**After printing this label:**
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning:** Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.
Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other items of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

**OUR COMPANY**

About FedEx
Our Portfolio
Investor Relations
Careers

FedEx Blog
Corporate Responsibility
Newsroom
Contact Us

**MORE FROM FEDEX**

FedEx Compatible
Developer Resource Center
FedEx Cross Border

**LANGUAGE**

Change Country

English

**FOLLOW FEDEX**

© FedEx 1995-2018

Feedback    |    Site Map    |    Terms of Use    |    Security & Privacy

REQUEST FOR JUDICIAL NOTICE

1   TANJA L. DARROW, Bar No. 175502
    tdarrow@littler.com
2   LITTLER MENDELSON, P.C.
    633 West 5th Street
3   63rd Floor
    Los Angeles, CA  90071
4   Telephone:  213.443.4300
    Facsimile:  213.443.4299
5
    JYOTI MITTAL, Bar No. 288084
6   jmittal@littler.com
    LITTLER MENDELSON, P.C.
7   2049 Century Park East
    5th Floor
8   Los Angeles, CA  90067
    Telephone:  310.553.0308
9   Fax No.:    310.553.5583

10  Attorneys for Defendant
    STARBUCKS CORPORATION D/B/A
11  STARBUCKS COFFEE COMPANY (erroneously
    named as STARBUCKS CORPORATION and
12  STARBUCKS COFFEE COMPANY as separate
    entities)
13

14                  UNITED STATES DISTRICT COURT

15                  CENTRAL DISTRICT OF CALIFORNIA

16  KEVIN BRISCOE,                    Case No.  2:17-cv-04832-JAK (JPRx)

17              Plaintiff,            ASSIGNED TO HON. JOHN A.
                                      KRONSTADT
18  v.
                                      **DEFENDANT STARBUCKS**
19  STARBUCKS COFFEE COMPANY;         **CORPORATION'S REQUEST FOR**
    and DOES 1-20; Inclusive,         **JUDICIAL NOTICE IN SUPPORT**
20                                    **OF ITS MOTION FOR SUMMARY**
                                      **JUDGMENT OR, IN THE**
21              Defendants.           **ALTERNATIVE, PARTIAL**
                                      **SUMMARY JUDGMENT**
22

23
                                      Date:        July 16, 2018
24                                    Time:        8:30 a.m.
                                      Courtroom:   10B
25
                                      Complaint Filed:  August 9, 2016 (Los
26                                    Angeles County Superior Court)
                                      Trial Date: None Set
27

28

LITTLER MENDELSON, P.C.
633 West 5th Street
63rd Floor
Los Angeles, CA  90071
213.443.4300

**TO PLAINTIFF KEVIN BRISCOE AND HIS ATTORNEYS OF RECORD:**

Defendant Starbucks Corporation ("Starbucks") respectfully requests that pursuant to Federal Rule of Evidence 201(d), this Court take judicial notice of the following documents in support of Starbucks' in Support of its Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment:

1.     A print-out of Starbucks' Mission Statement found on its website (https://www.starbucks.com/about-us/company-information/mission-statement. A true and correct copy of the Mission Statement is attached hereto as Exhibit A.

Starbucks contends judicial notice of its Mission Statement, and the facts contained therein, is proper pursuant to Federal Rule of Evidence 201(b), which allows the Court to take notice of adjudicative facts that are not subject to reasonable dispute because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b)(2); *see also United States v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980) (court may take judicial notice of facts "not subject to reasonable dispute in that [they are] . . . capable of accurate and ready determination by sources whose accuracy cannot reasonably be questioned"). Courts may take judicial notice of information published on websites. *See Wible v. Aetna Life Ins. Co.*, 375 F. Supp. 2d 956, 965 (C.D. Cal. 2005) (granting request for judicial notice of pages from the website www.amazon.com, and a page from the website of the American Academy of Allergy Asthma & Immunology); *County of Santa Clara v. Astra USA, Inc.*, 401 F. Supp. 2d 1022, 1024 (N.D. Cal. 2005) (granting request for judicial notice of information posted on a Department of Health and Human Services website).

2.     The Complaint filed on August 20, 2010, in *Briscoe v. DPMS, Inc. et al*, Case No. C 10-02532, filed in the County of Contra Costa.  A true and correct copy of the Complaint is attached hereto as Exhibit B.

Starbucks contends that judicial notice of the *DPMS, Inc.* Complaint, and the facts contained therein, is proper because the Court may properly take judicial notice

of court records and pleadings, and other facts not subject to reasonable dispute and which are either "generally known" in the community or "capable of accurate and ready determination by reference to sources whose accuracy cannot be reasonably questioned." *See* Federal Rules of Evidence Rule 201(b).

Dated:   May 21, 2018

/s/ Jyoti Mittal
TANJA L. DARROW
JYOTI MITTAL
LITTLER MENDELSON, P.C.
Attorneys for Defendant
STARBUCKS CORPORATION d/b/a
Starbucks Coffee Company
(erroneously named as STARBUCKS
CORPORATION and Starbucks Coffee
Company as separate entities)

Firmwide:154825948.1 055187.1066

# EXHIBIT A

## OUR MISSION

*To inspire and nurture the human spirit – one person, one cup and one neighborhood at a time.*

## OUR VALUES

With our partners, our coffee and our customers at our core, we live these values:

Creating a culture of warmth and belonging, where everyone is welcome.

Acting with courage, challenging the status quo and finding new ways to grow our company and each other.

Being present, connecting with transparency, dignity and respect.

Delivering our very best in all we do, holding ourselves accountable for results.

We are performance driven, through the lens of humanity.

About Us  .  Our Company  .  Our Starbucks Mission Statement

# EXHIBIT B

1   LAW OFFICES OF ALVIN L. PITTMAN
    Alvin L. Pittman, Esq. (SBN. 127009)
2   5933 West Century Blvd., Suite 230
    Los Angeles, CA 90045
3   Telephone:  (310) 337-3077
    Facsimile:  (310) 337-3080
4

5   Attorneys for Plaintiff
    Kevin Briscoe
6

**FILED**

2010 AUG 20  P 12: 05

K TORRE CLERK OF THE SUPERIOR COURT
COUNTY OF CONTRA COSTA CALIF.

BY _____ DEPUTY CLERK

7              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

8                **FOR THE COUNTY OF CONTRA COSTA**

9

10  KEVIN BRISCOE,                          ) Case No.  **C  10 - 02532**
                                            )
11              Plaintiff,                  )
                                            )
12      vs.                                 ) **COMPLAINT FOR DAMAGES AND**
                                            ) **DEMAND FOR JURY TRIAL FOR:**
13                                          )
    DPMS, INC., dba DPMSC, Inc; KOOL        )
14  SMILES II, INC; AND DOES 1 THROUGH      ) 1. EMPLOYMENT DISCRIMINATION
    20, INCLUSIVE.                          ) [RACE] (GOV. CODE § 12940 ET SEQ.);
15                                          )
                                            ) 2. EMPLOYMENT DISCRIMINATION
16              Defendants.                 ) [RELIGION] (GOV. CODE § 12940 ET
                                            ) SEQ.);
17                                          )
                                            ) 3. RETALIATION FOR OPPOSITION TO
18                                          ) DISCRIMINATION AND HARASSMENT
                                            ) (GOV. CODE §12940, ET SEQ.);
19
                                              4.  WRONGFUL DISCHARGE IN
20                                            VIOLATION OF PUBLIC POLICY);

21
                          PER LOCAL RULE 5 THIS
22                        CASE IS ASSIGNED TO        SUMMONS ISSUED
                          DEPT _____
23

24      1.      Plaintiff, KEVIN BRISCOE, (hereinafter referred to as "BRISCOE" or

25  "PLAINTIFF"), for his Complaint against Defendants, DPMS, INC., dba DPMSC and KOOL

26  SMILES II, Inc., (hereinafter referred to as "DEFENDANTS", charges that he is a former

27  employee of Defendants, and has suffered severe and continuing injury, including severe

28
                                          1
                   **COMPLAINT  & DEMAND FOR JURY TRIAL**

economic and non-economic injuries as a result of unlawful and wrongful conduct engaged in by the Defendants, individually and/or corporately.  Consequently, in this action, Plaintiff seeks an award of economic, non-economic and punitive damages, as well as an award of reasonable attorney's fees.

2.    Each of the fictitious Defendants Does 1 through 20, inclusive, are sued pursuant to Code of Civil Procedure Section 474, because Plaintiff does not know their names and/or capacities at this time.  Plaintiff will seek leave of the court to amend this complaint when the true names and capacities of the Defendants designated herein as "Does" have been ascertained.

3.    Each Defendant is sued as a joint-tortfeasor, aider-and-abetter, co-conspirator, officer, and/or agent of every other Defendant, acting within the course and scope of such status, relationship, conspiracy and/or agency unless otherwise specified.  Reference made in this complaint to "Defendants, and each of them," shall be deemed to mean the acts of all Defendants acting jointly and/or severally and/or as joint-tortfeasors and aiders-and-abettors and/or co-conspirators acting in furtherance of a targeted goal unless otherwise stated.

4.    At all times material to this action:

(a)    Plaintiff Kevin Briscoe was and is, at all times relevant to this action, a resident of the County of Contra Costa, State of California;

(b)    Upon information and belief, Defendant, DPMS, INC., dba DPMSC, INC., (hereinafter, "DPMS" or "Defendant"), and  was at all times material to this action, a business entity located within the County of Contra Costa, State of California;

2

**COMPLAINT  & DEMAND FOR JURY TRIAL**

(c)     Upon information and belief, Defendant, KOOL SMILES II, INC., (hereinafter, "Kool Smiles" or "Defendant"), and  was at all times material to this action, a business entity located within the County of Contra Costa, State of California;

## INTRODUCTORY PARAGRAPHS

5.      Upon information and belief, Kool Smiles I, Inc., and Defendants Kool Smiles II, Inc., are dental offices located throughout the United States engaged in the practice of General Dentistry for kids, which targets poor African American and poor Hispanic populations across America.

6.      Because the kids serviced by Defendants are considered underserved and underprivileged, the primary source of payment for Defendants' services is governmental funding (state and federal).

7.      Upon information and belief, Plaintiff was hired by Defendants, DPMS, Inc., and Kool Smiles II, Inc., on or about August 22, 2007, as Director of Go Team and Training.

8.      In this position (Director of Go Team and Training) Plaintiff was responsible for staffing, opening and managing dental offices including hiring, training and "on-boarding" Office Managers, Dental Assistants and Customer Relations Specialists for all of Defendants' dental offices.

9.      Around July of 2008, Plaintiff became Senior Director of Operations, a promotion that made him responsible for overseeing Texas and Mississippi dental operations of Defendants.

10.     Plaintiff's hire and promotion were primarily the actions of Gary Theard, an African American then employed by Defendants as Senior Vice-President of Operations and Brian Bouma, CEO (Caucasian).

11.     In his position as Senior Director of Operations, Plaintiff was responsible for set-

3

**COMPLAINT  & DEMAND FOR JURY TRIAL**

1  up, staffing, management of all of Defendants' operations, including training, development and

2  implementation of training materials, and the set-up and opening of KS2 "Go Team" offices in the

3  states of Texas and Mississippi.

4       12.    Around August of 2007, Plaintiff began opening, staffing and managing dental

5  offices with the assistance of two of Defendants' employees, Samantha Sharon and Tanya Depew

6  in Longview, Texas.

7       13.    Plaintiff began to encounter racially derogatory comments by dentists in both the

8

9  Longview, Texas office.

10      14.    Plaintiff reported the anti-black racial comments made by Texas dentists to

11  Defendants' Vice President of Human Resources (John Puterbaugh, Caucasian) and to Dale

12  Mayfield, Defendants' Chief Dentist (Caucasian).

13      15.    Office Manager, Tricia Harty, who was also made aware of hostile racial comments

14  made to and about Blacks and Plaintiff, sent John Puterbaugh a number of e-mails reporting the

15  racially hostile comments and work environment caused by personnel in the Longview, Texas

16  office.

17      16.    The hostile racial comments by dentists were ongoing and were complained of by

18  Plaintiff and reported to Puterbaugh ongoing from late August 2007.

19

20      17.    Defendants took no actions responsive to the complaints and reports of racist

21  comments directed toward Blacks and Plaintiff.  In fact, Puterbaugh informed Gary Theard that no

22  action would be taken relative to Plaintiff's complaints about racial hostility in the Texas office

23  because of the financial impact it would have on the business of the company

24      18.    On June 14, 2008, Sue Jerezec was interviewed by Gary Theard, Brian Bouma and

25  John Puterbaugh.  After Jerezec's interview, neither Bouma nor Peterbaugh were keen on hiring

26  Jerezec.  However, Theard decided to hire Jerezec as Manager of the Go Team.  She would later

27

28

4

**COMPLAINT  &  DEMAND FOR JURY TRIAL**

1   assume the role of Operations Services, a position that did not require any field experience, of

2   which Jerezec had none.

3        19.     Following the start of Plaintiff's complaints about racial hostility in the southern

4   offices, Puterbaugh started commenting to Theard "we like Sue" (Sue Jerezec).

5        20.     In September, 2008, Defendants, through Steve Savage, Vice President of

6   Operations & Vice President of Development, claimed that Plaintiff was "not suited to develop

7   and create the future culture of the Company", stripped Plaintiff of the Texas market and assigned

8   it to Sue Jerezec (Caucasian) whom Defendants hired June of 08 and (In September, 08) promoted

9   to Senior Director of Operations.

10        21.     Plaintiff was better qualified than Sue Jerezec for "field operations"

11        22.     In August, 2008, Theard took an administrative leave of absence, leaving Plaintiff

12   the sole African American ("Black") in Defendants' executive/managerial ranks.

13        23.     Due to Theard's absence (Plaintiff's immediate supervisor/report) CEO Bouma

14   Plaintiff and subordinates of Theard report directly to him.

15        24.     Under CEO Bouma, and because of Theard's absence and Plaintiff's request for

16   additional duties and responsibilities, Plaintiff was assigned responsibility for overseeing the day-

17   to-day operations for all of the Company's dental offices in Arizona, Texas, Mississippi and

18   Baltimore (all totaling about 21 offices).

19        25.     In Theard's absence, Jerezec remained responsible for overseeing the "Go Team"

20   openings of new locations and Operation Services in San Ramon.

21        26.     Plaintiff's job performance before and after Theard's was excellent, and continued

22   to be excellent throughout his tenure with Defendants.

23        27.     After about two months of Theard's absence, Steve Savage (Co-Founder and Vice-

24   President of Development for Kool Smiles 1) transferred from Kool Smiles 1 to Kool Smiles 2.

28.     In October Plaintiff met with Savage and reported on his assigned tasks preparatory to a DASH Meeting scheduled for September 10, 2008, all of which were completed (Vital Few and Most Important Tasks).  The DASH meeting is a quarterly meeting where the employees of Kool Smiles I and Kool Smiles II meet to discuss the corporate business.   During DASH Meetings, Department Heads are required to report to David Lowe (managing Partner) of FFL, Kool Smiles' parent company.

29.     On September 10, 2008, the DASH Meeting was held in Atlanta Georgia and Savage, Plaintiff and other executive and management staff attended from Kool Smiles.

30.     Plaintiff was the sole African American at this meeting of about seventy-five attendees.

31.     Savage reported on behalf of Kool Smiles 2 but, when the meeting concluded, and others were congratulating him on his report, he (Savage) rudely ignored Plaintiff's efforts to commend him on his report.

32.     In Plaintiff's presence, Savage told Chairman of the Board Doug Brown that he had to go out to San Ramon the following week (where Plaintiff was located) to "take care of this situation."

33.     In response to Brown's inquiry, Savage gestured toward Plaintiff, prompting Brown to turn and make eye contact with Plaintiff.

34.     Having completely ignored Plaintiff at this meeting, as Brown departed, Savage went over to Sue Jerezec briefly conversed with her before departing.

35.     On September 17, 2008, Savage approached Plaintiff at the San Ramon office and told him "I am going to make Sue the Sr. Director of Operations over Texas"

36.     In response to Plaintiff's question, "why", Savage said "well, the company is still young and we have the opportunity to build its culture, so I am going to move you to oversee

6
**COMPLAINT  & DEMAND FOR JURY TRIAL**

Arizona, Washington and Las Cruces" (territory consisting of 8 dental offices).  Savage told Plaintiff that while there was no problem with his performance, he (Savage) "wanted to build the culture with Sue"

37.  Savage told Plaintiff that while there was no problem, he wanted " . . . to build the culture in Texas with Sue."

38.  The Arizona, Washington and Las Cruces offices were known to be the worst performing and lowest priority offices in the Company at the time they were assigned to Plaintiff.  Plaintiff also indicated to Savage, that he did not understand why he was making the changes relative to his job duties and responsibilities.  Plaintiff reminded Savage that he was an excellent performer and remained committed to the Company.  Plaintiff also reminded Savage that he (Savage) had not even met with him to discuss his performance or any other issue pertaining to his department with him.  To which Savage replied, "it doesn't matter, I have made my decision. Either you are in or out.

39.  Later on September 17, 2008, Plaintiff met with Jerezec, Savage and Puterbaugh (all Caucasian) to interview Area Office Mangers (AOM), but Plaintiff was essentially denied opportunity to participate in the interview process.  In fact, Savage directed Plaintiff to turn over all his work other training materials Plaintiff had researched and gathered concerning the AOM candidates.

40.  Following the interview meeting, Savage announced that Jerezec would lead the training of AOM, a task normally performed by Plaintiff, and ordered Plaintiff to turn over the training material (created by Plaintiff) to Jerezec.

41.  During the week of September 29, 2008, Plaintiff met with Jerezec and Samantha Sharon (Caucasian) to interview for Area Clinical Trainer position(s), and again Plaintiff was shut out from participation in fashion similar to the September 11, interviews for AOM.

7

**COMPLAINT  & DEMAND FOR JURY TRIAL**

42.     In announcing Jerezec's assignment to oversee Texas, Savage announced that she would oversee the "Go Team" Office Openings, all training, operations services and clinical for Texas, and that she would have Sharon, Tonya Depew and Malorie Roland (staff that had reported to Plaintiff) reporting to her.

43.     In October, 2008, Savage had staff schedule 3 days of training in El Paso, Texas (October 6-8), using training materials created almost exclusively by Plaintiff.

44.     The October 2008, El Paso training meeting (using material developed by Plaintiff) was attended by the Company's top leadership (Savage, Bouma and Doug Brown, Co-Founder and Chairman) and Plaintiff, but Plaintiff was excluded from participation.

45.     Plaintiff's absence from participation in the training presentations reflected negatively on him in the face of Bouma and Brown and Savage concealed the fact that he excluded Plaintiff from participation.

46.     Plaintiff's absence from participation in the training was widely notice and inquired about by a number of AOM's and Area Clinical Trainers (ACTs), in addition to the Company's CEO and its Chairman, causing Plaintiff tremendous embarrassment as he was unable to explain why he had been barred from participation.

47.     On October 14, Plaintiff led Kool Smiles 2's successful roll out work plan for Commercial Insurance at a leadership conference with a number of corporate leaders present (of which only Plaintiff was African American).

48.     Training for the new commercial insurance rollout was planned for the first week of December 2008 and Plaintiff attempted, but was refused by Savage, to help with the training plan and implementation.

49.     Ongoing from October 2008, Savage denied Plaintiff the opportunity to participate in the formation of agendas for Senior Business Conference Calls with all Area Business Leaders ("ABL"), held once every two weeks, while allowing Jerezec to make the agendas.

50.     Ongoing from October, 2008 Savage assigned Jerezec to be the contact person for any ABL who had issues, again excluding Plaintiff.

51.     At a meeting with Plaintiff, Savage, Jerezec and Samantha Sharon in March of 2009, Savage, having had Plaintiff prepare and had a roll out for commercial insurance business, telling Plaintiff he would be responsible for the commercial insurance business, required Plaintiff to turn over his work (which had been successfully compiled and presented in October, 2008) over to Jerezec, again further isolating Plaintiff.

52.     Plaintiff objected to what he felt was discriminatory mistreatment, but Savage warned that he was a co-founder of the Company and that he would direct what was going to happen with the Company.

53.     In December, 2008, again an important conference call was conducted between and among the leadership Operations teams and again, Plaintiff was disallowed to participate in the planning or presentation while Savage, Puterbaugh and Jerezec (all White/Caucasians) participated.

54.     During late April of 2009, at a meeting in Dallas, Texas, Savage again harassed and embarrassed Plaintiff when, in the presence of a number of Office Managers and Puterbaugh, Plaintiff answered "no" to the question of whether he was married, and Savage said, "No he is not married; he doesn't have a wife; he uses a magazine."

55.     Puterbaugh, Vice-President of Human Resources said and did nothing responsive to Savage's outrageous comment in his and Office Managers' presence, while some of the Office managers expressed empathy to Plaintiff because of Savages' comment.

9
**COMPLAINT  & DEMAND FOR JURY TRIAL**

56.     At some point as Savage was functionally demoting Plaintiff while promoting and supporting Jerezec, Plaintiff told an African-American doctor in Texas that he felt that Savage was discriminating against him and trying to force him out.  This expressed view by Plaintiff somehow was shared with Savage.

57.     At an April 2009 meeting between Plaintiff, Savage and Justine Wildhaber, Savage initiated a conversation about the females in the office in Plaintiff's presence, assigning them a ranking based on looks, and saying that "Mariam was the hottest in the office," "Shaheen would be the best girl to show you the best time", making Plaintiff very uncomfortable.

58.     In April, 2009, after the interview process closed and the panel had selected a candidate to fill the Office Manager position in Phoenix Arizona, Savage told Plaintiff that the Chairman's son wanted to interview for the position and essentially ordered Plaintiff to re-open the interview process.

59.     As ordered, Plaintiff with Human Resource Representative Mariam Lodestein, and Mary Machado, interviewed Chris Brown, the Chairman's son, and forwarded the panel's notes (which were not favorable regarding Chris Brown) to Savage.

60.     In April, 2009, Plaintiff complained to Savage that he felt that Savage's treatment of him was unfair, discriminatory and seemed aimed at forcing him (Plaintiff) out, Savage did not disagree but angrily said, "well maybe we need to re-evaluate things."

61.     On April 29, 2009, in Dallas, the finalist selected by the interview panel for the Phoenix Office Manager position was presented by Plaintiff for interview by Savage, Puterbaugh, but Savage literally fell asleep during the interview and Puterbaugh walked out without completing the interview and did not return.

62.     In or around May of 2009, Savage rejected Plaintiff's request for a bonus for the Office Manger in his Spokane, Washington office and then, when the Office Manager tendered her

1    resignation, Savage granted her the bonus and falsely told the Office Manager that Plaintiff was

2    responsible for the denial of her bonus and for delay in making available the Area Business Leader

3    (ABL) position that she desired.

4           63.    On May 20, 2009, Savage asked Plaintiff if he told the African American female

5    doctor in Texas he felt that he was being pushed out, guarded and discriminated against, and

6    Plaintiff confirmed that he had made this report and reconfirmed that these remained his feelings.

7

8           64.    In April 2009, Plaintiff complained to Dale Mayfield (Caucasian) and (Black

9    Female) Diane Earl that Savage was subjecting him (Plaintiff) to discriminatory treatment, and

10   they (or least one of them) told Savage what Plaintiff said.

11          65.    In May of 2009, Savage initiated the topic of religion into a conversation with

12   Plaintiff, asking Plaintiff his religious beliefs and, upon learning that Plaintiff was of the

13   Pentecostal faith, told Plaintiff, "I am a practicing Mormon as are Dr. Mayfield and Doug Brown."

14   Savage then told Plaintiff that Dr. Mayfield used to be a church Bishop in the Mormon church that

15

16   he and Brown attended, and that "the Mormon's beliefs is the way to go" because he did not

17   understand how people could believe in all those other religions.

18          66.    One of the well-known tenants of Mormonism is that Black or people of African-

19   American decent are unfit to be leaders.

20          67.    On May 22, 2009, falsely claiming Plaintiff sexually harassed employees as a

21

22   pretext, Defendants, through Puterbaugh, terminated Plaintiff.

23          68.    Plaintiff exhausted his administrative remedies by filing a Charge of

24   Discrimination against all Defendants with the Department of Fair Employment and

25   Housing.  Plaintiff received a Notice of Case Closure from the Department of Fair

26   Employment and Housing on August 26, 2009.

27

28

                                           11
                        **COMPLAINT  & DEMAND FOR JURY TRIAL**

**FIRST COUNT**: RACE DISCRIMINATION AGAINST DEFENDANTS AND DOES 1 THROUGH 20, INCLUSIVE.

69.     The allegations of Paragraphs 1 through 68 of the Introductory Paragraphs are incorporated by reference.

70.     Defendants, acting through its officers, managing agents, partners and/or agents acting on behalf of Defendants Kool Smiles, discriminated against Plaintiff in part because of his race in violation of the California Government Code § 12940, et seq (the Fair Employment and Housing Act).

71.     Defendants, acting through its officers, managing agents, partners and/or agents by the acts set forth above (including suspension and termination of Plaintiff's employment), discriminated against Plaintiff in part because of his race.

72.     By these actions, Defendants unlawfully discriminated against Plaintiff in violation of Government Code Section 12940 and caused Plaintiff economic losses and physical and mental injuries for which Plaintiff seeks recovery of damages.

73.     As a direct and proximate result of Defendants' actions, jointly and severally, Plaintiff has been severely injured and harmed economically, emotionally and mentally. Thus, Plaintiff seeks economic and non-economic damages according to proof at trial, together with prejudgment interest pursuant to Civil Code Section 3287, 3288 and/or 3291.

74.     Plaintiff has incurred attorneys' fees in the prosecution of this action and, is entitled to an award of reasonable attorney's fees pursuant to Government Code Section 12965(b).

Wherefore, Plaintiff prays for judgment as set forth below.

**COMPLAINT  &  DEMAND FOR JURY TRIAL**

**SECOND COUNT**: RELIGIOUS DISCRIMINATION AGAINST
DEFENDANTS AND DOES 1 THROUGH 20, INCLUSIVE.

75.     The allegations of Paragraphs 1 through 68 of the Introductory Paragraphs are
incorporated by reference.

76.     Defendants, acting through its officers, managing agents, partners and/or agents
acting on behalf of Defendants Kool Smiles (specifically the acts of Savage), discriminated against
Plaintiff in part because of his religious beliefs in violation of the California Government Code §
12940, et seq (the Fair Employment and Housing Act).

77.     Defendants, acting through its officers, managing agents, partners and/or agents by
the acts set forth above (including suspension and termination of Plaintiff's employment),
discriminated against Plaintiff in part because of his religious beliefs.

78.     By these actions, Defendants unlawfully discriminated against Plaintiff in violation
of Government Code Section 12940 and caused Plaintiff economic losses and physical and mental
injuries for which Plaintiff seeks recovery of damages.

79.     As a direct and proximate result of Defendants' actions, jointly and
severally, Plaintiff has been severely injured and harmed economically, emotionally and mentally.
Thus, Plaintiff seeks economic and non-economic damages according to proof at trial, together
with prejudgment interest pursuant to Civil Code Section 3287, 3288 and/or 3291.

80.     Plaintiff has incurred attorneys' fees in the prosecution of this action and, is entitled
to an award of reasonable attorney's fees pursuant to Government Code Section 12965(b).

Wherefore, Plaintiff prays for judgment as set forth below.

**THIRD COUNT**: RETALIATION FOR OPPOSITION TO DISCRIMINATION
AGAINST DEFENDANTS AND DOES
1 THROUGH 20, INCLUSIVE.

81.     The allegations of Paragraphs 1 through 68 of the Introductory Paragraphs are incorporated by reference.

82.     That the Fair Employment and Housing Act and California Law prohibit retaliation against employees for exercising their employment rights guaranteed under the Fair Employment and Housing Act.

83.     That the Defendants did willfully retaliate against Plaintiff by terminating his employment in part because he complained of and/or opposed race and/or religious discrimination under the Fair employment and Housing Act.

84.     As a direct and proximate result of the aforesaid acts of Defendants by and through its agents and/or employees, and each of them (specifically the acts of Savage and Puterbaugh), Plaintiff has suffered a loss of earnings and has experienced substantial mental and emotional distress. Plaintiff thus seeks an award of economic and non-economic damages for such emotional distress against Defendants in an amount sufficient to fully compensate Plaintiff.

85.     The aforesaid acts of Defendants were inherently oppressive, outrageous and despicable, and said acts evidence conscious disregard of Plaintiff's employment rights.  Thus, Plaintiff seeks the award of punitive damages against Defendants to punish Defendants and to deter them from engaging in such conduct in the future.

86.     Plaintiff has incurred attorneys' fees in the prosecution of this action and is entitled to an award of reasonable, allowable attorney's fees herein

Wherefore, Plaintiff prays for judgment as set forth below.

**COMPLAINT  & DEMAND FOR JURY TRIAL**

**FOURTH COUNT:** WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY AGAINST AND DOES 1 THROUGH 20, INCLUSIVE.

87.   The allegations of Paragraphs 1 through 68 of the Introductory Paragraphs, Paragraphs 69 through 74 of the First Count, Paragraphs 75 through 80 of the Second Count and Paragraphs 81 through 86 of the Third Count are incorporated herein by reference.

88.   That the Fair Employment and Housing Act and California Constitution embodies public policy in the State of California, and guarantees protection against discrimination and harassment on the basis of age and race, as well as protection against retaliation for opposition to discrimination and harassment.

89.   That the Defendants did willfully violate the public policy of California, by intentionally and maliciously terminating Plaintiff's employment because of his age, race and because of his opposition to age and race discrimination and harassment.

90.   As a direct and proximate result of the aforesaid acts of Defendants by and through their agents and/or employees, and each of them, Plaintiff has suffered a loss of earnings and has experienced substantial mental and emotional distress. Plaintiff thus seeks an award of economic and non-economic damages for such emotional distress against such Defendants in an amount sufficient to fully compensate Plaintiff.

91.   The aforesaid acts of Defendants were inherently oppressive, outrageous and despicable, and said acts evidence conscious disregard of Plaintiff's employment rights.  Thus, Plaintiff seeks the award of punitive damages against Defendants to punish and to deter it from engaging in such conduct in the future.

92.   Plaintiff has incurred attorneys' fees in the prosecution of this action and is entitled to an award of reasonable, allowable attorney's fees herein

Wherefore, Plaintiff prays for judgment as set forth below.

15

**COMPLAINT  & DEMAND FOR JURY TRIAL**

**WHEREFORE,** Plaintiff prays for judgment against Defendants as follows:

1.      For economic damages, if any, based upon proof at time of trial;

2.      For non-economic damages in compensation for Plaintiff's severe emotional distress that Defendants' actions substantially and/or proximately cause, in such amount as shall be established by proof at the time of trial;

3.      For punitive damages against Defendants in an amount sufficient to punish Defendants and/or to deter Defendants from engaging in such conduct in the future.

4.      For costs of suit, including attorney's fees pursuant to California Government Code Section 12965(b);

5.      For prejudgment interest; and

6.      For such other relief that this court shall deem proper.

Dated: 8/19/10

LAW OFFICES OF ALVIN L. PITTMAN

By:

ALVIN L. PITTMAN, ESQ.
Attorneys for Plaintiff
Kevin Briscoe

**COMPLAINT  & DEMAND FOR JURY TRIAL**

## REQUEST FOR JURY TRIAL

Plaintiff hereby requests a trial by jury in the above-captioned matter.

Dated: _8/19/10_

LAW OFFICES OF ALVIN L. PITTMAN

By: _____

      ALVIN L. PITTMAN, ESQ.
      Attorneys for Plaintiff
      Kevin Briscoe

17

**COMPLAINT & DEMAND FOR JURY TRIAL**