1  LAW OFFICES OF ALVIN L. PITTMAN
2  Alvin L. Pittman, Esq. (SBN. 127009)
   Email:office@apittman-law.com
3  5901 W. Century Boulevard, Suite 412
   Los Angeles, CA  90045
4  Telephone:  (310) 337-3077
   Facsimile:   (310) 337-308O
5

6
7  Attorneys for Plaintiff
   KEVIN BRISCOE
8

9

10                 UNITED STATES DISTRICT COURT
11               CENTRAL DISTRICT OF CALIFORNIA
12

13  KEVIN BRISCOE,                    Case No.  2:17-cv-04832-JAK (JPRx)

14          Plaintiff,                ASSIGNED TO HON. JOHN A.
                                      KRONSTADT
15  v.
                                      **PLAINTIFF'S STATEMENT OF**
16  STARBUCKS COFFEE COMPANY;         **GENUINE DISPUTES OF**
    and DOES 1-20; Inclusive,         **MATERIAL FACT AND**
17                                    **CONCLUSIONS OF LAW IN**
            Defendants.               **OPPOSITION TO MOTION FOR**
18                                    **SUMMARY JUDGMENT OR, IN**
                                      **THE ALTERNATIVE, PARTIAL**
19                                    **SUMMARY JUDGMENT**

20                                    Date:        July 17, 2018
                                      Time:        8:30 a.m.
21                                    Courtroom:  10B

22                                    [Filed concurrently with Memorandum of
                                      Law in Opp. To Deft's MSJ; Decls. of
23                                    Alvin Pittman and Kevin Briscoe; Pltff's
                                      Statement of Additional Material Facts]
24
                                      Complaint Filed:  August 9, 2016 (Los
25                                    Angeles County Superior Court)
                                      Trial Date: None Set
26

27

28          Plaintiff Kevin Briscoe ("Briscoe") hereby submits pursuant to Local Rule 56-

2, his Statements of Genuine Disputes of Material Fact and Conclusions of Law in opposition to Defendant Starbucks Corporation's Motion For Summary Judgment, Or, In The Alternative, Partial Summary Judgment.

## STATEMENT OF UNCONTROVERTED FACTS

### A.      RACE DISCRIMINATION

ISSUE NO. 1:      Plaintiff Kevin Briscoe's claim for race discrimination fails because he cannot state a *prima facie* case of discrimination as he cannot show a causal connection between his race and any adverse employment action.

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
| --- | --- |
| 1.      Similar to a franchise, Starbucks licenses its brand and products to Licensed Stores run by other companies (Licensees), including, but not limited to, Vons, Ralphs, Marriott, and Disney.<br><br>**DECLARATION OF ANGELA M. RIVERS ("RIVERS DECL.") ¶ 6.** | Undisputed |
| 2.      Licensees, sell Starbucks' products, and are responsible for managing their retail operations.<br><br>**RIVERS DECL. ¶ 6.** | Undisputed |
| 3.      In August 2011, Mr. Briscoe was interviewed and hired as a Licensed Store District Manager ("DM") by | Undisputed |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| Angela Rivers ("Rivers"), Regional Director.<br><br>**DECLARATION OF JYOTI MITTAL ("MITTAL DECL.") ¶ 3, EXHIBIT ("EX.") A[2] (DEPOSITION OF PLAINTIFF KEVIN BRISCOE ("PLF'S DEP."), 63:21-64:10); RIVERS DECL. ¶ 4.** | |
| 4.     Rivers was Mr. Briscoe's direct supervisor during his entire employment at Starbucks.<br><br>**RIVERS DECL. ¶ 4.** | Undisputed |
| 5.     Mr. Briscoe was one of three African American DMs on Rivers' 12-person team, including Leah Bernard.<br><br>**RIVERS DECL. ¶ 4; PLF.'S DEP., 67:21-24, 148:18-149:3.** | Undisputed |
| 6.     While employed by Starbucks, Mr. Briscoe was familiar with its policies against discrimination and retaliation as well as Starbucks' open | Undisputed |

---

[2] All further excerpts from Mr. Briscoe's deposition are attached as Exhibit A to the Declaration of Jyoti Mittal.

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| door policy outlining procedures for reporting violations of company policies.<br><br>**PLF.'S DEP., 118:8-123:2, EX. 2; 129:25-130:3; 131:12-132:6, EX. 3; 132:7-25 EX. 4; 137:21-141:23, EX. 6; 271:4-6.** | |
| 7.   As a DM, Mr. Briscoe was responsible for leading an assigned group of Licensed Store management teams within his district.<br><br>**RIVERS DECL. ¶ 6, EX. A.** | Undisputed |
| 8.   As a DM Mr. Briscoe was responsible for assessing the overall operation of Licensed Stores, including ensuring Licensed Store compliance with Starbucks Experience standards.<br><br>**RIVERS DECL. ¶ 6, EX. A.** | Undisputed |
| 9.   Communication skills are crucial to the DM position because District Managers regularly interface with Starbucks' Licensees and their employees. | Undisputed |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
| --- | --- |
| **RIVERS DECL. ¶ 6, EX. A.** | |
| 10.    Paramount to Starbucks' business model is communication with its partners, Licensees, and patrons.<br><br>**RIVERS     DECL.     ¶     6; DECLARATION    OF    SARAH ROGERS ("ROGERS DECL.") ¶ 5, EX. A.;  <u>PLF.'S  DEP.,  139:12-140:7, EX. 14.</u>** | Undisputed |
| 11.    Plaintiff    acknowledged    that communication was vital and important at Starbucks.<br><br><u>**PLF.'S DEP., 88:3-11.**</u> | Undisputed |
| 12.    On April 27, 2014, Mr. Briscoe applied for a Business Development Manager ("BDM") position in the Branded Solutions Department.<br><br>**RIVERS DECL. ¶ 9, EX. D.** | Undisputed |
| 13.    Prior to Mr. Briscoe's interview for the BDM position, Rivers notified Frank Sica ("Sica") and John Warmke ("Warmke"),    Branded    Solutions | Undisputed |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| managers, regarding Mr. Briscoe's candidacy.<br><br>**RIVERS DECL. ¶ 9, EX. D; DECLARATION OF JOHN WARMKE ("WARMKE DECL.") ¶ 4.** | |
| 14. Mr. Briscoe interviewed with Kelly White ("White"), Senior Recruiter.<br><br>**WARMKE DECL. ¶ 6, EX. A.** | Undisputed |
| 15. On May 27, 2014, White emailed her notes about Mr. Briscoe and Mr. Briscoe's resume to Warmke.<br><br>**WARMKE DECL. ¶ 6, EXS. A AND B.** | Undisputed |
| 16. In her May 27, 2014, email to Warmke regarding Mr. Briscoe, Under the heading "Opportunities/Areas to probe further", White asked Warmke to "probe further on how this role fits into Kevin's overall career path. His background is heavy in operations and he has not held a traditional sales role in | Undisputed |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| his past." <br><br> **WARMKE DECL. ¶ 6, EX. A.** | |
| 17.   On   June   3,   2014,   Warmke telephonically interviewed Mr. Briscoe for the BDM position. <br><br> **WARMKE DECL. ¶ 7; <u>PLF.'S DEP., 253:10-16</u>.** | Undisputed |
| 18.   Warmke's took detailed notes of his interview of Mr. Briscoe <br><br><br> **WARMKE DECL. ¶ 7, EX. C.** | Objection:  the notes are redacted relative to the most important information relating to this fact.  Thus, Hearsay and Best Evidence Objections are valid. |
| 19.   Under the heading "Development Areas" in Warmke's notes regarding his interview with Mr. Briscoe, Warmke identifies the following items: <br> • "Strategic   approach   to   market, segment, account [sic] <br> ○ I was  looking  for  candidates that   could   provide   more insight   and   sales   and/or development examples which may be a function of a lack of | **Disputed** as to the author of the notes for the reasons set out in No 18, above.  Otherwise, Plaintiff responds that the content of the note is correctly restated, thus: **Undisputed.** |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| strategic selling experiences []<br><br>o You have a very good background but was [sic] much more centered on the operational approach of execution selling as an operator. This is a good quality, but the stronger candidates were able to demonstrate success through much more strategic influence and experience, such as market research, targeting top decision makers and influencers, focus on strategic questioning that drove alignment to customer needs from a strategic or organizational level that creating mutual partnership or joint business planning initiatives.<br><br>o Kevin's experience is that he is working within an existing account structure, usually franchise model of operations | |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| and maintaining margin and cost. | |

- o The successes and sharing as it relates to selling, relationship management, and business development were centered on an operational approach or execution of telling the customer what they needed to be successful from the eyes of the operator. Here's the menu, the POS, the space needed, etc.

- o He didn't speak to strategic sales and development approach and instead took a more operational approach to meeting costs and following an existing agreement model for sales.

  - ▪ Other candidates have been able to demonstrate success through market research, targeting top decision makers and

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| influencers, focus on strategic questioning that drove alignment to customer needs from a strategic or organizational level that creating mutual partnership or joint business planning initiatives.<br>• Listening to understand needs, focus on being concise.<br>  ○ There was a need to re-state several questions to re-focus Kevin's responses.  He is very enthusiastic and wants to share his story, but several questions were focused on specifics.<br>    ■ After asked further questions, the response often centered back on putting costs together, telling customer how it will work, specs, etc. and aligning on what they are willing to | |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| spend." <br><br> **Warmke Decl. ¶ 7, Ex. C.** | |
| 20.     On June 4, 2014, Mr. Briscoe also telephonically met with Frank Sica, Mr. Warmke's supervisor, to discuss the BDM position. <br><br><br><br><br><br><br> **WARMKE DECL. ¶ 8, EX. D; PLF.'S DEP. 252:25-253:9.** | Undisputed that Plaintiff had a very short telephone call with Sica, but, as Sica stated"…**this was not an interview from my perspective...**" **Sica also stated:** "John, I know you will share your complete feedback on Kevin with Angie…" <br><br> **Defendant's Exhibit D** |
| 21.     Mr. Briscoe was not offered the BDM position. <br><br><br> **WARMKE DECL. ¶ 9; RIVERS DECL. ¶ 10.** | Undisputed, but it is also important that Briscoe was not given Feedback. |
| 22.     At Starbucks, it is customary for the managers of internal candidates to receive feedback from interviewers so that the managers can assist the partner's development <br><br><br><br><br><br><br> **WARMKE,  DECL.  ¶  7,  RIVERS** | **Undisputed,** but Defendant had a mandatory Post Interview Feedback Procedure that was to be followed within 24 hours of the interview, which was not followed relative to Plaintiff's pursuit of promotion: <br> a. that an Interviewer complete a Post-Interview "Feedback Form", see Plaintiff's Exhibit - 36, and <br> b. that the Interviewee be provided with |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| **DECL. ¶ 10.** | the Feedback. |
| 23.   Warmke provided his feedback to Mr. Briscoe's manager, Rivers.<br><br><br><br><br><br><br><br><br><br><br><br>**WARMKE   DECL.   ¶   7,   EX.   C; RIVERS DECL. ¶ 10.** | Disputed.<br>Post Interview Feedback Procedure that was to be followed within 24 hours of the interview, which was not followed relative to Plaintiff's pursuit of promotion:<br>a. that an Interviewer complete a Post-Interview "Feedback Form", see Plaintiff's Exhibit - 36, and<br>b. that the Interviewee be provided with the Feedback.<br>Plaintiff was never provided with any Feedback. |
| 24.   On June 4, 2014, Sica emailed Rivers a summary of his conversation with Mr. Briscoe.<br><br><br>**WARMKE   DECL.   ¶   8,   EX.   D; RIVERS DECL. ¶ 10.** | Undisputed but Irrelevant as it was not an Interview.<br>**Defendant's Exhibit D** |
| 25.   In his   June   4,   2014,   email regarding Mr. Briscoe , Sica notes: "Kevin spoke for a majority of the 30 minutes and I found him to be . . . very operationally focused . . . . Although this was not an interview from my perspective | Undisputed, that this is an excerpt from Sica's email of June 4.<br>**Defendant's Exhibit D** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| (naturally Kevin treated it as an interview), his descriptions and examples of a majority of his diverse career work experiences were operationally focused. During our brief connect, he did not articulate any sales and/or development examples which may be a function of a lack of strategic selling experiences or not enough time to dive deep." <br><br> **WARMKE DECL.¶ 8, EX. D.** | |
| 26.    Prior to Mr. Briscoe's interview with Mr. Warmke for the BDM position they had met. <br><br> **WARMKE DECL. ¶ 5.** | **Undisputed, but Immaterial**, because any such "meeting" was in an incidental group setting and with non-specific purposes. |
| 27.    Warmke found Mr. Briscoe to be professional. <br><br> **WARMKE DECL. ¶ 5.** | Undisputed |
| 28.    Mr. Briscoe acknowledges that he has no reason to believe Warmke had a reason to dislike him. <br><br> **PLF.'S DEP., 253:10-19; 254:2-4.** | Undisputed |
| 29.    The role of BDM was developed | Undisputed |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| and went into effect in approximately late 2013, early 2013.<br><br>**WARMKE DECL. ¶ 3.** | |
| 30.    Warmke has hired an African American as a BDM in the past.<br><br>**WARMKE DECL. ¶ 3.** | Undisputed |
| 31.    Mr. Briscoe acknowledges that he has no reason to believe Frank Sica had a reason to dislike him.<br><br>**PLF.'S DEP., 253:24-254:1.** | Undisputed |
| 32.    In November 8, 2014, Mr. Briscoe applied for another BDM position, but was not interviewed.<br><br>**ROGERS DECL. ¶ 21.** | Undisputed |
| 33.    Warmke was not aware of Mr. Briscoe's November 8, 2014, application for the other BDM position. | Disputed<br>Warmke was the hiring manager for the BDM position when Plaintiff applied on-line on November 8, 2014.  Relative to Plaintiff's application, the "status " is noted as "Starbucks Not Interested", with the only Starbuck employee identified being "Hiring Manager John Warmke". |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| **WARMKE DECL. ¶ 9.** | The Internal Recruiter could never make that decision without the Hiring manager. Exhibit – 8; AMF #1051 |
| 34.    Rivers was not provided any details regarding any subsequent applications Mr. Briscoe made for other Starbucks positions. **RIVERS DECL. ¶ 11.** | Disputed Plaintiff personally told Rivers (and Rogers) that he had applied, and Rivers appeared upset, and told Plaintiff, "well I didn't know that you were going to do that." AMF 928 and 929 |
| 35.    Until this lawsuit, Rivers did not actually know whether he applied for other positions at Starbucks **RIVERS DECL. ¶ 11.** | Disputed Plaintiff personally told Rivers that he had applied, and she appeared upset, and told Plaintiff, "well I didn't know that you were going to do that." AMF 928 and 929 |
| 36.    Rivers had had no involvement in the hiring process for the Branded Solutions Department. **RIVERS DECL. ¶ 10.** | Undisputed but **this fact accentuates Rivers' lack of support and assistance to Plaintiff,** as noted in ADF #912 |
| 37.    Mr. Briscoe received District Manager Training at the beginning of his employment with Starbucks. | Undisputed |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 7.** | |
| 38.   When Mr. Briscoe completed his training, his District Manager Coach provided Rivers with a District Manager Assessment Guide. | Undisputed |
| **RIVERS DECL. ¶ 7.** | |
| 39.   In   the   District   Manager Assessment Guide, Mr. Briscoe's Coach identified the following areas for Mr. Briscoe to improve on: (1) attention to detail; (2) interpersonal style issues that resulted in ineffective communication with   others   (i.e.,   he   was   vocally loud during several meetings); (3) the perception that he was focused on his own   agenda;   and,   (4)   making   bad decisions (tardiness to three shifts of in-store training, late to one DM visit in District   Manager   Training,   and cancelling   a   visit   during   District Manager Training | **Undisputed in part** to the extent that it states excerpts from Defendant's Exhibit – B; **Disputed** to the extent that it ignores the fact that Coach Matt Scruggs made observations which note that Plaintiff was an effective communicator, stating, in part: "Kevin has demonstrated ability to successfully communicate a clear and concise message both written and verbally…He clearly has demonstrated the interpersonal skill set, understanding of motivational needs of his audience, and the charismatic ability to be successful …" **Defendant's Exhibit B** Further, |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 7, EX. B.** | Plaintiff's 2013 first year evaluation contradicts the claims made in Nos.1, 2, 3 and 4. **Exhibits 5 and 6** **Rivers**, as **Regional Director** over Plaintiff evaluated Plaintiff as an effective and successful communicator and leader, and she assigned him to important **Lead District Manager** Assignments to allow his work products and assistance to be used by other District Managers in Rivers' Region. **Exhibits- 5 and 6** Rivers also noted that, "[Plaintiff] has built and maintained relationships with CO DMs [Company Operations District Managers], RDs [Regional Directors] and SMs [Store Managers] this year and has become a requested partner in CO meetings." **Exhibits- 5 and 6** |
| 40.   For   the   2012   review   period, Rivers   rated   Mr.   Briscoe   "Above Expectations"   and   identified   the following   opportunities   for improvement: "[d]o more work around | Disputed to the extent that there is no component section for "improvement". The evaluation notes that Plaintiff was an effective and successful communicator, leader, and she assigned him to Lead |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| adjusting for his audience – tends to talk like he thinks and repeats himself rather than just adjusts; [p]eers sometimes wonder if he's listening; [s]hould continue to build strong and valuable 1st team relationships."<br><br><br><br>**RIVERS DECL. ¶ 8, EX. C; <u>PLF.'S DEP., 263:18-265:6, EX. 11</u>.** | District Manager Assignments which uses his work product and assistance for other District Managers in Rivers' Region.<br>**Exhibit- 5**<br>Rivers also noted that, "[Plaintiff] has built and maintained relationships with CO DMs [Company Operations District Managers], RDs [Regional Directors] and SMs [Store Managers] this year and has become a requested partner in CO meetings."<br>**Exhibit- 5** |
| 41.   Mr. Briscoe Acknowledges that he does not disagree with anything Rivers put in his evaluation for the 2012 review period.<br><br>**<u>PLF.'S DEP., 265: 3-6</u>.** | Undisputed |
| 42.   For the 2013 review period, Rivers rated Mr. Briscoe "Meets Expectations" and identified the following performance improvement opportunities:<br>Continued *focus on listening* for understanding rather than listening to | Disputed,<br>The evaluation does not contain a section for "Performance Improvement Opportunities, as suggested by this fact. Further, "opportunities" as used in the Form, are neither performance deficiencies or criticisms.  This same |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| respond. *Ensure you both understand and are understood*. *Communication is key to success*. Elevate store level issues where conflict or misunderstanding occurs. *Ensure all relevant facts are shared* and a clear picture is painted of problems without rounds of follow up questions required to fully understand situation. *Take time to ask questions to ensure understanding on all sides*. This will minimize opportunity to have integrity questioned. *Focus on team commitments* and execute in manner agreed to (or influence commitment). Once aligned execute in accord with agreement.<br><br><br><br>**RIVERS DECL. ¶ 8, EX. D; <u>PLF.'S DEP., 265:7-266:10, EX. 12</u>.** | Performance Appraisal noted a number of important accomplishments and significant assignments made to Plaintiff, recognizing his excellence.<br>The assignment as District Manager to Defendant's **"model operations"** and its highest revenue generators (**LAX and USC), was a positive statement about Plaintiff's performance.**<br>**AMF # 875-877; 881-891; 1048 and 1049**<br>Plaintiff performed successfully as District Manager over Rivers' Region's most productive and prestigious locations.<br>**AMF # 875-877; 881-891; 1048 and 1049**<br>LAX **and** USC, both managed by Plaintiff, were the two most complex and highest revenue generating locations in Rivers' entire Region of Licensed Stores.<br>**AMF # 875-877; 881-891** |
| 43.   Mr. Briscoe Acknowledges that he does not disagree with anything Rivers put in his evaluation for the 2013 review period. | Undisputed |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| **PLF.'S DEP., 266: 8-10.** | |
| 44. On May 16, 2014, Rivers received a complaint about Mr. Briscoe from LAX Marriott. | Disputed<br><br>After Plaintiff visited and cited Marriott for Non-compliance (infractions for which there had been recurring citations at the operation),  Hoenecke called Plaintiff saying that Marriott's Manager responsible Marriott for the Starbucks Licensee had called him with complaints about Plaintiff, Plaintiff  immediately telephoned Rivers and reported that the Licensee called Hoenecke complaining because Marriott was out of product when Plaintiff visited and Plaintiff intended to cite Marriott for Non-compliance (reflecting unfavorably on the Marriott Manager).<br><br>AMF #  975-978<br><br>Rivers told Plaintiff that he handled the matter properly.<br><br>AMF #978<br><br>A District Manager for a Licensed Store had duties to protect the Starbucks Brand |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| | which he did by working with the Licensee cooperatively, but, when necessary, having to cite the Licensee for Non-Compliance, a dynamic which sometimes put the LSDM at odd with the Licensee and him/its on-site manager, and gave on-site managers (who were employees of the Licensee and not of Starbucks) motivation to complain about the LSDM.<br><br>**AMF # 963-978** |
| **RIVERS DECL. ¶ 13.** | |
| 45.   LAX   Marriott   complained   to Rivers about an incident wherein a hotel guest  complained  to  the  front  desk having witnessed Mr. Briscoe yell at a LAX    Marriott's    Licensed    Store Manager, and make her cry. | Disputed<br><br>After Plaintiff visited and cited Marriott for Non-compliance (infractions for which there had been recurring citations at the operation),  Hoenecke called Plaintiff saying that Marriott's Manager responsible Marriott for the Starbucks Licensee had called him with complaints about Plaintiff, Plaintiff  immediately telephoned Rivers and reported that the Licensee called Hoenecke complaining because Marriott was out of product |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| | when Plaintiff visited and Plaintiff intended to cite Marriott for Non-compliance (reflecting unfavorably on the Marriott Manager). **AMF #  975-978** Rivers told Plaintiff that he handled the matter properly. **AMF #978** A District Manager for a Licensed Store had duties to protect the Starbucks Brand which he did by working with the Licensee cooperatively, but, when necessary, having to cite the Licensee for Non-Compliance, a dynamic which sometimes put the LSDM at odd with the Licensee and him/its on-site manager, and gave on-site managers (who were employees of the Licensee and not of Starbucks) motivation to complain about the LSDM. **AMF # 963-978** |
| **RIVERS DECL. ¶ 13.** | |
| 46.   LAX   Marriot   complained   to Rivers   that   when   it   discussed   the | Disputed After Plaintiff visited and cited Marriott |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| incident with Mr. Briscoe, he refused to take responsibility, apologize, or acknowledge that he did anything wrong. | for Non-compliance (infractions for which there had been recurring citations at the operation),  Hoenecke called Plaintiff saying that Marriott's Manager responsible Marriott for the Starbucks Licensee had called him with complaints about Plaintiff, Plaintiff  immediately telephoned Rivers and reported that the Licensee called Hoenecke complaining because Marriott was out of product when Plaintiff visited and Plaintiff intended to cite Marriott for Non-compliance (reflecting unfavorably on the Marriott Manager).  **AMF #  975-978**  Rivers told Plaintiff that he handled the matter properly.  **AMF #978**  A District Manager for a Licensed Store had duties to protect the Starbucks Brand which he did by working with the Licensee cooperatively, but, when necessary, having to cite the Licensee for Non-Compliance, a dynamic which sometimes put the LSDM at odd with the Licensee and him/its on-site manager, |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| | and gave on-site managers (who were employees of the Licensee and not of Starbucks) motivation to complain about the LSDM. |
| **RIVERS DECL. ¶ 13.** | **AMF # 963-978** |
| 47.    Mr. Briscoe did not disclose LAX Marriott incident to Rivers even though she regularly interacted with him after the incident. | Disputed<br>After Plaintiff visited and cited Marriott for Non-compliance (infractions for which there had been recurring citations at the operation),  Hoenecke called Plaintiff saying that Marriott's Manager responsible Marriott for the Starbucks Licensee had called him with complaints about Plaintiff, Plaintiff  immediately telephoned Rivers and reported that the Licensee called Hoenecke complaining because Marriott was out of product when Plaintiff visited and Plaintiff intended to cite Marriott for Non-compliance (reflecting unfavorably on the Marriott Manager).<br>**AMF #  975-978**<br>Rivers told Plaintiff that he handled the matter properly.<br>**AMF #978**<br>A District Manager for a Licensed Store |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 13; <u>PLF.'S DEP., 160:24-162:11</u>.** | had duties to protect the Starbucks Brand which he did by working with the Licensee cooperatively, but, when necessary, having to cite the Licensee for Non-Compliance, a dynamic which sometimes put the LSDM at odd with the Licensee and him/its on-site manager, and gave on-site managers (who were employees of the Licensee and not of Starbucks) motivation to complain about the LSDM. **AMF # 963-978** |
| 48.   At the demand of Starbucks' third-party client, Rivers removed Mr. Briscoe from the LAX Marriott account. | Undisputed, but Defendant knew that Plaintiff did nothing wrong, as Rivers had stated to Plaintiff, and Defendant's high level management later learned that the Marriott manager later boasted that he did not like District Managers and joke of how he got rid of Plaintiff at the LAX Marriott (essentially for doing his job) **AMF #978 and 980** Rivers and Defendant owed the LSDM the duty to support and assist them including providing reasonable review, investigation and analysis of complaints |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| **Rivers Decl. ¶ 13; Warmke Decl. ¶ 10, Ex. E.** | in light of the dynamics for conflicts given the LSDM's need to cite Licensees for non-compliance and the motivation that could give for false or misleading claims and complaints. **AMF # 983** |
| 49.    On February 23, 2015, Licensee Ralphs complained to Rivers that Mr. Briscoe was "not consistent with what he [was] telling the kiosk managers." | Undisputed but, Rivers and Defendant owed the LSDM the duty to support and assist them including providing reasonable review, investigation and analysis of complaints in light of the dynamics for conflicts given the LSDM's need to cite Licensees for non-compliance and the motivation that could give for false or misleading claims and complaints. **AMF # 983, AMF # 963-978** Plaintiff's criticisms by the Licensee's manager grew out of Plaintiff properly and correctly performing his duties and notifying the Licensee's manager know that he (Plaintiff) would have to issue citations for Non-compliance if the Licensee continued with staffing shortages because it adversely impacted |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| **Rivers Decl. ¶ 15, Ex. F; Rogers Decl. ¶ 15.** | customer service to Starbucks' customers and harmed the Starbucks Brand.<br>**AMF # 984-986** |
| 50.   On   March   2,   2015,   Rivers provided   Mr.   Briscoe   feedback regarding the Ralphs complaint.<br><br>**RIVERS DECL. ¶ 15, EX. G.** | Undisputed, but the Ralphs situation is as set out in response to UF # 49, above. |
| 51.   On   March   11,   2015,   Vons complained to Rivers that it was forced to pay an employee to wait two hours for Mr. Briscoe who was late to a scheduled meeting.<br><br>**RIVERS   DECL.   ¶   16;   ROGERS DECL. ¶ 15.** | Undisputed, but Plaintiff did nothing wrong.  Plaintiff was abruptly caused to change his schedule to make for a new store opening at Residence Inn, about which he timely and promptly notified Rivers, and she agreed.<br><br>AMF # 987, 994-995 |
| 52.   Ms. Rivers coached Mr. Briscoe about his lack of communication with respect to this incident<br><br>**RIVERS DECL. ¶ 16, EX. H.** | Undisputed |
| 53.   On May 6, 2015, Licensee Vons complained   to   Rivers   that   Vons employees felt harassed by Mr. Briscoe because he sent multiple texts to hourly Licensee   employees   about   buying | Disputed<br>Plaintiff properly discharged his duties ensure that the Licensee was properly stocked with Starbucks products (Coffee, in this instance); there was no undue |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| coffee.<br><br>**RIVERS DECL. ¶ 19, EXS. J-L.** | pressure or "bullying", and Starbucks had no policy preventing LSDMs from texting Licensee managers (or responsible persons) in fulfillment of their duties.  Plaintiff simply used the management tools provided by Defendant for monitoring product purchases by Licensees to predict their needs and ensure product was always on hand.<br>AMF 987-999 |
| 54.    It is against Starbucks policy to text third-party Licensee employees on their personal cellular phones.<br><br>**RIVERS DECL. ¶ 19.** | Disputed<br>Plaintiff properly discharged his duties ensure that the Licensee was properly stocked with Starbucks products (Coffee, in this instance); there was no undue pressure or "bullying", and Starbucks had no policy preventing LSDMs from texting Licensee managers (or responsible persons) in fulfillment of their duties.  Plaintiff simply used the management tools provided by Defendant for monitoring product purchases by Licensees to predict their needs and ensure product was always on hand. |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| | AMF 987-999 |
| 55.    On May 14, 2015, Rivers emailed Mr. Briscoe to coach him about the May 6th Vons complaint.<br><br>**RIVERS DECL. ¶ 19, EX. M.** | Undisputed, but,<br>Plaintiff properly discharged his duties ensure that the Licensee was properly stocked with Starbucks products (Coffee, in this instance); there was no undue pressure or "bullying", and Starbucks had no policy preventing LSDMs from texting Licensee managers (or responsible persons) in fulfillment of their duties.  Plaintiff simply used the management tools provided by Defendant for monitoring product purchases by Licensees to predict their needs and ensure product was always on hand.<br>AMF 987-999 |
| 56.    District Managers for Licensed Stores are responsible for certifying that baristas of new locations meet Starbucks' standards before the store is permitted to open.<br><br>**RIVERS DECL. ¶ 17.** | Undisputed. |
| 57.    If a store is not ready to open on a Licensee's preferred date it is the | Undisputed |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| District Manager's responsibility to escalate the issue to the Regional Manager.<br><br>**RIVERS DECL. ¶ 17.** | |
| 58.   Because Mr. Briscoe failed to follow Starbucks procedure, Starbucks had to close the new Residence Inn location in order to retrain the Licensee employee baristas.<br><br><br><br><br><br><br><br><br><br>**RIVERS DECL. ¶ 17, EX. I.** | Disputed<br>Plaintiff did not fail to follow any Starbucks procedure in training the Baristas.  The claim that "Starbucks had to close the new Residence Inn location in order to retrain the Licensee employee baristas" is a **lie, verified by Sindy Lomas, the on-site Licensee Manager, who wrote to Rivers and others noting that the additional training for baristas would be, "in addition to operating during normal business hours."**<br>Exhibit – 25;<br>AMF 1000-1006 |
| 59.   Mr. Briscoe refused to take responsibility for certifying the baristas. | Disputed<br>Plaintiff trained the baristas pursuant to Starbucks' policy and training procedure. Plaintiff did not fail to train the Baristas, causing them to performance inconsistent with expectations at |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 17.** | opening.  A combination of slower employees, nerves, novelty, a lot to learn, the transition from learning to application, the pressure of now, watchful eyes, and other factors, including the need for practice under live conditions. <br> AMF 1000-1006 |
| 60.   Mr.   Briscoe   believed   the deficiencies  with  the  baristas  existed because "the baristas that were there that day were handicapped baristas, meaning they had - - they were slower." <br><br> **PLF.'S DEP., 178:1-10.** | Disputed <br> Plaintiff was responsible for training the baristas, which he did in proper form pursuant to Starbucks' policy and training procedure. Plaintiff did not fail to train the Baristas, causing them to performance inconsistent with expectations at opening.  It was a combination of slower employees, nerves, novelty, a lot to learn, the transition from learning to application, the pressure of now, watchful eyes, and other factors, including the need for practice under live conditions. <br> AMF 1000-1006 |
| 61.    On July 23, 2014, Rivers coached Mr.    Briscoe    on    improving    his transparency and communication. | Disputed <br> Rivers harassed Plaintiff with this false and unsupportable claim. |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 22, EX. N .** | Plaintiff was a recognized Leader with excellent communication and people skills, and Defendant repeatedly tapped him for important leadership roles. AMF # 881-891; |
| 62.    On December 9, 2014, Rivers coached Mr. Briscoe regarding his tardiness to a meeting.  **RIVERS DECL. ¶ 22, EX. O.** | Disputed Rivers harassed Plaintiff with this false and unsupportable claim. Rivers' decision to make a late change in the meeting's scheduled start time created this situation. AMF # 930,954 |
| 63.    On February 11, 2015, Rivers coached Mr. Briscoe regarding his failure to notice whether exterior punch items were fixed at a Licensee location  **RIVERS DECL. ¶ 22, EX. P.** | Disputed Rivers harassed Plaintiff with this false and unsupportable claim. This relates to a "Construction issue for a new store under construction".  LSDM are Operational Employees whose duties, job descriptions and roles do not include managing or completing Construction Punch Lists at a Licensed Store. AMF # 1055 |
| 64.    On February 27, 2015, Mr. Briscoe provided Rivers improper sales for Terminal Two LAX locations during a period when the terminal was actually | Disputed Rivers harassed Plaintiff with this false and unsupportable claim. Defendant's Finance Department, for its |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| closed.<br><br>**RIVERS DECL. ¶ 22, EX. Q.** | own accounting purposes categorized a closed store as a remodel, resulting in an inaccurate reporting of revenues for a closed store at LAX.  It was Plaintiff who detected the accounting and questioned it, noting that the store, though closed, was budgeted for the entire year.<br>AMF # 1056 |
| 65.  On  April  21,  2015,  Rivers coached  Mr.  Briscoe  on  his communication with Licensees<br><br>**RIVERS DECL. ¶ 22, EX. R.** | Disputed,<br>Rivers harassed Plaintiff with this false and unsupportable claim.  Plaintiff's communication skills were outstanding and were recognized by Defendant as worthy of Leadership Roles, and Rivers had told Plaintiff that he handled the Marriott situation properly, just the way that Scruggs (a Caucasian LSDM had handled a similar situation.)<br> AMF # 883-894<br>Even in 2015, Rivers made false claims about Plaintiff, but Defendant continued to select Plaintiff for important Leadership roles because of his excellent communication and result orientation.<br>AMF # 934-943; 945-946. |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
| --- | --- |
| 66. On April 24, 2015, Rivers coached Mr. Briscoe regarding deficiencies at one of his stores.<br><br>**RIVERS DECL. ¶ 22, EX. S.** | Disputed<br><br>Rivers harassed Plaintiff with this false and unsupportable claim. Plaintiff's stores were not deficient. Rivers failed and refused to support Plaintiff when he did his job and cited Licensees for Non-Compliance, but she blamed Plaintiff if he did not cite them to enforce compliance. (Plaintiff couldn't do anything right in Rivers' eyes after he started to seek promotion for his recognized leadership performance.) AMF # 957-973; 975-1004 |
| 67. On May 14, 2015, Mr. Briscoe provided Ms. Rivers monthly reports for the wrong time period.<br><br>**RIVERS DECL. ¶ 22, EX. T.** | **Disputed**<br><br>Rivers harassed Plaintiff with this false and unsupportable claim. On a single occasion, Plaintiff handed Rivers one paper intending to give her another and Rivers abruptly ended her visit with Plaintiff. A couple of minutes after Rivers walked away from Plaintiff, he discovered that he gave Rivers the wrong page and sent her an email correcting it. Rivers refused to acknowledge Plaintiff's email, choosing instead to cite the incident as negative performance. This |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
|  | incident was not noteworthy for performance.  Rivers did not treat her Caucasian subordinates this way. AMF # 1040-1042; 896; 899 |
| 68.     On May 28, 2015, Rivers coached Mr. Briscoe regarding his failure to correspond with "key stakeholders." **RIVERS DECL. ¶ 22, EX. U.** | Disputed Rivers harassed Plaintiff with this false and unsupportable claim. Rivers' claim not genuine because Plaintiff knew and understood the Starbuck business, was a Business Leader and an effective communicator whom Defendant tapped for a number of leadership roles (before he started to seek Promotion and Promotional Opportunities) in recognition of his quality performance. AMF # 876-877; 883-894; |
| 69.     On June 5, 2015, Rivers coached Mr. Briscoe regarding errors he made in his sales sheet. **RIVERS DECL. ¶22, EX. V.** | Disputed Rivers harassed Plaintiff with this false and unsupportable claim.  Plaintiff's performance was Leadership quality and Rivers continued to select Plaintiff for high profile and important Leadership roles, in 2015. AMF # 934-946 |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
| --- | --- |
| | Special Leadership selections and assignments was indicative of Defendant's view of performance excellence.<br>AMF 891 |
| 70.    Most DMs on Rivers' team had a Personal Development Plan ("PDP") outlining their respective goals and aspirations at Starbucks, and strategies for obtaining such goals.<br><br>**RIVERS DECL. ¶ 14.** | Undisputed, but Plaintiff never had on. Plaintiff pursued promotion and solicited support and assistance, but none was given him.<br>AMF # 899-903; 906-913; 927-933; 1050-1053 |
| 71.    A Partner Resources Manager at Starbucks is the same role as a Human Resources Manager at other companies.<br><br>**ROGERS DECL. ¶ 2.** | Undisputed |
| 72.    On June 26, 2014, Mr. Briscoe, Rivers and Sarah Rogers ("Rogers"), the Partner Resources Manager working with Rivers' team, met to discuss Mr. Briscoe's development at Starbucks and Mr. Briscoe developing a PDP. | Undisputed |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| **ROGERS DECL.  ¶ 7, EXS. B-C.** | |
| 73.    On September 12, 2014, Rogers emailed Mr. Briscoe additional resources to assist his development.<br><br>**ROGERS DECL. ¶ 8, EX. D.** | Disputed<br>Plaintiff denies that Rogers (or Rivers) ever tried to "assist his development". Plaintiff sent Rogers an email (copying Rivers) seeking specific types of information that was uniquely related to Starbucks would be particularly helpful in assisting him with promotional development, but neither Rogers nor Rivers ever responded.<br>Exhibit 10;<br>AMF # 1057 |
| 74.    In November 2014, Mr. Briscoe, Rivers and Rogers met again to discuss Mr. Briscoe's progress and to ensure a formal PDP was in place.<br><br>**ROGERS DECL. ¶ 9.** | Disputed<br>Plaintiff denies that Rogers (or Rivers) ever tried to "assist his development". Plaintiff sent Rogers an email (copying Rivers) seeking specific types of information that was uniquely related to Starbucks would be particularly helpful in assisting him with promotional development, but neither Rogers nor Rivers ever responded.<br>Exhibit 10;<br>AMF # 1057 |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| | |
| 75.   In November 2014, Mr. Briscoe had not completed his PDP.<br><br>**ROGERS DECL. ¶ 9.** | Disputed<br>Plaintiff denies that Rogers (or Rivers) ever tried to "assist his development", including assisting Plaintiff with completion of a PDP.  Plaintiff sent Rogers an email (copying Rivers) seeking specific types of information that was uniquely related to Starbucks would be particularly helpful in assisting him with promotional development, but neither Rogers nor Rivers ever responded.<br>Exhibit 10;<br>AMF # 1057 |
| 76.   On December 9, 2014, Rogers scheduled an in-person meeting with Rivers and Mr. Briscoe to facilitate communication between them, and again discuss Starbucks' concerns regarding Mr. Briscoe's communication style.<br><br>**ROGERS DECL. ¶ 10.** | Disputed<br>Plaintiff personally requested a meeting with Rogers to discuss what Plaintiff felt to be Race discrimination against him.<br>Plaintiff Depo 277:6-278:14 |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| | |
| 77.   On December 17, 2014 Rivers emailed Rivers and Mr. Briscoe a summary of next steps for Mr. Briscoe's development and potential support tactics for him.<br><br>**ROGERS DECL. ¶ 13, EX. E.** | Disputed<br>It makes no sense that "Rivers emailed Rivers…"<br>Plaintiff denies that Rogers (or Rivers) ever tried to "assist his development", including assisting Plaintiff with completion of a PDP.  Plaintiff sent Rogers an email (copying Rivers) seeking specific types of information that was uniquely related to Starbucks would be particularly helpful in assisting him with promotional development, but neither Rogers nor Rivers ever responded.<br>**Exhibit 10;**<br>**AMF # 1057** |
| 78.   Mr. Briscoe agreed to participate in a 360 Peer review which was completed in February 2015, which was designed to give him additional insight into how he was perceived by his peers/other Partners.<br><br>**PLF.'S DEP., 267:16-24;  ROGERS** | Undisputed that Plaintiff agreed to participate in a "360".<br>**Disputed** that the purpose or intent of the 360 or Plaintiff's agreement to participate in it was to be used as a performance evaluation  tool from which Defendant would selectively pick and choose anything that it perceived to be a negative and ignore all of the many |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| **DECL. ¶ 14, EXS. F-G.** | positives.<br><br>**AMF # 1007-1012**;<br><br>Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose<br><br>**UF # 79-83**<br><br>Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360.<br><br>**AMF # 1014-1030**<br><br>The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them.<br><br>**AMF # 1007-1012**<br><br>No LSDM other than Plaintiff was the subject of a 360 Survey.<br><br>**AMF # 1012** |
| 79.   A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe stop "[c]oming in with his present agenda for the conversation. At times he seems unwilling to hear | Undisputed that this is one comment in the "360".<br><br>**Disputed** that the comment is performance worthy.   The purpose and intent of the 360 to which Plaintiff |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| what the other person has said if it doesn't fit in with his pack of thinking."<br><br><br>**ROGERS DECL. ¶ 14, EX. G.** | agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments.<br>**AMF # 1007-1012**;<br>Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose<br>**UF # 79-83**<br>Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360.<br>**AMF # 1014-1030**<br>The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them.<br>**AMF # 1007-1012**<br>No LSDM other than Plaintiff was the subject of a 360 Survey.<br>**AMF # 1012** |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| 80.   A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe stop "[w]orking while others are presenting."<br><br><br>**ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360".<br>**Disputed** that the comment is performance worthy.   The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments.<br>**AMF # 1007-1012**;<br>Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose<br>**UF # 79-83**<br>Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360.<br>**AMF # 1014-1030**<br>The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| | leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 81.    A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe stop "[s]peaking over others." **ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy.   The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| | of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them.<br><br>**AMF # 1007-1012**<br><br>No LSDM other than Plaintiff was the subject of a 360 Survey.<br><br>**AMF # 1012** |
| 82.   A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe stop "[a]cting superior to others."<br><br><br>**ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360".<br><br>**Disputed** that the comment is performance worthy.   The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments.<br><br>**AMF # 1007-1012**;<br><br>Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose<br><br>**UF # 79-83** |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| | Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 83.    A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe stop "[s]aying that he is aligned with team commitments and not follow thru [sic] and/or do it 'his way' rather than staying aligned with the team."<br><br>**ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy.   The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
|  | **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 84.   A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that "[w]hen [Mr. Briscoe] disagrees with RD [Rivers], at times it appears disrespectful." **ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy.  The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| | used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 85.    A   reviewer   responding   to   Mr. | Undisputed that this is one comment in |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| Briscoe's 360 Peer Review described Mr. Briscoe as "[s]low, or unwilling, to adapt or conform with Team direction."<br><br>**ROGERS DECL. ¶ 14, EX. G.** | the "360".<br><br>**Disputed** that the comment is performance worthy.   The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments.<br>**AMF # 1007-1012**;<br>Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose<br>**UF # 79-83**<br>Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360.<br>**AMF # 1014-1030**<br>The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| | **AMF # 1007-1012** |
| | No LSDM other than Plaintiff was the subject of a 360 Survey. |
| | **AMF # 1012** |
| 86.   A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe stop "[t]elling stories in generalities vs. actual specific examples."<br><br><br>**ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360".<br><br>**Disputed** that the comment is performance worthy.  The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments.<br>**AMF # 1007-1012;**<br>Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose<br>**UF # 79-83**<br>Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360.<br>**AMF # 1014-1030**<br>The 360 was an assessment by peers (not of Licensees with whom Plaintiff |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| | interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 87.  A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe start "[a]ctively listening more consistently." **ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy.   The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
|  | numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 88.   A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe start "[t]aking the time to listen to feedback of others." **ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy.   The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012;** |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| | Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose |
| | **UF # 79-83** |
| | Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. |
| | **AMF # 1014-1030** |
| | The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. |
| | **AMF # 1007-1012** |
| | No LSDM other than Plaintiff was the subject of a 360 Survey. |
| | **AMF # 1012** |
| 89.   A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe, "[w]hen communicating take additional time to consider what you want the partner to feel as a result of your communication." | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy.  The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| **ROGERS DECL. ¶ 14, EX. G.** | Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 90.    A reviewer responding to Mr. Briscoe's 360 Peer Review suggested | Undisputed that this is one comment in the "360". |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| that Mr. Briscoe start "[a]ctively listening when others are talking, sharing ideas, presenting, etc. Consider tone in communication may come across as 'aloof' or arrogant at times."<br><br>**ROGERS DECL. ¶ 14, EX. G.** | **Disputed** that the comment is performance worthy.  The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments.<br>**AMF # 1007-1012**;<br>Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose<br>**UF # 79-83**<br>Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360.<br>**AMF # 1014-1030**<br>The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them.<br>**AMF # 1007-1012** |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| | No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 91.   A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe start "[b]eing more welcoming and generous."<br><br>**ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy.   The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| | interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 92.    A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe start "[l]istening to directions, be respectful of others skill sets and experience, be open minded to other ideas." **ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy.  The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the numerous positive comments (over 37) |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| | contained in the 360. |
| | **AMF # 1014-1030** |
| | The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. |
| | **AMF # 1007-1012** |
| | No LSDM other than Plaintiff was the subject of a 360 Survey. |
| | **AMF # 1012** |
| 93.    A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe needs to "d]emonstrate professionalism    in    all    work environments."<br><br>**ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360".<br><br>**Disputed** that the comment is performance worthy.  The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments.<br>**AMF # 1007-1012**;<br>Defendant used the 360 solely as a tool |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
|  | against Plaintiff, which was never its intent or purpose |
|  | **UF # 79-83** |
|  | Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. |
|  | **AMF # 1014-1030** |
|  | The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. |
|  | **AMF # 1007-1012** |
|  | No LSDM other than Plaintiff was the subject of a 360 Survey. |
|  | **AMF # 1012** |
| 94.    Mr. Briscoe's response to the comments in his 360 review was he "absorbed them," but did not feel he needed to make adjustments based on the feedback.<br><br><br>**PLF.'S DEP., 268:19-269:15.** | Undisputed |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| 95.   Mr. Briscoe never drafted his PDP.<br><br>**PLF.'S  DEP.,  269:16-17;  ROGERS DECL. ¶ 20.** | Undisputed |
| 96.   On March 30, 2015, Starbucks issued Mr. Briscoe a Performance Concerns and Expectations Memorandum ("March 30 Memo")<br><br>**PLF.'S  DEP.  261:11-262:3,  EX.  9; ROGERS   DECL.   ¶16,   EX.   J; RIVERS DECL. ¶ 18.** | Undisputed |
| 97.   On May 6, 2015, Rivers advised Heidi Sundquist ("Sundquist"), another Partner Resources Manager, about the May 6th Vons Complaint.<br><br>**RIVERS     DECL.        ¶      19; DECLARATION   OF   HEIDI SUNDQUIST   ("SUNDQUIST DECL.") ¶ 7, EX. A.** | Undisputed, but the "Von" complaint was for Plaintiff doing what he was duty-bound to do.<br>AMF # 987-999 |
| 98.   On May 12, 2015, Starbucks decided to place Mr. Briscoe on a | Undisputed, but Plaintiff Disputes that a "PIP" was proper, noting that Defendant |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| Performance Improvement Plan ("PIP")<br><br>**RIVERS DECL.  ¶ 19, SUNDQUIST DECL. ¶ 7, EX. A, ¶ 8.** | continued to exhibit recognition of his excellent performance and Leadership by continuing to select and assign him to high profile and important leadership roles.<br>AMF # 934-946 |
| 99.    Starbucks maintains policies and procedures for issuing a PIP including Performance Improvement Plan Best Practices, and the Performance Improvement Plan Template.<br><br>**SUNDQUIST DECL. ¶ 8, EXS. B-C.** | Undisputed |
| 100.  On June 4, 2015, Rivers and Heidi Sundquist, issued Mr. Briscoe the PIP during an in-person meeting.<br><br>**PLF.'S    DECL.,    262:13-25; SUNDQUIST  DECL. ¶ 9, EX. D; RIVERS DECL. ¶ 19.** | Undisputed, but the PIP was improper because it was supported by false claims by Rivers.<br>AMF # 874-946<br>Of 5 LSDM who are racial minorities, two have filed lawsuits, one filed internal claims alleging discrimination, and one has verbally reported feeling discriminated against by Rivers, who assists Caucasians with promotions and promotional opportunities, but never assisted Plaintiff or any other racial minority, before Plaintiff filed his |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| | lawsuit. AMF # 896-898; 899-903; 915-924; 1050-1053 |
| 101.  On June 9, 2015, Mr. Briscoe had a meeting with Rivers and Sundquist wherein he provided his response to the PIP.<br><br>**SUNDQUIST DECL. ¶ 10, EX. E.** | Undisputed |
| 102.  Mr. Briscoe's June 9, 2015, response to the PIP demanded that Starbucks conduct an independent investigation into "unfair treatment and consciously biased actions and behaviors towards [him]" by Rivers.<br><br>**SUNDQUIST DECL. ¶ 10, EX. E.** | Undisputed |
| 103.  During the June 9, 2015, meeting, Mr. Briscoe told Rivers and Sundquist that he had recorded everything that was discussed at the meeting without our knowledge and/or consent.<br><br>**SUNDQUIST DECL. ¶ 10; RIVERS DECL. ¶ 20.** | Undisputed that Plaintiff disclosed to Rivers and Sundquist that he had recorded some 6-10 conversations at different times and offered to play the recordings for them to listen and hear the confirmation of his claims that Rivers was discriminating and retaliating against him once he began pursuing |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| | promotion.  They declined Plaintiff's offer to listen to the recordings and later told Plaintiff that the recordings were illegal, causing Plaintiff to believe that Defendant was saying that it did not want to hear his confirmatory recordings, and that the recordings were worthless. AMF # 1057 |
| 104.   During the June 9, 2015, meeting, Mr. Briscoe also told Rivers and Sundquist that in the past he recorded many of his conversations with us without our knowledge and/or consent. **SUNDQUIST DECL. ¶ 10; RIVERS DECL. ¶ 20.** | Undisputed that Plaintiff disclosed to Rivers and Sundquist that he had recorded some 6-10 conversations at different times, and offered to play the recordings for them to listen and hear the confirmation of his claims that Rivers was discriminating and retaliating against him once he began pursuing promotion.  They declined Plaintiff's offer to listen to the recordings and later told Plaintiff that the recordings were illegal, causing Plaintiff to believe that Defendant was saying that it did not want to hear his confirmatory recordings, and that the recordings were worthless. AMF # 1057 |
| 105.  Mr. Briscoe also recorded his conversations with Rogers without her | Undisputed |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| knowledge and consent.<br><br>**ROGERS DECL. ¶ 18.** | |
| 106.  The earliest Mr. Briscoe alleges he made any complaint about improper conduct at Starbucks was in December 2014.<br><br>**PLF.'S DEP., 277:6-278:6.** | Undisputed that Plaintiff alleged race discrimination to Defendant's HR Representative, December of 2014. |
| 107. On June 12, 2015, Starbucks engaged an independent investigator to investigate Mr. Briscoe's claims.<br><br>**DECLARATION OF EMILY SCHULTZ ("SHULTZ DECL.") ¶ 2, EX. A; SUNDQUIST DECL. ¶ 12, EX. G.** | Undisputed |
| 108.  On June 10, 2015, Mr. Briscoe's PIP was put on hold pending the outcome of the investigation.<br><br>**SUNDQUIST DECL. ¶ 12, EX. G.** | Disputed<br>Plaintiff was blocked from pursuing any promotions or being considered for promotional opportunities, earning pay increases and bonuses, because the PIP is a bar to them. |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| | AMF # 914, 950<br><br>Plaintiff was still being tapped assist Starbucks with important Leadership assignments requiring knowledge of the Business, excellent communication, analytical and leadership skills, at the same time that Rivers was claiming Plaintiff's performance was unacceptable (a contradiction).<br><br>AMF # 934-946 |
| 109.  As part of her investigation into Mr. Briscoe's claims, the independent investigator conducted in-depth interviews of five witnesses.<br><br>**SHULTZ DECL. ¶ 3.** | Disputed as a recent fabrication. Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made.<br><br>Plaintiff's Depo 244:15-245:2; 246:17-247:4 |
| 110.  As part of her investigation into Mr. Briscoe's claims, the independent investigator reviewed relevant documents provided by Starbucks including emails provided by Mr. Briscoe, Rivers, and Sundquist, and the | Disputed as a recent fabrication. Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| documents attached to Mr. Briscoe's June 9, 2015, complaint.<br><br>**SHULTZ DECL. ¶ 4.** | heard any claim about the contents of the results being made.<br>Plaintiff's Depo 244:15-245:2; 246:17-247:4 |
| 111. The independent investigator completed her investigation on July 27, 2015.<br><br>**SHULTZ DECL. ¶ 10.** | Undisputed |
| 112. At the conclusion of her investigation, the independent investigator drafted an investigation report that detailed the findings of her investigation.<br><br>**SHULTZ DECL. ¶ 5.** | Disputed as a recent fabrication. Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made.<br>Plaintiff's Depo 244:15-245:2; 246:17-247:4 |
| 113. The independent investigator's report focused on Mr. Briscoe's allegations of unfair treatment and unfair labor practices, discrimination, harassment and "consciously biased actions and behaviors" by Rivers. | Disputed as a recent fabrication. Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| **SHULTZ DECL. ¶ 6.** | results being made.<br>Plaintiff's Depo 244:15-245:2; 246:17-247:4 |
| 114. The independent investigator determined Mr. Briscoe's claims against Rivers were unsubstantiated.<br><br>**SHULTZ DECL. ¶ 7.** | Disputed as a recent fabrication. Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made.<br>Plaintiff's Depo 244:15-245:2; 246:17-247:4 |
| 115. The independent investigator determined:<br>"The facts do not show Ms. Rivers engaged in consciously biased actions and behaviors, discrimination or harassment toward Mr. Briscoe. Mr. Briscoe also did not identify race, gender or any other such category as the basis for the treatment. There is no indication Ms. Rivers treated him in a consciously biased way, or that she treated Mr. Briscoe differently than other DMs on her team." | Disputed as a recent fabrication. Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made.<br>Plaintiff's Depo 244:15-245:2; 246:17-247:4<br>Plaintiff identified race discrimination to S. Rogers at his one-on-one in December, 2014. |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| **SHULTZ DECL. ¶ 7.A.** | AMF # 1059 |
| 116.   The   independent   investigator determined:<br>"The facts do not support Mr. Briscoe's claim of unfair treatment. DMs [] who Mr. Briscoe believes are favored by Ms. Rivers, are top performers and/or take advantage of the career development opportunities given by Ms. Rivers, unlike Mr. Briscoe. In addition, Ms. Rivers has given Mr. Briscoe a great deal of recognition and many opportunities for growth and development in his career at Starbucks."<br><br>**SHULTZ DECL. ¶ 7.B.** | Disputed as a recent fabrication. Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made.<br>Plaintiff's Depo 244:15-245:2; 246:17-247:4 |
| 117.   The   independent   investigator determined "[t]he facts showed there was a legitimate basis for Mr. Briscoe's PIP" because:<br>• "At the request of Marriott, in May 2014 Ms. Rivers removed Mr. Briscoe from the Marriott account because of his improper handling of a non-compliance situation at one of its hotels and his failure to accept | **Disputed** as a recent fabrication and false and unsupportable finding. Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made.<br>**Plaintiff's Depo 244:15-245:2; 246:17-** |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| responsibility for the incident.<br>• Mr. Briscoe trained and certified licensed store employees as baristas at the Residence Inn for the New Store Opening (NSO). Ms. Rivers discovered those baristas could not ring up drinks and did not know how to make drinks correctly, and she wanted the store shutdown.<br>• Von's [sic] and Ralph's [sic] complained to Ms. Rivers about Mr. Briscoe, including that he "was a jerk" and he failed to attend scheduled meetings with them.<br>• Mr. Briscoe repeatedly provided inaccurate data to Ms. Rivers, including incorrect sales figures, even after they discussed the approach on a given topic and how it should be communicated.<br>• Despite extensive coaching by Ms. Rivers and PRM Sarah Rogers, Mr. Briscoe failed to accept responsibility for his actions, did not improve in the areas Ms. Rivers coached him about, he was not self- | **247:4: 188:21-189:11;**<br>Plaintiff was told by Rivers that he did nothing wrong at Marriott and that his situation was similar to that of Matt Scruggs (Caucasian).  Scruggs was assisted by Rivers with promotion.<br>**AMF # 975-983;**<br>Rivers lied about the entire Residence Inn situation, including her claim that the store had to shut down.<br>**AMF # 1000-1006;**<br>As to Vons, Rivers lied about Plaintiff for merely doing his job of monitoring and making certain that the Licensee was compliant with Coffee (product) Availability, as he was required to do. Rivers lied claiming there was a "Starbuck Policy" prohibiting texting to a cell phone.<br>**AMF # 987-999**<br>Plaintiff's performance remained excellent throughout his employment as supported by his performance evaluations (Exhibits - 5 and 6), his revenue generation constituting one-third of Rivers' Region's revenues which had 10 |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| aware and he did not incorporate the feedback they provided." **SHULTZ DECL. ¶ 8.** | to 12 District Managers in the Region (Exhibit- 3), an Plaintiff's continued selection for high profile assignments and important Leadership roles, right through to his separation in 2015. **AMF # 881-891; 934-946** |
| 118.  The   independent   investigator recommended that Starbucks reinstate the PIP. **SHULTZ DECL. ¶ 9.** | **Disputed** as a recent fabrication and false and unsupportable finding. Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made. **Plaintiff's Depo 244:15-245:2; 246:17-247:4: 188:21-189:11;** Plaintiff was told by Rivers that he did nothing wrong at Marriott and that his situation was similar to that of Matt Scruggs (Caucasian).  Scruggs was assisted by Rivers with promotion. **AMF # 975-983;** Rivers lied about the entire Residence Inn situation, including her claim that the store had to shut down. |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| | **AMF # 1000-1006;** |
| | As to Vons, Rivers lied about Plaintiff for merely doing his job of monitoring and making certain that the Licensee was compliant with Coffee (product) Availability, as he was required to do. Rivers lied claiming there was a "Starbuck Policy" prohibiting texting to a cell phone. |
| | **AMF # 987-999** |
| | Plaintiff's performance remained excellent throughout his employment as supported by his performance evaluations (Exhibits - 5 and 6), his revenue generation constituting one-third of Rivers' Region's revenues which had 10 to 12 District Managers in the Region (Exhibit- 3), an Plaintiff's continued selection for high profile assignments and important Leadership roles, right through to his separation in 2015. |
| | **AMF # 881-891; 934-946** |
| 119. On July 20, 2015, Mr. Briscoe resigned from his employment with Starbucks. | Undisputed that Plaintiff resigned because Rivers was constantly attacking him with false performance claims and suggesting that he couldn't do anything |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| **SUNDQUIST DECL. ¶ 20, EX. H.** | right, couldn't do emails, food warming…couldn't do anything, (when all the while, Rivers was assigning him to high profile and very important Leadership roles in recognition of his outstanding performance),  and Defendant was doing nothing to address Plaintiff's complaints of race discrimination, except to allow Rivers to retaliate against him. **Plaintiff's Depo 188:21-189:11; UF # 136-144(below).** |
| 120.  At the time of Mr. Briscoe's resignation, he had been offered, and had accepted, a job at Jack in the Box Inc. <br><br> **PLF.'S DEP. 206:12-15; 209:6-10; 309:24-310:9, EX. 45.** | Undisputed |
| 121.  Mr. Briscoe's starting salary at Jack in the Box Inc. was $120,000 per annum (not inclusive of bonuses). <br><br> **PLF.'S DEP., 302:13-15; 309:24-** | Undisputed |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| **310:9, EX. 45.** | |
| 122.  At the time of his resignation from Starbucks, Mr. Briscoe's annual salary at Starbucks was approximately $95,963.64 per annum (not including performance bonuses).<br><br><br><br>**ROGERS DECL. ¶ 22.** | Undisputed, but Plaintiff's bonus potential (quarterly payments rather than annually), stock and benefits were superior at Starbucks, and Starbucks as a Brand was Plaintiff's preferred career path.  Plaintiff took meaningful cut in salary compensation to leave his job at Burger King to accept the Starbucks position, because of the upside career and earnings potential and because he wanted to leave "fast food".  Also, at Starbucks, Plaintiff was in a "ready for promotion" posture, with four year of background and Plaintiff had begun making contact with License Stores VP for the United Kingdom.  At Jack in the Box, Plaintiff had to start from scratch. AMF # 1060 |
| 123.  Mr.   Briscoe's   discrimination claims are based solely on the conduct of Rivers.<br><br><br>**PLF.'S DEP., 143:15-21.** | Undisputed |
| 124.  With   respect   to   whether   Mr. Briscoe's    belief    that    Rivers | Undisputed in part, but Plaintiff also testified: |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| discriminated against was based on something specific, Mr. Briscoe acknowledged: "I don't know.  I asked that question myself and couldn't get an understanding why I started getting this treatment.  So I don't know why." | Plaintiff testified that he was well accepted by Rivers as long as he stayed in his place and did not try to advance, but that Rivers intentionally and discriminatorily tried to hold him back when he sought promotion like the Caucasians on Rivers team, and that race was the reason. |
| **PLF.'S DEP., 144:7-12.** | **Plaintiff's Depo 306:8-307:10**<br><br>Plaintiff also testified as follows:<br><br>Q. Do you think it was because of your race?<br><br>A. I do.<br><br>Q. Why?<br><br>A. I do.  Other employees that were non-black weren't being treated the way that I was being treated.<br><br>…<br><br>Q. Who specifically are you referring to?<br><br>A. Barb Holdgrafer, Deanna Pusatier, Kevin Dockery, Tammy Hereford, Ashley Larson, Erica Hernandez.<br><br>Q. Anybody else?<br><br>A. Donna Hernandez.<br><br>**Plaintiff's Depo 144:13-23.** |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| 125. With respect to his belief that Rivers discriminated against him, Plaintiff acknowledged he "do[esn't] know why things changed . . . I asked that question myself and couldn't get an understanding why I started getting this treatment. So I don't know why."<br><br>**PLF.'S DEP., 144:7-12.** | Plaintiff testified that he believed that Rivers was discriminating against him and that he reported same to Rogers as early as December, 2014<br>**Plaintiff's Depo 144:13-23; 277:6-278:2;**<br>Plaintiff testified that he was accepted and credited by Rivers as long as he stayed in his place and did not try to advance, but that Rivers intentionally and discriminatorily tried to hold him back when he sought promotion like the Caucasians on Rivers team, and race was the reason.<br>**Plaintiff's Depo 306:8-307:10** |
| 126. Mr. Briscoe acknowledged he does not know who at Starbucks actually issued, approved, or drafted the PIP.<br><br>**PLF.'S DEP., 263:6-17.** | Undisputed but Irrelevant because, Plaintiff knows Rivers supervised his work activities and that Rivers made numerous the false claims against him which support the PIP.<br>AMF # 904-933; 949-952; 974-1007; 1048-1049; |
| 127. The decision to issue the PIP was actually made in consultation with Partner Resources personnel, not Rivers | Undisputed but Irrelevant because, Plaintiff knows Rivers supervised his work activities and that Rivers made the |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| alone.<br><br>**SUNDQUIST DECL. ¶ 7, EX. A.** | false claims against him which support the PIP.<br>AMF # 904-933; 949-952; 974-1007; 1048-1049; |
| 128. Mr. Briscoe acknowledges his retaliation claim is based on the discriminatory actions he claims happened to him.<br><br>**PLF.'S DEP., 144:7-12; 214:21-215:14.** | Plaintiff testified that Rivers was constantly attacking him with false performance claims and suggesting that he couldn't do anything right, couldn't do emails, warm food, send a text message, check to see if Licensees were stocked with product, ask Licensees to comply with Starbucks' standards…couldn't do anything, (when all the while, Rivers was assigning him to high profile and very important Leadership roles in recognition of his outstanding performance), and Defendant was doing nothing to address Plaintiff's complaints of race discrimination, except to allow Rivers to retaliate against him.<br>**Plaintiff's Depo 188:21-189:11; UF # 136-144(below).** |
| 129. Rivers has no hiring authority outside of her team. | Undisputed, but she could support and assist District Managers on her team who sought promotion,  and she had |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 10; MITTAL DECL. ¶ 4, EX. B[3] (DEPOSITION OF ANGELA RIVERS ("RIVERS' DEP."), 105:23-106:5.** | supported and assisted Caucasian District Managers promote, but did not support and assist Plaintiff or other racial minorities during Plaintiff's tenure. AMF # 896-898, 974, 899-903, 912, 914-929, 932. |
| 130.   Rivers did not know Mr. Briscoe had applied for a subsequent BDM position until this lawsuit was filed.<br><br>**RIVERS DECL. ¶ 11.** | Disputed<br>Plaintiff personally told Rivers that he had again applied for the BDM position, and she appeared upset with Plaintiff , and told him: "well I didn't know that you were going to do that."<br> AMF 928 and 929 |
| 131.   Mr. Briscoe acknowledged that Leah Bernard, one of the seven partners he claims received preferential treatment from Rivers, is African American.<br><br><br>**PLF.'S DEP., 33:7-35:11, 67:23-24; RIVERS DECL. ¶ 4.** | **Undisputed** that L. Bernard is an African American.<br>**Disputed** that Bernard was the recipient of any preferential treatment before Plaintiff's allegations of discrimination and filing of a legal action.  Bernard has been the beneficiary of claims against Rivers by Plaintiff and other racial minorities.  Rivers provided no promotional support and/or assistance to racial minorities on her team during |

---

[3] All further excerpts from Ms. Rivers' deposition are attached as Exhibit B to the Declaration of Jyoti Mittal.

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| | Plaintiff's tenure. |
| | **AMF # 896-898, 974, 899-903, 912, 914-929, 932.** |
| | Rivers assisted Caucasians with promotions and promotional opportunities, but she never assisted any racial minority with promotions or promotional opportunity during Plaintiff's tenure. |
| | **AMF # 896-899** |
| 132.  Mr. Briscoe claims partners on Rivers' team received opportunities he did not, including "elevation," promotion and/or additional responsibilities.<br><br>**PLF.'S DEP., 33:7-35:11; 35:24-39:6; 150:13-152:25; 221:15-223:16.** | Undisputed |
| 133.  Mr. Briscoe acknowledges he did not apply for the positions he claims partners on Rivers' team received instead of him.<br><br>**PLF.'S DEP., 221:15-223:16.** | **Undisputed, but** Rivers did not support or assist Plaintiff in his promotional efforts; she actively blocked Plaintiff from pursuit of the positions for which he applied; and she refused to offer assistance when Plaintiff requested it.<br>**AMF # 912, 925-929;** |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| | Rivers also used PIPs to block other racial minorities on her team from promoting, while she supported and assisted Caucasians in obtaining promotions.<br>**AMF # 896-898, 974, 899-903, 912, 914-929, 932.** |
| 134. Mr. Briscoe acknowledges that the promotions he claims partners on Rivers' team received instead of him occurred after he resigned from Starbucks.<br><br>**PLF.'S DEP. 222:1-11.** | Disputed<br>Rivers herself testified that she supported the promotions of Dockery, Scruggs, Pusatier, and other Caucasians during Plaintiff's tenure.<br>**AMF # 896** |
| 135. Mr. Briscoe acknowledges that the opportunities he claims went to other partners instead of him went to partners far more senior to him at Starbucks.<br><br>**PLF.'S DEP., 48:3-10; 144:13-147:2.** | Undisputed but totally Irrelevant<br>Starbucks had no policy that made "seniority" a factor in promotional considerations.<br>**AMF # 1061** |
| 136. Rivers appointed Mr. Briscoe to the Disney Star Team in 2011.<br><br>**RIVERS DECL. ¶ 23.** | Undisputed, and an illustration that Rivers recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This high profile and important leadership assignment is an exhibition |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| | that Plaintiff was a recognized outstanding performer. |
| 137.   Rivers appointed Mr. Briscoe to the Disney Star Team in 2012.<br><br>**RIVERS DECL. ¶ 23.** | Undisputed, and an illustration that Rivers  recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This  high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 138.   Rivers nominated Mr. Briscoe as DM of the Quarter in 2012.<br><br>**RIVERS DECL. ¶ 23.** | Undisputed, and an illustration that Rivers  recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This  high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 139.   Rivers nominated Mr. Briscoe as DM of the Quarter in 2013.<br><br>**RIVERS DECL. ¶ 23.** | Undisputed, and an illustration that Rivers  recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This  high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| 140.  Rivers appointed Mr. Briscoe as Annual Operating Plan Pillar Lead in 2014.  **RIVERS DECL. ¶ 23.** | Undisputed, and an illustration that Rivers  recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This  high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 141.  Rivers selected Mr. Briscoe to highlight and tour one of his locations with the United States Leadership team in 2014.  **RIVERS DECL. ¶ 23.** | Undisputed, and an illustration that Rivers  recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This  high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 142.  Rivers appointed Mr. Briscoe as Annual Operating Plan Pillar Lead 2015 Our Coffee and Our Food, including Evenings and Refreshment (supporting peer DM).  **RIVERS DECL. ¶ 23.** | Undisputed, and an illustration that Rivers  recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This  high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 143.  Rivers selected Mr. Briscoe as highlighted in a partner appreciation | Undisputed, and an illustration that Rivers  recognized Plaintiff's excellence, |

| UNCONTROVERTED FACTS[1] | SUPPORTING EVIDENCE |
|---|---|
| week in Q2 of 2015 for specific support of a senior leader visit.<br><br>**RIVERS DECL. ¶ 23.** | in communication, leadership, interpersonal skills and professionalism. This  high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 144.  Rivers  selected  Mr.  Briscoe's USC  location  for  a  March  2015  tour with the United States Leadership team.<br><br>**RIVERS DECL. ¶ 23.** | Undisputed, and an illustration that Rivers  recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This  high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 145.  Starbucks  has  policies  and procedures  that  specifically  prohibit discrimination,  harassment,  and retaliation.   Attached as Exhibit A are true and correct copies of these policies.<br><br>**ROGERS DECL. ¶ 5, EX. A.** | Undisputed, but Starbucks has allowed Rivers to discriminate against racial minorities (Nelson, Hernandez and Plaintiff) with impunity. AMF 915-924; 949-952. |

ISSUE NO. 2:    Plaintiff's claim for race discrimination also fails because, even assuming *arguendo* that Plaintiff can establish a *prima facie* case, Starbucks had legitimate, non-discriminatory business reasons for all actions taken regarding Plaintiff's employment and Plaintiff cannot prove that Starbucks' proffered reasons are pretext for any discrimination.

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
| --- | --- |
| 146.  Similar to a franchise, Starbucks licenses its brand and products to Licensed Stores run by other companies (Licensees), including, but not limited to, Vons, Ralphs, Marriott, and Disney.<br><br>**DECLARATION OF ANGELA M. RIVERS ("RIVERS DECL.") ¶ 6.** | Undisputed |
| 147. Licensees, sell Starbucks' products, and are responsible for managing their retail operations.<br><br>**RIVERS DECL. ¶ 6.** | Undisputed |
| 148.  In August 2011, Mr. Briscoe was interviewed and hired as a Licensed Store District Manager ("DM") by Angela Rivers ("Rivers"), Regional Director.<br><br>**DECLARATION OF JYOTI** | Undisputed |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| **MITTAL ("MITTAL DECL.") ¶ 3, EXHIBIT ("EX.") A[5] (DEPOSITION OF PLAINTIFF KEVIN BRISCOE ("PLF'S DEP."), 63:21-64:10); RIVERS DECL. ¶ 4.** | |
| 149.  Rivers was Mr. Briscoe's direct supervisor during his entire employment at Starbucks.<br><br>**RIVERS DECL. ¶ 4.** | Undisputed |
| 150.  Mr. Briscoe was one of three African American DMs on Rivers' 12-person team, including Leah Bernard.<br><br>**RIVERS DECL. ¶ 4; PLF.'S DEP., 67:21-24, 148:18-149:3.** | Undisputed |
| 151.  While employed by Starbucks, Mr. Briscoe was familiar with its policies against discrimination and retaliation as well as Starbucks' open door policy outlining procedures for reporting violations of company policies. | Undisputed |

---

[5] All further excerpts from Mr. Briscoe's deposition are attached as Exhibit A to the Declaration of Jyoti Mittal.

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| **PLF.'S DEP., 118:8-123:2, EX. 2; 129:25-130:3; 131:12-132:6, EX. 3; 132:7-25 EX. 4; 137:21-141:23, EX. 6; 271:4-6.** | |
| 152. As a DM, Mr. Briscoe was responsible for leading an assigned group of Licensed Store management teams within his district.<br><br>**RIVERS DECL. ¶ 6, EX. A.** | Undisputed |
| 153. As a DM Mr. Briscoe was responsible for assessing the overall operation of Licensed Stores, including ensuring Licensed Store compliance with Starbucks Experience standards.<br><br>**RIVERS DECL. ¶ 6, EX. A.** | Undisputed |
| 154. Communication skills are crucial to the DM position because District Managers regularly interface with Starbucks' Licensees and their employees.<br><br>**RIVERS DECL. ¶ 6, EX. A.** | Undisputed |
| 155. Paramount to Starbucks' business model is communication with its | Undisputed |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| partners, Licensees, and patrons.<br><br>**RIVERS DECL. ¶ 6; DECLARATION OF SARAH ROGERS ("ROGERS DECL.") ¶ 5, EX. A.; PLF.'S DEP., 139:12-140:7, EX. 14.** | |
| 156. Plaintiff acknowledged that communication was vital and important at Starbucks.<br><br>**PLF.'S DEP., 88:3-11.** | Undisputed |
| 157. On April 27, 2014, Mr. Briscoe applied for a Business Development Manager ("BDM") position in the Branded Solutions Department.<br><br>**RIVERS DECL. ¶ 9, EX. D.** | Undisputed |
| 158. Prior to Mr. Briscoe's interview for the BDM position, Rivers notified Frank Sica ("Sica") and John Warmke ("Warmke"), Branded Solutions managers, regarding Mr. Briscoe's candidacy.<br><br>**RIVERS DECL. ¶ 9, EX. D;** | Undisputed |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| DECLARATION OF JOHN WARMKE ("WARMKE DECL.") ¶ 4. | |
| 159. Mr. Briscoe interviewed with Kelly White ("White"), Senior Recruiter.<br><br>**WARMKE DECL. ¶ 6, EX. A.** | Undisputed |
| 160. On May 27, 2014, White emailed her notes about Mr. Briscoe and Mr. Briscoe's resume to Warmke.<br><br>**WARMKE DECL. ¶ 6, EXS. A AND B.** | Undisputed |
| 161. In her May 27, 2014, email to Warmke regarding Mr. Briscoe, Under the heading "Opportunities/Areas to probe further", White asked Warmke to "probe further on how this role fits into Kevin's overall career path. His background is heavy in operations and he has not held a traditional sales role in his past."<br><br>**WARMKE DECL. ¶ 6, EX. A.** | Undisputed |
| 162. On June 3, 2014, Warmke | Undisputed |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| telephonically interviewed Mr. Briscoe for the BDM position.<br><br>**WARMKE DECL. ¶ 7; <u>PLF.'S DEP., 253:10-16</u>.** | |
| 163.   Warmke's took detailed notes of his interview of Mr. Briscoe<br><br>**WARMKE DECL. ¶ 7, EX. C.** | Objection:  the notes are redacted relative to the most important information relating to this fact.  Thus, Hearsay and Best Evidence Objections are valid. |
| 164.   Under the heading "Development Areas" in Warmke's notes regarding his interview with Mr. Briscoe, Warmke identifies the following items:<br>• "Strategic approach to market, segment, account [sic]<br>   o  I was looking for candidates that could provide more insight and sales and/or development examples which may be a function of a lack of strategic selling experiences []<br>   o  You have a very good background but was [sic] much more centered on the | **Disputed** as to the author of the notes for the reasons set out in No 18, above. Otherwise, Plaintiff responds that the content of the note is correctly restated, thus: **Undisputed.** |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| operational approach of execution selling as an operator. This is a good quality, but the stronger candidates were able to demonstrate success through much more strategic influence and experience, such as market research, targeting top decision makers and influencers, focus on strategic questioning that drove alignment to customer needs from a strategic or organizational level that creating mutual partnership or joint business planning initiatives. | |

o Kevin's experience is that he is working within an existing account structure, usually franchise model of operations and maintaining margin and cost.

o The successes and sharing as it relates to selling, relationship

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| management, and business development were centered on an operational approach or execution of telling the customer what they needed to be successful from the eyes of the operator. Here's the menu, the POS, the space needed, etc. | |

o He didn't speak to strategic sales and development approach and instead took a more operational approach to meeting costs and following an existing agreement model for sales.

  ▪ Other candidates have been able to demonstrate success through market research, targeting top decision makers and influencers, focus on strategic questioning that drove alignment to customer needs from a

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| strategic or organizational level that creating mutual partnership or joint business planning initiatives.<br><br>• Listening to understand needs, focus on being concise.<br><br>   o There was a need to re-state several questions to re-focus Kevin's responses. He is very enthusiastic and wants to share his story, but several questions were focused on specifics.<br><br>     ■ After asked further questions, the response often centered back on putting costs together, telling customer how it will work, specs, etc. and aligning on what they are willing to spend."<br><br>**Warmke Decl. ¶ 7, Ex. C.** | |
| 165.   On June 4, 2014, Mr. Briscoe also telephonically met with Frank Sica, Mr. | Undisputed that Plaintiff had a very short telephone call with Sica, but, as Sica |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| Warmke's supervisor, to discuss the BDM position.<br><br><br><br><br>**WARMKE DECL. ¶ 8, EX. D; <u>PLF.'S DEP. 252:25-253:9</u>.** | stated "…**this was not an interview from my perspective...**" **Sica also stated:** "John, I know you will share your complete feedback on Kevin with Angie…"<br>**Defendant's Exhibit D** |
| 166.  Mr. Briscoe was not offered the BDM position.<br><br><br>**WARMKE DECL. ¶ 9; RIVERS DECL. ¶ 10.** | Undisputed, but it is also important that Briscoe was not given Feedback. |
| 167.  At Starbucks, it is customary for the managers of internal candidates to receive feedback from interviewers so that the managers can assist the partner's development<br><br><br><br><br><br>**WARMKE, DECL. ¶ 7, RIVERS DECL. ¶ 10.** | **Undisputed,** but Defendant had a mandatory Post Interview Feedback Procedure that was to be followed within 24 hours of the interview, which was not followed relative to Plaintiff's pursuit of promotion:<br>a. that an Interviewer complete a Post-Interview "Feedback Form", see Plaintiff's Exhibit - 36, and<br>b. that the Interviewee be provided with the Feedback. |
| 168.  Warmke provided his feedback to Mr. Briscoe's manager, Rivers. | Disputed.<br>Post Interview Feedback Procedure that was to be followed within 24 hours of |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| **WARMKE DECL. ¶ 7, EX. C; RIVERS DECL. ¶ 10.** | the interview, which was not followed relative to Plaintiff's pursuit of promotion: <br> a. that an Interviewer complete a Post-Interview "Feedback Form", see Plaintiff's Exhibit - 36, and <br> b. that the Interviewee be provided with the Feedback. <br> Plaintiff was never provided with any Feedback. |
| 169.  On June 4, 2014, Sica emailed Rivers a summary of his conversation with Mr. Briscoe. <br><br> **WARMKE DECL. ¶ 8, EX. D; RIVERS DECL. ¶ 10.** | Undisputed but Irrelevant as it was not an Interview. <br> **Defendant's Exhibit D** |
| 170.  In his June 4, 2014, email regarding Mr. Briscoe , Sica notes: "Kevin spoke for a majority of the 30 minutes and I found him to be . . . very operationally focused . . . . Although this was not an interview from my perspective (naturally Kevin treated it as an interview), his descriptions and examples of a majority of his diverse career work experiences were operationally focused. | Undisputed, that this is an excerpt from Sica's email of June 4. <br> **Defendant's Exhibit D** |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| During our brief connect, he did not articulate any sales and/or development examples which may be a function of a lack of strategic selling experiences or not enough time to dive deep."<br><br>**WARMKE DECL.¶ 8, EX. D.** | |
| 171.   Prior to Mr. Briscoe's interview with Mr. Warmke for the BDM position they had met.<br><br>**WARMKE DECL. ¶ 5.** | **Undisputed, but Immaterial**, because any such "meeting" was in an incidental group setting and with non-specific purposes. |
| 172.   Warmke found Mr. Briscoe to be professional.<br><br>**WARMKE DECL. ¶ 5.** | Undisputed |
| 173.   Mr. Briscoe acknowledges that he has no reason to believe Warmke had a reason to dislike him.<br><br>**PLF.'S DEP., 253:10-19; 254:2-4.** | Undisputed |
| 174.   The role of BDM was developed and went into effect in approximately late 2013, early 2013.<br><br>**WARMKE DECL. ¶ 3.** | Undisputed |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| 175.  Warmke has hired an African American as a BDM in the past.<br><br>**WARMKE DECL. ¶ 3.** | Undisputed |
| 176.  Mr. Briscoe acknowledges that he has no reason to believe Frank Sica had a reason to dislike him.<br><br>**PLF.'S DEP., 253:24-254:1.** | Undisputed |
| 177.  In November 8, 2014, Mr. Briscoe applied for another BDM position, but was not interviewed.<br><br>**ROGERS DECL. ¶ 21.** | Undisputed |
| 178.  Warmke was not aware of Mr. Briscoe's November 8, 2014, application for the other BDM position.<br><br>**WARMKE DECL. ¶ 9.** | Disputed<br>Warmke was the hiring manager for the BDM position when Plaintiff applied on-line on November 8, 2014.  Relative to Plaintiff's application, the "status " is noted as "Starbucks Not Interested", with the only Starbuck employee identified being "Hiring Manager John Warmke". The Internal Recruiter could never make that decision without the Hiring manager.<br>Exhibit – 8; |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| | AMF #1051 |
| 179.  Rivers was not provided any details regarding any subsequent applications Mr. Briscoe made for other Starbucks positions.<br><br>**RIVERS DECL. ¶ 11.** | Disputed<br>Plaintiff personally told Rivers (and Rogers) that he had applied, and Rivers appeared upset, and told Plaintiff, "well I didn't know that you were going to do that."<br> AMF 928 and 929 |
| 180.  Until this lawsuit, Rivers did not actually know whether he applied for other positions at Starbucks<br><br>**RIVERS DECL. ¶ 11.** | Disputed<br>Plaintiff personally told Rivers that he had applied, and she appeared upset, and told Plaintiff, "well I didn't know that you were going to do that."<br> AMF 928 and 929 |
| 181.  Rivers had had no involvement in the hiring process for the Branded Solutions Department.<br><br>**RIVERS DECL. ¶ 10.** | Undisputed but **this fact accentuates Rivers' lack of support and assistance to Plaintiff,** as noted in ADF #912 |
| 182.  Mr.  Briscoe received District Manager Training at the beginning of his employment with Starbucks.<br><br>**RIVERS DECL. ¶ 7.** | Undisputed |
| 183.  When Mr. Briscoe completed his training, his District Manager Coach | Undisputed |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| provided Rivers with a District Manager Assessment Guide.<br><br>**RIVERS DECL. ¶ 7.** | |
| 184. In the District Manager Assessment Guide, Mr. Briscoe's Coach identified the following areas for Mr. Briscoe to improve on: (1) attention to detail; (2) interpersonal style issues that resulted in ineffective communication with others (i.e., he was vocally loud during several meetings); (3) the perception that he was focused on his own agenda; and, (4) making bad decisions (tardiness to three shifts of in-store training, late to one DM visit in District Manager Training, and cancelling a visit during District Manager Training<br><br><br><br><br>**RIVERS DECL. ¶ 7, EX. B.** | **Undisputed in part** to the extent that it states excerpts from Defendant's Exhibit – B;<br>**Disputed** to the extent that it ignores the fact that Coach Matt Scruggs made observations which note that Plaintiff was an effective communicator, stating, in part:<br>"Kevin has demonstrated ability to successfully communicate a clear and concise message both written and verbally…He clearly has demonstrated the interpersonal skill set, understanding of motivational needs of his audience, and the charismatic ability to be successful …"<br>**Defendant's Exhibit B**<br>Further,<br>Plaintiff's 2013 first year evaluation contradicts the claims made in Nos.1, 2, 3 and 4.<br>**Exhibits 5 and 6** |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| | **Rivers**, as **Regional Director** over Plaintiff evaluated Plaintiff as an effective and successful communicator and leader, and she assigned him to important **Lead District Manager** Assignments to allow his work products and assistance to be used by other District Managers in Rivers' Region. **Exhibits- 5 and 6** Rivers also noted that, "[Plaintiff] has built and maintained relationships with CO DMs [Company Operations District Managers], RDs [Regional Directors] and SMs [Store Managers] this year and has become a requested partner in CO meetings." **Exhibits- 5 and 6** |
| 185. For the 2012 review period, Rivers rated Mr. Briscoe "Above Expectations" and identified the following opportunities for improvement: "[d]o more work around adjusting for his audience – tends to talk like he thinks and repeats himself rather than just adjusts; [p]eers sometimes wonder if he's listening; [s]hould | Disputed to the extent that there is no component section for "improvement". The evaluation notes that Plaintiff was an effective and successful communicator, leader, and she assigned him to Lead District Manager Assignments which uses his work product and assistance for other District Managers in Rivers' Region. |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| continue to build strong and valuable 1st team relationships." <br><br><br><br><br> **RIVERS DECL. ¶ 8, EX. C; <u>PLF.'S DEP., 263:18-265:6, EX. 11</u>.** | **Exhibit- 5** <br> Rivers also noted that, "[Plaintiff] has built and maintained relationships with CO DMs [Company Operations District Managers], RDs [Regional Directors] and SMs [Store Managers] this year and has become a requested partner in CO meetings." <br> **Exhibit- 5** |
| 186.  Mr. Briscoe Acknowledges that he does not disagree with anything Rivers put in his evaluation for the 2012 review period. <br><br> **<u>PLF.'S DEP., 265: 3-6</u>.** | Undisputed |
| 187.  For the 2013 review period, Rivers rated Mr. Briscoe "Meets Expectations" and identified the following performance improvement opportunities: <br> Continued *focus on listening* for understanding rather than listening to respond. *Ensure you both understand and are understood.  Communication is key to success*.  Elevate store level issues where conflict or misunderstanding occurs. | Disputed, <br> The evaluation does not contain a section for "Performance Improvement Opportunities, as suggested by this fact.  Further, "opportunities" as used in the Form, are neither performance deficiencies or criticisms.  This same Performance Appraisal noted a number of important accomplishments and significant assignments made to Plaintiff, recognizing his excellence. |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| *Ensure all relevant facts are shared* and a clear picture is painted of problems without rounds of follow up questions required to fully understand situation. *Take time to ask questions to ensure understanding on all sides*.   This will minimize opportunity to have integrity questioned.  *Focus on team commitments* and execute in manner agreed to (or influence commitment).   Once aligned execute in accord with agreement.<br><br><br><br><br><br>**RIVERS DECL. ¶ 8, EX. D; <u>PLF.'S DEP., 265:7-266:10, EX. 12</u>.** | The assignment as District Manager to Defendant's **"model operations"** and its highest revenue generators (**LAX and USC), was a positive statement about Plaintiff's performance.**<br><br>**AMF # 875-877; 881-891; 1048 and 1049**<br><br>Plaintiff performed successfully as District Manager over Rivers' Region's most productive and prestigious locations.<br><br>**AMF # 875-877; 881-891; 1048 and 1049**<br><br>LAX **and** USC, both managed by Plaintiff, were the two most complex and highest revenue generating locations in Rivers' entire Region of Licensed Stores.<br><br>**AMF # 875-877; 881-891** |
| 188.  Mr. Briscoe Acknowledges that he does not disagree with anything Rivers put in his evaluation for the 2013 review period.<br><br><br>**<u>PLF.'S DEP., 266: 8-10</u>.** | Undisputed |
| 189.  On May 16, 2014, Rivers received a complaint about Mr. Briscoe | Disputed |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| from LAX Marriott.<br><br><br>**RIVERS DECL. ¶ 13.** | After Plaintiff visited and cited Marriott for Non-compliance (infractions for which there had been recurring citations at the operation),  Hoenecke called Plaintiff saying that Marriott's Manager responsible Marriott for the Starbucks Licensee had called him with complaints about Plaintiff, Plaintiff  immediately telephoned Rivers and reported that the Licensee called Hoenecke complaining because Marriott was out of product when Plaintiff visited and Plaintiff intended to cite Marriott for Non-compliance (reflecting unfavorably on the Marriott Manager).<br><br>AMF #  975-978<br><br>Rivers told Plaintiff that he handled the matter properly.<br><br>AMF #978<br><br>A District Manager for a Licensed Store had duties to protect the Starbucks Brand which he did by working with the Licensee cooperatively, but, when necessary, having to cite the Licensee for |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
|  | Non-Compliance, a dynamic which sometimes put the LSDM at odd with the Licensee and him/its on-site manager, and gave on-site managers (who were employees of the Licensee and not of Starbucks) motivation to complain about the LSDM.<br><br>**AMF # 963-978** |
| 190. LAX Marriott complained to Rivers about an incident wherein a hotel guest complained to the front desk having witnessed Mr. Briscoe yell at a LAX Marriott's Licensed Store Manager, and make her cry. | Disputed<br><br>After Plaintiff visited and cited Marriott for Non-compliance (infractions for which there had been recurring citations at the operation), Hoenecke called Plaintiff saying that Marriott's Manager responsible Marriott for the Starbucks Licensee had called him with complaints about Plaintiff, Plaintiff immediately telephoned Rivers and reported that the Licensee called Hoenecke complaining because Marriott was out of product when Plaintiff visited and Plaintiff intended to cite Marriott for Non-compliance (reflecting unfavorably on the Marriott Manager). |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| | **AMF #  975-978** |
| | Rivers told Plaintiff that he handled the matter properly. |
| | **AMF #978** |
| | A District Manager for a Licensed Store had duties to protect the Starbucks Brand which he did by working with the Licensee cooperatively, but, when necessary, having to cite the Licensee for Non-Compliance, a dynamic which sometimes put the LSDM at odd with the Licensee and him/its on-site manager, and gave on-site managers (who were employees of the Licensee and not of Starbucks) motivation to complain about the LSDM. |
| **RIVERS DECL. ¶ 13.** | **AMF # 963-978** |
| 191.  LAX  Marriot  complained  to Rivers  that  when  it  discussed  the incident with Mr. Briscoe, he refused to take  responsibility,  apologize,  or acknowledge  that  he  did  anything wrong. | Disputed<br>After Plaintiff visited and cited Marriott for Non-compliance (infractions for which there had been recurring citations at the operation),  Hoenecke called Plaintiff saying that Marriott's Manager |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 13.** | responsible Marriott for the Starbucks Licensee had called him with complaints about Plaintiff, Plaintiff  immediately telephoned Rivers and reported that the Licensee called Hoenecke complaining because Marriott was out of product when Plaintiff visited and Plaintiff intended to cite Marriott for Non-compliance (reflecting unfavorably on the Marriott Manager). **AMF #  975-978** Rivers told Plaintiff that he handled the matter properly. **AMF #978** A District Manager for a Licensed Store had duties to protect the Starbucks Brand which he did by working with the Licensee cooperatively, but, when necessary, having to cite the Licensee for Non-Compliance, a dynamic which sometimes put the LSDM at odd with the Licensee and him/its on-site manager, and gave on-site managers (who were employees of the Licensee and not of Starbucks) motivation to complain about the LSDM. |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| | **AMF # 963-978** |
| 192.   Mr. Briscoe did not disclose LAX Marriott incident to Rivers even though she regularly interacted with him after the incident. | Disputed  After Plaintiff visited and cited Marriott for Non-compliance (infractions for which there had been recurring citations at the operation),  Hoenecke called Plaintiff saying that Marriott's Manager responsible Marriott for the Starbucks Licensee had called him with complaints about Plaintiff, Plaintiff  immediately telephoned Rivers and reported that the Licensee called Hoenecke complaining because Marriott was out of product when Plaintiff visited and Plaintiff intended to cite Marriott for Non-compliance (reflecting unfavorably on the Marriott Manager).  **AMF #   975-978**  Rivers told Plaintiff that he handled the matter properly.  **AMF #978**  A District Manager for a Licensed Store had duties to protect the Starbucks Brand which he did by working with the Licensee cooperatively, but, when necessary, having to cite the Licensee for |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 13; <u>PLF.'S DEP., 160:24-162:11</u>.** | Non-Compliance, a dynamic which sometimes put the LSDM at odd with the Licensee and him/its on-site manager, and gave on-site managers (who were employees of the Licensee and not of Starbucks) motivation to complain about the LSDM. **AMF # 963-978** |
| 193.  At the demand of Starbucks' third-party client, Rivers removed Mr. Briscoe from the LAX Marriott account.<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>**Rivers Decl. ¶ 13; Warmke Decl. ¶ 10,** | Undisputed, but Defendant knew that Plaintiff did nothing wrong, as Rivers had stated to Plaintiff, and Defendant's high level management later learned that the Marriott manager later boasted that he did not like District Managers and joke of how he got rid of Plaintiff at the LAX Marriott (essentially for doing his job) **AMF #978 and 980** Rivers and Defendant owed the LSDM the duty to support and assist them including providing reasonable review, investigation and analysis of complaints in light of the dynamics for conflicts given the LSDM's need to cite Licensees for non-compliance and the motivation that could give for false or misleading |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| **Ex. E.** | claims and complaints.<br><br>**AMF # 983** |
| 194.   On February 23, 2015, Licensee Ralphs complained to Rivers that Mr. Briscoe was "not consistent with what he [was] telling the kiosk managers."<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>**Rivers Decl.  ¶ 15, Ex. F; Rogers Decl. ¶ 15.** | Undisputed but,<br><br>Rivers and Defendant owed the LSDM the duty to support and assist them including providing reasonable review, investigation and analysis of complaints in light of the dynamics for conflicts given the LSDM's need to cite Licensees for non-compliance and the motivation that could give for false or misleading claims and complaints.<br><br>**AMF # 983,**<br><br>**AMF # 963-978**<br><br>Plaintiff's criticisms by the Licensee's manager grew out of Plaintiff properly and correctly performing his duties and notifying the Licensee's manager know that he (Plaintiff) would have to issue citations for Non-compliance if the Licensee continued with staffing shortages because it adversely impacted customer service to Starbucks' customers and harmed the Starbucks Brand.<br><br>**AMF # 984-986** |
| 195.   On   March   2,   2015,   Rivers | Undisputed, but the Ralphs situation is as |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| provided Mr. Briscoe feedback regarding the Ralphs complaint.<br><br>**RIVERS DECL. ¶ 15, EX. G.** | set out in response to UF # 49, above. |
| 196. On March 11, 2015, Vons complained to Rivers that it was forced to pay an employee to wait two hours for Mr. Briscoe who was late to a scheduled meeting.<br><br>**RIVERS DECL. ¶ 16; ROGERS DECL. ¶ 15.** | Undisputed, but Plaintiff did nothing wrong. Plaintiff was abruptly caused to change his schedule to make for a new store opening at Residence Inn, about which he timely and promptly notified Rivers, and she agreed.<br><br>AMF # 987, 994-995 |
| 197. Ms. Rivers coached Mr. Briscoe about his lack of communication with respect to this incident<br><br>**RIVERS DECL. ¶ 16, EX. H.** | Undisputed |
| 198. On May 6, 2015, Licensee Vons complained to Rivers that Vons employees felt harassed by Mr. Briscoe because he sent multiple texts to hourly Licensee employees about buying coffee. | Disputed<br>Plaintiff properly discharged his duties ensure that the Licensee was properly stocked with Starbucks products (Coffee, in this instance); there was no undue pressure or "bullying", and Starbucks had no policy preventing LSDMs from texting Licensee managers (or responsible persons) in fulfillment of |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 19, EXS. J-L.** | their duties. Plaintiff simply used the management tools provided by Defendant for monitoring product purchases by Licensees to predict their needs and ensure product was always on hand.<br>AMF 987-999 |
| 199. It is against Starbucks policy to text third-party Licensee employees on their personal cellular phones.<br><br><br><br><br><br><br><br><br><br><br>**RIVERS DECL. ¶ 19.** | Disputed<br>Plaintiff properly discharged his duties ensure that the Licensee was properly stocked with Starbucks products (Coffee, in this instance); there was no undue pressure or "bullying", and Starbucks had no policy preventing LSDMs from texting Licensee managers (or responsible persons) in fulfillment of their duties. Plaintiff simply used the management tools provided by Defendant for monitoring product purchases by Licensees to predict their needs and ensure product was always on hand.<br>AMF 987-999 |
| 200. On May 14, 2015, Rivers emailed Mr. Briscoe to coach him about the May 6th Vons complaint. | Undisputed, but,<br>Plaintiff properly discharged his duties ensure that the Licensee was properly |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| RIVERS DECL. ¶ 19, EX. M. | stocked with Starbucks products (Coffee, in this instance); there was no undue pressure or "bullying", and Starbucks had no policy preventing LSDMs from texting Licensee managers (or responsible persons) in fulfillment of their duties.  Plaintiff simply used the management tools provided by Defendant for monitoring product purchases by Licensees to predict their needs and ensure product was always on hand.<br>AMF 987-999 |
| 201.  District Managers for Licensed Stores are responsible for certifying that baristas of new locations meet Starbucks' standards before the store is permitted to open.<br><br>RIVERS DECL. ¶ 17. | Undisputed. |
| 202.   If a store is not ready to open on a Licensee's preferred date it is the District Manager's responsibility to escalate the issue to the Regional Manager. | Undisputed |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 17.** | |
| 203.  Because Mr. Briscoe failed to follow Starbucks procedure, Starbucks had to close the new Residence Inn location in order to retrain the Licensee employee baristas.<br><br><br><br><br><br><br><br><br><br><br><br>**RIVERS DECL. ¶ 17, EX. I.** | Disputed<br>Plaintiff did not fail to follow any Starbucks procedure in training the Baristas.  The claim that "Starbucks had to close the new Residence Inn location in order to retrain the Licensee employee baristas" is a **lie, verified by Sindy Lomas, the on-site Licensee Manager, who wrote to Rivers and others noting that the additional training for baristas would be, "in addition to operating during normal business hours."**<br>Exhibit – 25;<br>AMF 1000-1006 |
| 204.  Mr.  Briscoe refused to take responsibility for certifying the baristas. | Disputed<br>Plaintiff trained the baristas pursuant to Starbucks' policy and training procedure.  Plaintiff did not fail to train the Baristas, causing them to performance inconsistent with expectations at opening.  A combination of slower employees, nerves, novelty, a lot to learn, the transition from learning to application, the pressure of now, |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 17.** | watchful eyes, and other factors, including the need for practice under live conditions.<br>AMF 1000-1006 |
| 205. Mr. Briscoe believed the deficiencies with the baristas existed because "the baristas that were there that day were handicapped baristas, meaning they had - - they were slower."<br><br>**PLF.'S DEP., 178:1-10.** | Disputed<br>Plaintiff was responsible for training the baristas, which he did in proper form pursuant to Starbucks' policy and training procedure. Plaintiff did not fail to train the Baristas, causing them to performance inconsistent with expectations at opening. It was a combination of slower employees, nerves, novelty, a lot to learn, the transition from learning to application, the pressure of now, watchful eyes, and other factors, including the need for practice under live conditions.<br>AMF 1000-1006 |
| 206. On July 23, 2014, Rivers coached Mr. Briscoe on improving his transparency and communication. | Disputed<br>Rivers harassed Plaintiff with this false and unsupportable claim.<br>Plaintiff was a recognized Leader with excellent communication and people skills, and Defendant repeatedly tapped him for important leadership roles. |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 22, EX. N .** | AMF # 881-891; |
| 207.  On  December  9,  2014,  Rivers coached  Mr.  Briscoe  regarding  his tardiness to a meeting. | Disputed<br><br>Rivers harassed Plaintiff with this false and unsupportable claim.<br><br>Rivers' decision to make a late change in the meeting's scheduled start time created this situation. |
| **RIVERS DECL. ¶ 22, EX. O.** | AMF # 930,954 |
| 208.  On  February  11,  2015,  Rivers coached  Mr.  Briscoe  regarding  his failure  to  notice  whether  exterior  punch items at a Licensee location | Disputed<br><br>Rivers harassed Plaintiff with this false and unsupportable claim.<br><br>This relates to a "Construction issue for a new store under construction".  LSDM are Operational Employees whose duties, job descriptions and roles do not include managing or completing Construction Punch Lists at a Licensed Store. |
| **RIVERS DECL. ¶ 22, EX. P.** | AMF # 1055 |
| 209.  On  February  27,  2015,  Mr. Briscoe provided Rivers improper sales for Terminal Two LAX locations during a period when the terminal was actually closed.<br><br>**RIVERS DECL. ¶ 22, EX. Q.** | Disputed<br><br>Rivers harassed Plaintiff with this false and unsupportable claim.<br><br>Defendant's Finance Department, for its own accounting purposes categorized a closed store as a remodel, resulting in an inaccurate reporting of revenues for a closed store at LAX.  It was Plaintiff |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| | who detected the accounting and questioned it, noting that the store, though closed, was budgeted for the entire year. AMF # 1056 |
| 210. On April 21, 2015, Rivers coached Mr. Briscoe on his communication with Licensees **RIVERS DECL. ¶ 22, EX. R.** | Disputed, Rivers harassed Plaintiff with this false and unsupportable claim. Plaintiff's communication skills were outstanding and were recognized by Defendant as worthy of Leadership Roles, and Rivers had told Plaintiff that he handled the Marriott situation properly, just the way that Scruggs (a Caucasian LSDM had handled a similar situation.) AMF # 883-894 Even in 2015, Rivers made false claims about Plaintiff, but Defendant continued to select Plaintiff for important Leadership roles because of his excellent communication and result orientation. AMF # 934-943; 945-946. |
| 211. On April 24, 2015, Rivers coached Mr. Briscoe regarding deficiencies at one of his stores. | Disputed Rivers harassed Plaintiff with this false and unsupportable claim. Plaintiff's stores were not deficient. Rivers failed |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 22, EX. S.** | and refused to support Plaintiff when he did his job and cited Licensees for Non-Compliance, but she blamed Plaintiff if he did not cite them to enforce compliance.  (Plaintiff couldn't do anything right in Rivers' eyes after he started to seek promotion for his recognized leadership performance.)  AMF # 957-973; 975-1004 |
| 212.  On May 14, 2015, Mr. Briscoe provided Ms. Rivers monthly reports for the wrong time period.  **RIVERS DECL. ¶ 22, EX. T.** | **Disputed**  Rivers harassed Plaintiff with this false and unsupportable claim.  On a single occasion, Plaintiff handed Rivers one paper intending to give her another and Rivers abruptly ended her visit with Plaintiff.  A couple of minutes after Rivers walked away from Plaintiff, he discovered that he gave Rivers the wrong page and sent her an email correcting it.  Rivers refused to acknowledge Plaintiff's email, choosing instead to cite the incident as negative performance.  This incident was not noteworthy for performance.  Rivers did not treat her Caucasian subordinates this way.  AMF # 1040-1042; 896; 899 |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
|  |  |
| 213.  On May 28, 2015, Rivers coached Mr. Briscoe regarding his failure to correspond with "key stakeholders."<br><br>**RIVERS DECL. ¶ 22, EX. U.** | Disputed<br>Rivers harassed Plaintiff with this false and unsupportable claim.<br>Rivers' claim not genuine because Plaintiff knew and understood the Starbuck business, was a Business Leader and an effective communicator whom Defendant tapped for a number of leadership roles (before he started to seek Promotion and Promotional Opportunities) in recognition of his quality performance.<br>AMF # 876-877; 883-894; |
| 214.  On June 5, 2015, Rivers coached Mr. Briscoe regarding errors he made in his sales sheet.<br><br>**RIVERS DECL. ¶22, EX. V.** | Disputed<br>Rivers harassed Plaintiff with this false and unsupportable claim.  Plaintiff's performance was Leadership quality and Rivers continued to select Plaintiff for high profile and important Leadership roles, in 2015.<br>AMF # 934-946<br>Special Leadership selections and assignments was indicative of Defendant's view of performance excellence. |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| | AMF 891 |
| 215.   Most DMs on Rivers' team had a Personal Development Plan ("PDP") outlining their respective goals and aspirations at Starbucks, and strategies for obtaining such goals.<br><br>**RIVERS DECL. ¶ 14.** | Undisputed, but Plaintiff never had on. Plaintiff pursued promotion and solicited support and assistance, but none was given him.<br>AMF # 899-903; 906-913; 927-933; 1050-1053 |
| 216.   A Partner Resources Manager at Starbucks is the same role as a Human Resources Manager at other companies.<br><br>**ROGERS DECL. ¶ 2.** | Undisputed |
| 217.   On June 26, 2014, Mr. Briscoe, Rivers and Sarah Rogers ("Rogers"), the Partner Resources Manager working with Rivers' team, met to discuss Mr. Briscoe's development at Starbucks and Mr. Briscoe developing a PDP.<br><br>**ROGERS DECL.  ¶ 7, EXS. B-C.** | Undisputed |
| 218.   On September 12, 2014, Rogers emailed Mr. Briscoe additional | Disputed<br>Plaintiff denies that Rogers (or Rivers) |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| resources to assist his development.<br><br>**ROGERS DECL. ¶ 8, EX. D.** | ever tried to "assist his development".<br>Plaintiff sent Rogers an email (copying Rivers) seeking specific types of information that was uniquely related to Starbucks would be particularly helpful in assisting him with promotional development, but neither Rogers nor Rivers ever responded.<br>Exhibit 10;<br>AMF # 1057 |
| 219.  In November 2014, Mr. Briscoe, Rivers and Rogers met again to discuss Mr. Briscoe's progress and to ensure a formal PDP was in place.<br><br>**ROGERS DECL. ¶ 9.** | Disputed<br>Plaintiff denies that Rogers (or Rivers) ever tried to "assist his development".<br>Plaintiff sent Rogers an email (copying Rivers) seeking specific types of information that was uniquely related to Starbucks would be particularly helpful in assisting him with promotional development, but neither Rogers nor Rivers ever responded.<br>Exhibit 10;<br>AMF # 1057 |
| 220.  In November 2014, Mr. Briscoe had not completed his PDP. | Disputed<br>Plaintiff denies that Rogers (or Rivers) ever tried to "assist his development", |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| **ROGERS DECL. ¶ 9.** | including assisting Plaintiff with completion of a PDP.  Plaintiff sent Rogers an email (copying Rivers) seeking specific types of information that was uniquely related to Starbucks would be particularly helpful in assisting him with promotional development, but neither Rogers nor Rivers ever responded. Exhibit 10; AMF # 1057 |
| 221.  On December 9, 2014, Rogers scheduled an in-person meeting with Rivers and Mr. Briscoe to facilitate communication between them, and again discuss Starbucks' concerns regarding Mr. Briscoe's communication style.<br><br><br>**ROGERS DECL. ¶ 10.** | Disputed<br>Plaintiff personally requested a meeting with Rogers to discuss what Plaintiff felt to be Race discrimination against him. Plaintiff Depo 277:6-278:14 |
| 222.  On December 17, 2014 Rivers emailed Rivers and Mr. Briscoe a summary of next steps for Mr. Briscoe's | Disputed<br>It makes no sense that "Rivers emailed Rivers…" |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| development and potential support tactics for him.<br><br><br>**ROGERS DECL. ¶ 13, EX. E.** | Plaintiff denies that Rogers (or Rivers) ever tried to "assist his development", including assisting Plaintiff with completion of a PDP.  Plaintiff sent Rogers an email (copying Rivers) seeking specific types of information that was uniquely related to Starbucks would be particularly helpful in assisting him with promotional development, but neither Rogers nor Rivers ever responded.<br>**Exhibit 10;**<br>**AMF # 1057** |
| 223.  Mr. Briscoe agreed to participate in a 360 Peer review which was completed in February 2015, which was designed to give him additional insight into how he was perceived by his peers/other Partners.<br><br><br>**PLF.'S  DEP.,  267:16-24;  ROGERS DECL. ¶ 14, EXS. F-G.** | Undisputed that Plaintiff agreed to participate in a "360".<br>**Disputed** that the purpose or intent of the 360 or Plaintiff's agreement to participate in it was to be used as a performance evaluation  tool from which Defendant would selectively pick and choose anything that it perceived to be a negative and ignore all of the many positives.<br>**AMF # 1007-1012**;<br>Defendant used the 360 solely as a tool against Plaintiff, which was never its |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
| --- | --- |
| | intent or purpose |
| | **UF # 79-83** |
| | Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. |
| | **AMF # 1014-1030** |
| | The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. |
| | **AMF # 1007-1012** |
| | No LSDM other than Plaintiff was the subject of a 360 Survey. |
| | **AMF # 1012** |
| 224. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe stop "[c]oming in with his present agenda for the conversation. At times he seems unwilling to hear what the other person has said if it doesn't fit in with his pack of thinking." | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy.  The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| **ROGERS DECL. ¶ 14, EX. G.** | make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 225.  A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe stop "[w]orking while others are presenting." | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy.   The purpose and |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| **ROGERS DECL. ¶ 14, EX. G.** | intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| | **AMF # 1012** |
| 226. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe stop "[s]peaking over others."<br><br>**ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360".<br>**Disputed** that the comment is performance worthy.  The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments.<br>**AMF # 1007-1012**;<br>Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose<br>**UF # 79-83**<br>Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360.<br>**AMF # 1014-1030**<br>The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| | Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 227.  A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe stop "[a]cting superior to others." **ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy.   The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| | The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 228. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe stop "[s]aying that he is aligned with team commitments and not follow thru [sic] and/or do it 'his way' rather than staying aligned with the team." **ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy.  The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| | **UF # 79-83** |
| | Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. |
| | **AMF # 1014-1030** |
| | The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. |
| | **AMF # 1007-1012** |
| | No LSDM other than Plaintiff was the subject of a 360 Survey. |
| | **AMF # 1012** |
| 229. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that "[w]hen [Mr. Briscoe] disagrees with RD [Rivers], at times it appears disrespectful." **ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy.  The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| | all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 230. A reviewer responding to Mr. Briscoe's 360 Peer Review described Mr. Briscoe as "[s]low, or unwilling, to adapt or conform with Team direction." | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy.  The purpose and intent of the 360 to which Plaintiff |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| **ROGERS DECL. ¶ 14, EX. G.** | agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| 231. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe stop "[t]elling stories in generalities vs. actual specific examples."<br><br><br>**ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360".<br><br>**Disputed** that the comment is performance worthy.  The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments.<br><br>**AMF # 1007-1012**;<br>Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose<br><br>**UF # 79-83**<br>Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360.<br><br>**AMF # 1014-1030**<br>The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| | leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 232.  A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe start "[a]ctively listening more consistently." **ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy.   The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| | of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 233. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe start "[t]aking the time to listen to feedback of others." **ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy. The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant. Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| | Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 234. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe, "[w]hen communicating take additional time to consider what you want the partner to feel as a result of your communication." **ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy.  The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| | **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 235. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe start "[a]ctively listening when others are talking, sharing ideas, presenting, etc. Consider tone in communication may come | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy. The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| across as 'aloof' or arrogant at times." | used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. |
| **ROGERS DECL. ¶ 14, EX. G.** | **AMF # 1007-1012**;<br>Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose |
| | **UF # 79-83**<br>Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. |
| | **AMF # 1014-1030**<br>The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. |
| | **AMF # 1007-1012**<br>No LSDM other than Plaintiff was the subject of a 360 Survey. |
| | **AMF # 1012** |
| 236.  A reviewer responding to Mr. | Undisputed that this is one comment in |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| Briscoe's 360 Peer Review suggested that Mr. Briscoe start "[b]eing more welcoming and generous."<br><br><br>**ROGERS DECL. ¶ 14, EX. G.** | the "360".<br><br>**Disputed** that the comment is performance worthy.   The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments.<br>**AMF # 1007-1012**;<br>Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose<br>**UF # 79-83**<br>Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360.<br>**AMF # 1014-1030**<br>The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| | **AMF # 1007-1012** |
| | No LSDM other than Plaintiff was the subject of a 360 Survey. |
| | **AMF # 1012** |
| 237. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe start "[l]istening to directions, be respectful of others skill sets and experience, be open minded to other ideas."<br><br>**ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360".<br><br>**Disputed** that the comment is performance worthy. The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant. Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments.<br><br>**AMF # 1007-1012**;<br>Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose<br><br>**UF # 79-83**<br>Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360.<br><br>**AMF # 1014-1030**<br>The 360 was an assessment by peers (not of Licensees with whom Plaintiff |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| | interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 238. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe needs to "d]emonstrate professionalism in all work environments." **ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy. The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant. Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| | numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 239. Mr. Briscoe's response to the comments in his 360 review was he "absorbed them," but did not feel he needed to make adjustments based on the feedback. **PLF.'S DEP., 268:19-269:15.** | Undisputed |
| 240. Mr. Briscoe never drafted his PDP. | Undisputed |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| **PLF.'S DEP., 269:16-17; ROGERS DECL. ¶ 20.** | |
| 241. On March 30, 2015, Starbucks issued Mr. Briscoe a Performance Concerns and Expectations Memorandum ("March 30 Memo")  **PLF.'S DEP. 261:11-262:3, EX. 9; ROGERS DECL. ¶16, EX. J; RIVERS DECL. ¶ 18.** | Undisputed |
| 242. On May 6, 2015, Rivers advised Heidi Sundquist ("Sundquist"), another Partner Resources Manager, about the May 6th Vons Complaint.  **RIVERS DECL. ¶ 19; DECLARATION OF HEIDI SUNDQUIST ("SUNDQUIST DECL.") ¶ 7, EX. A.** | Undisputed, but the "Von" complaint was for Plaintiff doing what he was duty-bound to do. AMF # 987-999 |
| 243. On May 12, 2015, Starbucks decided to place Mr. Briscoe on a Performance Improvement Plan ("PIP")  **RIVERS DECL. ¶ 19, SUNDQUIST DECL. ¶ 7, EX. A, ¶ 8.** | Undisputed, but Plaintiff Disputes that a "PIP" was proper, noting that Defendant continued to exhibit recognition of his excellent performance and Leadership by continuing to select and assign him to high profile and important leadership |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| | roles.<br>AMF # 934-946 |
| 244.  Starbucks maintains policies and procedures for issuing a PIP including Performance Improvement Plan Best Practices, and the Performance Improvement Plan Template.<br><br>**SUNDQUIST DECL. ¶ 8, EXS. B-C.** | Undisputed |
| 245.  On June 4, 2015, Rivers and Heidi Sundquist, issued Mr. Briscoe the PIP during an in-person meeting.<br><br>**PLF.'S DECL., 262:13-25; SUNDQUIST DECL. ¶ 9, EX. D; RIVERS DECL. ¶ 19.** | Undisputed, but the PIP was improper because it was supported by false claims by Rivers.<br>AMF # 874-946<br>Of 5 LSDM who are racial minorities, two have filed lawsuits, one filed internal claims alleging discrimination, and one has verbally reported feeling discriminated against by Rivers, who assists Caucasians with promotions and promotional opportunities, but never assisted Plaintiff or any other racial minority, before Plaintiff filed his lawsuit.<br>AMF # 896-898; 899-903; 915-924; 1050-1053 |
| 246.  On June 9, 2015, Mr. Briscoe had | Undisputed |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| a meeting with Rivers and Sundquist wherein he provided his response to the PIP.<br><br>**SUNDQUIST DECL. ¶ 10, EX. E.** | |
| 247. Mr. Briscoe's June 9, 2015, response to the PIP demanded that Starbucks conduct an independent investigation into "unfair treatment and consciously biased actions and behaviors towards [him]" by Rivers.<br><br>**SUNDQUIST DECL. ¶ 10, EX. E.** | Undisputed |
| 248.  During the June 9, 2015, meeting, Mr. Briscoe told Rivers and Sundquist that he had recorded everything that was discussed at the meeting without our knowledge and/or consent.<br><br>**SUNDQUIST DECL. ¶ 10; RIVERS DECL. ¶ 20.** | Undisputed that Plaintiff disclosed to Rivers and Sundquist that he had recorded some 6-10 conversations at different times and offered to play the recordings for them to listen and hear the confirmation of his claims that Rivers was discriminating and retaliating against him once he began pursuing promotion.  They declined Plaintiff's offer to listen to the recordings and later told Plaintiff that the recordings were illegal, causing Plaintiff to believe that |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| | Defendant was saying that it did not want to hear his confirmatory recordings, and that the recordings were worthless. AMF # 1057 |
| 249.   During the June 9, 2015, meeting, Mr. Briscoe also told Rivers and Sundquist that in the past he recorded many of his conversations with us without our knowledge and/or consent.  **SUNDQUIST DECL. ¶ 10; RIVERS DECL. ¶ 20.** | Undisputed that Plaintiff disclosed to Rivers and Sundquist that he had recorded some 6-10 conversations at different times, and offered to play the recordings for them to listen and hear the confirmation of his claims that Rivers was discriminating and retaliating against him once he began pursuing promotion.  They declined Plaintiff's offer to listen to the recordings and later told Plaintiff that the recordings were illegal, causing Plaintiff to believe that Defendant was saying that it did not want to hear his confirmatory recordings, and that the recordings were worthless. AMF # 1057 |
| 250.   Mr. Briscoe also recorded his conversations with Rogers without her knowledge and consent.  **ROGERS DECL. ¶ 18.** | Undisputed |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| 251.  The earliest Mr. Briscoe alleges he made any complaint about improper conduct at Starbucks was in December 2014.<br><br>**PLF.'S DEP., 277:6-278:6.** | Undisputed that Plaintiff alleged race discrimination to Defendant's HR Representative, December of 2014. |
| 252.  On June 12, 2015, Starbucks engaged an independent investigator to investigate Mr. Briscoe's claims.<br><br>**DECLARATION OF EMILY SCHULTZ ("SHULTZ DECL.") ¶ 2, EX. A; SUNDQUIST DECL. ¶ 12, EX. G.** | Undisputed |
| 253.  On June 10, 2015, Mr. Briscoe's PIP was put on hold pending the outcome of the investigation.<br><br>**SUNDQUIST DECL. ¶ 12, EX. G.** | Disputed<br>Plaintiff was blocked from pursuing any promotions or being considered for promotional opportunities, earning pay increases and bonuses, because the PIP is a bar to them.<br>AMF # 914, 950<br>Plaintiff was still being tapped assist Starbucks with important Leadership assignments requiring knowledge of the |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| | Business, excellent communication, analytical and leadership skills, at the same time that Rivers was claiming Plaintiff's performance was unacceptable (a contradiction). AMF # 934-946 |
| 254.  As part of her investigation into Mr. Briscoe's claims, the independent investigator conducted in-depth interviews of five witnesses. **SHULTZ DECL. ¶ 3.** | Disputed as a recent fabrication. Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made. Plaintiff's Depo 244:15-245:2; 246:17-247:4 |
| 255.  As part of her investigation into Mr. Briscoe's claims, the independent investigator reviewed relevant documents provided by Starbucks including emails provided by Mr. Briscoe, Rivers, and Sundquist, and the documents attached to Mr. Briscoe's June 9, 2015, complaint. **SHULTZ DECL. ¶ 4.** | Disputed as a recent fabrication. Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made. Plaintiff's Depo 244:15-245:2; 246:17-247:4 |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| 256. The independent investigator completed her investigation on July 27, 2015.<br><br>**SHULTZ DECL. ¶ 10.** | Undisputed |
| 257. At the conclusion of her investigation, the independent investigator drafted an investigation report that detailed the findings of her investigation.<br><br>**SHULTZ DECL. ¶ 5.** | Disputed as a recent fabrication. Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made.<br>Plaintiff's Depo 244:15-245:2; 246:17-247:4 |
| 258. The independent investigator's report focused on Mr. Briscoe's allegations of unfair treatment and unfair labor practices, discrimination, harassment and "consciously biased actions and behaviors" by Rivers.<br><br>**SHULTZ DECL. ¶ 6.** | Disputed as a recent fabrication. Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made.<br>Plaintiff's Depo 244:15-245:2; 246:17-247:4 |
| 259. The independent investigator | Disputed as a recent fabrication. |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| determined Mr. Briscoe's claims against Rivers were unsubstantiated.<br><br><br>**SHULTZ DECL. ¶ 7.** | Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made.<br>Plaintiff's Depo 244:15-245:2; 246:17-247:4 |
| 260. The independent investigator determined:<br>"The facts do not show Ms. Rivers engaged in consciously biased actions and behaviors, discrimination or harassment toward Mr. Briscoe. Mr. Briscoe also did not identify race, gender or any other such category as the basis for the treatment. There is no indication Ms. Rivers treated him in a consciously biased way, or that she treated Mr. Briscoe differently than other DMs on her team."<br><br>**SHULTZ DECL. ¶ 7.A.** | Disputed as a recent fabrication.<br>Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made.<br>Plaintiff's Depo 244:15-245:2; 246:17-247:4<br>Plaintiff identified race discrimination to S. Rogers at his one-on-one in December, 2014.<br>AMF # 1059 |
| 261. The independent investigator determined:<br>"The facts do not support Mr. Briscoe's | Disputed as a recent fabrication.<br>Plaintiff was told by Shultz that the investigation was complete and that |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| claim of unfair treatment. DMs [] who Mr. Briscoe believes are favored by Ms. Rivers, are top performers and/or take advantage of the career development opportunities given by Ms. Rivers, unlike Mr. Briscoe. In addition, Ms. Rivers has given Mr. Briscoe a great deal of recognition and many opportunities for growth and development in his career at Starbucks." <br><br> **SHULTZ DECL. ¶ 7.B.** | Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made. <br> Plaintiff's Depo 244:15-245:2; 246:17-247:4 |
| 262.   The   independent   investigator determined "[t]he   facts   showed   there was   a   legitimate   basis   for   Mr. Briscoe's PIP" because: <br><br> • "At the request of Marriott, in May 2014 Ms. Rivers removed Mr. Briscoe from the Marriott account because of his improper handling of a non-compliance situation at one of its hotels and his failure to accept responsibility for the incident. <br><br> • Mr. Briscoe trained and certified licensed store employees as baristas at the Residence Inn for the New | **Disputed** as a recent fabrication and false and unsupportable finding. Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made. <br> **Plaintiff's Depo 244:15-245:2; 246:17-247:4: 188:21-189:11;** <br> Plaintiff was told by Rivers that he did nothing wrong at Marriott and that his situation was similar to that of Matt |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| Store Opening (NSO). Ms. Rivers discovered those baristas could not ring up drinks and did not know how to make drinks correctly, and she wanted the store shutdown.<br>• Von's [sic] and Ralph's [sic] complained to Ms. Rivers about Mr. Briscoe, including that he "was a jerk" and he failed to attend scheduled meetings with them.<br>• Mr. Briscoe repeatedly provided inaccurate data to Ms. Rivers, including incorrect sales figures, even after they discussed the approach on a given topic and how it should be communicated.<br>• Despite extensive coaching by Ms. Rivers and PRM Sarah Rogers, Mr. Briscoe failed to accept responsibility for his actions, did not improve in the areas Ms. Rivers coached him about, he was not self-aware and he did not incorporate the feedback they provided."<br><br>**SHULTZ DECL. ¶ 8.** | Scruggs (Caucasian). Scruggs was assisted by Rivers with promotion.<br>**AMF # 975-983;**<br>Rivers lied about the entire Residence Inn situation, including her claim that the store had to shut down.<br>**AMF # 1000-1006;**<br>As to Vons, Rivers lied about Plaintiff for merely doing his job of monitoring and making certain that the Licensee was compliant with Coffee (product) Availability, as he was required to do. Rivers lied claiming there was a "Starbuck Policy" prohibiting texting to a cell phone.<br>**AMF # 987-999**<br>Plaintiff's performance remained excellent throughout his employment as supported by his performance evaluations (Exhibits - 5 and 6), his revenue generation constituting one-third of Rivers' Region's revenues which had 10 to 12 District Managers in the Region (Exhibit- 3), an Plaintiff's continued selection for high profile assignments and important Leadership roles, right through |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| | to his separation in 2015. **AMF # 881-891; 934-946** |
| 263. The independent investigator recommended that Starbucks reinstate the PIP.<br><br>**SHULTZ DECL. ¶ 9.** | **Disputed** as a recent fabrication and false and unsupportable finding. Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made. **Plaintiff's Depo 244:15-245:2; 246:17-247:4: 188:21-189:11;** Plaintiff was told by Rivers that he did nothing wrong at Marriott and that his situation was similar to that of Matt Scruggs (Caucasian). Scruggs was assisted by Rivers with promotion. **AMF # 975-983;** Rivers lied about the entire Residence Inn situation, including her claim that the store had to shut down. **AMF # 1000-1006;** As to Vons, Rivers lied about Plaintiff for merely doing his job of monitoring and making certain that the Licensee was |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| | compliant with Coffee (product) Availability, as he was required to do. Rivers lied claiming there was a "Starbuck Policy" prohibiting texting to a cell phone. **AMF # 987-999** Plaintiff's performance remained excellent throughout his employment as supported by his performance evaluations (Exhibits - 5 and 6), his revenue generation constituting one-third of Rivers' Region's revenues which had 10 to 12 District Managers in the Region (Exhibit- 3), an Plaintiff's continued selection for high profile assignments and important Leadership roles, right through to his separation in 2015. **AMF # 881-891; 934-946** |
| 264.  On July 20, 2015, Mr. Briscoe resigned from his employment with Starbucks.  **SUNDQUIST DECL. ¶ 20, EX. H.** | Undisputed that Plaintiff resigned because Rivers was constantly attacking him with false performance claims and suggesting that he couldn't do anything right, couldn't do emails, food warming…couldn't do anything, (when all the while, Rivers was assigning him to high profile and very important |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| | Leadership roles in recognition of his outstanding performance),  and Defendant was doing nothing to address Plaintiff's complaints of race discrimination, except to allow Rivers to retaliate against him. **Plaintiff's Depo 188:21-189:11; UF # 136-144(below).** |
| 265.  At the time of Mr. Briscoe's resignation, he had been offered, and had accepted, a job at Jack in the Box Inc.<br><br>**PLF.'S DEP. 206:12-15; 209:6-10; 309:24-310:9, EX. 45.** | Undisputed |
| 266.  Mr. Briscoe's starting salary at Jack in the Box Inc. was $120,000 per annum (not inclusive of bonuses).<br><br>**PLF.'S DEP., 302:13-15; 309:24-310:9, EX. 45.** | Undisputed |
| 267.  At the time of his resignation from Starbucks, Mr. Briscoe's annual salary at Starbucks was approximately | Undisputed, but Plaintiff's bonus potential (quarterly payments rather than annually), stock and benefits were |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| $95,963.64 per annum (not including performance bonuses).<br><br><br>**ROGERS DECL. ¶ 22.** | superior at Starbucks, and Starbucks as a Brand was Plaintiff's preferred career path.  Plaintiff took meaningful cut in salary compensation to leave his job at Burger King to accept the Starbucks position, because of the upside career and earnings potential and because he wanted to leave "fast food".  Also, at Starbucks, Plaintiff was in a "ready for promotion" posture, with four year of background and Plaintiff had begun making contact with License Stores VP for the United Kingdom.  At Jack in the Box, Plaintiff had to start from scratch. AMF # 1060 |
| 268.  Mr.   Briscoe's   discrimination claims are based solely on the conduct of Rivers.<br><br><br>**PLF.'S DEP., 143:15-21.** | Undisputed |
| 269.  With  respect  to  whether  Mr. Briscoe's   belief   that   Rivers discriminated  against  was  based  on something   specific,   Mr.   Briscoe acknowledged: "I don't know.  I asked that question myself and couldn't get an | Undisputed in part, but Plaintiff also testified:<br>Plaintiff testified that he was well accepted by Rivers as long as he stayed in his place and did not try to advance, but that Rivers intentionally and |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| <u>understanding why I started getting this treatment. So I don't know why."</u><br><br>**<u>PLF.'S DEP., 144:7-12.</u>** | discriminatorily tried to hold him back when he sought promotion like the Caucasians on Rivers team, and that race was the reason.<br><br>**Plaintiff's Depo 306:8-307:10**<br>Plaintiff also testified as follows:<br>Q. Do you think it was because of your race?<br>A. I do.<br>Q. Why?<br>A. I do. Other employees that were non-black weren't being treated the way that I was being treated.<br>…<br>Q. Who specifically are you referring to?<br>A. Barb Holdgrafer, Deanna Pusatier, Kevin Dockery, Tammy Hereford, Ashley Larson, Erica Hernandez.<br>Q. Anybody else?<br>A. Donna Hernandez.<br>**Plaintiff's Depo 144:13-23.** |
| 270. With respect to his belief that Rivers discriminated against him, Plaintiff acknowledged he "do[esn't] know why things changed . . . I asked | Plaintiff testified that he believed that Rivers was discriminating against him and that he reported same to Rogers as early as December, 2014 |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| that question myself and couldn't get an understanding why I started getting this treatment. So I don't know why."<br><br>**PLF.'S DEP., 144:7-12.** | **Plaintiff's Depo 144:13-23; 277:6-278:2;**<br>Plaintiff testified that he was accepted and credited by Rivers as long as he stayed in his place and did not try to advance, but that Rivers intentionally and discriminatorily tried to hold him back when he sought promotion like the Caucasians on Rivers team, and race was the reason.<br>**Plaintiff's Depo 306:8-307:10** |
| 271. Mr. Briscoe acknowledged he does not know who at Starbucks actually issued, approved, or drafted the PIP.<br><br>**PLF.'S DEP., 263:6-17.** | Undisputed but Irrelevant because, Plaintiff knows Rivers supervised his work activities and that Rivers made numerous the false claims against him which support the PIP.<br>AMF # 904-933; 949-952; 974-1007; 1048-1049; |
| 272. The decision to issue the PIP was actually made in consultation with Partner Resources personnel, not Rivers alone.<br><br>**SUNDQUIST DECL. ¶ 7, EX. A.** | Undisputed but Irrelevant because, Plaintiff knows Rivers supervised his work activities and that Rivers made the false claims against him which support the PIP.<br>AMF # 904-933; 949-952; 974-1007; 1048-1049; |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| 273. Mr. Briscoe acknowledges his retaliation claim is based on the discriminatory actions he claims happened to him.<br><br>**PLF.'S DEP., 144:7-12; 214:21-215:14.** | Plaintiff testified that Rivers was constantly attacking him with false performance claims and suggesting that he couldn't do anything right, couldn't do emails, warm food, send a text message, check to see if Licensees were stocked with product, ask Licensees to comply with Starbucks' standards…couldn't do anything, (when all the while, Rivers was assigning him to high profile and very important Leadership roles in recognition of his outstanding performance), and Defendant was doing nothing to address Plaintiff's complaints of race discrimination, except to allow Rivers to retaliate against him.<br>**Plaintiff's Depo 188:21-189:11; UF # 136-144(below).** |
| 274. Rivers has no hiring authority outside of her team.<br><br>**RIVERS DECL. ¶ 10; MITTAL DECL. ¶ 4, EX. B[6] (DEPOSITION** | Undisputed, but she could support and assist District Managers on her team who sought promotion, and she had supported and assisted Caucasian District Managers promote, but did not support and assist Plaintiff or other racial |

[6] All further excerpts from Ms. Rivers' deposition are attached as Exhibit B to the

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| **OF ANGELA RIVERS ("RIVERS' DEP."), 105:23-106:5.** | minorities during Plaintiff's tenure. AMF # 896-898, 974, 899-903, 912, 914-929, 932. |
| 275.   Rivers did not know Mr. Briscoe had applied for a subsequent BDM position until this lawsuit was filed.  **RIVERS DECL. ¶ 11.** | Disputed Plaintiff personally told Rivers that he had again applied for the BDM position, and she appeared upset with Plaintiff , and told him: "well I didn't know that you were going to do that."  AMF 928 and 929 |
| 276.   Mr. Briscoe acknowledged that Leah Bernard, one of the seven partners he claims received preferential treatment from Rivers, is African American.   **PLF.'S DEP., 33:7-35:11, 67:23-24; RIVERS DECL. ¶ 4.** | **Undisputed** that L. Bernard is an African American. **Disputed** that Bernard was the recipient of any preferential treatment before Plaintiff's allegations of discrimination and filing of a legal action.  Bernard has been the beneficiary of claims against Rivers by Plaintiff and other racial minorities.  Rivers provided no promotional support and/or assistance to racial minorities on her team during Plaintiff's tenure. **AMF # 896-898, 974, 899-903, 912, 914-929, 932.** Rivers assisted Caucasians with |

Declaration of Jyoti Mittal.

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| | promotions and promotional opportunities, but she never assisted any racial minority with promotions or promotional opportunity during Plaintiff's tenure. **AMF # 896-899** |
| 277. Mr. Briscoe claims partners on Rivers' team received opportunities he did not, including "elevation," promotion and/or additional responsibilities.<br><br>**PLF.'S DEP., 33:7-35:11; 35:24-39:6; 150:13-152:25; 221:15-223:16.** | Undisputed |
| 278. Mr. Briscoe acknowledges he did not apply for the positions he claims partners on Rivers' team received instead of him.<br><br>**PLF.'S DEP., 221:15-223:16.** | **Undisputed, but** Rivers did not support or assist Plaintiff in his promotional efforts; she actively blocked Plaintiff from pursuit of the positions for which he applied; and she refused to offer assistance when Plaintiff requested it. **AMF # 912, 925-929;** Rivers also used PIPs to block other racial minorities on her team from promoting, while she supported and assisted Caucasians in obtaining |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| | promotions.<br>**AMF # 896-898, 974, 899-903, 912, 914-929, 932.** |
| 279.  Mr. Briscoe acknowledges that the promotions he claims partners on Rivers' team received instead of him occurred after he resigned from Starbucks.<br><br>**PLF.'S DEP. 222:1-11.** | Disputed<br>Rivers herself testified that she supported the promotions of Dockery, Scruggs, Pusatier, and other Caucasians during Plaintiff's tenure.<br>**AMF # 896** |
| 280.  Mr. Briscoe acknowledges that the opportunities he claims went to other partners instead of him went to partners far more senior to him at Starbucks.<br><br>**PLF.'S DEP., 48:3-10; 144:13-147:2.** | Undisputed but totally Irrelevant<br>Starbucks had no policy that made "seniority" a factor in promotional considerations.<br>**AMF # 1061** |
| 281.  Rivers appointed Mr. Briscoe to the Disney Star Team in 2011.<br><br>**RIVERS DECL. ¶ 23.** | Undisputed, and an illustration that Rivers recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 282.  Rivers appointed Mr. Briscoe to the Disney Star Team in 2012. | Undisputed, and an illustration that Rivers recognized Plaintiff's excellence, |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 23.** | in communication, leadership, interpersonal skills and professionalism. This high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 283.   Rivers nominated Mr. Briscoe as DM of the Quarter in 2012.<br><br>**RIVERS DECL. ¶ 23.** | Undisputed, and an illustration that Rivers recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 284.   Rivers nominated Mr. Briscoe as DM of the Quarter in 2013.<br><br>**RIVERS DECL. ¶ 23.** | Undisputed, and an illustration that Rivers recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 285.   Rivers appointed Mr. Briscoe as Annual Operating Plan Pillar Lead in 2014. | Undisputed, and an illustration that Rivers recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 23.** | This high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 286.  Rivers selected Mr. Briscoe to highlight and tour one of his locations with the United States Leadership team in 2014.<br><br>**RIVERS DECL. ¶ 23.** | Undisputed, and an illustration that Rivers recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 287.  Rivers appointed Mr. Briscoe as Annual Operating Plan Pillar Lead 2015 Our Coffee and Our Food, including Evenings and Refreshment (supporting peer DM).<br><br>**RIVERS DECL. ¶ 23.** | Undisputed, and an illustration that Rivers recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 288.  Rivers selected Mr. Briscoe as highlighted in a partner appreciation week in Q2 of 2015 for specific support of a senior leader visit.<br><br>**RIVERS DECL. ¶ 23.** | Undisputed, and an illustration that Rivers recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This high profile and important leadership assignment is an exhibition |

| UNCONTROVERTED FACTS[4] | SUPPORTING EVIDENCE |
|---|---|
| | that Plaintiff was a recognized outstanding performer. |
| 289. Rivers selected Mr. Briscoe's USC location for a March 2015 tour with the United States Leadership team.<br><br>**RIVERS DECL. ¶ 23.** | Undisputed, and an illustration that Rivers recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 290. Starbucks has policies and procedures that specifically prohibit discrimination, harassment, and retaliation. Attached as Exhibit A are true and correct copies of these policies.<br><br>**ROGERS DECL. ¶ 5, EX. A.** | Undisputed, but Starbucks has allowed Rivers to discriminate against racial minorities (Nelson, Hernandez and Plaintiff) with impunity. AMF 915-924; 949-952. |

## B.   RETALIATION

ISSUE NO. 3:   Plaintiff's retaliation claim fails because Plaintiff cannot state a *prima facie* case of retaliation as he cannot show a causal connection between any protected activity and any adverse employment action.

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| 291. Similar to a franchise, Starbucks licenses its brand and products to | Undisputed |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| Licensed Stores run by other companies (Licensees), including, but not limited to, Vons, Ralphs, Marriott, and Disney.<br><br>**DECLARATION OF ANGELA M. RIVERS ("RIVERS DECL.") ¶ 6.** | |
| 292. Licensees, sell Starbucks' products, and are responsible for managing their retail operations.<br><br>**RIVERS DECL. ¶ 6.** | Undisputed |
| 293.  In August 2011, Mr. Briscoe was interviewed and hired as a Licensed Store District Manager ("DM") by Angela Rivers ("Rivers"), Regional Director.<br><br>**DECLARATION OF JYOTI MITTAL ("MITTAL DECL.") ¶ 3, EXHIBIT ("EX.") A[8] (DEPOSITION OF PLAINTIFF KEVIN BRISCOE ("PLF'S DEP."), <u>63:21-64:10</u>); RIVERS DECL. ¶ 4.** | Undisputed |
| 294.  Rivers was Mr. Briscoe's direct | Undisputed |

---

[8] All further excerpts from Mr. Briscoe's deposition are attached as Exhibit A to the Declaration of Jyoti Mittal.

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| supervisor during his entire employment at Starbucks.<br><br>**RIVERS DECL. ¶ 4.** | |
| 295. Mr. Briscoe was one of three African American DMs on Rivers' 12-person team, including Leah Bernard.<br><br>**RIVERS DECL. ¶ 4; PLF.'S DEP., 67:21-24, 148:18-149:3.** | Undisputed |
| 296. While employed by Starbucks, Mr. Briscoe was familiar with its policies against discrimination and retaliation as well as Starbucks' open door policy outlining procedures for reporting violations of company policies.<br><br>**PLF.'S DEP., 118:8-123:2, EX. 2; 129:25-130:3; 131:12-132:6, EX. 3; 132:7-25 EX. 4; 137:21-141:23, EX. 6; 271:4-6.** | Undisputed |
| 297. As a DM, Mr. Briscoe was responsible for leading an assigned group of Licensed Store management | Undisputed |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| teams within his district.<br><br>**RIVERS DECL. ¶ 6, EX. A.** | |
| 298. As a DM Mr. Briscoe was responsible for assessing the overall operation of Licensed Stores, including ensuring Licensed Store compliance with Starbucks Experience standards.<br><br>**RIVERS DECL. ¶ 6, EX. A.** | Undisputed |
| 299. Communication skills are crucial to the DM position because District Managers regularly interface with Starbucks' Licensees and their employees.<br><br>**RIVERS DECL. ¶ 6, EX. A.** | Undisputed |
| 300. Paramount to Starbucks' business model is communication with its partners, Licensees, and patrons.<br><br>**RIVERS DECL. ¶ 6; DECLARATION OF SARAH ROGERS ("ROGERS DECL.") ¶ 5, EX. A.; <u>PLF.'S DEP., 139:12-140:7, EX. 14.</u>** | Undisputed |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
| --- | --- |
| 301. Plaintiff acknowledged that communication was vital and important at Starbucks.<br><br>**PLF.'S DEP., 88:3-11.** | Undisputed |
| 302. On April 27, 2014, Mr. Briscoe applied for a Business Development Manager ("BDM") position in the Branded Solutions Department.<br><br>**RIVERS DECL. ¶ 9, EX. D.** | Undisputed |
| 303. Prior to Mr. Briscoe's interview for the BDM position, Rivers notified Frank Sica ("Sica") and John Warmke ("Warmke"), Branded Solutions managers, regarding Mr. Briscoe's candidacy.<br><br>**RIVERS DECL. ¶ 9, EX. D; DECLARATION OF JOHN WARMKE ("WARMKE DECL.") ¶ 4.** | Undisputed |
| 304. Mr. Briscoe interviewed with Kelly White ("White"), Senior Recruiter. | Undisputed |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| **WARMKE DECL. ¶ 6, EX. A.** | |
| 305.  On May 27, 2014, White emailed her notes about Mr. Briscoe and Mr. Briscoe's resume to Warmke. | Undisputed |
| **WARMKE DECL. ¶ 6, EXS. A AND B.** | |
| 306.  In her May 27, 2014, email to Warmke regarding Mr. Briscoe, Under the heading "Opportunities/Areas to probe further", White asked Warmke to "probe further on how this role fits into Kevin's overall career path.   His background is heavy in operations and he has not held a traditional sales role in his past." | Undisputed |
| **WARMKE DECL. ¶ 6, EX. A.** | |
| 307.  On   June   3,   2014,   Warmke telephonically interviewed Mr. Briscoe for the BDM position. | Undisputed |
| **WARMKE DECL. ¶ 7; <u>PLF.'S DEP., 253:10-16</u>.** | |
| 308.  Warmke's took detailed notes of his interview of Mr. Briscoe | Objection:  the notes are redacted relative to the most important |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| **WARMKE DECL. ¶ 7, EX. C.** | information relating to this fact.  Thus, Hearsay and Best Evidence Objections are valid. |
| 309.   Under the heading "Development Areas" in Warmke's notes regarding his interview with Mr. Briscoe, Warmke identifies the following items:<br>• "Strategic approach to market, segment, account [sic]<br> o I was looking for candidates that could provide more insight and sales and/or development examples which may be a function of a lack of strategic selling experiences []<br> o You have a very good background but was [sic] much more centered on the operational approach of execution selling as an operator.  This is a good quality, but the stronger candidates were able to demonstrate success through much more strategic influence | **Disputed** as to the author of the notes for the reasons set out in No 18, above.  Otherwise, Plaintiff responds that the content of the note is correctly restated, thus: **Undisputed.** |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| and experience, such as market research, targeting top decision makers and influencers, focus on strategic questioning that drove alignment to customer needs from a strategic or organizational level that creating mutual partnership or joint business planning initiatives.<br><br>o Kevin's experience is that he is working within an existing account structure, usually franchise model of operations and maintaining margin and cost.<br><br>o The successes and sharing as it relates to selling, relationship management, and business development were centered on an operational approach or execution of telling the customer what they needed to be successful from the eyes of the operator.  Here's the menu, | |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| the POS, the space needed, etc.<br><br>    o He didn't speak to strategic sales and development approach and instead took a more operational approach to meeting costs and following an existing agreement model for sales.<br><br>        ▪ Other candidates have been able to demonstrate success through market research, targeting top decision makers and influencers, focus on strategic questioning that drove alignment to customer needs from a strategic or organizational level that creating mutual partnership or joint business planning initiatives.<br><br>• Listening to understand needs, focus | |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| on being concise.<br><br>   o  There was a need to re-state several questions to re-focus Kevin's responses. He is very enthusiastic and wants to share his story, but several questions were focused on specifics.<br><br>        ■  After asked further questions, the response often centered back on putting costs together, telling customer how it will work, specs, etc. and aligning on what they are willing to spend."<br><br>**Warmke Decl. ¶ 7, Ex. C.** | |
| 310.   On June 4, 2014, Mr. Briscoe also telephonically met with Frank Sica, Mr. Warmke's supervisor, to discuss the BDM position.<br><br>**WARMKE DECL. ¶ 8, EX. D; <u>PLF.'S DEP. 252:25-253:9</u>.** | Undisputed that Plaintiff had a very short telephone call with Sica, but, as Sica stated"…**this was not an interview from my perspective...**" **Sica also stated:** "John, I know you will share your complete feedback on Kevin with Angie…"<br><br>**Defendant's Exhibit D** |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| 311.  Mr. Briscoe was not offered the BDM position.<br><br>**WARMKE DECL. ¶ 9; RIVERS DECL. ¶ 10.** | Undisputed, but it is also important that Briscoe was not given Feedback. |
| 312.  At Starbucks, it is customary for the managers of internal candidates to receive feedback from interviewers so that the managers can assist the partner's development<br><br>**WARMKE, DECL. ¶ 7, RIVERS DECL. ¶ 10.** | **Undisputed,** but Defendant had a mandatory Post Interview Feedback Procedure that was to be followed within 24 hours of the interview, which was not followed relative to Plaintiff's pursuit of promotion:<br>a. that an Interviewer complete a Post-Interview "Feedback Form", see Plaintiff's Exhibit - 36, and<br>b. that the Interviewee be provided with the Feedback. |
| 313.  Warmke provided his feedback to Mr. Briscoe's manager, Rivers. | Disputed.<br>Post Interview Feedback Procedure that was to be followed within 24 hours of the interview, which was not followed relative to Plaintiff's pursuit of promotion:<br>a. that an Interviewer complete a Post-Interview "Feedback Form", see Plaintiff's Exhibit - 36, and<br>b. that the Interviewee be provided with |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| **WARMKE DECL. ¶ 7, EX. C; RIVERS DECL. ¶ 10.** | the Feedback.<br>Plaintiff was never provided with any Feedback. |
| 314. On June 4, 2014, Sica emailed Rivers a summary of his conversation with Mr. Briscoe.<br><br>**WARMKE DECL. ¶ 8, EX. D; RIVERS DECL. ¶ 10.** | Undisputed but Irrelevant as it was not an Interview.<br>**Defendant's Exhibit D** |
| 315. In his June 4, 2014, email regarding Mr. Briscoe , Sica notes: "Kevin spoke for a majority of the 30 minutes and I found him to be . . . very operationally focused . . . . Although this was not an interview from my perspective (naturally Kevin treated it as an interview), his descriptions and examples of a majority of his diverse career work experiences were operationally focused. During our brief connect, he did not articulate any sales and/or development examples which may be a function of a lack of strategic selling experiences or not enough time to dive deep."<br><br>**WARMKE DECL.¶ 8, EX. D.** | Undisputed, that this is an excerpt from Sica's email of June 4.<br>**Defendant's Exhibit D** |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| 316.  Prior to Mr. Briscoe's interview with Mr. Warmke for the BDM position they had met.<br><br>**WARMKE DECL. ¶ 5.** | **Undisputed, but Immaterial**, because any such "meeting" was in an incidental group setting and with non-specific purposes. |
| 317.  Warmke found Mr. Briscoe to be professional.<br><br>**WARMKE DECL. ¶ 5.** | Undisputed |
| 318.  Mr. Briscoe acknowledges that he has no reason to believe Warmke had a reason to dislike him.<br><br>**PLF.'S DEP., 253:10-19; 254:2-4.** | Undisputed |
| 319.  The role of BDM was developed and went into effect in approximately late 2013, early 2013.<br><br>**WARMKE DECL. ¶ 3.** | Undisputed |
| 320.  Warmke has hired an African American as a BDM in the past.<br><br>**WARMKE DECL. ¶ 3.** | Undisputed |
| 321.  Mr. Briscoe acknowledges that he has no reason to believe Frank Sica had a reason to dislike him. | Undisputed |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| **PLF.'S DEP., 253:24-254:1.** | |
| 322. In November 8, 2014, Mr. Briscoe applied for another BDM position, but was not interviewed. <br><br> **ROGERS DECL. ¶ 21.** | Undisputed |
| 323. Warmke was not aware of Mr. Briscoe's November 8, 2014, application for the other BDM position. <br><br><br><br><br><br><br><br><br> **WARMKE DECL. ¶ 9.** | Disputed <br> Warmke was the hiring manager for the BDM position when Plaintiff applied on-line on November 8, 2014. Relative to Plaintiff's application, the "status " is noted as "Starbucks Not Interested", with the only Starbuck employee identified being "Hiring Manager John Warmke". The Internal Recruiter could never make that decision without the Hiring manager. <br> Exhibit – 8; <br> AMF #1051 |
| 324. Rivers was not provided any details regarding any subsequent applications Mr. Briscoe made for other Starbucks positions. | Disputed <br> Plaintiff personally told Rivers (and Rogers) that he had applied, and Rivers appeared upset, and told Plaintiff, "well I didn't know that you were going to do that." |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 11.** | AMF 928 and 929 |
| 325.  Until this lawsuit, Rivers did not actually know whether he applied for other positions at Starbucks | Disputed<br><br>Plaintiff personally told Rivers that he had applied, and she appeared upset, and told Plaintiff, "well I didn't know that you were going to do that." |
| **RIVERS DECL. ¶ 11.** | AMF 928 and 929 |
| 326.  Rivers had had no involvement in the hiring process for the Branded Solutions Department. | Undisputed but **this fact accentuates Rivers' lack of support and assistance to Plaintiff,** as noted in ADF #912 |
| **RIVERS DECL. ¶ 10.** | |
| 327. Mr. Briscoe received District Manager Training at the beginning of his employment with Starbucks. | Undisputed |
| **RIVERS DECL. ¶ 7.** | |
| 328.  When Mr. Briscoe completed his training, his District Manager Coach provided Rivers with a District Manager Assessment Guide. | Undisputed |
| **RIVERS DECL. ¶ 7.** | |
| 329. In  the  District  Manager Assessment Guide, Mr. Briscoe's Coach identified  the  following  areas  for  Mr. | **Undisputed in part** to the extent that it states excerpts from Defendant's Exhibit – B; |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| Briscoe to improve on: (1) attention to detail; (2) interpersonal style issues that resulted in ineffective communication with others (i.e., he was vocally loud during several meetings); (3) the perception that he was focused on his own agenda; and, (4) making bad decisions (tardiness to three shifts of in-store training, late to one DM visit in District Manager Training, and cancelling a visit during District Manager Training | **Disputed** to the extent that it ignores the fact that Coach Matt Scruggs made observations which note that Plaintiff was an effective communicator, stating, in part: "Kevin has demonstrated ability to successfully communicate a clear and concise message both written and verbally…He clearly has demonstrated the interpersonal skill set, understanding of motivational needs of his audience, and the charismatic ability to be successful …" **Defendant's Exhibit B** Further, Plaintiff's 2013 first year evaluation contradicts the claims made in Nos.1, 2, 3 and 4. **Exhibits 5 and 6** **Rivers**, as **Regional Director** over Plaintiff evaluated Plaintiff as an effective and successful communicator and leader, and she assigned him to important **Lead District Manager** Assignments to allow his work products and assistance to be used by other |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 7, EX. B.** | District Managers in Rivers' Region. **Exhibits- 5 and 6** Rivers also noted that, "[Plaintiff] has built and maintained relationships with CO DMs [Company Operations District Managers], RDs [Regional Directors] and SMs [Store Managers] this year and has become a requested partner in CO meetings." **Exhibits- 5 and 6** |
| 330. For the 2012 review period, Rivers rated Mr. Briscoe "Above Expectations" and identified the following opportunities for improvement: "[d]o more work around adjusting for his audience – tends to talk like he thinks and repeats himself rather than just adjusts; [p]eers sometimes wonder if he's listening; [s]hould continue to build strong and valuable 1st team relationships." **RIVERS DECL. ¶ 8, EX. C; PLF.'S** | Disputed to the extent that there is no component section for "improvement". The evaluation notes that Plaintiff was an effective and successful communicator, leader, and she assigned him to Lead District Manager Assignments which uses his work product and assistance for other District Managers in Rivers' Region. **Exhibit- 5** Rivers also noted that, "[Plaintiff] has built and maintained relationships with CO DMs [Company Operations District Managers], RDs [Regional Directors] and SMs [Store Managers] this year and has become a requested partner in CO |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| **DEP., 263:18-265:6, EX. 11.** | meetings." <br> **Exhibit- 5** |
| 331. Mr. Briscoe Acknowledges that he does not disagree with anything Rivers put in his evaluation for the 2012 review period. <br><br> **PLF.'S DEP., 265: 3-6.** | Undisputed |
| 332. For the 2013 review period, Rivers rated Mr. Briscoe "Meets Expectations" and identified the following performance improvement opportunities: <br> Continued *focus on listening* for understanding rather than listening to respond. *Ensure you both understand and are understood. Communication is key to success.* Elevate store level issues where conflict or misunderstanding occurs. *Ensure all relevant facts are shared* and a clear picture is painted of problems without rounds of follow up questions required to fully understand situation. *Take time to ask questions to ensure understanding on all sides.* This will minimize opportunity to have integrity | Disputed, <br> The evaluation does not contain a section for "Performance Improvement Opportunities," as suggested by this fact. Further, "opportunities" as used in the Form, are neither performance deficiencies or criticisms. This same Performance Appraisal noted a number of important accomplishments and significant assignments made to Plaintiff, recognizing his excellence. <br> The assignment as District Manager to Defendant's **"model operations"** and its highest revenue generators **(LAX and USC), was a positive statement about Plaintiff's performance.** <br> **AMF # 875-877; 881-891; 1048 and 1049** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| questioned.  *Focus on team commitments and execute in manner agreed to (or influence commitment).   Once aligned execute in accord with agreement.* <br><br><br><br><br><br> **RIVERS DECL. ¶ 8, EX. D; <u>PLF.'S DEP., 265:7-266:10, EX. 12</u>.** | Plaintiff performed successfully as District Manager over Rivers' Region's most productive and prestigious locations. <br> **AMF # 875-877; 881-891; 1048 and 1049** <br> LAX **and** USC, both managed by Plaintiff, were the two most complex and highest revenue generating locations in Rivers' entire Region of Licensed Stores. <br> **AMF # 875-877; 881-891** |
| 333.  Mr. Briscoe Acknowledges that he does not disagree with anything Rivers put in his evaluation for the 2013 review period. <br><br> **<u>PLF.'S DEP., 266: 8-10</u>.** | Undisputed |
| 334.  On May 16, 2014, Rivers received a complaint about Mr. Briscoe from LAX Marriott. | Disputed <br><br> After Plaintiff visited and cited Marriott for Non-compliance (infractions for which there had been recurring citations at the operation),  Hoenecke called Plaintiff saying that Marriott's Manager responsible Marriott for the Starbucks Licensee had called him with complaints |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| | about Plaintiff, Plaintiff  immediately telephoned Rivers and reported that the Licensee called Hoenecke complaining because Marriott was out of product when Plaintiff visited and Plaintiff intended to cite Marriott for Non-compliance (reflecting unfavorably on the Marriott Manager).<br><br>AMF #  975-978<br><br>Rivers told Plaintiff that he handled the matter properly.<br><br>AMF #978<br><br>A District Manager for a Licensed Store had duties to protect the Starbucks Brand which he did by working with the Licensee cooperatively, but, when necessary, having to cite the Licensee for Non-Compliance, a dynamic which sometimes put the LSDM at odd with the Licensee and him/its on-site manager, and gave on-site managers (who were employees of the Licensee and not of Starbucks) motivation to complain about the LSDM. |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 13.** | **AMF # 963-978** |
| 335. LAX Marriott complained to Rivers about an incident wherein a hotel guest complained to the front desk having witnessed Mr. Briscoe yell at a LAX Marriott's Licensed Store Manager, and make her cry. | Disputed<br><br>After Plaintiff visited and cited Marriott for Non-compliance (infractions for which there had been recurring citations at the operation), Hoenecke called Plaintiff saying that Marriott's Manager responsible Marriott for the Starbucks Licensee had called him with complaints about Plaintiff, Plaintiff immediately telephoned Rivers and reported that the Licensee called Hoenecke complaining because Marriott was out of product when Plaintiff visited and Plaintiff intended to cite Marriott for Non-compliance (reflecting unfavorably on the Marriott Manager).<br><br>**AMF #  975-978**<br><br>Rivers told Plaintiff that he handled the matter properly.<br><br>**AMF #978**<br><br>A District Manager for a Licensed Store |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| | had duties to protect the Starbucks Brand which he did by working with the Licensee cooperatively, but, when necessary, having to cite the Licensee for Non-Compliance, a dynamic which sometimes put the LSDM at odd with the Licensee and him/its on-site manager, and gave on-site managers (who were employees of the Licensee and not of Starbucks) motivation to complain about the LSDM. |
| **RIVERS DECL. ¶ 13.** | **AMF # 963-978** |
| 336. LAX Marriot complained to Rivers that when it discussed the incident with Mr. Briscoe, he refused to take responsibility, apologize, or acknowledge that he did anything wrong. | Disputed<br><br>After Plaintiff visited and cited Marriott for Non-compliance (infractions for which there had been recurring citations at the operation),  Hoenecke called Plaintiff saying that Marriott's Manager responsible Marriott for the Starbucks Licensee had called him with complaints about Plaintiff, Plaintiff  immediately telephoned Rivers and reported that the Licensee called Hoenecke complaining because Marriott was out of product when Plaintiff visited and Plaintiff |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| | intended to cite Marriott for Non-compliance (reflecting unfavorably on the Marriott Manager). **AMF #  975-978** Rivers told Plaintiff that he handled the matter properly. **AMF #978** A District Manager for a Licensed Store had duties to protect the Starbucks Brand which he did by working with the Licensee cooperatively, but, when necessary, having to cite the Licensee for Non-Compliance, a dynamic which sometimes put the LSDM at odd with the Licensee and him/its on-site manager, and gave on-site managers (who were employees of the Licensee and not of Starbucks) motivation to complain about the LSDM. |
| **RIVERS DECL. ¶ 13.** | **AMF # 963-978** |
| 337.   Mr. Briscoe did not disclose LAX Marriott incident to Rivers even though she regularly interacted with him after the incident. | Disputed After Plaintiff visited and cited Marriott for Non-compliance (infractions for which there had been recurring citations at the operation),  Hoenecke called Plaintiff saying that Marriott's Manager |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| | responsible Marriott for the Starbucks Licensee had called him with complaints about Plaintiff, Plaintiff immediately telephoned Rivers and reported that the Licensee called Hoenecke complaining because Marriott was out of product when Plaintiff visited and Plaintiff intended to cite Marriott for Non-compliance (reflecting unfavorably on the Marriott Manager). |
| | **AMF #  975-978** |
| | Rivers told Plaintiff that he handled the matter properly. |
| | **AMF #978** |
| | A District Manager for a Licensed Store had duties to protect the Starbucks Brand which he did by working with the Licensee cooperatively, but, when necessary, having to cite the Licensee for Non-Compliance, a dynamic which sometimes put the LSDM at odd with the Licensee and him/its on-site manager, and gave on-site managers (who were employees of the Licensee and not of Starbucks) motivation to complain about the LSDM. |
| **RIVERS DECL. ¶ 13; <u>PLF.'S DEP.,</u>** | |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| **160:24-162:11.** | **AMF # 963-978** |
| 338. At the demand of Starbucks' third-party client, Rivers removed Mr. Briscoe from the LAX Marriott account.<br><br>**Rivers Decl. ¶ 13; Warmke Decl. ¶ 10, Ex. E.** | Undisputed, but Defendant knew that Plaintiff did nothing wrong, as Rivers had stated to Plaintiff, and Defendant's high level management later learned that the Marriott manager later boasted that he did not like District Managers and joke of how he got rid of Plaintiff at the LAX Marriott (essentially for doing his job)<br><br>**AMF #978 and 980**<br><br>Rivers and Defendant owed the LSDM the duty to support and assist them including providing reasonable review, investigation and analysis of complaints in light of the dynamics for conflicts given the LSDM's need to cite Licensees for non-compliance and the motivation that could give for false or misleading claims and complaints.<br><br>**AMF # 983** |
| 339. On February 23, 2015, Licensee Ralphs complained to Rivers that Mr. Briscoe was "not consistent with what he [was] telling the kiosk managers." | Undisputed but,<br>Rivers and Defendant owed the LSDM the duty to support and assist them including providing reasonable review, investigation and analysis of complaints |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| | in light of the dynamics for conflicts given the LSDM's need to cite Licensees for non-compliance and the motivation that could give for false or misleading claims and complaints. **AMF # 983,** **AMF # 963-978** Plaintiff's criticisms by the Licensee's manager grew out of Plaintiff properly and correctly performing his duties and notifying the Licensee's manager know that he (Plaintiff) would have to issue citations for Non-compliance if the Licensee continued with staffing shortages because it adversely impacted customer service to Starbucks' customers and harmed the Starbucks Brand. |
| **Rivers Decl. ¶ 15, Ex. F; Rogers Decl. ¶ 15.** | **AMF # 984-986** |
| 340. On March 2, 2015, Rivers provided Mr. Briscoe feedback regarding the Ralphs complaint. **RIVERS DECL. ¶ 15, EX. G.** | Undisputed, but the Ralphs situation is as set out in response to UF # 49, above. |
| 341. On March 11, 2015, Vons complained to Rivers that it was forced to pay an employee to wait two hours | Undisputed, but Plaintiff did nothing wrong. Plaintiff was abruptly caused to change his schedule to make for a new |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| for Mr. Briscoe who was late to a scheduled meeting.<br><br>**RIVERS DECL. ¶ 16; ROGERS DECL. ¶ 15.** | store opening at Residence Inn, about which he timely and promptly notified Rivers, and she agreed.<br><br>AMF # 987, 994-995 |
| 342.  Ms. Rivers coached Mr. Briscoe about his lack of communication with respect to this incident<br><br>**RIVERS DECL. ¶ 16, EX. H.** | Undisputed |
| 343.  On May 6, 2015, Licensee Vons complained to Rivers that Vons employees felt harassed by Mr. Briscoe because he sent multiple texts to hourly Licensee employees about buying coffee.<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>**RIVERS DECL. ¶ 19, EXS. J.-L.** | Disputed<br>Plaintiff properly discharged his duties ensure that the Licensee was properly stocked with Starbucks products (Coffee, in this instance); there was no undue pressure or "bullying", and Starbucks had no policy preventing LSDMs from texting Licensee managers (or responsible persons) in fulfillment of their duties.  Plaintiff simply used the management tools provided by Defendant for monitoring product purchases by Licensees to predict their needs and ensure product was always on hand.<br>AMF 987-999 |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| 344.  It is against Starbucks policy to text third-party Licensee employees on their personal cellular phones.<br><br>**RIVERS DECL. ¶ 19.** | Disputed<br>Plaintiff properly discharged his duties ensure that the Licensee was properly stocked with Starbucks products (Coffee, in this instance); there was no undue pressure or "bullying", and Starbucks had no policy preventing LSDMs from texting Licensee managers (or responsible persons) in fulfillment of their duties.  Plaintiff simply used the management tools provided by Defendant for monitoring product purchases by Licensees to predict their needs and ensure product was always on hand.<br>AMF 987-999 |
| 345.   On May 14, 2015, Rivers emailed Mr. Briscoe to coach him about the May 6th Vons complaint. | Undisputed, but,<br>Plaintiff properly discharged his duties ensure that the Licensee was properly stocked with Starbucks products (Coffee, in this instance); there was no undue pressure or "bullying", and Starbucks had no policy preventing LSDMs from texting Licensee managers (or responsible persons) in fulfillment of their duties.  Plaintiff simply used the |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 19, EX. M.** | management tools provided by Defendant for monitoring product purchases by Licensees to predict their needs and ensure product was always on hand.<br>AMF 987-999 |
| 346. District Managers for Licensed Stores are responsible for certifying that baristas of new locations meet Starbucks' standards before the store is permitted to open.<br><br>**RIVERS DECL. ¶ 17.** | Undisputed. |
| 347. If a store is not ready to open on a Licensee's preferred date it is the District Manager's responsibility to escalate the issue to the Regional Manager.<br><br>**RIVERS DECL. ¶ 17.** | Undisputed |
| 348. Because Mr. Briscoe failed to follow Starbucks procedure, Starbucks had to close the new Residence Inn location in order to retrain the Licensee employee baristas. | Disputed<br>Plaintiff did not fail to follow any Starbucks procedure in training the Baristas. The claim that "Starbucks had to close the new Residence Inn location in order to retrain the Licensee employee |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 17, EX. I.** | baristas" is a **lie, verified by Sindy Lomas, the on-site Licensee Manager, who wrote to Rivers and others noting that the additional training for baristas would be, "in addition to operating during normal business hours."** Exhibit – 25; AMF 1000-1006 |
| 349. Mr. Briscoe refused to take responsibility for certifying the baristas.  **RIVERS DECL. ¶ 17.** | Disputed Plaintiff trained the baristas pursuant to Starbucks' policy and training procedure. Plaintiff did not fail to train the Baristas, causing them to performance inconsistent with expectations at opening.  A combination of slower employees, nerves, novelty, a lot to learn, the transition from learning to application, the pressure of now, watchful eyes, and other factors, including the need for practice under live conditions. AMF 1000-1006 |
| 350. Mr. Briscoe believed the deficiencies with the baristas existed because "the baristas that were there that | Disputed Plaintiff was responsible for training the baristas, which he did in proper form |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| day were handicapped baristas, meaning they had - - they were slower." <br><br><br><br><br><br><br><br><br><br><br><br>**PLF.'S DEP., 178:1-10.** | pursuant to Starbucks' policy and training procedure. Plaintiff did not fail to train the Baristas, causing them to performance inconsistent with expectations at opening.  It was a combination of slower employees, nerves, novelty, a lot to learn, the transition from learning to application, the pressure of now, watchful eyes, and other factors, including the need for practice under live conditions. <br>AMF 1000-1006 |
| 351.   On July 23, 2014, Rivers coached Mr.     Briscoe    on    improving    his transparency and communication. <br><br><br><br><br><br>**RIVERS DECL. ¶ 22, EX. N .** | Disputed <br>Rivers harassed Plaintiff with this false and unsupportable claim. <br>Plaintiff was a recognized Leader with excellent communication and people skills, and Defendant repeatedly tapped him for important leadership roles. <br>AMF # 881-891; |
| 352.   On December 9, 2014, Rivers coached  Mr. Briscoe  regarding  his tardiness to a meeting. | Disputed <br>Rivers harassed Plaintiff with this false and unsupportable claim. <br>Rivers' decision to make a late change in the meeting's scheduled start time created this situation. |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 22, EX. O.** | AMF # 930,954 |
| 353. On February 11, 2015, Rivers coached Mr. Briscoe regarding his failure to notice whether exterior punch items were fixed at a Licensee location | Disputed<br><br>Rivers harassed Plaintiff with this false and unsupportable claim.<br><br>This relates to a "Construction issue for a new store under construction". LSDM are Operational Employees whose duties, job descriptions and roles do not include managing or completing Construction Punch Lists at a Licensed Store. |
| **RIVERS DECL. ¶ 22, EX. P.** | AMF # 1055 |
| 354. On February 27, 2015, Mr. Briscoe provided Rivers improper sales for Terminal Two LAX locations during a period when the terminal was actually closed.<br><br>**RIVERS DECL. ¶ 22, EX. Q.** | Disputed<br><br>Rivers harassed Plaintiff with this false and unsupportable claim.<br><br>Defendant's Finance Department, for its own accounting purposes categorized a closed store as a remodel, resulting in an inaccurate reporting of revenues for a closed store at LAX. It was Plaintiff who detected the accounting and questioned it, noting that the store, though closed, was budgeted for the entire year.<br><br>AMF # 1056 |
| 355. On April 21, 2015, Rivers coached Mr. Briscoe on his | Disputed,<br><br>Rivers harassed Plaintiff with this false |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| communication with Licensees<br><br>**RIVERS DECL. ¶ 22, EX. R.** | and unsupportable claim.  Plaintiff's communication skills were outstanding and were recognized by Defendant as worthy of Leadership Roles, and Rivers had told Plaintiff that he handled the Marriott situation properly, just the way that Scruggs (a Caucasian LSDM had handled a similar situation.)<br> AMF # 883-894<br>Even in 2015, Rivers made false claims about Plaintiff, but Defendant continued to select Plaintiff for important Leadership roles because of his excellent communication and result orientation. AMF # 934-943; 945-946. |
| 356. On April 24, 2015, Rivers coached Mr. Briscoe regarding deficiencies at one of his stores.<br><br>**RIVERS DECL. ¶ 22, EX. S.** | Disputed<br>Rivers harassed Plaintiff with this false and unsupportable claim.   Plaintiff's stores were not deficient.  Rivers failed and refused to support Plaintiff when he did his job and cited Licensees for Non-Compliance, but she blamed Plaintiff if he did not cite them to enforce compliance.  (Plaintiff couldn't do anything right in Rivers' eyes after he started to seek promotion for his |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| | recognized leadership performance.) AMF # 957-973; 975-1004 |
| 357.  On May 14, 2015, Mr. Briscoe provided Ms. Rivers monthly reports for the wrong time period.<br><br>**RIVERS DECL. ¶ 22, EX. T.** | **Disputed**<br>Rivers harassed Plaintiff with this false and unsupportable claim.  On a single occasion, Plaintiff handed Rivers one paper intending to give her another and Rivers abruptly ended her visit with Plaintiff.  A couple of minutes after Rivers walked away from Plaintiff, he discovered that he gave Rivers the wrong page and sent her an email correcting it. Rivers refused to acknowledge Plaintiff's email, choosing instead to cite the incident as negative performance.  This incident was not noteworthy for performance.  Rivers did not treat her Caucasian subordinates this way.<br>AMF # 1040-1042; 896; 899 |
| 358.   On May 28, 2015, Rivers coached Mr. Briscoe regarding his failure to correspond with "key stakeholders."<br><br>**RIVERS DECL. ¶ 22, EX. U.** | Disputed<br>Rivers harassed Plaintiff with this false and unsupportable claim.<br>Rivers' claim not genuine because Plaintiff knew and understood the Starbuck business, was a Business |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| | Leader and an effective communicator whom Defendant tapped for a number of leadership roles (before he started to seek Promotion and Promotional Opportunities) in recognition of his quality performance. AMF # 876-877; 883-894; |
| 359.   On June 5, 2015, Rivers coached Mr. Briscoe regarding errors he made in his sales sheet.<br><br>**RIVERS DECL. ¶22, EX. V.** | Disputed<br>Rivers harassed Plaintiff with this false and unsupportable claim.  Plaintiff's performance was Leadership quality and Rivers continued to select Plaintiff for high profile and important Leadership roles, in 2015.<br>AMF # 934-946<br>Special Leadership selections and assignments was indicative of Defendant's view of performance excellence.<br>AMF 891 |
| 360.   Most DMs on Rivers' team had a Personal Development Plan ("PDP") outlining their respective goals and aspirations at Starbucks, and strategies for obtaining such goals. | Undisputed, but Plaintiff never had on. Plaintiff pursued promotion and solicited support and assistance, but none was given him.<br>AMF # 899-903; 906-913; 927-933; 1050-1053 |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 14.** | |
| 361.  A Partner Resources Manager at Starbucks is the same role as a Human Resources Manager at other companies.<br><br>**ROGERS DECL. ¶ 2.** | Undisputed |
| 362.  On June 26, 2014, Mr. Briscoe, Rivers and Sarah Rogers ("Rogers"), the Partner Resources Manager working with Rivers' team, met to discuss Mr. Briscoe's development at Starbucks and Mr. Briscoe developing a PDP.<br><br>**ROGERS DECL.  ¶ 7, EXS. B-C.** | Undisputed |
| 363.  On September 12, 2014, Rogers emailed Mr. Briscoe additional resources to assist his development.<br><br>**ROGERS DECL. ¶ 8, EX. D.** | Disputed<br>Plaintiff denies that Rogers (or Rivers) ever tried to "assist his development". Plaintiff sent Rogers an email (copying Rivers) seeking specific types of information that was uniquely related to Starbucks would be particularly helpful in assisting him with promotional development, but neither Rogers nor |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| | Rivers ever responded. Exhibit 10; AMF # 1057 |
| 364.  In November 2014, Mr. Briscoe, Rivers and Rogers met again to discuss Mr. Briscoe's progress and to ensure a formal PDP was in place.<br><br>**ROGERS DECL. ¶ 9.** | Disputed<br>Plaintiff denies that Rogers (or Rivers) ever tried to "assist his development". Plaintiff sent Rogers an email (copying Rivers) seeking specific types of information that was uniquely related to Starbucks would be particularly helpful in assisting him with promotional development, but neither Rogers nor Rivers ever responded. Exhibit 10; AMF # 1057 |
| 365.  In November 2014, Mr. Briscoe had not completed his PDP.<br><br>**ROGERS DECL. ¶ 9.** | Disputed<br>Plaintiff denies that Rogers (or Rivers) ever tried to "assist his development", including assisting Plaintiff with completion of a PDP.  Plaintiff sent Rogers an email (copying Rivers) seeking specific types of information that was uniquely related to Starbucks would be particularly helpful in assisting him with promotional development, but |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| | neither Rogers nor Rivers ever responded. Exhibit 10; AMF # 1057 |
| 366. On December 9, 2014, Rogers scheduled an in-person meeting with Rivers and Mr. Briscoe to facilitate communication between them, and again discuss Starbucks' concerns regarding Mr. Briscoe's communication style.<br><br>**ROGERS DECL. ¶ 10.** | Disputed Plaintiff personally requested a meeting with Rogers to discuss what Plaintiff felt to be Race discrimination against him. Plaintiff Depo 277:6-278:14 |
| 367. On December 17, 2014 Rivers emailed Rivers and Mr. Briscoe a summary of next steps for Mr. Briscoe's development and potential support tactics for him.<br><br>**ROGERS DECL. ¶ 13, EX. E.** | Disputed It makes no sense that "Rivers emailed Rivers…" Plaintiff denies that Rogers (or Rivers) ever tried to "assist his development", including assisting Plaintiff with completion of a PDP. Plaintiff sent Rogers an email (copying Rivers) seeking specific types of information that was uniquely related to Starbucks would |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| | be particularly helpful in assisting him with promotional development, but neither Rogers nor Rivers ever responded. **Exhibit 10; AMF # 1057** |
| 368.  Mr. Briscoe agreed to participate in a 360 Peer review which was completed in February 2015, which was designed to give him additional insight into how he was perceived by his peers/other Partners.<br><br><br>**PLF.'S DEP., 267:16-24; ROGERS DECL. ¶ 14, EXS. F-G.** | Undisputed that Plaintiff agreed to participate in a "360". **Disputed** that the purpose or intent of the 360 or Plaintiff's agreement to participate in it was to be used as a performance evaluation  tool from which Defendant would selectively pick and choose anything that it perceived to be a negative and ignore all of the many positives. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| | of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 369.  A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe stop "[c]oming in with his present agenda for the conversation. At times he seems unwilling to hear what the other person has said if it doesn't fit in with his pack of thinking." **ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy.   The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
|  | Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 370. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe stop "[w]orking while others are presenting." **ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy.  The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| | **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 371. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe stop "[s]peaking over others." **ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy.  The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| | used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 372.  A reviewer responding to Mr. | Undisputed that this is one comment in |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| Briscoe's 360 Peer Review suggested that Mr. Briscoe stop "[a]cting superior to others." <br><br><br> **ROGERS DECL. ¶ 14, EX. G.** | the "360". <br><br> **Disputed** that the comment is performance worthy.   The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. <br> **AMF # 1007-1012**; <br> Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose <br> **UF # 79-83** <br> Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. <br> **AMF # 1014-1030** <br> The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| | **AMF # 1007-1012** |
| | No LSDM other than Plaintiff was the subject of a 360 Survey. |
| | **AMF # 1012** |
| 373. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe stop "[s]aying that he is aligned with team commitments and not follow thru [sic] and/or do it 'his way' rather than staying aligned with the team."<br><br>**ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy. The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant. Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not of Licensees with whom Plaintiff |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| | interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 374. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that "[w]hen [Mr. Briscoe] disagrees with RD [Rivers], at times it appears disrespectful." **ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy. The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant. Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| | numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 375.  A reviewer responding to Mr. Briscoe's 360 Peer Review described Mr. Briscoe as "[s]low, or unwilling, to adapt or conform with Team direction."    **ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy.   The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012;** |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| | Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 376. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe stop "[t]elling stories in generalities vs. actual specific examples." | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy.   The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| **ROGERS DECL. ¶ 14, EX. G.** | Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 377.  A reviewer responding to Mr. Briscoe's 360 Peer Review suggested | Undisputed that this is one comment in the "360". |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| that Mr. Briscoe start "[a]ctively listening more consistently."<br><br><br>**ROGERS DECL. ¶ 14, EX. G.** | **Disputed** that the comment is performance worthy.   The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments.<br>**AMF # 1007-1012**;<br>Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose<br>**UF # 79-83**<br>Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360.<br>**AMF # 1014-1030**<br>The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them.<br>**AMF # 1007-1012** |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| | No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 378. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe start "[t]aking the time to listen to feedback of others." **ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy.   The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
|  | interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 379. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe, "[w]hen communicating take additional time to consider what you want the partner to feel as a result of your communication." **ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy.  The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the numerous positive comments (over 37) |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| | contained in the 360. |
| | **AMF # 1014-1030** |
| | The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. |
| | **AMF # 1007-1012** |
| | No LSDM other than Plaintiff was the subject of a 360 Survey. |
| | **AMF # 1012** |
| 380. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe start "[a]ctively listening when others are talking, sharing ideas, presenting, etc. Consider tone in communication may come across as 'aloof' or arrogant at times." <br><br> **ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". <br><br> **Disputed** that the comment is performance worthy. The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant. Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. <br><br> **AMF # 1007-1012**; <br> Defendant used the 360 solely as a tool |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| | against Plaintiff, which was never its intent or purpose |
| | **UF # 79-83** |
| | Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. |
| | **AMF # 1014-1030** |
| | The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. |
| | **AMF # 1007-1012** |
| | No LSDM other than Plaintiff was the subject of a 360 Survey. |
| | **AMF # 1012** |
| 381. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe start "[b]eing more welcoming and generous." | Undisputed that this is one comment in the "360". |
| | **Disputed** that the comment is performance worthy.   The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be |
| **ROGERS DECL. ¶ 14, EX. G.** | used as a performance evaluation tool for Defendant.  Defendant has selectively |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| | picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 382. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe start "[l]istening to | Undisputed that this is one comment in the "360". **Disputed** that the comment is |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| directions, be respectful of others skill sets and experience, be open minded to other ideas." | performance worthy.  The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. |
| **ROGERS DECL. ¶ 14, EX. G.** | **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose |
|  | **UF # 79-83** Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. |
|  | **AMF # 1014-1030** The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. |
|  | **AMF # 1007-1012** No LSDM other than Plaintiff was the |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| | subject of a 360 Survey. |
| | **AMF # 1012** |
| 383. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe needs to "d]emonstrate professionalism in all work environments."<br><br>**ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360".<br><br>**Disputed** that the comment is performance worthy.  The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments.<br><br>**AMF # 1007-1012**;<br><br>Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose<br><br>**UF # 79-83**<br><br>Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360.<br><br>**AMF # 1014-1030**<br><br>The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| | basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 384. Mr. Briscoe's response to the comments in his 360 review was he "absorbed them," but did not feel he needed to make adjustments based on the feedback. **PLF.'S DEP., 268:19-269:15.** | Undisputed |
| 385. Mr. Briscoe never drafted his PDP. **PLF.'S DEP., 269:16-17; ROGERS DECL. ¶ 20.** | Undisputed |
| 386. On March 30, 2015, Starbucks issued Mr. Briscoe a Performance Concerns and Expectations Memorandum ("March 30 Memo") | Undisputed |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| **PLF.'S DEP. 261:11-262:3,** EX. 9; **ROGERS DECL.** ¶16, EX. J; **RIVERS DECL. ¶ 18.** | |
| 387. On May 6, 2015, Rivers advised Heidi Sundquist ("Sundquist"), another Partner Resources Manager, about the May 6th Vons Complaint.<br><br>**RIVERS DECL. ¶ 19; DECLARATION OF HEIDI SUNDQUIST ("SUNDQUIST DECL.") ¶ 7, EX. A.** | Undisputed, but the "Von" complaint was for Plaintiff doing what he was duty-bound to do.<br>AMF # 987-999 |
| 388. On May 12, 2015, Starbucks decided to place Mr. Briscoe on a Performance Improvement Plan ("PIP")<br><br>**RIVERS DECL. ¶ 19, SUNDQUIST DECL. ¶ 7, EX. A, ¶ 8.** | Undisputed, but Plaintiff Disputes that a "PIP" was proper, noting that Defendant continued to exhibit recognition of his excellent performance and Leadership by continuing to select and assign him to high profile and important leadership roles.<br>AMF # 934-946 |
| 389. Starbucks maintains policies and procedures for issuing a PIP including Performance Improvement Plan Best Practices, and the Performance Improvement Plan Template. | Undisputed |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| **SUNDQUIST DECL. ¶ 8, EXS. B-C.** | |
| 390.  On June 4, 2015, Rivers and Heidi Sundquist, issued Mr. Briscoe the PIP during an in-person meeting.<br><br>**PLF.'S  DECL.,  262:13-25; SUNDQUIST DECL. ¶ 9, EX. D; RIVERS DECL. ¶ 19.** | Undisputed, but the PIP was improper because it was supported by false claims by Rivers.<br>AMF # 874-946<br>Of 5 LSDM who are racial minorities, two have filed lawsuits, one filed internal claims alleging discrimination, and one has verbally reported feeling discriminated against by Rivers, who assists Caucasians with promotions and promotional opportunities, but never assisted Plaintiff or any other racial minority, before Plaintiff filed his lawsuit.<br>AMF # 896-898; 899-903; 915-924; 1050-1053 |
| 391.   On June 9, 2015, Mr. Briscoe had a meeting with Rivers and Sundquist wherein he provided his response to the PIP.<br><br>**SUNDQUIST DECL. ¶ 10, EX. E.** | Undisputed |
| 392.  Mr.  Briscoe's  June  9,  2015, | Undisputed |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| response to the PIP demanded that Starbucks conduct an independent investigation into "unfair treatment and consciously biased actions and behaviors towards [him]" by Rivers.<br><br>**SUNDQUIST DECL. ¶ 10, EX. E.** | |
| 393.   During the June 9, 2015, meeting, Mr. Briscoe told Rivers and Sundquist that he had recorded everything that was discussed at the meeting without our knowledge and/or consent.<br><br>**SUNDQUIST DECL. ¶ 10; RIVERS DECL. ¶ 20.** | Undisputed that Plaintiff disclosed to Rivers and Sundquist that he had recorded some 6-10 conversations at different times and offered to play the recordings for them to listen and hear the confirmation of his claims that Rivers was discriminating and retaliating against him once he began pursuing promotion.  They declined Plaintiff's offer to listen to the recordings and later told Plaintiff that the recordings were illegal, causing Plaintiff to believe that Defendant was saying that it did not want to hear his confirmatory recordings, and that the recordings were worthless. AMF # 1057 |
| 394.   During the June 9, 2015, meeting, Mr.   Briscoe   also   told   Rivers   and Sundquist that in the past he recorded | Undisputed that Plaintiff disclosed to Rivers and Sundquist that he had recorded some 6-10 conversations at |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| many of his conversations with us without our knowledge and/or consent.<br><br>**SUNDQUIST DECL. ¶ 10; RIVERS DECL. ¶ 20.** | different times, and offered to play the recordings for them to listen and hear the confirmation of his claims that Rivers was discriminating and retaliating against him once he began pursuing promotion.  They declined Plaintiff's offer to listen to the recordings and later told Plaintiff that the recordings were illegal, causing Plaintiff to believe that Defendant was saying that it did not want to hear his confirmatory recordings, and that the recordings were worthless.<br>AMF # 1057 |
| 395.  Mr. Briscoe also recorded his conversations with Rogers without her knowledge and consent.<br><br>**ROGERS DECL. ¶ 18.** | Undisputed |
| 396.  The earliest Mr. Briscoe alleges he made any complaint about improper conduct at Starbucks was in December 2014.<br><br>**PLF.'S DEP., 277:6-278:6.** | Undisputed that Plaintiff alleged race discrimination to Defendant's HR Representative, December of 2014. |
| 397.  On June 12, 2015, Starbucks | Undisputed |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| engaged an independent investigator to investigate Mr. Briscoe's claims.<br><br>**DECLARATION OF EMILY SCHULTZ ("SHULTZ DECL.") ¶ 2, EX. A; SUNDQUIST DECL. ¶ 12, EX. G.** | |
| 398.   On June 10, 2015, Mr. Briscoe's PIP was put on hold pending the outcome of the investigation.<br><br>**SUNDQUIST DECL. ¶ 12, EX. G.** | Disputed<br>Plaintiff was blocked from pursuing any promotions or being considered for promotional opportunities, earning pay increases and bonuses, because the PIP is a bar to them.<br>AMF # 914, 950<br>Plaintiff was still being tapped assist Starbucks with important Leadership assignments requiring knowledge of the Business, excellent communication, analytical and leadership skills, at the same time that Rivers was claiming Plaintiff's performance was unacceptable (a contradiction).<br>AMF # 934-946 |
| 399.   As part of her investigation into | Disputed as a recent fabrication. |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| Mr. Briscoe's claims, the independent investigator conducted in-depth interviews of five witnesses.<br><br>**SHULTZ DECL. ¶ 3.** | Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made.<br>Plaintiff's Depo 244:15-245:2; 246:17-247:4 |
| 400.  As part of her investigation into Mr. Briscoe's claims, the independent investigator reviewed relevant documents provided by Starbucks including emails provided by Mr. Briscoe, Rivers, and Sundquist, and the documents attached to Mr. Briscoe's June 9, 2015, complaint.<br><br>**SHULTZ DECL. ¶ 4.** | Disputed as a recent fabrication.<br>Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made.<br>Plaintiff's Depo 244:15-245:2; 246:17-247:4 |
| 401. The independent investigator completed her investigation on July 27, 2015.<br><br>**SHULTZ DECL. ¶ 10.** | Undisputed |
| 402. At the conclusion of her investigation, the independent | Disputed as a recent fabrication.<br>Plaintiff was told by Shultz that the |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| investigator drafted an investigation report that detailed the findings of her investigation.<br><br><br><br><br><br>**SHULTZ DECL. ¶ 5.** | investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made.<br>Plaintiff's Depo 244:15-245:2; 246:17-247:4 |
| 403. The independent investigator's report focused on Mr. Briscoe's allegations of unfair treatment and unfair labor practices, discrimination, harassment and "consciously biased actions and behaviors" by Rivers.<br><br><br><br>**SHULTZ DECL. ¶ 6.** | Disputed as a recent fabrication.<br>Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made.<br>Plaintiff's Depo 244:15-245:2; 246:17-247:4 |
| 404. The independent investigator determined Mr. Briscoe's claims against Rivers were unsubstantiated.<br><br><br><br>**SHULTZ DECL. ¶ 7.** | Disputed as a recent fabrication.<br>Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made. |

1

2

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| | Plaintiff's Depo 244:15-245:2; 246:17-247:4 |
| 405. The independent investigator determined: "The facts do not show Ms. Rivers engaged in consciously biased actions and behaviors, discrimination or harassment toward Mr. Briscoe. Mr. Briscoe also did not identify race, gender or any other such category as the basis for the treatment. There is no indication Ms. Rivers treated him in a consciously biased way, or that she treated Mr. Briscoe differently than other DMs on her team." **SHULTZ DECL. ¶ 7.A.** | Disputed as a recent fabrication. Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made. Plaintiff's Depo 244:15-245:2; 246:17-247:4 Plaintiff identified race discrimination to S. Rogers at his one-on-one in December, 2014. AMF # 1059 |
| 406. The independent investigator determined: "The facts do not support Mr. Briscoe's claim of unfair treatment. DMs [] who Mr. Briscoe believes are favored by Ms. Rivers, are top performers and/or take advantage of the career development opportunities given by Ms. Rivers, unlike Mr. Briscoe. In addition, Ms. Rivers has given Mr. Briscoe a great deal of | Disputed as a recent fabrication. Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made. Plaintiff's Depo 244:15-245:2; 246:17-247:4 |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| recognition and many opportunities for growth and development in his career at Starbucks." **SHULTZ DECL. ¶ 7.B.** | |
| 407. The independent investigator determined "[t]he facts showed there was a legitimate basis for Mr. Briscoe's PIP" because: <br> • "At the request of Marriott, in May 2014 Ms. Rivers removed Mr. Briscoe from the Marriott account because of his improper handling of a non-compliance situation at one of its hotels and his failure to accept responsibility for the incident. <br> • Mr. Briscoe trained and certified licensed store employees as baristas at the Residence Inn for the New Store Opening (NSO). Ms. Rivers discovered those baristas could not ring up drinks and did not know how to make drinks correctly, and she wanted the store shutdown. <br> • Von's [sic] and Ralph's [sic] complained to Ms. Rivers about Mr. | **Disputed** as a recent fabrication and false and unsupportable finding. Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made. <br> **Plaintiff's Depo 244:15-245:2; 246:17-247:4: 188:21-189:11;** <br> Plaintiff was told by Rivers that he did nothing wrong at Marriott and that his situation was similar to that of Matt Scruggs (Caucasian). Scruggs was assisted by Rivers with promotion. <br> **AMF # 975-983;** <br> Rivers lied about the entire Residence Inn situation, including her claim that the store had to shut down. <br> **AMF # 1000-1006;** |

| **UNCONTROVERTED FACTS[7]** | **SUPPORTING EVIDENCE** |
|---|---|
| Briscoe, including that he "was a jerk" and he failed to attend scheduled meetings with them.<br>• Mr. Briscoe repeatedly provided inaccurate data to Ms. Rivers, including incorrect sales figures, even after they discussed the approach on a given topic and how it should be communicated.<br>• Despite extensive coaching by Ms. Rivers and PRM Sarah Rogers, Mr. Briscoe failed to accept responsibility for his actions, did not improve in the areas Ms. Rivers coached him about, he was not self-aware and he did not incorporate the feedback they provided."<br><br>**SHULTZ DECL. ¶ 8.** | As to Vons, Rivers lied about Plaintiff for merely doing his job of monitoring and making certain that the Licensee was compliant with Coffee (product) Availability, as he was required to do. Rivers lied claiming there was a "Starbuck Policy" prohibiting texting to a cell phone.<br><br>**AMF # 987-999**<br><br>Plaintiff's performance remained excellent throughout his employment as supported by his performance evaluations (Exhibits - 5 and 6), his revenue generation constituting one-third of Rivers' Region's revenues which had 10 to 12 District Managers in the Region (Exhibit- 3), an Plaintiff's continued selection for high profile assignments and important Leadership roles, right through to his separation in 2015.<br><br>**AMF # 881-891; 934-946** |
| 408. The independent investigator recommended that Starbucks reinstate the PIP. | **Disputed** as a recent fabrication and false and unsupportable finding. Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| **SHULTZ DECL. ¶ 9.** | Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made. **Plaintiff's Depo 244:15-245:2; 246:17-247:4: 188:21-189:11;** Plaintiff was told by Rivers that he did nothing wrong at Marriott and that his situation was similar to that of Matt Scruggs (Caucasian). Scruggs was assisted by Rivers with promotion. **AMF # 975-983;** Rivers lied about the entire Residence Inn situation, including her claim that the store had to shut down. **AMF # 1000-1006;** As to Vons, Rivers lied about Plaintiff for merely doing his job of monitoring and making certain that the Licensee was compliant with Coffee (product) Availability, as he was required to do. Rivers lied claiming there was a "Starbuck Policy" prohibiting texting to a cell phone. **AMF # 987-999** Plaintiff's performance remained |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| | excellent throughout his employment as supported by his performance evaluations (Exhibits - 5 and 6), his revenue generation constituting one-third of Rivers' Region's revenues which had 10 to 12 District Managers in the Region (Exhibit- 3), an Plaintiff's continued selection for high profile assignments and important Leadership roles, right through to his separation in 2015. **AMF # 881-891; 934-946** |
| 409.  On July 20, 2015, Mr. Briscoe resigned from his employment with Starbucks.  **SUNDQUIST DECL. ¶ 20, EX. H.** | Undisputed that Plaintiff resigned because Rivers was constantly attacking him with false performance claims and suggesting that he couldn't do anything right, couldn't do emails, food warming…couldn't do anything, (when all the while, Rivers was assigning him to high profile and very important Leadership roles in recognition of his outstanding performance),  and Defendant was doing nothing to address Plaintiff's complaints of race discrimination, except to allow Rivers to retaliate against him. **Plaintiff's Depo 188:21-189:11; UF #** |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| | **136-144(below).** |
| 410. At the time of Mr. Briscoe's resignation, he had been offered, and had accepted, a job at Jack in the Box Inc.<br><br>**PLF.'S DEP. 206:12-15; 209:6-10; 309:24-310:9, EX. 45.** | Undisputed |
| 411. Mr. Briscoe's starting salary at Jack in the Box Inc. was $120,000 per annum (not inclusive of bonuses).<br><br>**PLF.'S DEP., 302:13-15; 309:24-310:9, EX. 45.** | Undisputed |
| 412. At the time of his resignation from Starbucks, Mr. Briscoe's annual salary at Starbucks was approximately $95,963.64 per annum (not including performance bonuses).<br><br>**ROGERS DECL. ¶ 22.** | Undisputed, but Plaintiff's bonus potential (quarterly payments rather than annually), stock and benefits were superior at Starbucks, and Starbucks as a Brand was Plaintiff's preferred career path. Plaintiff took meaningful cut in salary compensation to leave his job at Burger King to accept the Starbucks position, because of the upside career and earnings potential and because he |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
|  | wanted to leave "fast food".  Also, at Starbucks, Plaintiff was in a "ready for promotion" posture, with four year of background and Plaintiff had begun making contact with License Stores VP for the United Kingdom.  At Jack in the Box, Plaintiff had to start from scratch. AMF # 1060 |
| 413.  Mr.  Briscoe's  discrimination claims are based solely on the conduct of Rivers.<br><br>**PLF.'S DEP., 143:15-21.** | Undisputed |
| 414.  With  respect  to  whether  Mr. Briscoe's  belief  that  Rivers discriminated against  was  based  on something  specific,  Mr.  Briscoe acknowledged: "<u>I don't know.  I asked that question myself and couldn't get an understanding why I started getting this treatment.  So I don't know why.</u>"<br><br>**PLF.'S DEP., 144:7-12.** | Undisputed in part, but Plaintiff also testified:<br>Plaintiff testified that he was well accepted by Rivers as long as he stayed in his place and did not try to advance, but that Rivers intentionally and discriminatorily tried to hold him back when he sought promotion like the Caucasians on Rivers team, and that race was the reason.<br>**Plaintiff's Depo 306:8-307:10**<br>Plaintiff also testified as follows:<br>Q. Do you think it was because of your |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| | race? <br> A. I do. <br> Q. Why? <br> A. I do.  Other employees that were non-black weren't being treated the way that I was being treated. <br> … <br> Q. Who specifically are you referring to? <br> A. Barb Holdgrafer, Deanna Pusatier, Kevin Dockery, Tammy Hereford, Ashley Larson, Erica Hernandez. <br> Q. Anybody else? <br> A. Donna Hernandez. <br> **Plaintiff's Depo 144:13-23.** |
| 415. With respect to his belief that Rivers discriminated against him, Plaintiff acknowledged he "do[esn't] know why things changed . . . I asked that question myself and couldn't get an understanding why I started getting this treatment.  So I don't know why." <br><br> **PLF.'S DEP., 144:7-12.** | Plaintiff testified that he believed that Rivers was discriminating against him and that he reported same to Rogers as early as December, 2014 <br> **Plaintiff's Depo 144:13-23; 277:6-278:2;** <br> Plaintiff testified that he was accepted and credited by Rivers as long as he stayed in his place and did not try to advance, but that Rivers intentionally and discriminatorily tried to hold him |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| | back when he sought promotion like the Caucasians on Rivers team, and race was the reason.<br><br>**Plaintiff's Depo 306:8-307:10** |
| 416.  Mr.  Briscoe  acknowledged  he does  not  know  who  at  Starbucks actually issued, approved, or drafted the PIP.<br><br>**PLF.'S DEP., 263:6-17.** | Undisputed but Irrelevant because, Plaintiff knows Rivers supervised his work activities and that Rivers made numerous the false claims against him which support the PIP.<br>AMF # 904-933; 949-952; 974-1007; 1048-1049; |
| 417.   The decision to issue the PIP was actually  made  in  consultation  with Partner Resources personnel, not Rivers alone.<br><br>**SUNDQUIST DECL. ¶ 7, EX. A.** | Undisputed but Irrelevant because, Plaintiff knows Rivers supervised his work activities and that Rivers made the false claims against him which support the PIP.<br>AMF # 904-933; 949-952; 974-1007; 1048-1049; |
| 418.  Mr.  Briscoe  acknowledges  his retaliation  claim  is  based  on  the discriminatory   actions   he   claims happened to him.<br><br>**PLF.'S   DEP.,   144:7-12;   214:21-** | Plaintiff testified that Rivers was constantly attacking him with false performance claims and suggesting that he couldn't do anything right, couldn't do emails, warm food, send a text message, check to see if Licensees were stocked with product, ask Licensees to |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| **215:14.** | comply with Starbucks' standards…couldn't do anything, (when all the while, Rivers was assigning him to high profile and very important Leadership roles in recognition of his outstanding performance), and Defendant was doing nothing to address Plaintiff's complaints of race discrimination, except to allow Rivers to retaliate against him. **Plaintiff's Depo 188:21-189:11; UF # 136-144(below).** |
| 419. Rivers has no hiring authority outside of her team. **RIVERS DECL. ¶ 10; MITTAL DECL. ¶ 4, EX. B[9] (DEPOSITION OF ANGELA RIVERS ("RIVERS' DEP."), 105:23-106:5.** | Undisputed, but she could support and assist District Managers on her team who sought promotion, and she had supported and assisted Caucasian District Managers promote, but did not support and assist Plaintiff or other racial minorities during Plaintiff's tenure. AMF # 896-898, 974, 899-903, 912, 914-929, 932. |
| 420. Rivers did not know Mr. Briscoe had applied for a subsequent BDM position until this lawsuit was filed. | Disputed Plaintiff personally told Rivers that he had again applied for the BDM position, |

[9] All further excerpts from Ms. Rivers' deposition are attached as Exhibit B to the Declaration of Jyoti Mittal.

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 11.** | and she appeared upset with Plaintiff, and told him: "well I didn't know that you were going to do that." AMF 928 and 929 |
| 421. Mr. Briscoe acknowledged that Leah Bernard, one of the seven partners he claims received preferential treatment from Rivers, is African American.<br><br>**PLF.'S DEP., 33:7-35:11, 67:23-24; RIVERS DECL. ¶ 4.** | **Undisputed** that L. Bernard is an African American. **Disputed** that Bernard was the recipient of any preferential treatment before Plaintiff's allegations of discrimination and filing of a legal action. Bernard has been the beneficiary of claims against Rivers by Plaintiff and other racial minorities. Rivers provided no promotional support and/or assistance to racial minorities on her team during Plaintiff's tenure. **AMF # 896-898, 974, 899-903, 912, 914-929, 932.** Rivers assisted Caucasians with promotions and promotional opportunities, but she never assisted any racial minority with promotions or promotional opportunity during Plaintiff's tenure. **AMF # 896-899** |
| 422. Mr. Briscoe claims partners on | Undisputed |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| Rivers' team received opportunities he did not, including "elevation," promotion and/or additional responsibilities.<br><br>**PLF.'S DEP., 33:7-35:11; 35:24-39:6; 150:13-152:25; 221:15-223:16.** | |
| 423.   Mr. Briscoe acknowledges he did not apply for the positions he claims partners on Rivers' team received instead of him.<br><br>**PLF.'S DEP., 221:15-223:16.** | **Undisputed, but**<br>Rivers did not support or assist Plaintiff in his promotional efforts; she actively blocked Plaintiff from pursuit of the positions for which he applied; and she refused to offer assistance when Plaintiff requested it.<br>**AMF # 912, 925-929;**<br>Rivers also used PIPs to block other racial minorities on her team from promoting, while she supported and assisted Caucasians in obtaining promotions.<br>**AMF # 896-898, 974, 899-903, 912, 914-929, 932.** |
| 424.   Mr. Briscoe acknowledges that the promotions he claims partners on Rivers' team received instead of him occurred after he resigned from | Disputed<br>Rivers herself testified that she supported the promotions of Dockery, Scruggs, Pusatier, and other Caucasians |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| Starbucks.<br><br>**PLF.'S DEP. 222:1-11.** | during Plaintiff's tenure.<br>**AMF # 896** |
| 425.  Mr. Briscoe acknowledges that the opportunities he claims went to other partners instead of him went to partners far more senior to him at Starbucks.<br><br>**PLF.'S DEP., 48:3-10; 144:13-147:2.** | Undisputed but totally Irrelevant Starbucks had no policy that made "seniority" a factor in promotional considerations.<br>**AMF # 1061** |
| 426.  Rivers appointed Mr. Briscoe to the Disney Star Team in 2011.<br><br>**RIVERS DECL. ¶ 23.** | Undisputed, and an illustration that Rivers  recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This  high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 427.  Rivers appointed Mr. Briscoe to the Disney Star Team in 2012.<br><br>**RIVERS DECL. ¶ 23.** | Undisputed, and an illustration that Rivers  recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This  high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 428.  Rivers nominated Mr. Briscoe as | Undisputed, and an illustration that |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| DM of the Quarter in 2012.<br><br>**RIVERS DECL. ¶ 23.** | Rivers recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 429.   Rivers nominated Mr. Briscoe as DM of the Quarter in 2013.<br><br>**RIVERS DECL. ¶ 23.** | Undisputed, and an illustration that Rivers recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 430.   Rivers appointed Mr. Briscoe as Annual Operating Plan Pillar Lead in 2014.<br><br>**RIVERS DECL. ¶ 23.** | Undisputed, and an illustration that Rivers recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 431.  Rivers selected Mr. Briscoe to highlight and tour one of his locations with the United States Leadership team | Undisputed, and an illustration that Rivers recognized Plaintiff's excellence, in communication, leadership, |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| in 2014.<br><br>**RIVERS DECL. ¶ 23.** | interpersonal skills and professionalism. This high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 432. Rivers appointed Mr. Briscoe as Annual Operating Plan Pillar Lead 2015 Our Coffee and Our Food, including Evenings and Refreshment (supporting peer DM).<br><br>**RIVERS DECL. ¶ 23.** | Undisputed, and an illustration that Rivers recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 433. Rivers selected Mr. Briscoe as highlighted in a partner appreciation week in Q2 of 2015 for specific support of a senior leader visit.<br><br>**RIVERS DECL. ¶ 23.** | Undisputed, and an illustration that Rivers recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 434. Rivers selected Mr. Briscoe's USC location for a March 2015 tour with the United States Leadership team. | Undisputed, and an illustration that Rivers recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This high profile and important |

| UNCONTROVERTED FACTS[7] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 23.** | leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 435. Starbucks has policies and procedures that specifically prohibit discrimination, harassment, and retaliation.  Attached as Exhibit A are true and correct copies of these policies.<br><br>**ROGERS DECL. ¶ 5, EX. A.** | Undisputed, but Starbucks has allowed Rivers to discriminate against racial minorities (Nelson, Hernandez and Plaintiff) with impunity.<br>AMF 915-924; 949-952. |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ISSUE NO. 4: Plaintiff's retaliation claim fails because, even assuming *arguendo* that Plaintiff can establish a *prima facie* case, Starbucks had legitimate, non-retaliatory business reasons for all actions taken regarding Plaintiff's employment and Plaintiff cannot prove that Starbucks' proffered reasons are pretext for any retaliation.

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| 436.  Similar to a franchise, Starbucks licenses its brand and products to Licensed Stores run by other companies (Licensees), including, but not limited to, Vons, Ralphs, Marriott, and Disney.<br><br>**DECLARATION OF ANGELA M. RIVERS ("RIVERS DECL.") ¶ 6.** | Undisputed |
| 437. Licensees, sell Starbucks' products, and are responsible for managing their retail operations.<br><br>**RIVERS DECL. ¶ 6.** | Undisputed |
| 438.  In August 2011, Mr. Briscoe was interviewed and hired as a Licensed Store District Manager ("DM") by Angela Rivers ("Rivers"), Regional Director.<br><br>**DECLARATION OF JYOTI** | Undisputed |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| MITTAL ("MITTAL DECL.") ¶ 3, EXHIBIT ("EX.") A[11] (DEPOSITION OF PLAINTIFF KEVIN BRISCOE ("PLF'S DEP."), **63:21-64:10**); RIVERS DECL. ¶ 4. | |
| 439.  Rivers was Mr. Briscoe's direct supervisor during his entire employment at Starbucks.<br><br>**RIVERS DECL. ¶ 4.** | Undisputed |
| 440. Mr. Briscoe was one of three African American DMs on Rivers' 12-person team, including Leah Bernard.<br><br>**RIVERS DECL. ¶ 4; PLF.'S DEP., 67:21-24, 148:18-149:3.** | Undisputed |
| 441. While employed by Starbucks, Mr. Briscoe was familiar with its policies against discrimination and retaliation as well as Starbucks' open door policy outlining procedures for reporting violations of company policies. | Undisputed |

---

[11] All further excerpts from Mr. Briscoe's deposition are attached as Exhibit A to the Declaration of Jyoti Mittal.

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| **PLF.'S DEP., 118:8-123:2, EX. 2; 129:25-130:3; 131:12-132:6, EX. 3; 132:7-25 EX. 4; 137:21-141:23, EX. 6; 271:4-6.** | |
| 442. As a DM, Mr. Briscoe was responsible for leading an assigned group of Licensed Store management teams within his district.<br><br>**RIVERS DECL. ¶ 6, EX. A.** | Undisputed |
| 443. As a DM Mr. Briscoe was responsible for assessing the overall operation of Licensed Stores, including ensuring Licensed Store compliance with Starbucks Experience standards.<br><br>**RIVERS DECL. ¶ 6, EX. A.** | Undisputed |
| 444. Communication skills are crucial to the DM position because District Managers regularly interface with Starbucks' Licensees and their employees.<br><br>**RIVERS DECL. ¶ 6, EX. A.** | Undisputed |
| 445. Paramount to Starbucks' business model is communication with its | Undisputed |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| partners, Licensees, and patrons.<br><br>**RIVERS DECL. ¶ 6; DECLARATION OF SARAH ROGERS ("ROGERS DECL.") ¶ 5, EX. A.; <u>PLF.'S DEP., 139:12-140:7, EX. 14</u>.** | |
| 446. Plaintiff acknowledged that communication was vital and important at Starbucks.<br><br>**<u>PLF.'S DEP., 88:3-11</u>.** | Undisputed |
| 447. On April 27, 2014, Mr. Briscoe applied for a Business Development Manager ("BDM") position in the Branded Solutions Department.<br><br>**RIVERS DECL. ¶ 9, EX. D.** | Undisputed |
| 448. Prior to Mr. Briscoe's interview for the BDM position, Rivers notified Frank Sica ("Sica") and John Warmke ("Warmke"), Branded Solutions managers, regarding Mr. Briscoe's candidacy.<br><br>**RIVERS DECL. ¶ 9, EX. D;** | Undisputed |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| **DECLARATION OF JOHN WARMKE ("WARMKE DECL.") ¶ 4.** | |
| 449.  Mr.  Briscoe  interviewed  with Kelly  White  ("White"),  Senior Recruiter.<br><br>**WARMKE DECL. ¶ 6, EX. A.** | Undisputed |
| 450.   On May 27, 2014, White emailed her  notes  about  Mr.  Briscoe  and  Mr. Briscoe's resume to Warmke.<br><br>**WARMKE DECL. ¶ 6, EXS. A AND B.** | Undisputed |
| 451.  In  her  May  27,  2014,  email  to Warmke regarding Mr. Briscoe, Under the  heading  "Opportunities/Areas  to probe further", White asked Warmke to "probe further on how this role fits into Kevin's  overall  career  path.   His background is heavy in operations and he has not held a traditional sales role in his past."<br><br>**WARMKE DECL. ¶ 6, EX. A.** | Undisputed |
| 452.  On  June  3,  2014,  Warmke | Undisputed |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| telephonically interviewed Mr. Briscoe for the BDM position.<br><br>**WARMKE DECL. ¶ 7; <u>PLF.'S DEP., 253:10-16</u>.** | |
| 453.   Warmke's took detailed notes of his interview of Mr. Briscoe<br><br>**WARMKE DECL. ¶ 7, EX. C.** | Objection:  the notes are redacted relative to the most important information relating to this fact.  Thus, Hearsay and Best Evidence Objections are valid. |
| 454.   Under the heading "Development Areas" in Warmke's notes regarding his interview with Mr. Briscoe, Warmke identifies the following items:<br>• "Strategic   approach   to   market, segment, account [sic]<br>  ○ I was looking for candidates that   could   provide   more insight   and   sales   and/or development examples which may be a function of a lack of strategic selling experiences []<br>  ○ You   have   a   very   good background   but   was   [sic] much   more   centered   on   the | **Disputed** as to the author of the notes for the reasons set out in No 18, above.  Otherwise, Plaintiff responds that the content of the note is correctly restated, thus: **Undisputed.** |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| operational approach of execution selling as an operator. This is a good quality, but the stronger candidates were able to demonstrate success through much more strategic influence and experience, such as market research, targeting top decision makers and influencers, focus on strategic questioning that drove alignment to customer needs from a strategic or organizational level that creating mutual partnership or joint business planning initiatives.<br>o Kevin's experience is that he is working within an existing account structure, usually franchise model of operations and maintaining margin and cost.<br>o The successes and sharing as it relates to selling, relationship | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| management, and business development were centered on an operational approach or execution of telling the customer what they needed to be successful from the eyes of the operator. Here's the menu, the POS, the space needed, etc. | |

- o He didn't speak to strategic sales and development approach and instead took a more operational approach to meeting costs and following an existing agreement model for sales.
  - Other candidates have been able to demonstrate success through market research, targeting top decision makers and influencers, focus on strategic questioning that drove alignment to customer needs from a

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| strategic or organizational level that creating mutual partnership or joint business planning initiatives.<br><br>• Listening to understand needs, focus on being concise.<br><br>   o There was a need to re-state several questions to re-focus Kevin's responses.  He is very enthusiastic and wants to share his story, but several questions were focused on specifics.<br><br>      ▪ After asked further questions, the response often centered back on putting costs together, telling customer how it will work, specs, etc. and aligning on what they are willing to spend."<br><br>**Warmke Decl. ¶ 7, Ex. C.** | |
| 455.   On June 4, 2014, Mr. Briscoe also telephonically met with Frank Sica, Mr. | Undisputed that Plaintiff had a very short telephone call with Sica, but, as Sica |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| Warmke's supervisor, to discuss the BDM position.<br><br><br><br><br>**WARMKE DECL. ¶ 8, EX. D; <u>PLF.'S DEP. 252:25-253:9.</u>** | stated"…**this was not an interview from my perspective…" Sica also stated:** "John, I know you will share your complete feedback on Kevin with Angie…"<br>**Defendant's Exhibit D** |
| 456.  Mr. Briscoe was not offered the BDM position.<br><br>**WARMKE DECL. ¶ 9; RIVERS DECL. ¶ 10.** | Undisputed, but it is also important that Briscoe was not given Feedback. |
| 457.  At Starbucks, it is customary for the managers of internal candidates to receive feedback from interviewers so that the managers can assist the partner's development<br><br><br><br><br><br><br>**WARMKE, DECL. ¶ 7, RIVERS DECL. ¶ 10.** | **Undisputed,** but Defendant had a mandatory Post Interview Feedback Procedure that was to be followed within 24 hours of the interview, which was not followed relative to Plaintiff's pursuit of promotion:<br>a. that an Interviewer complete a Post-Interview "Feedback Form", see Plaintiff's Exhibit - 36, and<br>b. that the Interviewee be provided with the Feedback. |
| 458.  Warmke provided his feedback to Mr. Briscoe's manager, Rivers. | Disputed.<br>Post Interview Feedback Procedure that was to be followed within 24 hours of |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| **WARMKE DECL. ¶ 7, EX. C; RIVERS DECL. ¶ 10.** | the interview, which was not followed relative to Plaintiff's pursuit of promotion: a. that an Interviewer complete a Post-Interview "Feedback Form", see Plaintiff's Exhibit - 36, and b. that the Interviewee be provided with the Feedback. Plaintiff was never provided with any Feedback. |
| 459. On June 4, 2014, Sica emailed Rivers a summary of his conversation with Mr. Briscoe. **WARMKE DECL. ¶ 8, EX. D; RIVERS DECL. ¶ 10.** | Undisputed but Irrelevant as it was not an Interview. **Defendant's Exhibit D** |
| 460. In his June 4, 2014, email regarding Mr. Briscoe , Sica notes: "Kevin spoke for a majority of the 30 minutes and I found him to be . . . very operationally focused . . . . Although this was not an interview from my perspective (naturally Kevin treated it as an interview), his descriptions and examples of a majority of his diverse career work experiences were operationally focused. | Undisputed, that this is an excerpt from Sica's email of June 4. **Defendant's Exhibit D** |

| **UNCONTROVERTED FACTS**[10] | **SUPPORTING EVIDENCE** |
|---|---|
| During our brief connect, he did not articulate any sales and/or development examples which may be a function of a lack of strategic selling experiences or not enough time to dive deep." <br><br> **WARMKE DECL.¶ 8, EX. D.** | |
| 461.  Prior to Mr. Briscoe's interview with Mr. Warmke for the BDM position they had met. <br><br> **WARMKE DECL. ¶ 5.** | **Undisputed, but Immaterial**, because any such "meeting" was in an incidental group setting and with non-specific purposes. |
| 462.  Warmke found Mr. Briscoe to be professional. <br><br> **WARMKE DECL. ¶ 5.** | Undisputed |
| 463.  Mr. Briscoe acknowledges that he has no reason to believe Warmke had a reason to dislike him. <br><br> **PLF.'S DEP., 253:10-19; 254:2-4.** | Undisputed |
| 464.  The role of BDM was developed and went into effect in approximately late 2013, early 2013. <br><br> **WARMKE DECL. ¶ 3.** | Undisputed |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| 465. Warmke has hired an African American as a BDM in the past.<br><br>**WARMKE DECL. ¶ 3.** | Undisputed |
| 466. Mr. Briscoe acknowledges that he has no reason to believe Frank Sica had a reason to dislike him.<br><br>**PLF.'S DEP., 253:24-254:1.** | Undisputed |
| 467. In November 8, 2014, Mr. Briscoe applied for another BDM position, but was not interviewed.<br><br>**ROGERS DECL. ¶ 21.** | Undisputed |
| 468. Warmke was not aware of Mr. Briscoe's November 8, 2014, application for the other BDM position.<br><br>**WARMKE DECL. ¶ 9.** | Disputed<br>Warmke was the hiring manager for the BDM position when Plaintiff applied on-line on November 8, 2014. Relative to Plaintiff's application, the "status " is noted as "Starbucks Not Interested", with the only Starbuck employee identified being "Hiring Manager John Warmke". The Internal Recruiter could never make that decision without the Hiring manager.<br>Exhibit – 8; |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| | AMF #1051 |
| 469.  Rivers  was  not  provided  any details  regarding  any  subsequent applications Mr. Briscoe made for other Starbucks positions.<br><br>**RIVERS DECL. ¶ 11.** | Disputed<br>Plaintiff personally told Rivers (and Rogers) that he had applied, and Rivers appeared upset, and told Plaintiff, "well I didn't know that you were going to do that."<br> AMF 928 and 929 |
| 470.  Until this lawsuit, Rivers did not actually  know  whether  he  applied  for other positions at Starbucks<br><br>**RIVERS DECL. ¶ 11.** | Disputed<br>Plaintiff personally told Rivers that he had applied, and she appeared upset, and told Plaintiff, "well I didn't know that you were going to do that."<br> AMF 928 and 929 |
| 471.  Rivers had had no involvement in the  hiring  process  for  the  Branded Solutions Department.<br><br>**RIVERS DECL. ¶ 10.** | Undisputed but **this fact accentuates Rivers' lack of support and assistance to Plaintiff,** as noted in ADF #912 |
| 472.  Mr.  Briscoe  received  District Manager Training at the beginning of his employment with Starbucks.<br><br>**RIVERS DECL. ¶ 7.** | Undisputed |
| 473.  When Mr. Briscoe completed his training,  his  District  Manager  Coach | Undisputed |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| provided Rivers with a District Manager Assessment Guide.<br><br>**RIVERS DECL. ¶ 7.** | |
| 474. In the District Manager Assessment Guide, Mr. Briscoe's Coach identified the following areas for Mr. Briscoe to improve on: (1) attention to detail; (2) interpersonal style issues that resulted in ineffective communication with others (i.e., he was vocally loud during several meetings); (3) the perception that he was focused on his own agenda; and, (4) making bad decisions (tardiness to three shifts of in-store training, late to one DM visit in District Manager Training, and cancelling a visit during District Manager Training | **Undisputed in part** to the extent that it states excerpts from Defendant's Exhibit – B;<br>**Disputed** to the extent that it ignores the fact that Coach Matt Scruggs made observations which note that Plaintiff was an effective communicator, stating, in part:<br>"Kevin has demonstrated ability to successfully communicate a clear and concise message both written and verbally…He clearly has demonstrated the interpersonal skill set, understanding of motivational needs of his audience, and the charismatic ability to be successful …"<br>**Defendant's Exhibit B**<br>Further,<br>Plaintiff's 2013 first year evaluation contradicts the claims made in Nos.1, 2, 3 and 4.<br>**Exhibits 5 and 6** |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| RIVERS DECL. ¶ 7, EX. B. | **Rivers**, as **Regional Director** over Plaintiff evaluated Plaintiff as an effective and successful communicator and leader, and she assigned him to important **Lead District Manager** Assignments to allow his work products and assistance to be used by other District Managers in Rivers' Region. **Exhibits- 5 and 6** Rivers also noted that, "[Plaintiff] has built and maintained relationships with CO DMs [Company Operations District Managers], RDs [Regional Directors] and SMs [Store Managers] this year and has become a requested partner in CO meetings." **Exhibits- 5 and 6** |
| 475. For the 2012 review period, Rivers rated Mr. Briscoe "Above Expectations" and identified the following opportunities for improvement: "[d]o more work around adjusting for his audience – tends to talk like he thinks and repeats himself rather than just adjusts; [p]eers sometimes wonder if he's listening; [s]hould | Disputed to the extent that there is no component section for "improvement". The evaluation notes that Plaintiff was an effective and successful communicator, leader, and she assigned him to Lead District Manager Assignments which uses his work product and assistance for other District Managers in Rivers' Region. |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| continue to build strong and valuable 1st team relationships." **RIVERS DECL. ¶ 8, EX. C; <u>PLF.'S DEP., 263:18-265:6, EX. 11</u>.** | **Exhibit- 5** Rivers also noted that, "[Plaintiff] has built and maintained relationships with CO DMs [Company Operations District Managers], RDs [Regional Directors] and SMs [Store Managers] this year and has become a requested partner in CO meetings." **Exhibit- 5** |
| 476. Mr. Briscoe Acknowledges that he does not disagree with anything Rivers put in his evaluation for the 2012 review period. **<u>PLF.'S DEP., 265: 3-6</u>.** | Undisputed |
| 477. For the 2013 review period, Rivers rated Mr. Briscoe "Meets Expectations" and identified the following performance improvement opportunities: Continued *focus on listening* for understanding rather than listening to respond. *Ensure you both understand and are understood. Communication is key to success.* Elevate store level issues where conflict or misunderstanding occurs. | Disputed, The evaluation does not contain a section for "Performance Improvement Opportunities, as suggested by this fact. Further, "opportunities" as used in the Form, are neither performance deficiencies or criticisms. This same Performance Appraisal noted a number of important accomplishments and significant assignments made to Plaintiff, recognizing his excellence. |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| *Ensure all relevant facts are shared* and a clear picture is painted of problems without rounds of follow up questions required to fully understand situation. *Take time to ask questions to ensure understanding on all sides*. This will minimize opportunity to have integrity questioned. *Focus on team commitments* and execute in manner agreed to (or influence commitment). Once aligned execute in accord with agreement.<br><br><br><br><br>**RIVERS DECL. ¶ 8, EX. D; <u>PLF.'S DEP., 265:7-266:10, EX. 12</u>.** | The assignment as District Manager to Defendant's **"model operations"** and its highest revenue generators (**LAX and USC), was a positive statement about Plaintiff's performance.**<br><br>**AMF # 875-877; 881-891; 1048 and 1049**<br><br>Plaintiff performed successfully as District Manager over Rivers' Region's most productive and prestigious locations.<br><br>**AMF # 875-877; 881-891; 1048 and 1049**<br><br>LAX **and** USC, both managed by Plaintiff, were the two most complex and highest revenue generating locations in Rivers' entire Region of Licensed Stores.<br><br>**AMF # 875-877; 881-891** |
| 478.  Mr. Briscoe Acknowledges that he does not disagree with anything Rivers put in his evaluation for the 2013 review period.<br><br>**<u>PLF.'S DEP., 266: 8-10</u>.** | Undisputed |
| 479.  On May 16, 2014, Rivers received a complaint about Mr. Briscoe | Disputed |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| from LAX Marriott. | After Plaintiff visited and cited Marriott for Non-compliance (infractions for which there had been recurring citations at the operation),  Hoenecke called Plaintiff saying that Marriott's Manager responsible Marriott for the Starbucks Licensee had called him with complaints about Plaintiff, Plaintiff  immediately telephoned Rivers and reported that the Licensee called Hoenecke complaining because Marriott was out of product when Plaintiff visited and Plaintiff intended to cite Marriott for Non-compliance (reflecting unfavorably on the Marriott Manager).<br><br>AMF #  975-978<br><br>Rivers told Plaintiff that he handled the matter properly.<br><br>AMF #978<br><br>A District Manager for a Licensed Store had duties to protect the Starbucks Brand which he did by working with the Licensee cooperatively, but, when necessary, having to cite the Licensee for |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| | Non-Compliance, a dynamic which sometimes put the LSDM at odd with the Licensee and him/its on-site manager, and gave on-site managers (who were employees of the Licensee and not of Starbucks) motivation to complain about the LSDM. |
| **RIVERS DECL. ¶ 13.** | **AMF # 963-978** |
| 480. LAX Marriott complained to Rivers about an incident wherein a hotel guest complained to the front desk having witnessed Mr. Briscoe yell at a LAX Marriott's Licensed Store Manager, and make her cry. | Disputed<br><br>After Plaintiff visited and cited Marriott for Non-compliance (infractions for which there had been recurring citations at the operation),  Hoenecke called Plaintiff saying that Marriott's Manager responsible Marriott for the Starbucks Licensee had called him with complaints about Plaintiff, Plaintiff  immediately telephoned Rivers and reported that the Licensee called Hoenecke complaining because Marriott was out of product when Plaintiff visited and Plaintiff intended to cite Marriott for Non-compliance (reflecting unfavorably on the Marriott Manager). |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| | **AMF #  975-978**<br><br>Rivers told Plaintiff that he handled the matter properly.<br><br>**AMF #978**<br><br>A District Manager for a Licensed Store had duties to protect the Starbucks Brand which he did by working with the Licensee cooperatively, but, when necessary, having to cite the Licensee for Non-Compliance, a dynamic which sometimes put the LSDM at odd with the Licensee and him/its on-site manager, and gave on-site managers (who were employees of the Licensee and not of Starbucks) motivation to complain about the LSDM.<br><br>**AMF # 963-978** |
| **RIVERS DECL. ¶ 13.** | |
| 481. LAX Marriot complained to Rivers that when it discussed the incident with Mr. Briscoe, he refused to take responsibility, apologize, or acknowledge that he did anything wrong. | Disputed<br>After Plaintiff visited and cited Marriott for Non-compliance (infractions for which there had been recurring citations at the operation), Hoenecke called Plaintiff saying that Marriott's Manager |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| | responsible Marriott for the Starbucks Licensee had called him with complaints about Plaintiff, Plaintiff immediately telephoned Rivers and reported that the Licensee called Hoenecke complaining because Marriott was out of product when Plaintiff visited and Plaintiff intended to cite Marriott for Non-compliance (reflecting unfavorably on the Marriott Manager). **AMF # 975-978** Rivers told Plaintiff that he handled the matter properly. **AMF #978** A District Manager for a Licensed Store had duties to protect the Starbucks Brand which he did by working with the Licensee cooperatively, but, when necessary, having to cite the Licensee for Non-Compliance, a dynamic which sometimes put the LSDM at odd with the Licensee and him/its on-site manager, and gave on-site managers (who were employees of the Licensee and not of Starbucks) motivation to complain about the LSDM. |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 13.** | **AMF # 963-978** |
| 482.   Mr. Briscoe did not disclose LAX Marriott incident to Rivers even though she regularly interacted with him after the incident. | Disputed<br><br>After Plaintiff visited and cited Marriott for Non-compliance (infractions for which there had been recurring citations at the operation),  Hoenecke called Plaintiff saying that Marriott's Manager responsible Marriott for the Starbucks Licensee had called him with complaints about Plaintiff, Plaintiff  immediately telephoned Rivers and reported that the Licensee called Hoenecke complaining because Marriott was out of product when Plaintiff visited and Plaintiff intended to cite Marriott for Non-compliance (reflecting unfavorably on the Marriott Manager).<br><br>**AMF #   975-978**<br>Rivers told Plaintiff that he handled the matter properly.<br><br>**AMF #978**<br>A District Manager for a Licensed Store had duties to protect the Starbucks Brand which he did by working with the Licensee cooperatively, but, when necessary, having to cite the Licensee for |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 13; <u>PLF.'S DEP., 160:24-162:11</u>.** | Non-Compliance, a dynamic which sometimes put the LSDM at odd with the Licensee and him/its on-site manager, and gave on-site managers (who were employees of the Licensee and not of Starbucks) motivation to complain about the LSDM.<br>**AMF # 963-978** |
| 483. At the demand of Starbucks' third-party client, Rivers removed Mr. Briscoe from the LAX Marriott account.<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>**Rivers Decl. ¶ 13; Warmke Decl. ¶ 10,** | Undisputed, but Defendant knew that Plaintiff did nothing wrong, as Rivers had stated to Plaintiff, and Defendant's high level management later learned that the Marriott manager later boasted that he did not like District Managers and joke of how he got rid of Plaintiff at the LAX Marriott (essentially for doing his job)<br>**AMF #978 and 980**<br>Rivers and Defendant owed the LSDM the duty to support and assist them including providing reasonable review, investigation and analysis of complaints in light of the dynamics for conflicts given the LSDM's need to cite Licensees for non-compliance and the motivation that could give for false or misleading |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| **Ex. E.** | claims and complaints. |
| | **AMF # 983** |
| 484.   On February 23, 2015, Licensee Ralphs complained to Rivers that Mr. Briscoe was "not consistent with what he [was] telling the kiosk managers." | Undisputed but, |
| | Rivers and Defendant owed the LSDM the duty to support and assist them including providing reasonable review, investigation and analysis of complaints in light of the dynamics for conflicts given the LSDM's need to cite Licensees for non-compliance and the motivation that could give for false or misleading claims and complaints. |
| | **AMF # 983,** |
| | **AMF # 963-978** |
| | Plaintiff's criticisms by the Licensee's manager grew out of Plaintiff properly and correctly performing his duties and notifying the Licensee's manager know that he (Plaintiff) would have to issue citations for Non-compliance if the Licensee continued with staffing shortages because it adversely impacted customer service to Starbucks' customers and harmed the Starbucks Brand. |
| **Rivers Decl.  ¶ 15, Ex. F; Rogers Decl. ¶ 15.** | **AMF # 984-986** |
| 485.   On   March   2,   2015,   Rivers | Undisputed, but the Ralphs situation is as |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| provided Mr. Briscoe feedback regarding the Ralphs complaint.<br><br>**RIVERS DECL. ¶ 15, EX. G.** | set out in response to UF # 49, above. |
| 486. On March 11, 2015, Vons complained to Rivers that it was forced to pay an employee to wait two hours for Mr. Briscoe who was late to a scheduled meeting.<br><br>**RIVERS DECL. ¶ 16; ROGERS DECL. ¶ 15.** | Undisputed, but Plaintiff did nothing wrong. Plaintiff was abruptly caused to change his schedule to make for a new store opening at Residence Inn, about which he timely and promptly notified Rivers, and she agreed.<br><br>AMF # 987, 994-995 |
| 487. Ms. Rivers coached Mr. Briscoe about his lack of communication with respect to this incident<br><br>**RIVERS DECL. ¶ 16, EX. H.** | Undisputed |
| 488. On May 6, 2015, Licensee Vons complained to Rivers that Vons employees felt harassed by Mr. Briscoe because he sent multiple texts to hourly Licensee employees about buying coffee. | Disputed<br>Plaintiff properly discharged his duties ensure that the Licensee was properly stocked with Starbucks products (Coffee, in this instance); there was no undue pressure or "bullying", and Starbucks had no policy preventing LSDMs from texting Licensee managers (or responsible persons) in fulfillment of |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 19, EXS. J-L.** | their duties.  Plaintiff simply used the management tools provided by Defendant for monitoring product purchases by Licensees to predict their needs and ensure product was always on hand. AMF 987-999 |
| 489.  It is against Starbucks policy to text third-party Licensee employees on their personal cellular phones.<br><br>**RIVERS DECL. ¶ 19.** | Disputed<br>Plaintiff properly discharged his duties ensure that the Licensee was properly stocked with Starbucks products (Coffee, in this instance); there was no undue pressure or "bullying", and Starbucks had no policy preventing LSDMs from texting Licensee managers (or responsible persons) in fulfillment of their duties.  Plaintiff simply used the management tools provided by Defendant for monitoring product purchases by Licensees to predict their needs and ensure product was always on hand. AMF 987-999 |
| 490.   On May 14, 2015, Rivers emailed Mr. Briscoe to coach him about the May 6th Vons complaint. | Undisputed, but,<br>Plaintiff properly discharged his duties ensure that the Licensee was properly |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 19, EX. M.** | stocked with Starbucks products (Coffee, in this instance); there was no undue pressure or "bullying", and Starbucks had no policy preventing LSDMs from texting Licensee managers (or responsible persons) in fulfillment of their duties.  Plaintiff simply used the management tools provided by Defendant for monitoring product purchases by Licensees to predict their needs and ensure product was always on hand.<br>AMF 987-999 |
| 491.  District Managers for Licensed Stores are responsible for certifying that baristas of new locations meet Starbucks' standards before the store is permitted to open.<br><br>**RIVERS DECL. ¶ 17.** | Undisputed. |
| 492.   If a store is not ready to open on a Licensee's preferred date it is the District Manager's responsibility to escalate the issue to the Regional Manager. | Undisputed |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 17.** | |
| 493. Because Mr. Briscoe failed to follow Starbucks procedure, Starbucks had to close the new Residence Inn location in order to retrain the Licensee employee baristas.<br><br><br><br><br><br><br><br><br><br><br><br><br><br>**RIVERS DECL. ¶ 17, EX. I.** | Disputed<br><br>Plaintiff did not fail to follow any Starbucks procedure in training the Baristas.  The claim that "Starbucks had to close the new Residence Inn location in order to retrain the Licensee employee baristas" is a **lie, verified by Sindy Lomas, the on-site Licensee Manager, who wrote to Rivers and others noting that the additional training for baristas would be, "in addition to operating during normal business hours."**<br><br>Exhibit – 25;<br>AMF 1000-1006 |
| 494. Mr. Briscoe refused to take responsibility for certifying the baristas. | Disputed<br><br>Plaintiff trained the baristas pursuant to Starbucks' policy and training procedure. Plaintiff did not fail to train the Baristas, causing them to performance inconsistent with expectations at opening.  A combination of slower employees, nerves, novelty, a lot to learn, the transition from learning to application, the pressure of now, |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 17.** | watchful eyes, and other factors, including the need for practice under live conditions.<br>AMF 1000-1006 |
| 495.  Mr.  Briscoe  believed  the deficiencies with the baristas existed because "the baristas that were there that day were handicapped baristas, meaning they had - - they were slower."<br><br>**PLF.'S DEP., 178:1-10.** | Disputed<br>Plaintiff was responsible for training the baristas, which he did in proper form pursuant to Starbucks' policy and training procedure. Plaintiff did not fail to train the Baristas, causing them to performance inconsistent with expectations at opening.  It was a combination of slower employees, nerves, novelty, a lot to learn, the transition from learning to application, the pressure of now, watchful eyes, and other factors, including the need for practice under live conditions.<br>AMF 1000-1006 |
| 496.   On July 23, 2014, Rivers coached Mr.  Briscoe  on  improving  his transparency and communication. | Disputed<br>Rivers harassed Plaintiff with this false and unsupportable claim.<br>Plaintiff was a recognized Leader with excellent communication and people skills, and Defendant repeatedly tapped him for important leadership roles. |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 22, EX. N .** | AMF # 881-891; |
| 497. On December 9, 2014, Rivers coached Mr. Briscoe regarding his tardiness to a meeting. | Disputed<br>Rivers harassed Plaintiff with this false and unsupportable claim.<br>Rivers' decision to make a late change in the meeting's scheduled start time created this situation. |
| **RIVERS DECL. ¶ 22, EX. O.** | AMF # 930,954 |
| 498. On February 11, 2015, Rivers coached Mr. Briscoe regarding his failure to notice whether exterior punch items were fixed at a Licensee location | Disputed<br>Rivers harassed Plaintiff with this false and unsupportable claim.<br>This relates to a "Construction issue for a new store under construction".  LSDM are Operational Employees whose duties, job descriptions and roles do not include managing or completing Construction Punch Lists at a Licensed Store. |
| **RIVERS DECL. ¶ 22, EX. P.** | AMF # 1055 |
| 499. On February 27, 2015, Mr. Briscoe provided Rivers improper sales for Terminal Two LAX locations during a period when the terminal was actually closed.<br><br>**RIVERS DECL. ¶ 22, EX. Q.** | Disputed<br>Rivers harassed Plaintiff with this false and unsupportable claim.<br>Defendant's Finance Department, for its own accounting purposes categorized a closed store as a remodel, resulting in an inaccurate reporting of revenues for a closed store at LAX.  It was Plaintiff |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| | who detected the accounting and questioned it, noting that the store, though closed, was budgeted for the entire year. AMF # 1056 |
| 500. On April 21, 2015, Rivers coached Mr. Briscoe on his communication with Licensees **RIVERS DECL. ¶ 22, EX. R.** | Disputed, Rivers harassed Plaintiff with this false and unsupportable claim.  Plaintiff's communication skills were outstanding and were recognized by Defendant as worthy of Leadership Roles, and Rivers had told Plaintiff that he handled the Marriott situation properly, just the way that Scruggs (a Caucasian LSDM had handled a similar situation.)  AMF # 883-894 Even in 2015, Rivers made false claims about Plaintiff, but Defendant continued to select Plaintiff for important Leadership roles because of his excellent communication and result orientation. AMF # 934-943; 945-946. |
| 501. On April 24, 2015, Rivers coached Mr. Briscoe regarding deficiencies at one of his stores. | Disputed Rivers harassed Plaintiff with this false and unsupportable claim.   Plaintiff's stores were not deficient.  Rivers failed |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 22, EX. S.** | and refused to support Plaintiff when he did his job and cited Licensees for Non-Compliance, but she blamed Plaintiff if he did not cite them to enforce compliance.  (Plaintiff couldn't do anything right in Rivers' eyes after he started to seek promotion for his recognized leadership performance.) AMF # 957-973; 975-1004 |
| 502.   On May 14, 2015, Mr. Briscoe provided Ms. Rivers monthly reports for the wrong time period. <br><br> **RIVERS DECL. ¶ 22, EX. T.** | **Disputed** <br> Rivers harassed Plaintiff with this false and unsupportable claim.  On a single occasion, Plaintiff handed Rivers one paper intending to give her another and Rivers abruptly ended her visit with Plaintiff.  A couple of minutes after Rivers walked away from Plaintiff, he discovered that he gave Rivers the wrong page and sent her an email correcting it.  Rivers refused to acknowledge Plaintiff's email, choosing instead to cite the incident as negative performance.  This incident was not noteworthy for performance.  Rivers did not treat her Caucasian subordinates this way. AMF # 1040-1042; 896; 899 |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| | |
| 503.   On May 28, 2015, Rivers coached Mr. Briscoe regarding his failure to correspond with "key stakeholders." <br><br> **RIVERS DECL. ¶ 22, EX. U.** | Disputed <br> Rivers harassed Plaintiff with this false and unsupportable claim. <br> Rivers' claim not genuine because Plaintiff knew and understood the Starbuck business, was a Business Leader and an effective communicator whom Defendant tapped for a number of leadership roles (before he started to seek Promotion and Promotional Opportunities) in recognition of his quality performance. <br> AMF # 876-877; 883-894; |
| 504.   On June 5, 2015, Rivers coached Mr. Briscoe regarding errors he made in his sales sheet. <br><br> **RIVERS DECL. ¶22, EX. V.** | Disputed <br> Rivers harassed Plaintiff with this false and unsupportable claim.  Plaintiff's performance was Leadership quality and Rivers continued to select Plaintiff for high profile and important Leadership roles, in 2015. <br> AMF # 934-946 <br> Special Leadership selections and assignments was indicative of Defendant's view of performance excellence. |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| | AMF 891 |
| 505.  Most DMs on Rivers' team had a Personal Development Plan ("PDP") outlining their respective goals and aspirations at Starbucks, and strategies for obtaining such goals.<br><br>**RIVERS DECL. ¶ 14.** | Undisputed, but Plaintiff never had on. Plaintiff pursued promotion and solicited support and assistance, but none was given him.<br>AMF # 899-903; 906-913; 927-933; 1050-1053 |
| 506.  A Partner Resources Manager at Starbucks is the same role as a Human Resources Manager at other companies.<br><br>**ROGERS DECL. ¶ 2.** | Undisputed |
| 507.  On June 26, 2014, Mr. Briscoe, Rivers and Sarah Rogers ("Rogers"), the Partner Resources Manager working with Rivers' team, met to discuss Mr. Briscoe's development at Starbucks and Mr. Briscoe developing a PDP.<br><br>**ROGERS DECL.  ¶ 7, EXS. B-C.** | Undisputed |
| 508.  On September 12, 2014, Rogers emailed   Mr.   Briscoe   additional | Disputed<br>Plaintiff denies that Rogers (or Rivers) |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| resources to assist his development.<br><br><br>**ROGERS DECL. ¶ 8, EX. D.** | ever tried to "assist his development".<br>Plaintiff sent Rogers an email (copying Rivers) seeking specific types of information that was uniquely related to Starbucks would be particularly helpful in assisting him with promotional development, but neither Rogers nor Rivers ever responded.<br>Exhibit 10;<br>AMF # 1057 |
| 509.  In November 2014, Mr. Briscoe, Rivers and Rogers met again to discuss Mr. Briscoe's progress and to ensure a formal PDP was in place.<br><br><br>**ROGERS DECL. ¶ 9.** | Disputed<br>Plaintiff denies that Rogers (or Rivers) ever tried to "assist his development".<br>Plaintiff sent Rogers an email (copying Rivers) seeking specific types of information that was uniquely related to Starbucks would be particularly helpful in assisting him with promotional development, but neither Rogers nor Rivers ever responded.<br>Exhibit 10;<br>AMF # 1057 |
| 510.  In November 2014, Mr. Briscoe had not completed his PDP. | Disputed<br>Plaintiff denies that Rogers (or Rivers) ever tried to "assist his development", |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| **ROGERS DECL. ¶ 9.** | including assisting Plaintiff with completion of a PDP. Plaintiff sent Rogers an email (copying Rivers) seeking specific types of information that was uniquely related to Starbucks would be particularly helpful in assisting him with promotional development, but neither Rogers nor Rivers ever responded. Exhibit 10; AMF # 1057 |
| 511. On December 9, 2014, Rogers scheduled an in-person meeting with Rivers and Mr. Briscoe to facilitate communication between them, and again discuss Starbucks' concerns regarding Mr. Briscoe's communication style.<br><br>**ROGERS DECL. ¶ 10.** | Disputed<br>Plaintiff personally requested a meeting with Rogers to discuss what Plaintiff felt to be Race discrimination against him. Plaintiff Depo 277:6-278:14 |
| 512. On December 17, 2014 Rivers emailed Rivers and Mr. Briscoe a summary of next steps for Mr. Briscoe's | Disputed<br>It makes no sense that "Rivers emailed Rivers…" |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| development and potential support tactics for him.<br><br><br>**ROGERS DECL. ¶ 13, EX. E.** | Plaintiff denies that Rogers (or Rivers) ever tried to "assist his development", including assisting Plaintiff with completion of a PDP.  Plaintiff sent Rogers an email (copying Rivers) seeking specific types of information that was uniquely related to Starbucks would be particularly helpful in assisting him with promotional development, but neither Rogers nor Rivers ever responded.<br>**Exhibit 10;**<br>**AMF # 1057** |
| 513.  Mr. Briscoe agreed to participate in a 360 Peer review which was completed in February 2015, which was designed to give him additional insight into how he was perceived by his peers/other Partners.<br><br><br>**PLF.'S DEP., 267:16-24;  ROGERS DECL. ¶ 14, EXS. F-G.** | Undisputed that Plaintiff agreed to participate in a "360".<br>**Disputed** that the purpose or intent of the 360 or Plaintiff's agreement to participate in it was to be used as a performance evaluation  tool from which Defendant would selectively pick and choose anything that it perceived to be a negative and ignore all of the many positives.<br>**AMF # 1007-1012**;<br>Defendant used the 360 solely as a tool against Plaintiff, which was never its |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| | intent or purpose |
| | **UF # 79-83** |
| | Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. |
| | **AMF # 1014-1030** |
| | The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. |
| | **AMF # 1007-1012** |
| | No LSDM other than Plaintiff was the subject of a 360 Survey. |
| | **AMF # 1012** |
| 514. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe stop "[c]oming in with his present agenda for the conversation. At times he seems unwilling to hear what the other person has said if it doesn't fit in with his pack of thinking." | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy. The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant. Defendant has selectively picked and cited to anything that it can |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| **ROGERS DECL. ¶ 14, EX. G.** | make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 515. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe stop "[w]orking while others are presenting." | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy.   The purpose and |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| **ROGERS DECL. ¶ 14, EX. G.** | intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| | **AMF # 1012** |
| 516. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe stop "[s]peaking over others."<br><br>**ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360".<br><br>**Disputed** that the comment is performance worthy. The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant. Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments.<br><br>**AMF # 1007-1012**;<br>Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose<br><br>**UF # 79-83**<br>Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360.<br><br>**AMF # 1014-1030**<br>The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| | Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 517. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe stop "[a]cting superior to others." **ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy.  The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| | The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 518.  A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe stop "[s]aying that he is aligned with team commitments and not follow thru [sic] and/or do it 'his way' rather than staying aligned with the team." **ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy.  The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| | **UF # 79-83**<br><br>Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360.<br><br>**AMF # 1014-1030**<br><br>The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them.<br><br>**AMF # 1007-1012**<br><br>No LSDM other than Plaintiff was the subject of a 360 Survey.<br><br>**AMF # 1012** |
| 519.  A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that "[w]hen [Mr. Briscoe] disagrees with RD [Rivers], at times it appears disrespectful."<br>**ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360".<br><br>**Disputed** that the comment is performance worthy.  The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| | all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 520. A reviewer responding to Mr. Briscoe's 360 Peer Review described Mr. Briscoe as "[s]low, or unwilling, to adapt or conform with Team direction." | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy. The purpose and intent of the 360 to which Plaintiff |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| **ROGERS DECL. ¶ 14, EX. G.** | agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| 521. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe stop "[t]elling stories in generalities vs. actual specific examples."<br><br><br>**ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360".<br>**Disputed** that the comment is performance worthy.  The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments.<br>**AMF # 1007-1012**;<br>Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose<br>**UF # 79-83**<br>Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360.<br>**AMF # 1014-1030**<br>The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| | leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 522. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe start "[a]ctively listening more consistently." **ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy. The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant. Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| | of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 523. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe start "[t]aking the time to listen to feedback of others." **ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy.   The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| | Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 524. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe, "[w]hen communicating take additional time to consider what you want the partner to feel as a result of your communication." **ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy.  The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| | **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 525. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe start "[a]ctively listening when others are talking, sharing ideas, presenting, etc. Consider tone in communication may come | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy. The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| across as 'aloof' or arrogant at times."<br><br>**ROGERS DECL. ¶ 14, EX. G.** | used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments.<br>**AMF # 1007-1012**;<br>Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose<br>**UF # 79-83**<br>Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360.<br>**AMF # 1014-1030**<br>The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them.<br>**AMF # 1007-1012**<br>No LSDM other than Plaintiff was the subject of a 360 Survey.<br>**AMF # 1012** |
| 526.   A   reviewer   responding   to   Mr. | Undisputed that this is one comment in |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| Briscoe's 360 Peer Review suggested that Mr. Briscoe start "[b]eing more welcoming and generous."<br><br>**ROGERS DECL. ¶ 14, EX. G.** | the "360".<br><br>**Disputed** that the comment is performance worthy.  The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments.<br>**AMF # 1007-1012**;<br>Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose<br>**UF # 79-83**<br>Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360.<br>**AMF # 1014-1030**<br>The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| | **AMF # 1007-1012** |
| | No LSDM other than Plaintiff was the subject of a 360 Survey. |
| | **AMF # 1012** |
| 527. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe start "[l]istening to directions, be respectful of others skill sets and experience, be open minded to other ideas."<br><br>**ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". <br><br>**Disputed** that the comment is performance worthy.  The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments.<br><br>**AMF # 1007-1012**;<br>Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose<br><br>**UF # 79-83**<br>Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360.<br><br>**AMF # 1014-1030**<br>The 360 was an assessment by peers (not of Licensees with whom Plaintiff |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| | interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 528. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe needs to "d]emonstrate professionalism in all work environments." **ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy.  The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| | numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 529. Mr. Briscoe's response to the comments in his 360 review was he "absorbed them," but did not feel he needed to make adjustments based on the feedback.  **PLF.'S DEP., 268:19-269:15.** | Undisputed |
| 530. Mr. Briscoe never drafted his PDP. | Undisputed |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| **PLF.'S DEP., 269:16-17; ROGERS DECL. ¶ 20.** | |
| 531. On March 30, 2015, Starbucks issued Mr. Briscoe a Performance Concerns and Expectations Memorandum ("March 30 Memo")<br><br>**PLF.'S DEP. 261:11-262:3, EX. 9; ROGERS DECL. ¶16, EX. J; RIVERS DECL. ¶ 18.** | Undisputed |
| 532. On May 6, 2015, Rivers advised Heidi Sundquist ("Sundquist"), another Partner Resources Manager, about the May 6th Vons Complaint.<br><br>**RIVERS DECL. ¶ 19; DECLARATION OF HEIDI SUNDQUIST ("SUNDQUIST DECL.") ¶ 7, EX. A.** | Undisputed, but the "Von" complaint was for Plaintiff doing what he was duty-bound to do.<br>AMF # 987-999 |
| 533. On May 12, 2015, Starbucks decided to place Mr. Briscoe on a Performance Improvement Plan ("PIP")<br><br>**RIVERS DECL. ¶ 19, SUNDQUIST DECL. ¶ 7, EX. A, ¶ 8.** | Undisputed, but Plaintiff Disputes that a "PIP" was proper, noting that Defendant continued to exhibit recognition of his excellent performance and Leadership by continuing to select and assign him to high profile and important leadership |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| | roles.<br>AMF # 934-946 |
| 534.  Starbucks maintains policies and procedures for issuing a PIP including Performance Improvement Plan Best Practices, and the Performance Improvement Plan Template.<br><br>**SUNDQUIST DECL. ¶ 8, EXS. B-C.** | Undisputed |
| 535.  On June 4, 2015, Rivers and Heidi Sundquist, issued Mr. Briscoe the PIP during an in-person meeting.<br><br>**PLF.'S DECL., 262:13-25; SUNDQUIST DECL. ¶ 9, EX. D; RIVERS DECL. ¶ 19.** | Undisputed, but the PIP was improper because it was supported by false claims by Rivers.<br>AMF # 874-946<br>Of 5 LSDM who are racial minorities, two have filed lawsuits, one filed internal claims alleging discrimination, and one has verbally reported feeling discriminated against by Rivers, who assists Caucasians with promotions and promotional opportunities, but never assisted Plaintiff or any other racial minority, before Plaintiff filed his lawsuit.<br>AMF # 896-898; 899-903; 915-924; 1050-1053 |
| 536.  On June 9, 2015, Mr. Briscoe had | Undisputed |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| a meeting with Rivers and Sundquist wherein he provided his response to the PIP.<br><br>**SUNDQUIST DECL. ¶ 10, EX. E.** | |
| 537. Mr. Briscoe's June 9, 2015, response to the PIP demanded that Starbucks conduct an independent investigation into "unfair treatment and consciously biased actions and behaviors towards [him]" by Rivers.<br><br>**SUNDQUIST DECL. ¶ 10, EX. E.** | Undisputed |
| 538. During the June 9, 2015, meeting, Mr. Briscoe told Rivers and Sundquist that he had recorded everything that was discussed at the meeting without our knowledge and/or consent.<br><br>**SUNDQUIST DECL. ¶ 10; RIVERS DECL. ¶ 20.** | Undisputed that Plaintiff disclosed to Rivers and Sundquist that he had recorded some 6-10 conversations at different times and offered to play the recordings for them to listen and hear the confirmation of his claims that Rivers was discriminating and retaliating against him once he began pursuing promotion. They declined Plaintiff's offer to listen to the recordings and later told Plaintiff that the recordings were illegal, causing Plaintiff to believe that |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
|  | Defendant was saying that it did not want to hear his confirmatory recordings, and that the recordings were worthless. AMF # 1057 |
| 539.   During the June 9, 2015, meeting, Mr. Briscoe also told Rivers and Sundquist that in the past he recorded many of his conversations with us without our knowledge and/or consent.<br><br>**SUNDQUIST DECL. ¶ 10; RIVERS DECL. ¶ 20.** | Undisputed that Plaintiff disclosed to Rivers and Sundquist that he had recorded some 6-10 conversations at different times, and offered to play the recordings for them to listen and hear the confirmation of his claims that Rivers was discriminating and retaliating against him once he began pursuing promotion.  They declined Plaintiff's offer to listen to the recordings and later told Plaintiff that the recordings were illegal, causing Plaintiff to believe that Defendant was saying that it did not want to hear his confirmatory recordings, and that the recordings were worthless. AMF # 1057 |
| 540.  Mr. Briscoe also recorded his conversations with Rogers without her knowledge and consent.<br><br>**ROGERS DECL. ¶ 18.** | Undisputed |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| 541.  The earliest Mr. Briscoe alleges he made any complaint about improper conduct at Starbucks was in December 2014.<br><br>**PLF.'S DEP., 277:6-278:6.** | Undisputed that Plaintiff alleged race discrimination to Defendant's HR Representative, December of 2014. |
| 542.  On June 12, 2015, Starbucks engaged an independent investigator to investigate Mr. Briscoe's claims.<br><br>**DECLARATION OF EMILY SCHULTZ ("SHULTZ DECL.") ¶ 2, EX. A; SUNDQUIST DECL. ¶ 12, EX. G.** | Undisputed |
| 543.  On June 10, 2015, Mr. Briscoe's PIP was put on hold pending the outcome of the investigation.<br><br>**SUNDQUIST DECL. ¶ 12, EX. G.** | Disputed<br>Plaintiff was blocked from pursuing any promotions or being considered for promotional opportunities, earning pay increases and bonuses, because the PIP is a bar to them.<br>AMF # 914, 950<br>Plaintiff was still being tapped assist Starbucks with important Leadership assignments requiring knowledge of the |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| | Business, excellent communication, analytical and leadership skills, at the same time that Rivers was claiming Plaintiff's performance was unacceptable (a contradiction). AMF # 934-946 |
| 544.   As part of her investigation into Mr. Briscoe's claims, the independent investigator conducted in-depth interviews of five witnesses. **SHULTZ DECL. ¶ 3.** | Disputed as a recent fabrication. Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made. Plaintiff's Depo 244:15-245:2; 246:17-247:4 |
| 545.   As part of her investigation into Mr. Briscoe's claims, the independent investigator reviewed relevant documents provided by Starbucks including emails provided by Mr. Briscoe, Rivers, and Sundquist, and the documents attached to Mr. Briscoe's June 9, 2015, complaint. **SHULTZ DECL. ¶ 4.** | Disputed as a recent fabrication. Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made. Plaintiff's Depo 244:15-245:2; 246:17-247:4 |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| 546. The independent investigator completed her investigation on July 27, 2015.<br><br>**SHULTZ DECL. ¶ 10.** | Undisputed |
| 547. At the conclusion of her investigation, the independent investigator drafted an investigation report that detailed the findings of her investigation.<br><br>**SHULTZ DECL. ¶ 5.** | Disputed as a recent fabrication. Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made.<br>Plaintiff's Depo 244:15-245:2; 246:17-247:4 |
| 548. The independent investigator's report focused on Mr. Briscoe's allegations of unfair treatment and unfair labor practices, discrimination, harassment and "consciously biased actions and behaviors" by Rivers.<br><br>**SHULTZ DECL. ¶ 6.** | Disputed as a recent fabrication. Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made.<br>Plaintiff's Depo 244:15-245:2; 246:17-247:4 |
| 549. The independent investigator | Disputed as a recent fabrication. |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| determined Mr. Briscoe's claims against Rivers were unsubstantiated.<br><br><br>**SHULTZ DECL. ¶ 7.** | Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made.<br>Plaintiff's Depo 244:15-245:2; 246:17-247:4 |
| 550. The independent investigator determined:<br>"The facts do not show Ms. Rivers engaged in consciously biased actions and behaviors, discrimination or harassment toward Mr. Briscoe. Mr. Briscoe also did not identify race, gender or any other such category as the basis for the treatment. There is no indication Ms. Rivers treated him in a consciously biased way, or that she treated Mr. Briscoe differently than other DMs on her team."<br><br>**SHULTZ DECL. ¶ 7.A.** | Disputed as a recent fabrication.<br>Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made.<br>Plaintiff's Depo 244:15-245:2; 246:17-247:4<br>Plaintiff identified race discrimination to S. Rogers at his one-on-one in December, 2014.<br>AMF # 1059 |
| 551. The independent investigator determined:<br>"The facts do not support Mr. Briscoe's | Disputed as a recent fabrication.<br>Plaintiff was told by Shultz that the investigation was complete and that |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| claim of unfair treatment. DMs [] who Mr. Briscoe believes are favored by Ms. Rivers, are top performers and/or take advantage of the career development opportunities given by Ms. Rivers, unlike Mr. Briscoe. In addition, Ms. Rivers has given Mr. Briscoe a great deal of recognition and many opportunities for growth and development in his career at Starbucks." | Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made. Plaintiff's Depo 244:15-245:2; 246:17-247:4 |
| **SHULTZ DECL. ¶ 7.B.** | |
| 552. The independent investigator determined "[t]he facts showed there was a legitimate basis for Mr. Briscoe's PIP" because: <br>• "At the request of Marriott, in May 2014 Ms. Rivers removed Mr. Briscoe from the Marriott account because of his improper handling of a non-compliance situation at one of its hotels and his failure to accept responsibility for the incident. <br>• Mr. Briscoe trained and certified licensed store employees as baristas at the Residence Inn for the New | **Disputed** as a recent fabrication and false and unsupportable finding. Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made. **Plaintiff's Depo 244:15-245:2; 246:17-247:4: 188:21-189:11;** Plaintiff was told by Rivers that he did nothing wrong at Marriott and that his situation was similar to that of Matt |

| **UNCONTROVERTED FACTS[10]** | **SUPPORTING EVIDENCE** |
|---|---|
| Store Opening (NSO). Ms. Rivers discovered those baristas could not ring up drinks and did not know how to make drinks correctly, and she wanted the store shutdown.<br><br>• Von's [sic] and Ralph's [sic] complained to Ms. Rivers about Mr. Briscoe, including that he "was a jerk" and he failed to attend scheduled meetings with them.<br><br>• Mr. Briscoe repeatedly provided inaccurate data to Ms. Rivers, including incorrect sales figures, even after they discussed the approach on a given topic and how it should be communicated.<br><br>• Despite extensive coaching by Ms. Rivers and PRM Sarah Rogers, Mr. Briscoe failed to accept responsibility for his actions, did not improve in the areas Ms. Rivers coached him about, he was not self-aware and he did not incorporate the feedback they provided."<br><br>**SHULTZ DECL. ¶ 8.** | Scruggs (Caucasian).  Scruggs was assisted by Rivers with promotion.<br><br>**AMF # 975-983;**<br>Rivers lied about the entire Residence Inn situation, including her claim that the store had to shut down.<br><br>**AMF # 1000-1006;**<br>As to Vons, Rivers lied about Plaintiff for merely doing his job of monitoring and making certain that the Licensee was compliant with Coffee (product) Availability, as he was required to do. Rivers lied claiming there was a "Starbuck Policy" prohibiting texting to a cell phone.<br><br>**AMF # 987-999**<br>Plaintiff's performance remained excellent throughout his employment as supported by his performance evaluations (Exhibits - 5 and 6), his revenue generation constituting one-third of Rivers' Region's revenues which had 10 to 12 District Managers in the Region (Exhibit- 3), an Plaintiff's continued selection for high profile assignments and important Leadership roles, right through |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| | to his separation in 2015.<br>**AMF # 881-891; 934-946** |
| 553. The independent investigator recommended that Starbucks reinstate the PIP.<br><br>**SHULTZ DECL. ¶ 9.** | **Disputed** as a recent fabrication and false and unsupportable finding. Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made.<br>**Plaintiff's Depo 244:15-245:2; 246:17-247:4; 188:21-189:11;**<br>Plaintiff was told by Rivers that he did nothing wrong at Marriott and that his situation was similar to that of Matt Scruggs (Caucasian).  Scruggs was assisted by Rivers with promotion.<br>**AMF # 975-983;**<br>Rivers lied about the entire Residence Inn situation, including her claim that the store had to shut down.<br>**AMF # 1000-1006;**<br>As to Vons, Rivers lied about Plaintiff for merely doing his job of monitoring and making certain that the Licensee was |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| | compliant with Coffee (product) Availability, as he was required to do. Rivers lied claiming there was a "Starbuck Policy" prohibiting texting to a cell phone. **AMF # 987-999** Plaintiff's performance remained excellent throughout his employment as supported by his performance evaluations (Exhibits - 5 and 6), his revenue generation constituting one-third of Rivers' Region's revenues which had 10 to 12 District Managers in the Region (Exhibit- 3), an Plaintiff's continued selection for high profile assignments and important Leadership roles, right through to his separation in 2015. **AMF # 881-891; 934-946** |
| 554. On July 20, 2015, Mr. Briscoe resigned from his employment with Starbucks.<br><br>**SUNDQUIST DECL. ¶ 20, EX. H.** | Undisputed that Plaintiff resigned because Rivers was constantly attacking him with false performance claims and suggesting that he couldn't do anything right, couldn't do emails, food warming…couldn't do anything, (when all the while, Rivers was assigning him to high profile and very important |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| | Leadership roles in recognition of his outstanding performance),  and Defendant was doing nothing to address Plaintiff's complaints of race discrimination, except to allow Rivers to retaliate against him. **Plaintiff's Depo 188:21-189:11; UF # 136-144(below).** |
| 555. At the time of Mr. Briscoe's resignation, he had been offered, and had accepted, a job at Jack in the Box Inc.<br><br>**PLF.'S  DEP.  206:12-15;  209:6-10; 309:24-310:9, EX. 45.** | Undisputed |
| 556. Mr. Briscoe's starting salary at Jack in the Box Inc. was $120,000 per annum (not inclusive of bonuses).<br><br>**PLF.'S   DEP.,   302:13-15;   309:24-310:9, EX. 45.** | Undisputed |
| 557. At the time of his resignation from Starbucks, Mr. Briscoe's annual salary at Starbucks was approximately | Undisputed, but Plaintiff's bonus potential (quarterly payments rather than annually), stock and benefits were |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| $95,963.64 per annum (not including performance bonuses).<br><br><br>**ROGERS DECL. ¶ 22.** | superior at Starbucks, and Starbucks as a Brand was Plaintiff's preferred career path.  Plaintiff took meaningful cut in salary compensation to leave his job at Burger King to accept the Starbucks position, because of the upside career and earnings potential and because he wanted to leave "fast food".  Also, at Starbucks, Plaintiff was in a "ready for promotion" posture, with four year of background and Plaintiff had begun making contact with License Stores VP for the United Kingdom.  At Jack in the Box, Plaintiff had to start from scratch. AMF # 1060 |
| 558. Mr. Briscoe's discrimination claims are based solely on the conduct of Rivers.<br><br><br>**PLF.'S DEP., 143:15-21.** | Undisputed |
| 559. With respect to whether Mr. Briscoe's belief that Rivers discriminated against was based on something specific, Mr. Briscoe acknowledged: "I don't know.  I asked that question myself and couldn't get an | Undisputed in part, but Plaintiff also testified:<br>Plaintiff testified that he was well accepted by Rivers as long as he stayed in his place and did not try to advance, but that Rivers intentionally and |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| <u>understanding why I started getting this treatment.  So I don't know why."</u><br><br>**PLF.'S DEP., 144:7-12.** | discriminatorily tried to hold him back when he sought promotion like the Caucasians on Rivers team, and that race was the reason.<br><br>**Plaintiff's Depo 306:8-307:10**<br>Plaintiff also testified as follows:<br>Q. Do you think it was because of your race?<br>A. I do.<br>Q. Why?<br>A. I do.  Other employees that were non-black weren't being treated the way that I was being treated.<br>…<br>Q. Who specifically are you referring to?<br>A. Barb Holdgrafer, Deanna Pusatier, Kevin Dockery, Tammy Hereford, Ashley Larson, Erica Hernandez.<br>Q. Anybody else?<br>A. Donna Hernandez.<br>**Plaintiff's Depo 144:13-23.** |
| 560.  With respect to his belief that Rivers discriminated against him, Plaintiff acknowledged he "do[esn't] know why things changed . . . I asked | Plaintiff testified that he believed that Rivers was discriminating against him and that he reported same to Rogers as early as December, 2014 |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| that question myself and couldn't get an understanding why I started getting this treatment.  So I don't know why." **PLF.'S DEP., 144:7-12.** | **Plaintiff's Depo 144:13-23; 277:6-278:2;** Plaintiff testified that he was accepted and credited by Rivers as long as he stayed in his place and did not try to advance, but that Rivers intentionally and discriminatorily tried to hold him back when he sought promotion like the Caucasians on Rivers team, and race was the reason. **Plaintiff's Depo 306:8-307:10** |
| 561.  Mr.  Briscoe  acknowledged  he does  not  know  who  at  Starbucks actually issued, approved, or drafted the PIP. **PLF.'S DEP., 263:6-17.** | Undisputed but Irrelevant because, Plaintiff knows Rivers supervised his work activities and that Rivers made numerous the false claims against him which support the PIP. AMF # 904-933; 949-952; 974-1007; 1048-1049; |
| 562.  The decision to issue the PIP was actually  made  in  consultation  with Partner Resources personnel, not Rivers alone. **SUNDQUIST DECL. ¶ 7, EX. A.** | Undisputed but Irrelevant because, Plaintiff knows Rivers supervised his work activities and that Rivers made the false claims against him which support the PIP. AMF # 904-933; 949-952; 974-1007; 1048-1049; |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| 563.  Mr.  Briscoe  acknowledges  his retaliation  claim  is  based  on  the discriminatory  actions  he  claims happened to him.<br><br>**PLF.'S   DEP.,   144:7-12;   214:21-215:14.** | Plaintiff testified that Rivers was constantly attacking him with false performance claims and suggesting that he couldn't do anything right, couldn't do emails, warm food, send a text message, check to see if Licensees were stocked with product, ask Licensees to comply with Starbucks' standards…couldn't do anything, (when all the while, Rivers was assigning him to high profile and very important Leadership roles in recognition of his outstanding performance), and Defendant was doing nothing to address Plaintiff's complaints of race discrimination, except to allow Rivers to retaliate against him.<br>**Plaintiff's Depo 188:21-189:11; UF # 136-144(below).** |
| 564.  Rivers  has  no  hiring  authority outside of her team.<br><br>**RIVERS   DECL.   ¶   10;   MITTAL DECL. ¶ 4, EX. B[12] (DEPOSITION** | Undisputed, but she could support and assist District Managers on her team who sought promotion,  and she had supported and assisted Caucasian District Managers promote, but did not support and assist Plaintiff or other racial |

---

[12] All further excerpts from Ms. Rivers' deposition are attached as Exhibit B to the

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| **OF ANGELA RIVERS ("RIVERS' DEP."), 105:23-106:5.** | minorities during Plaintiff's tenure. AMF # 896-898, 974, 899-903, 912, 914-929, 932. |
| 565.  Rivers did not know Mr. Briscoe had applied for a subsequent BDM position until this lawsuit was filed.  **RIVERS DECL. ¶ 11.** | Disputed  Plaintiff personally told Rivers that he had again applied for the BDM position, and she appeared upset with Plaintiff , and told him: "well I didn't know that you were going to do that."   AMF 928 and 929 |
| 566.  Mr. Briscoe acknowledged that Leah Bernard, one of the seven partners he claims received preferential treatment from Rivers, is African American.     **PLF.'S DEP., 33:7-35:11, 67:23-24; RIVERS DECL. ¶ 4.** | **Undisputed** that L. Bernard is an African American.  **Disputed** that Bernard was the recipient of any preferential treatment before Plaintiff's allegations of discrimination and filing of a legal action.  Bernard has been the beneficiary of claims against Rivers by Plaintiff and other racial minorities.  Rivers provided no promotional support and/or assistance to racial minorities on her team during Plaintiff's tenure.  **AMF # 896-898, 974, 899-903, 912, 914-929, 932.**  Rivers assisted Caucasians with |

Declaration of Jyoti Mittal.

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| | promotions and promotional opportunities, but she never assisted any racial minority with promotions or promotional opportunity during Plaintiff's tenure. **AMF # 896-899** |
| 567.  Mr. Briscoe claims partners on Rivers' team received opportunities he did not, including "elevation," promotion and/or additional responsibilities.  **PLF.'S DEP., 33:7-35:11; 35:24-39:6; 150:13-152:25; 221:15-223:16**. | Undisputed |
| 568.  Mr. Briscoe acknowledges he did not apply for the positions he claims partners on Rivers' team received instead of him.  **PLF.'S DEP., 221:15-223:16**. | **Undisputed, but** Rivers did not support or assist Plaintiff in his promotional efforts; she actively blocked Plaintiff from pursuit of the positions for which he applied; and she refused to offer assistance when Plaintiff requested it. **AMF # 912, 925-929;** Rivers also used PIPs to block other racial minorities on her team from promoting, while she supported and assisted Caucasians in obtaining |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| | promotions.<br>**AMF # 896-898, 974, 899-903, 912, 914-929, 932.** |
| 569.  Mr. Briscoe acknowledges that the promotions he claims partners on Rivers' team received instead of him occurred after he resigned from Starbucks.<br><br>**PLF.'S DEP. 222:1-11.** | Disputed<br>Rivers herself testified that she supported the promotions of Dockery, Scruggs, Pusatier, and other Caucasians during Plaintiff's tenure.<br>**AMF # 896** |
| 570.  Mr. Briscoe acknowledges that the opportunities he claims went to other partners instead of him went to partners far more senior to him at Starbucks.<br><br>**PLF.'S DEP., 48:3-10; 144:13-147:2.** | Undisputed but totally Irrelevant<br>Starbucks had no policy that made "seniority" a factor in promotional considerations.<br>**AMF # 1061** |
| 571.  Rivers appointed Mr. Briscoe to the Disney Star Team in 2011.<br><br>**RIVERS DECL. ¶ 23.** | Undisputed, and an illustration that Rivers  recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This  high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 572.  Rivers appointed Mr. Briscoe to the Disney Star Team in 2012. | Undisputed, and an illustration that Rivers  recognized Plaintiff's excellence, |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| RIVERS DECL. ¶ 23. | in communication, leadership, interpersonal skills and professionalism. This high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 573.  Rivers nominated Mr. Briscoe as DM of the Quarter in 2012.<br><br>RIVERS DECL. ¶ 23. | Undisputed, and an illustration that Rivers recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 574.  Rivers nominated Mr. Briscoe as DM of the Quarter in 2013.<br><br>RIVERS DECL. ¶ 23. | Undisputed, and an illustration that Rivers recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 575.  Rivers appointed Mr. Briscoe as Annual Operating Plan Pillar Lead in 2014. | Undisputed, and an illustration that Rivers recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 23.** | This high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 576. Rivers selected Mr. Briscoe to highlight and tour one of his locations with the United States Leadership team in 2014.<br><br>**RIVERS DECL. ¶ 23.** | Undisputed, and an illustration that Rivers recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 577. Rivers appointed Mr. Briscoe as Annual Operating Plan Pillar Lead 2015 Our Coffee and Our Food, including Evenings and Refreshment (supporting peer DM).<br><br>**RIVERS DECL. ¶ 23.** | Undisputed, and an illustration that Rivers recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 578. Rivers selected Mr. Briscoe as highlighted in a partner appreciation week in Q2 of 2015 for specific support of a senior leader visit.<br><br>**RIVERS DECL. ¶ 23.** | Undisputed, and an illustration that Rivers recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This high profile and important leadership assignment is an exhibition |

| UNCONTROVERTED FACTS[10] | SUPPORTING EVIDENCE |
|---|---|
| | that Plaintiff was a recognized outstanding performer. |
| 579. Rivers selected Mr. Briscoe's USC location for a March 2015 tour with the United States Leadership team.<br><br>**RIVERS DECL. ¶ 23.** | Undisputed, and an illustration that Rivers recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 580. Starbucks has policies and procedures that specifically prohibit discrimination, harassment, and retaliation. Attached as Exhibit A are true and correct copies of these policies.<br><br>**ROGERS DECL. ¶ 5, EX. A.** | Undisputed, but Starbucks has allowed Rivers to discriminate against racial minorities (Nelson, Hernandez and Plaintiff) with impunity.<br>AMF 915-924; 949-952. |

## C.   CONSTRUCTIVE WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

ISSUE NO. 5: Plaintiff's claim for constructive wrongful termination in violation of public policy fails as it is derivative of his claims for discrimination and retaliation, which fail.

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| 581.  Similar to a franchise, Starbucks licenses its brand and products to Licensed Stores run by other companies (Licensees), including, but not limited to, Vons, Ralphs, Marriott, and Disney.<br><br>**DECLARATION OF ANGELA M. RIVERS ("RIVERS DECL.") ¶ 6.** | Undisputed |
| 582.  Licensees, sell Starbucks' products, and are responsible for managing their retail operations.<br><br>**RIVERS DECL. ¶ 6.** | Undisputed |
| 583.  In August 2011, Mr. Briscoe was interviewed and hired as a Licensed Store District Manager ("DM") by Angela Rivers ("Rivers"), Regional Director. | Undisputed |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| **DECLARATION OF JYOTI MITTAL ("MITTAL DECL.") ¶ 3, EXHIBIT ("EX.") A**[14] **(DEPOSITION OF PLAINTIFF KEVIN BRISCOE ("PLF'S DEP."), <u>63:21-64:10</u>); RIVERS DECL. ¶ 4.** | |
| 584.  Rivers was Mr. Briscoe's direct supervisor during his entire employment at Starbucks.<br><br>**RIVERS DECL. ¶ 4.** | Undisputed |
| 585.  Mr. Briscoe was one of three African American DMs on Rivers' 12-person team, including Leah Bernard.<br><br>**RIVERS DECL. ¶ 4; <u>PLF.'S DEP., 67:21-24, 148:18-149:3</u>.** | Undisputed |
| 586.  While employed by Starbucks, Mr. Briscoe was familiar with its policies against discrimination and retaliation as well as Starbucks' open door policy outlining procedures for reporting violations of company policies. | Undisputed |

---

[14] All further excerpts from Mr. Briscoe's deposition are attached as Exhibit A to the Declaration of Jyoti Mittal.

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| **PLF.'S DEP., 118:8-123:2, EX. 2; 129:25-130:3; 131:12-132:6, EX. 3; 132:7-25 EX. 4; 137:21-141:23, EX. 6; 271:4-6.** | |
| 587. As a DM, Mr. Briscoe was responsible for leading an assigned group of Licensed Store management teams within his district.<br><br>**RIVERS DECL. ¶ 6, EX. A.** | Undisputed |
| 588. As a DM Mr. Briscoe was responsible for assessing the overall operation of Licensed Stores, including ensuring Licensed Store compliance with Starbucks Experience standards.<br><br>**RIVERS DECL. ¶ 6, EX. A.** | Undisputed |
| 589. Communication skills are crucial to the DM position because District Managers regularly interface with Starbucks' Licensees and their employees.<br><br>**RIVERS DECL. ¶ 6, EX. A.** | Undisputed |
| 590. Paramount to Starbucks' business | Undisputed |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| model is communication with its partners, Licensees, and patrons.<br><br>**RIVERS DECL. ¶ 6; DECLARATION OF SARAH ROGERS ("ROGERS DECL.") ¶ 5, EX. A.; <u>PLF.'S DEP., 139:12-140:7, EX. 14</u>.** | |
| 591. Plaintiff acknowledged that communication was vital and important at Starbucks.<br><br><u>**PLF.'S DEP., 88:3-11**</u>. | Undisputed |
| 592. On April 27, 2014, Mr. Briscoe applied for a Business Development Manager ("BDM") position in the Branded Solutions Department.<br><br>**RIVERS DECL. ¶ 9, EX. D.** | Undisputed |
| 593. Prior to Mr. Briscoe's interview for the BDM position, Rivers notified Frank Sica ("Sica") and John Warmke ("Warmke"), Branded Solutions managers, regarding Mr. Briscoe's candidacy. | Undisputed |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 9, EX. D; DECLARATION OF JOHN WARMKE ("WARMKE DECL.") ¶ 4.** | |
| 594.  Mr. Briscoe interviewed with Kelly White ("White"), Senior Recruiter.<br><br>**WARMKE DECL. ¶ 6, EX. A.** | Undisputed |
| 595.   On May 27, 2014, White emailed her notes about Mr. Briscoe and Mr. Briscoe's resume to Warmke.<br><br>**WARMKE DECL. ¶ 6, EXS. A AND B.** | Undisputed |
| 596.   In her May 27, 2014, email to Warmke regarding Mr. Briscoe, Under the heading "Opportunities/Areas to probe further", White asked Warmke to "probe further on how this role fits into Kevin's overall career path.   His background is heavy in operations and he has not held a traditional sales role in his past."<br><br>**WARMKE DECL. ¶ 6, EX. A.** | Undisputed |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| 597.  On   June   3,   2014,  Warmke telephonically  interviewed  Mr.  Briscoe for the BDM position.<br><br>**WARMKE DECL. ¶ 7; <u>PLF.'S DEP., 253:10-16</u>.** | Undisputed |
| 598.  Warmke's  took  detailed  notes  of his interview of Mr. Briscoe<br><br>**WARMKE DECL. ¶ 7, EX. C.** | Objection:  the notes are redacted relative to the most important information relating to this fact.  Thus, Hearsay and Best Evidence Objections are valid. |
| 599.   Under the heading "Development Areas"  in  Warmke's notes regarding his interview  with  Mr.  Briscoe,  Warmke identifies the following items:<br>• "Strategic    approach    to    market, segment, account [sic]<br>    o  I  was  looking  for  candidates that    could    provide    more insight    and    sales    and/or development examples which may be a function of a lack of strategic selling experiences []<br>    o  You   have   a   very   good background   but   was   [sic] | **Disputed** as to the author of the notes for the reasons set out in No 18, above. Otherwise, Plaintiff responds that the content of the note is correctly restated, thus: **Undisputed.** |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| much more centered on the operational approach of execution selling as an operator. This is a good quality, but the stronger candidates were able to demonstrate success through much more strategic influence and experience, such as market research, targeting top decision makers and influencers, focus on strategic questioning that drove alignment to customer needs from a strategic or organizational level that creating mutual partnership or joint business planning initiatives.<br><br>o Kevin's experience is that he is working within an existing account structure, usually franchise model of operations and maintaining margin and cost.<br><br>o The successes and sharing as it | |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| relates to selling, relationship management, and business development were centered on an operational approach or execution of telling the customer what they needed to be successful from the eyes of the operator. Here's the menu, the POS, the space needed, etc.<br><br>○ He didn't speak to strategic sales and development approach and instead took a more operational approach to meeting costs and following an existing agreement model for sales.<br><br>■ Other candidates have been able to demonstrate success through market research, targeting top decision makers and influencers, focus on strategic questioning that drove alignment to | |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| customer needs from a strategic or organizational level that creating mutual partnership or joint business planning initiatives.<br>• Listening to understand needs, focus on being concise.<br>  o There was a need to re-state several questions to re-focus Kevin's responses. He is very enthusiastic and wants to share his story, but several questions were focused on specifics.<br>    ▪ After asked further questions, the response often centered back on putting costs together, telling customer how it will work, specs, etc. and aligning on what they are willing to spend."<br>**Warmke Decl. ¶ 7, Ex. C.** | |
| 600.   On June 4, 2014, Mr. Briscoe also | Undisputed that Plaintiff had a very short |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| telephonically met with Frank Sica, Mr. Warmke's supervisor, to discuss the BDM position.<br><br>**WARMKE DECL. ¶ 8, EX. D; <u>PLF.'S DEP. 252:25-253:9.</u>** | telephone call with Sica, but, as Sica stated"…**this was not an interview from my perspective..." Sica also stated:** "John, I know you will share your complete feedback on Kevin with Angie…"<br><br>**Defendant's Exhibit D** |
| 601.  Mr. Briscoe was not offered the BDM position.<br><br>**WARMKE   DECL.   ¶   9;   RIVERS DECL. ¶ 10.** | Undisputed, but it is also important that Briscoe was not given Feedback. |
| 602.  At Starbucks, it is customary for the managers of internal candidates to receive feedback from interviewers so that the managers can assist the partner's development<br><br>**WARMKE,   DECL.   ¶   7,   RIVERS DECL. ¶ 10.** | **Undisputed,** but Defendant had a mandatory Post Interview Feedback Procedure that was to be followed within 24 hours of the interview, which was not followed relative to Plaintiff's pursuit of promotion:<br>a. that an Interviewer complete a Post-Interview "Feedback Form", see Plaintiff's Exhibit - 36, and<br>b. that the Interviewee be provided with the Feedback. |
| 603.  Warmke provided his feedback to Mr. Briscoe's manager, Rivers. | Disputed.<br>Post Interview Feedback Procedure that |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| **WARMKE DECL. ¶ 7, EX. C; RIVERS DECL. ¶ 10.** | was to be followed within 24 hours of the interview, which was not followed relative to Plaintiff's pursuit of promotion: <br><br>a. that an Interviewer complete a Post-Interview "Feedback Form", see Plaintiff's Exhibit - 36, and <br><br>b. that the Interviewee be provided with the Feedback. <br><br>Plaintiff was never provided with any Feedback. |
| 604.  On June 4, 2014, Sica emailed Rivers a summary of his conversation with Mr. Briscoe. <br><br>**WARMKE DECL. ¶ 8, EX. D; RIVERS DECL. ¶ 10.** | Undisputed but Irrelevant as it was not an Interview. <br>**Defendant's Exhibit D** |
| 605.  In his  June 4, 2014,  email regarding Mr. Briscoe , Sica notes: "Kevin spoke for a majority of the 30 minutes and I found him to be . . . very operationally focused . . . . Although this was not an interview from my perspective (naturally Kevin treated it as an interview), his descriptions and examples of a majority of his diverse career work | Undisputed, that this is an excerpt from Sica's email of June 4. <br>**Defendant's Exhibit D** |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| experiences were operationally focused. During our brief connect, he did not articulate any sales and/or development examples which may be a function of a lack of strategic selling experiences or not enough time to dive deep." <br><br> **WARMKE DECL.¶ 8, EX. D.** | |
| 606.   Prior to Mr. Briscoe's interview with Mr. Warmke for the BDM position they had met. <br><br> **WARMKE DECL. ¶ 5.** | **Undisputed, but Immaterial**, because any such "meeting" was in an incidental group setting and with non-specific purposes. |
| 607.   Warmke found Mr. Briscoe to be professional. <br><br> **WARMKE DECL. ¶ 5.** | Undisputed |
| 608.   Mr. Briscoe acknowledges that he has no reason to believe Warmke had a reason to dislike him. <br><br> **PLF.'S DEP., 253:10-19; 254:2-4.** | Undisputed |
| 609.   The role of BDM was developed and went into effect in approximately late 2013, early 2013. | Undisputed |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| **WARMKE DECL. ¶ 3.** | |
| 610.  Warmke has hired an African American as a BDM in the past.<br><br>**WARMKE DECL. ¶ 3.** | Undisputed |
| 611.   Mr. Briscoe acknowledges that he has no reason to believe Frank Sica had a reason to dislike him.<br><br>**PLF.'S DEP., 253:24-254:1.** | Undisputed |
| 612.  In November 8, 2014, Mr. Briscoe applied for another BDM position, but was not interviewed.<br><br>**ROGERS DECL. ¶ 21.** | Undisputed |
| 613.  Warmke was not aware of Mr. Briscoe's November 8, 2014, application for the other BDM position. | Disputed<br>Warmke was the hiring manager for the BDM position when Plaintiff applied on-line on November 8, 2014.  Relative to Plaintiff's application, the "status " is noted as "Starbucks Not Interested", with the only Starbuck employee identified being "Hiring Manager John Warmke".  The Internal Recruiter could never make that decision without the Hiring manager. |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| **WARMKE DECL. ¶ 9.** | Exhibit – 8; AMF #1051 |
| 614.  Rivers was not provided any details regarding any subsequent applications Mr. Briscoe made for other Starbucks positions.<br><br>**RIVERS DECL. ¶ 11.** | Disputed<br>Plaintiff personally told Rivers (and Rogers) that he had applied, and Rivers appeared upset, and told Plaintiff, "well I didn't know that you were going to do that."<br> AMF 928 and 929 |
| 615.  Until this lawsuit, Rivers did not actually know whether he applied for other positions at Starbucks<br><br>**RIVERS DECL. ¶ 11.** | Disputed<br>Plaintiff personally told Rivers that he had applied, and she appeared upset, and told Plaintiff, "well I didn't know that you were going to do that."<br> AMF 928 and 929 |
| 616.  Rivers had had no involvement in the hiring process for the Branded Solutions Department.<br><br>**RIVERS DECL. ¶ 10.** | Undisputed but **this fact accentuates Rivers' lack of support and assistance to Plaintiff,** as noted in ADF #912 |
| 617.  Mr. Briscoe received District Manager Training at the beginning of his employment with Starbucks.<br><br>**RIVERS DECL. ¶ 7.** | Undisputed |
| 618.  When Mr. Briscoe completed his | Undisputed |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| training, his District Manager Coach provided Rivers with a District Manager Assessment Guide.<br><br>**RIVERS DECL. ¶ 7.** | |
| 619. In the District Manager Assessment Guide, Mr. Briscoe's Coach identified the following areas for Mr. Briscoe to improve on: (1) attention to detail; (2) interpersonal style issues that resulted in ineffective communication with others (i.e., he was vocally loud during several meetings); (3) the perception that he was focused on his own agenda; and, (4) making bad decisions (tardiness to three shifts of in-store training, late to one DM visit in District Manager Training, and cancelling a visit during District Manager Training | **Undisputed in part** to the extent that it states excerpts from Defendant's Exhibit – B;<br>**Disputed** to the extent that it ignores the fact that Coach Matt Scruggs made observations which note that Plaintiff was an effective communicator, stating, in part:<br>"Kevin has demonstrated ability to successfully communicate a clear and concise message both written and verbally…He clearly has demonstrated the interpersonal skill set, understanding of motivational needs of his audience, and the charismatic ability to be successful …"<br>**Defendant's Exhibit B**<br>Further,<br>Plaintiff's 2013 first year evaluation contradicts the claims made in Nos.1, 2, 3 and 4. |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| | **Exhibits 5 and 6** |
| | **Rivers**, as **Regional Director** over Plaintiff evaluated Plaintiff as an effective and successful communicator and leader, and she assigned him to important **Lead District Manager** Assignments to allow his work products and assistance to be used by other District Managers in Rivers' Region. |
| | **Exhibits- 5 and 6** |
| | Rivers also noted that, "[Plaintiff] has built and maintained relationships with CO DMs [Company Operations District Managers], RDs [Regional Directors] and SMs [Store Managers] this year and has become a requested partner in CO meetings." |
| **RIVERS DECL. ¶ 7, EX. B.** | **Exhibits- 5 and 6** |
| 620. For the 2012 review period, Rivers rated Mr. Briscoe "Above Expectations" and identified the following opportunities for improvement: "[d]o more work around adjusting for his audience – tends to talk like he thinks and repeats himself rather than just adjusts; [p]eers sometimes | Disputed to the extent that there is no component section for "improvement". The evaluation notes that Plaintiff was an effective and successful communicator, leader, and she assigned him to Lead District Manager Assignments which uses his work product and assistance for other District Managers in Rivers' |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| wonder if he's listening; [s]hould continue to build strong and valuable 1st team relationships."<br><br><br><br><br><br>**RIVERS DECL. ¶ 8, EX. C; <u>PLF.'S DEP., 263:18-265:6,  EX. 11</u>.** | Region.<br>**Exhibit- 5**<br>Rivers also noted that, "[Plaintiff] has built and maintained relationships with CO DMs [Company Operations District Managers], RDs [Regional Directors] and SMs [Store Managers] this year and has become a requested partner in CO meetings."<br>**Exhibit- 5** |
| 621. Mr. Briscoe Acknowledges that he does not disagree with anything Rivers put in his evaluation for the 2012 review period.<br><br>**<u>PLF.'S DEP., 265: 3-6.</u>** | Undisputed |
| 622. For the 2013 review period, Rivers rated Mr. Briscoe "Meets Expectations" and identified the following performance improvement opportunities:<br>Continued *focus on listening* for understanding rather than listening to respond. *Ensure you both understand and are understood.  Communication is key to success.*  Elevate store level issues where | Disputed,<br>The evaluation does not contain a section for "Performance Improvement Opportunities," as suggested by this fact. Further, "opportunities" as used in the Form, are neither performance deficiencies or criticisms.  This same Performance Appraisal noted a number of important accomplishments and significant assignments made to Plaintiff, |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| conflict or misunderstanding occurs. *Ensure all relevant facts are shared* and a clear picture is painted of problems without rounds of follow up questions required to fully understand situation. *Take time to ask questions to ensure understanding on all sides*. This will minimize opportunity to have integrity questioned. *Focus on team commitments* and execute in manner agreed to (or influence commitment). Once aligned execute in accord with agreement.<br><br>**RIVERS DECL. ¶ 8, EX. D; <u>PLF.'S DEP., 265:7-266:10, EX. 12</u>.** | recognizing his excellence.<br>The assignment as District Manager to Defendant's **"model operations"** and its highest revenue generators (**LAX and USC), was a positive statement about Plaintiff's performance.**<br>**AMF # 875-877; 881-891; 1048 and 1049**<br>Plaintiff performed successfully as District Manager over Rivers' Region's most productive and prestigious locations.<br>**AMF # 875-877; 881-891; 1048 and 1049**<br>LAX **and** USC, both managed by Plaintiff, were the two most complex and highest revenue generating locations in Rivers' entire Region of Licensed Stores.<br>**AMF # 875-877; 881-891** |
| 623. Mr. Briscoe Acknowledges that he does not disagree with anything Rivers put in his evaluation for the 2013 review period.<br><br>**<u>PLF.'S DEP., 266: 8-10</u>.** | Undisputed |
| 624. On May 16, 2014, Rivers | Disputed |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| received a complaint about Mr. Briscoe from LAX Marriott. | After Plaintiff visited and cited Marriott for Non-compliance (infractions for which there had been recurring citations at the operation),  Hoenecke called Plaintiff saying that Marriott's Manager responsible Marriott for the Starbucks Licensee had called him with complaints about Plaintiff, Plaintiff  immediately telephoned Rivers and reported that the Licensee called Hoenecke complaining because Marriott was out of product when Plaintiff visited and Plaintiff intended to cite Marriott for Non-compliance (reflecting unfavorably on the Marriott Manager).

AMF #  975-978

Rivers told Plaintiff that he handled the matter properly.

AMF #978

A District Manager for a Licensed Store had duties to protect the Starbucks Brand which he did by working with the Licensee cooperatively, but, when necessary, having to cite the Licensee for |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| | Non-Compliance, a dynamic which sometimes put the LSDM at odd with the Licensee and him/its on-site manager, and gave on-site managers (who were employees of the Licensee and not of Starbucks) motivation to complain about the LSDM. |
| **RIVERS DECL. ¶ 13.** | **AMF # 963-978** |
| 625. LAX Marriott complained to Rivers about an incident wherein a hotel guest complained to the front desk having witnessed Mr. Briscoe yell at a LAX Marriott's Licensed Store Manager, and make her cry. | Disputed<br><br>After Plaintiff visited and cited Marriott for Non-compliance (infractions for which there had been recurring citations at the operation),  Hoenecke called Plaintiff saying that Marriott's Manager responsible Marriott for the Starbucks Licensee had called him with complaints about Plaintiff, Plaintiff  immediately telephoned Rivers and reported that the Licensee called Hoenecke complaining because Marriott was out of product when Plaintiff visited and Plaintiff intended to cite Marriott for Non-compliance (reflecting unfavorably on |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| | the Marriott Manager). |
| | **AMF #  975-978** |
| | Rivers told Plaintiff that he handled the matter properly. |
| | **AMF #978** |
| | A District Manager for a Licensed Store had duties to protect the Starbucks Brand which he did by working with the Licensee cooperatively, but, when necessary, having to cite the Licensee for Non-Compliance, a dynamic which sometimes put the LSDM at odd with the Licensee and him/its on-site manager, and gave on-site managers (who were employees of the Licensee and not of Starbucks) motivation to complain about the LSDM. |
| **RIVERS DECL. ¶ 13.** | **AMF # 963-978** |
| 626.  LAX  Marriot  complained  to Rivers  that  when  it  discussed  the incident with Mr. Briscoe, he refused to take  responsibility,  apologize,  or acknowledge  that  he  did  anything | Disputed After Plaintiff visited and cited Marriott for Non-compliance (infractions for which there had been recurring citations at the operation),  Hoenecke called |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| wrong. | Plaintiff saying that Marriott's Manager responsible Marriott for the Starbucks Licensee had called him with complaints about Plaintiff, Plaintiff immediately telephoned Rivers and reported that the Licensee called Hoenecke complaining because Marriott was out of product when Plaintiff visited and Plaintiff intended to cite Marriott for Non-compliance (reflecting unfavorably on the Marriott Manager). **AMF #  975-978** Rivers told Plaintiff that he handled the matter properly. **AMF #978** A District Manager for a Licensed Store had duties to protect the Starbucks Brand which he did by working with the Licensee cooperatively, but, when necessary, having to cite the Licensee for Non-Compliance, a dynamic which sometimes put the LSDM at odd with the Licensee and him/its on-site manager, and gave on-site managers (who were employees of the Licensee and not of Starbucks) motivation to complain about |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 13.** | the LSDM.<br>**AMF # 963-978** |
| 627.   Mr. Briscoe did not disclose LAX Marriott incident to Rivers even though she regularly interacted with him after the incident. | Disputed<br><br>After Plaintiff visited and cited Marriott for Non-compliance (infractions for which there had been recurring citations at the operation),  Hoenecke called Plaintiff saying that Marriott's Manager responsible Marriott for the Starbucks Licensee had called him with complaints about Plaintiff, Plaintiff  immediately telephoned Rivers and reported that the Licensee called Hoenecke complaining because Marriott was out of product when Plaintiff visited and Plaintiff intended to cite Marriott for Non-compliance (reflecting unfavorably on the Marriott Manager).<br>**AMF #   975-978**<br>Rivers told Plaintiff that he handled the matter properly.<br>**AMF #978**<br>A District Manager for a Licensed Store had duties to protect the Starbucks Brand which he did by working with the Licensee cooperatively, but, when |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 13; <u>PLF.'S DEP., 160:24-162:11</u>.** | necessary, having to cite the Licensee for Non-Compliance, a dynamic which sometimes put the LSDM at odd with the Licensee and him/its on-site manager, and gave on-site managers (who were employees of the Licensee and not of Starbucks) motivation to complain about the LSDM. **AMF # 963-978** |
| 628. At the demand of Starbucks' third-party client, Rivers removed Mr. Briscoe from the LAX Marriott account. | Undisputed, but Defendant knew that Plaintiff did nothing wrong, as Rivers had stated to Plaintiff, and Defendant's high level management later learned that the Marriott manager later boasted that he did not like District Managers and joke of how he got rid of Plaintiff at the LAX Marriott (essentially for doing his job) **AMF #978 and 980** Rivers and Defendant owed the LSDM the duty to support and assist them including providing reasonable review, investigation and analysis of complaints in light of the dynamics for conflicts given the LSDM's need to cite Licensees for non-compliance and the motivation |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| **Rivers Decl. ¶ 13; Warmke Decl. ¶ 10, Ex. E.** | that could give for false or misleading claims and complaints. <br><br> **AMF # 983** |
| 629.  On February 23, 2015, Licensee Ralphs complained to Rivers that Mr. Briscoe was "not consistent with what he [was] telling the kiosk managers." <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br> **Rivers Decl.  ¶ 15, Ex. F; Rogers Decl. ¶ 15.** | Undisputed but, <br> Rivers and Defendant owed the LSDM the duty to support and assist them including providing reasonable review, investigation and analysis of complaints in light of the dynamics for conflicts given the LSDM's need to cite Licensees for non-compliance and the motivation that could give for false or misleading claims and complaints. <br> **AMF # 983,** <br> **AMF # 963-978** <br> Plaintiff's criticisms by the Licensee's manager grew out of Plaintiff properly and correctly performing his duties and notifying the Licensee's manager know that he (Plaintiff) would have to issue citations for Non-compliance if the Licensee continued with staffing shortages because it adversely impacted customer service to Starbucks' customers and harmed the Starbucks Brand. <br> **AMF # 984-986** |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| 630. On March 2, 2015, Rivers provided Mr. Briscoe feedback regarding the Ralphs complaint.<br><br>**RIVERS DECL. ¶ 15, EX. G.** | Undisputed, but the Ralphs situation is as set out in response to UF # 49, above. |
| 631. On March 11, 2015, Vons complained to Rivers that it was forced to pay an employee to wait two hours for Mr. Briscoe who was late to a scheduled meeting.<br><br>**RIVERS DECL. ¶ 16; ROGERS DECL. ¶ 15.** | Undisputed, but Plaintiff did nothing wrong. Plaintiff was abruptly caused to change his schedule to make for a new store opening at Residence Inn, about which he timely and promptly notified Rivers, and she agreed.<br><br>AMF # 987, 994-995 |
| 632. Ms. Rivers coached Mr. Briscoe about his lack of communication with respect to this incident<br><br>**RIVERS DECL. ¶ 16, EX. H.** | Undisputed |
| 633. On May 6, 2015, Licensee Vons complained to Rivers that Vons employees felt harassed by Mr. Briscoe because he sent multiple texts to hourly Licensee employees about buying coffee. | Disputed<br>Plaintiff properly discharged his duties ensure that the Licensee was properly stocked with Starbucks products (Coffee, in this instance); there was no undue pressure or "bullying", and Starbucks had no policy preventing LSDMs from texting Licensee managers (or |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 19, EXS. J-L.** | responsible persons) in fulfillment of their duties.  Plaintiff simply used the management tools provided by Defendant for monitoring product purchases by Licensees to predict their needs and ensure product was always on hand.<br>AMF 987-999 |
| 634.   It is against Starbucks policy to text third-party Licensee employees on their personal cellular phones.<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>**RIVERS DECL. ¶ 19.** | Disputed<br>Plaintiff properly discharged his duties ensure that the Licensee was properly stocked with Starbucks products (Coffee, in this instance); there was no undue pressure or "bullying", and Starbucks had no policy preventing LSDMs from texting Licensee managers (or responsible persons) in fulfillment of their duties.  Plaintiff simply used the management tools provided by Defendant for monitoring product purchases by Licensees to predict their needs and ensure product was always on hand.<br>AMF 987-999 |
| 635.   On May 14, 2015, Rivers emailed Mr. Briscoe to coach him about the May | Undisputed, but,<br>Plaintiff properly discharged his duties |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| 6th Vons complaint.<br><br><br><br><br><br><br><br><br><br><br><br>**RIVERS DECL. ¶ 19, EX. M.** | ensure that the Licensee was properly stocked with Starbucks products (Coffee, in this instance); there was no undue pressure or "bullying", and Starbucks had no policy preventing LSDMs from texting Licensee managers (or responsible persons) in fulfillment of their duties. Plaintiff simply used the management tools provided by Defendant for monitoring product purchases by Licensees to predict their needs and ensure product was always on hand.<br>AMF 987-999 |
| 636. District Managers for Licensed Stores are responsible for certifying that baristas of new locations meet Starbucks' standards before the store is permitted to open.<br><br>**RIVERS DECL. ¶ 17.** | Undisputed. |
| 637. If a store is not ready to open on a Licensee's preferred date it is the District Manager's responsibility to escalate the issue to the Regional Manager. | Undisputed |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 17.** | |
| 638. Because Mr. Briscoe failed to follow Starbucks procedure, Starbucks had to close the new Residence Inn location in order to retrain the Licensee employee baristas.<br><br>**RIVERS DECL. ¶ 17, EX. I.** | Disputed<br>Plaintiff did not fail to follow any Starbucks procedure in training the Baristas. The claim that "Starbucks had to close the new Residence Inn location in order to retrain the Licensee employee baristas" is a **lie, verified by Sindy Lomas, the on-site Licensee Manager, who wrote to Rivers and others noting that the additional training for baristas would be, "in addition to operating during normal business hours."**<br>Exhibit – 25;<br>AMF 1000-1006 |
| 639. Mr. Briscoe refused to take responsibility for certifying the baristas. | Disputed<br>Plaintiff trained the baristas pursuant to Starbucks' policy and training procedure. Plaintiff did not fail to train the Baristas, causing them to performance inconsistent with expectations at opening. A combination of slower employees, nerves, novelty, a lot to learn, the transition from learning to |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 17.** | application, the pressure of now, watchful eyes, and other factors, including the need for practice under live conditions.<br>AMF 1000-1006 |
| 640.   Mr.   Briscoe   believed   the deficiencies with the baristas existed because "the baristas that were there that day were handicapped baristas, meaning they had - - they were slower."<br><br>**PLF.'S DEP., 178:1-10.** | Disputed<br>Plaintiff was responsible for training the baristas, which he did in proper form pursuant to Starbucks' policy and training procedure. Plaintiff did not fail to train the Baristas, causing them to performance inconsistent with expectations at opening.  It was a combination of slower employees, nerves, novelty, a lot to learn, the transition from learning to application, the pressure of now, watchful eyes, and other factors, including the need for practice under live conditions.<br>AMF 1000-1006 |
| 641.   On July 23, 2014, Rivers coached Mr.   Briscoe   on   improving   his transparency and communication. | Disputed<br>Rivers harassed Plaintiff with this false and unsupportable claim.<br>Plaintiff was a recognized Leader with excellent communication and people skills, and Defendant repeatedly tapped |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 22, EX. N .** | him for important leadership roles. <br> AMF # 881-891; |
| 642. On December 9, 2014, Rivers coached Mr. Briscoe regarding his tardiness to a meeting. <br><br><br><br><br> **RIVERS DECL. ¶ 22, EX. O.** | Disputed <br> Rivers harassed Plaintiff with this false and unsupportable claim. <br> Rivers' decision to make a late change in the meeting's scheduled start time created this situation. <br> AMF # 930,954 |
| 643. On February 11, 2015, Rivers coached Mr. Briscoe regarding his failure to notice whether exterior punch items were fixed at a Licensee location <br><br><br><br><br><br><br> **RIVERS DECL. ¶ 22, EX. P.** | Disputed <br> Rivers harassed Plaintiff with this false and unsupportable claim. <br> This relates to a "Construction issue for a new store under construction".  LSDM are Operational Employees whose duties, job descriptions and roles do not include managing or completing Construction Punch Lists at a Licensed Store. <br> AMF # 1055 |
| 644. On February 27, 2015, Mr. Briscoe provided Rivers improper sales for Terminal Two LAX locations during a period when the terminal was actually closed. <br><br> **RIVERS DECL. ¶ 22, EX. Q.** | Disputed <br> Rivers harassed Plaintiff with this false and unsupportable claim. <br> Defendant's Finance Department, for its own accounting purposes categorized a closed store as a remodel, resulting in an inaccurate reporting of revenues for a |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
|  | closed store at LAX.  It was Plaintiff who detected the accounting and questioned it, noting that the store, though closed, was budgeted for the entire year. AMF # 1056 |
| 645.  On  April  21,  2015,  Rivers coached  Mr.  Briscoe  on  his communication with Licensees **RIVERS DECL. ¶ 22, EX. R.** | Disputed, Rivers harassed Plaintiff with this false and unsupportable claim.  Plaintiff's communication skills were outstanding and were recognized by Defendant as worthy of Leadership Roles, and Rivers had told Plaintiff that he handled the Marriott situation properly, just the way that Scruggs (a Caucasian LSDM had handled a similar situation.)  AMF # 883-894 Even in 2015, Rivers made false claims about Plaintiff, but Defendant continued to select Plaintiff for important Leadership roles because of his excellent communication and result orientation. AMF # 934-943; 945-946. |
| 646.  On  April  24,  2015,  Rivers coached  Mr.  Briscoe  regarding deficiencies at one of his stores. | Disputed Rivers harassed Plaintiff with this false and unsupportable claim.   Plaintiff's |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 22, EX. S.** | stores were not deficient. Rivers failed and refused to support Plaintiff when he did his job and cited Licensees for Non-Compliance, but she blamed Plaintiff if he did not cite them to enforce compliance. (Plaintiff couldn't do anything right in Rivers' eyes after he started to seek promotion for his recognized leadership performance.) AMF # 957-973; 975-1004 |
| 647. On May 14, 2015, Mr. Briscoe provided Ms. Rivers monthly reports for the wrong time period.<br><br>**RIVERS DECL. ¶ 22, EX. T.** | **Disputed**<br>Rivers harassed Plaintiff with this false and unsupportable claim. On a single occasion, Plaintiff handed Rivers one paper intending to give her another and Rivers abruptly ended her visit with Plaintiff. A couple of minutes after Rivers walked away from Plaintiff, he discovered that he gave Rivers the wrong page and sent her an email correcting it. Rivers refused to acknowledge Plaintiff's email, choosing instead to cite the incident as negative performance. This incident was not noteworthy for performance. Rivers did not treat her Caucasian subordinates this way. |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| | AMF # 1040-1042; 896; 899 |
| 648.   On May 28, 2015, Rivers coached Mr. Briscoe regarding his failure to correspond with "key stakeholders."<br><br>**RIVERS DECL. ¶ 22, EX. U.** | Disputed<br>Rivers harassed Plaintiff with this false and unsupportable claim.<br>Rivers' claim not genuine because Plaintiff knew and understood the Starbuck business, was a Business Leader and an effective communicator whom Defendant tapped for a number of leadership roles (before he started to seek Promotion and Promotional Opportunities) in recognition of his quality performance.<br>AMF # 876-877; 883-894; |
| 649.   On June 5, 2015, Rivers coached Mr. Briscoe regarding errors he made in his sales sheet.<br><br>**RIVERS DECL. ¶22, EX. V.** | Disputed<br>Rivers harassed Plaintiff with this false and unsupportable claim.  Plaintiff's performance was Leadership quality and Rivers continued to select Plaintiff for high profile and important Leadership roles, in 2015.<br>AMF # 934-946<br>Special Leadership selections and assignments was indicative of Defendant's view of performance |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| | excellence. |
| | AMF 891 |
| 650.  Most DMs on Rivers' team had a Personal Development Plan ("PDP") outlining their respective goals and aspirations at Starbucks, and strategies for obtaining such goals.<br><br>**RIVERS DECL. ¶ 14.** | Undisputed, but Plaintiff never had on. Plaintiff pursued promotion and solicited support and assistance, but none was given him.<br>AMF # 899-903; 906-913; 927-933; 1050-1053 |
| 651.  A Partner Resources Manager at Starbucks is the same role as a Human Resources Manager at other companies.<br><br>**ROGERS DECL. ¶ 2.** | Undisputed |
| 652.  On June 26, 2014, Mr. Briscoe, Rivers and Sarah Rogers ("Rogers"), the Partner Resources Manager working with Rivers' team, met to discuss Mr. Briscoe's development at Starbucks and Mr. Briscoe developing a PDP.<br><br>**ROGERS DECL.  ¶ 7, EXS. B-C.** | Undisputed |
| 653.  On September 12, 2014, Rogers | Disputed |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| emailed Mr. Briscoe additional resources to assist his development.<br><br>**ROGERS DECL. ¶ 8, EX. D.** | Plaintiff denies that Rogers (or Rivers) ever tried to "assist his development". Plaintiff sent Rogers an email (copying Rivers) seeking specific types of information that was uniquely related to Starbucks would be particularly helpful in assisting him with promotional development, but neither Rogers nor Rivers ever responded.<br>Exhibit 10;<br>AMF # 1057 |
| 654.   In November 2014, Mr. Briscoe, Rivers and Rogers met again to discuss Mr. Briscoe's progress and to ensure a formal PDP was in place.<br><br>**ROGERS DECL. ¶ 9.** | Disputed<br>Plaintiff denies that Rogers (or Rivers) ever tried to "assist his development". Plaintiff sent Rogers an email (copying Rivers) seeking specific types of information that was uniquely related to Starbucks would be particularly helpful in assisting him with promotional development, but neither Rogers nor Rivers ever responded.<br>Exhibit 10;<br>AMF # 1057 |
| 655.   In November 2014, Mr. Briscoe had not completed his PDP. | Disputed<br>Plaintiff denies that Rogers (or Rivers) |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| **ROGERS DECL. ¶ 9.** | ever tried to "assist his development", including assisting Plaintiff with completion of a PDP.  Plaintiff sent Rogers an email (copying Rivers) seeking specific types of information that was uniquely related to Starbucks would be particularly helpful in assisting him with promotional development, but neither Rogers nor Rivers ever responded.<br>Exhibit 10;<br>AMF # 1057 |
| 656.  On December 9, 2014, Rogers scheduled an in-person meeting with Rivers and Mr. Briscoe to facilitate communication between them, and again discuss Starbucks' concerns regarding Mr. Briscoe's communication style.<br><br><br>**ROGERS DECL. ¶ 10.** | Disputed<br>Plaintiff personally requested a meeting with Rogers to discuss what Plaintiff felt to be Race discrimination against him.<br>Plaintiff Depo 277:6-278:14 |
| 657.  On December 17, 2014 Rivers emailed Rivers and Mr. Briscoe a | Disputed<br>It makes no sense that "Rivers emailed |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| summary of next steps for Mr. Briscoe's development and potential support tactics for him.<br><br><br><br>**ROGERS DECL. ¶ 13, EX. E.** | Rivers…"<br>Plaintiff denies that Rogers (or Rivers) ever tried to "assist his development", including assisting Plaintiff with completion of a PDP.  Plaintiff sent Rogers an email (copying Rivers) seeking specific types of information that was uniquely related to Starbucks would be particularly helpful in assisting him with promotional development, but neither Rogers nor Rivers ever responded.<br>**Exhibit 10;**<br>**AMF # 1057** |
| 658.  Mr. Briscoe agreed to participate in a 360 Peer review which was completed in February 2015, which was designed to give him additional insight into how he was perceived by his peers/other Partners.<br><br><br>**PLF.'S DEP., 267:16-24;  ROGERS DECL. ¶ 14, EXS. F-G.** | Undisputed that Plaintiff agreed to participate in a "360".<br>**Disputed** that the purpose or intent of the 360 or Plaintiff's agreement to participate in it was to be used as a performance evaluation  tool from which Defendant would selectively pick and choose anything that it perceived to be a negative and ignore all of the many positives.<br>**AMF # 1007-1012;**<br>Defendant used the 360 solely as a tool |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| | against Plaintiff, which was never its intent or purpose |
| | **UF # 79-83** |
| | Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. |
| | **AMF # 1014-1030** |
| | The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. |
| | **AMF # 1007-1012** |
| | No LSDM other than Plaintiff was the subject of a 360 Survey. |
| | **AMF # 1012** |
| 659. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe stop "[c]oming in with his present agenda for the conversation. At times he seems unwilling to hear what the other person has said if it doesn't fit in with his pack of thinking." | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy.  The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| **ROGERS DECL. ¶ 14, EX. G.** | picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 660. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe stop "[w]orking while | Undisputed that this is one comment in the "360". **Disputed** that the comment is |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| others are presenting."<br><br><br>**ROGERS DECL. ¶ 14, EX. G.** | performance worthy.   The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments.<br>**AMF # 1007-1012**;<br>Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose<br>**UF # 79-83**<br>Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360.<br>**AMF # 1014-1030**<br>The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them.<br>**AMF # 1007-1012**<br>No LSDM other than Plaintiff was the |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| | subject of a 360 Survey. **AMF # 1012** |
| 661. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe stop "[s]peaking over others." **ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy.   The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent |

1
2

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| | basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 662. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe stop "[a]cting superior to others."<br><br>**ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy.   The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. |

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| | **AMF # 1014-1030** |
| | The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. |
| | **AMF # 1007-1012** |
| | No LSDM other than Plaintiff was the subject of a 360 Survey. |
| | **AMF # 1012** |
| 663.   A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe stop "[s]aying that he is aligned with team commitments and not follow thru [sic] and/or do it 'his way' rather than staying aligned with the team."<br><br>**ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". <br><br>**Disputed** that the comment is performance worthy.   The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. <br><br>**AMF # 1007-1012**; <br>Defendant used the 360 solely as a tool against Plaintiff, which was never its |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| | intent or purpose |
| | **UF # 79-83** |
| | Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. |
| | **AMF # 1014-1030** |
| | The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. |
| | **AMF # 1007-1012** |
| | No LSDM other than Plaintiff was the subject of a 360 Survey. |
| | **AMF # 1012** |
| 664. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that "[w]hen [Mr. Briscoe] disagrees with RD [Rivers], at times it appears disrespectful." **ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy.  The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
|  | make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 665.  A reviewer responding to Mr. Briscoe's 360 Peer Review described Mr. Briscoe as "[s]low, or unwilling, to adapt or conform with Team direction." | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy.   The purpose and |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| **ROGERS DECL. ¶ 14, EX. G.** | intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| | **AMF # 1012** |
| 666.  A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe stop "[t]elling stories in generalities vs. actual specific examples."<br><br><br>**ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". <br><br>**Disputed** that the comment is performance worthy.   The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments.<br><br>**AMF # 1007-1012**;<br>Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose<br><br>**UF # 79-83**<br>Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360.<br><br>**AMF # 1014-1030**<br>The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| | Plaintiff's selection for important leadership roles as opposed to them.<br><br>**AMF # 1007-1012**<br><br>No LSDM other than Plaintiff was the subject of a 360 Survey.<br><br>**AMF # 1012** |
| 667. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe start "[a]ctively listening more consistently."<br><br><br>**ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360".<br><br>**Disputed** that the comment is performance worthy.   The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments.<br><br>**AMF # 1007-1012**;<br><br>Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose<br><br>**UF # 79-83**<br><br>Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360.<br><br>**AMF # 1014-1030** |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| | The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 668.  A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe start "[t]aking the time to listen to feedback of others." **ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy.  The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| | **UF # 79-83** |
| | Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. |
| | **AMF # 1014-1030** |
| | The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. |
| | **AMF # 1007-1012** |
| | No LSDM other than Plaintiff was the subject of a 360 Survey. |
| | **AMF # 1012** |
| 669. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe, "[w]hen communicating take additional time to consider what you want the partner to feel as a result of your communication." <br><br> **ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". <br><br> **Disputed** that the comment is performance worthy.  The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| | all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 670. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe start "[a]ctively listening when others are talking, sharing ideas, presenting, etc. Consider | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy. The purpose and intent of the 360 to which Plaintiff |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| tone in communication may come across as 'aloof' or arrogant at times." | agreed to participate was never to be used as a performance evaluation tool for Defendant. Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. |
| **ROGERS DECL. ¶ 14, EX. G.** | **AMF # 1007-1012;** |
| | Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose |
| | **UF # 79-83** |
| | Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. |
| | **AMF # 1014-1030** |
| | The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. |
| | **AMF # 1007-1012** |
| | No LSDM other than Plaintiff was the subject of a 360 Survey. |
| | **AMF # 1012** |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| 671. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe start "[b]eing more welcoming and generous."<br><br><br>**ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360".<br><br>**Disputed** that the comment is performance worthy.  The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments.<br>**AMF # 1007-1012**;<br>Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose<br>**UF # 79-83**<br>Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360.<br>**AMF # 1014-1030**<br>The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| | leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 672. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe start "[l]istening to directions, be respectful of others skill sets and experience, be open minded to other ideas." **ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy.  The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| | of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 673. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe needs to "d]emonstrate professionalism in all work environments." **ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy.   The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| | Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 674.  Mr. Briscoe's response to the comments in his 360 review was he "absorbed them," but did not feel he needed to make adjustments based on the feedback.<br><br>**PLF.'S DEP., 268:19-269:15.** | Undisputed |
| 675.  Mr. Briscoe never drafted his PDP. | Undisputed |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| **PLF.'S DEP., 269:16-17; ROGERS DECL. ¶ 20.** | |
| 676. On March 30, 2015, Starbucks issued Mr. Briscoe a Performance Concerns and Expectations Memorandum ("March 30 Memo") | Undisputed |
| **PLF.'S DEP. 261:11-262:3, EX. 9; ROGERS DECL. ¶16, EX. J; RIVERS DECL. ¶ 18.** | |
| 677. On May 6, 2015, Rivers advised Heidi Sundquist ("Sundquist"), another Partner Resources Manager, about the May 6th Vons Complaint. | Undisputed, but the "Von" complaint was for Plaintiff doing what he was duty-bound to do.<br>AMF # 987-999 |
| **RIVERS DECL. ¶ 19; DECLARATION OF HEIDI SUNDQUIST ("SUNDQUIST DECL.") ¶ 7, EX. A.** | |
| 678. On May 12, 2015, Starbucks decided to place Mr. Briscoe on a Performance Improvement Plan ("PIP")<br><br>**RIVERS DECL. ¶ 19, SUNDQUIST** | Undisputed, but Plaintiff Disputes that a "PIP" was proper, noting that Defendant continued to exhibit recognition of his excellent performance and Leadership by continuing to select and assign him to |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| **DECL. ¶ 7, EX. A, ¶ 8.** | high profile and important leadership roles.<br>AMF # 934-946 |
| 679.  Starbucks maintains policies and procedures for issuing a PIP including Performance Improvement Plan Best Practices, and the Performance Improvement Plan Template.<br><br>**SUNDQUIST DECL. ¶ 8, EXS. B-C.** | Undisputed |
| 680.  On June 4, 2015, Rivers and Heidi Sundquist, issued Mr. Briscoe the PIP during an in-person meeting.<br><br>**PLF.'S   DECL.,   262:13-25; SUNDQUIST DECL. ¶ 9, EX. D; RIVERS DECL. ¶ 19.** | Undisputed, but the PIP was improper because it was supported by false claims by Rivers.<br>AMF # 874-946<br>Of 5 LSDM who are racial minorities, two have filed lawsuits, one filed internal claims alleging discrimination, and one has verbally reported feeling discriminated against by Rivers, who assists Caucasians with promotions and promotional opportunities, but never assisted Plaintiff or any other racial minority, before Plaintiff filed his lawsuit.<br>AMF # 896-898; 899-903; 915-924; 1050-1053 |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| 681.   On June 9, 2015, Mr. Briscoe had a meeting with Rivers and Sundquist wherein he provided his response to the PIP.<br><br>**SUNDQUIST DECL. ¶ 10, EX. E.** | Undisputed |
| 682.   Mr. Briscoe's June 9, 2015, response to the PIP demanded that Starbucks conduct an independent investigation into "unfair treatment and consciously biased actions and behaviors towards [him]" by Rivers.<br><br>**SUNDQUIST DECL. ¶ 10, EX. E.** | Undisputed |
| 683.   During the June 9, 2015, meeting, Mr. Briscoe told Rivers and Sundquist that he had recorded everything that was discussed at the meeting without our knowledge and/or consent.<br><br>**SUNDQUIST DECL.  ¶ 10; RIVERS DECL. ¶ 20.** | Undisputed that Plaintiff disclosed to Rivers and Sundquist that he had recorded some 6-10 conversations at different times and offered to play the recordings for them to listen and hear the confirmation of his claims that Rivers was discriminating and retaliating against him once he began pursuing promotion.  They declined Plaintiff's offer to listen to the recordings and later told Plaintiff that the recordings were |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| | illegal, causing Plaintiff to believe that Defendant was saying that it did not want to hear his confirmatory recordings, and that the recordings were worthless. AMF # 1057 |
| 684.  During the June 9, 2015, meeting, Mr. Briscoe also told Rivers and Sundquist that in the past he recorded many of his conversations with us without our knowledge and/or consent. **SUNDQUIST DECL. ¶ 10; RIVERS DECL. ¶ 20.** | Undisputed that Plaintiff disclosed to Rivers and Sundquist that he had recorded some 6-10 conversations at different times, and offered to play the recordings for them to listen and hear the confirmation of his claims that Rivers was discriminating and retaliating against him once he began pursuing promotion.  They declined Plaintiff's offer to listen to the recordings and later told Plaintiff that the recordings were illegal, causing Plaintiff to believe that Defendant was saying that it did not want to hear his confirmatory recordings, and that the recordings were worthless. AMF # 1057 |
| 685. Mr. Briscoe also recorded his conversations with Rogers without her knowledge and consent. | Undisputed |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| **ROGERS DECL. ¶ 18.** | |
| 686.  The earliest Mr. Briscoe alleges he made any complaint about improper conduct at Starbucks was in December 2014.<br><br>**PLF.'S DEP., 277:6-278:6.** | Undisputed that Plaintiff alleged race discrimination to Defendant's HR Representative, December of 2014. |
| 687.  On June 12, 2015, Starbucks engaged an independent investigator to investigate Mr. Briscoe's claims.<br><br>**DECLARATION OF EMILY SCHULTZ ("SHULTZ DECL.") ¶ 2, EX. A; SUNDQUIST DECL. ¶ 12, EX. G.** | Undisputed |
| 688.  On June 10, 2015, Mr. Briscoe's PIP was put on hold pending the outcome of the investigation.<br><br>**SUNDQUIST DECL. ¶ 12, EX. G.** | Disputed<br>Plaintiff was blocked from pursuing any promotions or being considered for promotional opportunities, earning pay increases and bonuses, because the PIP is a bar to them.<br>AMF # 914, 950<br>Plaintiff was still being tapped assist Starbucks with important Leadership |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| | assignments requiring knowledge of the Business, excellent communication, analytical and leadership skills, at the same time that Rivers was claiming Plaintiff's performance was unacceptable (a contradiction). AMF # 934-946 |
| 689.  As part of her investigation into Mr. Briscoe's claims, the independent investigator conducted in-depth interviews of five witnesses.<br><br>**SHULTZ DECL. ¶ 3.** | Disputed as a recent fabrication. Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made. Plaintiff's Depo 244:15-245:2; 246:17-247:4 |
| 690.  As part of her investigation into Mr. Briscoe's claims, the independent investigator reviewed relevant documents provided by Starbucks including emails provided by Mr. Briscoe, Rivers, and Sundquist, and the documents attached to Mr. Briscoe's June 9, 2015, complaint. | Disputed as a recent fabrication. Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made. Plaintiff's Depo 244:15-245:2; 246:17- |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| **SHULTZ DECL. ¶ 4.** | 247:4 |
| 691. The independent investigator completed her investigation on July 27, 2015.<br><br>**SHULTZ DECL. ¶ 10.** | Undisputed |
| 692. At the conclusion of her investigation, the independent investigator drafted an investigation report that detailed the findings of her investigation.<br><br>**SHULTZ DECL. ¶ 5.** | Disputed as a recent fabrication. Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made.<br>Plaintiff's Depo 244:15-245:2; 246:17-247:4 |
| 693. The independent investigator's report focused on Mr. Briscoe's allegations of unfair treatment and unfair labor practices, discrimination, harassment and "consciously biased actions and behaviors" by Rivers.<br><br>**SHULTZ DECL. ¶ 6.** | Disputed as a recent fabrication. Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made.<br>Plaintiff's Depo 244:15-245:2; 246:17-247:4 |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| 694. The independent investigator determined Mr. Briscoe's claims against Rivers were unsubstantiated.<br><br><br>**SHULTZ DECL. ¶ 7.** | Disputed as a recent fabrication. Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made. Plaintiff's Depo 244:15-245:2; 246:17-247:4 |
| 695. The independent investigator determined:<br>"The facts do not show Ms. Rivers engaged in consciously biased actions and behaviors, discrimination or harassment toward Mr. Briscoe. Mr. Briscoe also did not identify race, gender or any other such category as the basis for the treatment. There is no indication Ms. Rivers treated him in a consciously biased way, or that she treated Mr. Briscoe differently than other DMs on her team."<br><br>**SHULTZ DECL. ¶ 7.A.** | Disputed as a recent fabrication. Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made. Plaintiff's Depo 244:15-245:2; 246:17-247:4<br>Plaintiff identified race discrimination to S. Rogers at his one-on-one in December, 2014.<br>AMF # 1059 |
| 696. The independent investigator determined: | Disputed as a recent fabrication. Plaintiff was told by Shultz that the |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| "The facts do not support Mr. Briscoe's claim of unfair treatment. DMs [] who Mr. Briscoe believes are favored by Ms. Rivers, are top performers and/or take advantage of the career development opportunities given by Ms. Rivers, unlike Mr. Briscoe. In addition, Ms. Rivers has given Mr. Briscoe a great deal of recognition and many opportunities for growth and development in his career at Starbucks."<br><br>**SHULTZ DECL. ¶ 7.B.** | investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made.<br>Plaintiff's Depo 244:15-245:2; 246:17-247:4 |
| 697. The independent investigator determined "[t]he facts showed there was a legitimate basis for Mr. Briscoe's PIP" because:<br>• "At the request of Marriott, in May 2014 Ms. Rivers removed Mr. Briscoe from the Marriott account because of his improper handling of a non-compliance situation at one of its hotels and his failure to accept responsibility for the incident.<br>• Mr. Briscoe trained and certified licensed store employees as baristas | **Disputed** as a recent fabrication and false and unsupportable finding. Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made.<br>**Plaintiff's Depo 244:15-245:2; 246:17-247:4: 188:21-189:11;**<br>Plaintiff was told by Rivers that he did nothing wrong at Marriott and that his |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| at the Residence Inn for the New Store Opening (NSO). Ms. Rivers discovered those baristas could not ring up drinks and did not know how to make drinks correctly, and she wanted the store shutdown.<br><br>• Von's [sic] and Ralph's [sic] complained to Ms. Rivers about Mr. Briscoe, including that he "was a jerk" and he failed to attend scheduled meetings with them.<br><br>• Mr. Briscoe repeatedly provided inaccurate data to Ms. Rivers, including incorrect sales figures, even after they discussed the approach on a given topic and how it should be communicated.<br><br>• Despite extensive coaching by Ms. Rivers and PRM Sarah Rogers, Mr. Briscoe failed to accept responsibility for his actions, did not improve in the areas Ms. Rivers coached him about, he was not self-aware and he did not incorporate the feedback they provided."<br><br>**SHULTZ DECL. ¶ 8.** | situation was similar to that of Matt Scruggs (Caucasian). Scruggs was assisted by Rivers with promotion.<br><br>**AMF # 975-983;**<br><br>Rivers lied about the entire Residence Inn situation, including her claim that the store had to shut down.<br><br>**AMF # 1000-1006;**<br><br>As to Vons, Rivers lied about Plaintiff for merely doing his job of monitoring and making certain that the Licensee was compliant with Coffee (product) Availability, as he was required to do. Rivers lied claiming there was a "Starbuck Policy" prohibiting texting to a cell phone.<br><br>**AMF # 987-999**<br><br>Plaintiff's performance remained excellent throughout his employment as supported by his performance evaluations (Exhibits - 5 and 6), his revenue generation constituting one-third of Rivers' Region's revenues which had 10 to 12 District Managers in the Region (Exhibit- 3), an Plaintiff's continued selection for high profile assignments and |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| | important Leadership roles, right through to his separation in 2015. **AMF # 881-891; 934-946** |
| 698. The independent investigator recommended that Starbucks reinstate the PIP.<br><br>**SHULTZ DECL. ¶ 9.** | **Disputed** as a recent fabrication and false and unsupportable finding. Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made. **Plaintiff's Depo 244:15-245:2; 246:17-247:4: 188:21-189:11;** Plaintiff was told by Rivers that he did nothing wrong at Marriott and that his situation was similar to that of Matt Scruggs (Caucasian).  Scruggs was assisted by Rivers with promotion. **AMF # 975-983;** Rivers lied about the entire Residence Inn situation, including her claim that the store had to shut down. **AMF # 1000-1006;** As to Vons, Rivers lied about Plaintiff for merely doing his job of monitoring |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
|  | and making certain that the Licensee was compliant with Coffee (product) Availability, as he was required to do. Rivers lied claiming there was a "Starbuck Policy" prohibiting texting to a cell phone. **AMF # 987-999** Plaintiff's performance remained excellent throughout his employment as supported by his performance evaluations (Exhibits - 5 and 6), his revenue generation constituting one-third of Rivers' Region's revenues which had 10 to 12 District Managers in the Region (Exhibit- 3), an Plaintiff's continued selection for high profile assignments and important Leadership roles, right through to his separation in 2015. **AMF # 881-891; 934-946** |
| 699.  On July 20, 2015, Mr. Briscoe resigned from his employment with Starbucks.  **SUNDQUIST DECL. ¶ 20, EX. H.** | Undisputed that Plaintiff resigned because Rivers was constantly attacking him with false performance claims and suggesting that he couldn't do anything right, couldn't do emails, food warming…couldn't do anything, (when all the while, Rivers was assigning him |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| | to high profile and very important Leadership roles in recognition of his outstanding performance),  and Defendant was doing nothing to address Plaintiff's complaints of race discrimination, except to allow Rivers to retaliate against him. **Plaintiff's Depo 188:21-189:11; UF # 136-144(below).** |
| 700.  At the time of Mr. Briscoe's resignation, he had been offered, and had accepted, a job at Jack in the Box Inc.<br><br>**PLF.'S   DEP.   206:12-15;   209:6-10; 309:24-310:9, EX. 45.** | Undisputed |
| 701.  Mr. Briscoe's starting salary at Jack in the Box Inc. was $120,000 per annum (not inclusive of bonuses).<br><br>**PLF.'S    DEP.,    302:13-15;   309:24-310:9, EX. 45.** | Undisputed |
| 702.  At the time of his resignation from Starbucks, Mr. Briscoe's annual | Undisputed, but Plaintiff's bonus potential (quarterly payments rather than |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| salary at Starbucks was approximately $95,963.64 per annum (not including performance bonuses).<br><br><br>**ROGERS DECL. ¶ 22.** | annually), stock and benefits were superior at Starbucks, and Starbucks as a Brand was Plaintiff's preferred career path.  Plaintiff took meaningful cut in salary compensation to leave his job at Burger King to accept the Starbucks position, because of the upside career and earnings potential and because he wanted to leave "fast food".  Also, at Starbucks, Plaintiff was in a "ready for promotion" posture, with four year of background and Plaintiff had begun making contact with License Stores VP for the United Kingdom.  At Jack in the Box, Plaintiff had to start from scratch. AMF # 1060 |
| 703.  Mr. Briscoe's discrimination claims are based solely on the conduct of Rivers.<br><br><br>**PLF.'S DEP., 143:15-21.** | Undisputed |
| 704.  With respect to whether Mr. Briscoe's belief that Rivers discriminated against was based on something specific, Mr. Briscoe acknowledged: "<u>I don't know.  I asked</u> | Undisputed in part, but Plaintiff also testified:<br>Plaintiff testified that he was well accepted by Rivers as long as he stayed in his place and did not try to advance, |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| that question myself and couldn't get an understanding why I started getting this treatment.  So I don't know why." | but that Rivers intentionally and discriminatorily tried to hold him back when he sought promotion like the Caucasians on Rivers team, and that race was the reason. |
| **PLF.'S DEP., 144:7-12.** | **Plaintiff's Depo 306:8-307:10**<br>Plaintiff also testified as follows:<br>Q. Do you think it was because of your race?<br>A. I do.<br>Q. Why?<br>A. I do.  Other employees that were non-black weren't being treated the way that I was being treated.<br>…<br>Q. Who specifically are you referring to?<br>A. Barb Holdgrafer, Deanna Pusatier, Kevin Dockery, Tammy Hereford, Ashley Larson, Erica Hernandez.<br>Q. Anybody else?<br>A. Donna Hernandez.<br>**Plaintiff's Depo 144:13-23.** |
| 705.  With respect to his belief that Rivers discriminated against him, Plaintiff acknowledged he "do[esn't] | Plaintiff testified that he believed that Rivers was discriminating against him and that he reported same to Rogers as |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| know why things changed . . . I asked that question myself and couldn't get an understanding why I started getting this treatment. So I don't know why." <br><br><br> **PLF.'S DEP., 144:7-12.** | early as December, 2014 <br> **Plaintiff's Depo 144:13-23; 277:6-278:2;** <br> Plaintiff testified that he was accepted and credited by Rivers as long as he stayed in his place and did not try to advance, but that Rivers intentionally and discriminatorily tried to hold him back when he sought promotion like the Caucasians on Rivers team, and race was the reason. <br> **Plaintiff's Depo 306:8-307:10** |
| 706. Mr. Briscoe acknowledged he does not know who at Starbucks actually issued, approved, or drafted the PIP. <br><br><br> **PLF.'S DEP., 263:6-17.** | Undisputed but Irrelevant because, Plaintiff knows Rivers supervised his work activities and that Rivers made numerous the false claims against him which support the PIP. <br> AMF # 904-933; 949-952; 974-1007; 1048-1049; |
| 707.  The decision to issue the PIP was actually made in consultation with Partner Resources personnel, not Rivers alone. | Undisputed but Irrelevant because, Plaintiff knows Rivers supervised his work activities and that Rivers made the false claims against him which support the PIP. <br> AMF # 904-933; 949-952; 974-1007; |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| **SUNDQUIST DECL. ¶ 7, EX. A.** | 1048-1049; |
| 708. Mr. Briscoe acknowledges his retaliation claim is based on the discriminatory actions he claims happened to him.<br><br>**PLF.'S DEP., 144:7-12; 214:21-215:14.** | Plaintiff testified that Rivers was constantly attacking him with false performance claims and suggesting that he couldn't do anything right, couldn't do emails, warm food, send a text message, check to see if Licensees were stocked with product, ask Licensees to comply with Starbucks' standards…couldn't do anything, (when all the while, Rivers was assigning him to high profile and very important Leadership roles in recognition of his outstanding performance), and Defendant was doing nothing to address Plaintiff's complaints of race discrimination, except to allow Rivers to retaliate against him. **Plaintiff's Depo 188:21-189:11; UF # 136-144(below).** |
| 709. Rivers has no hiring authority outside of her team. | Undisputed, but she could support and assist District Managers on her team who sought promotion,  and she had supported and assisted Caucasian District |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 10; MITTAL DECL. ¶ 4, EX. B[15] (DEPOSITION OF ANGELA RIVERS ("RIVERS' DEP."), 105:23-106:5.** | Managers promote, but did not support and assist Plaintiff or other racial minorities during Plaintiff's tenure. AMF # 896-898, 974, 899-903, 912, 914-929, 932. |
| 710.   Rivers did not know Mr. Briscoe had applied for a subsequent BDM position until this lawsuit was filed.<br><br>**RIVERS DECL. ¶ 11.** | Disputed<br>Plaintiff personally told Rivers that he had again applied for the BDM position, and she appeared upset with Plaintiff , and told him: "well I didn't know that you were going to do that."<br> AMF 928 and 929 |
| 711.  Mr. Briscoe acknowledged that Leah Bernard, one of the seven partners he claims received preferential treatment from Rivers, is African American.<br><br><br>**PLF.'S DEP., 33:7-35:11, 67:23-24; RIVERS DECL. ¶ 4.** | **Undisputed** that L. Bernard is an African American.<br>**Disputed** that Bernard was the recipient of any preferential treatment before Plaintiff's allegations of discrimination and filing of a legal action.  Bernard has been the beneficiary of claims against Rivers by Plaintiff and other racial minorities.  Rivers provided no promotional support and/or assistance to racial minorities on her team during Plaintiff's tenure. |

---

[15] All further excerpts from Ms. Rivers' deposition are attached as Exhibit B to the Declaration of Jyoti Mittal.

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| | **AMF # 896-898, 974, 899-903, 912, 914-929, 932.** Rivers assisted Caucasians with promotions and promotional opportunities, but she never assisted any racial minority with promotions or promotional opportunity during Plaintiff's tenure. **AMF # 896-899** |
| 712.  Mr. Briscoe claims partners on Rivers' team received opportunities he did not, including "elevation," promotion and/or additional responsibilities.<br><br>**PLF.'S DEP., 33:7-35:11; 35:24-39:6; 150:13-152:25; 221:15-223:16.** | Undisputed |
| 713.  Mr. Briscoe acknowledges he did not apply for the positions he claims partners on Rivers' team received instead of him.<br><br>**PLF.'S DEP., 221:15-223:16.** | **Undisputed, but** Rivers did not support or assist Plaintiff in his promotional efforts; she actively blocked Plaintiff from pursuit of the positions for which he applied; and she refused to offer assistance when Plaintiff requested it. **AMF # 912, 925-929;** Rivers also used PIPs to block other |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
|  | racial minorities on her team from promoting, while she supported and assisted Caucasians in obtaining promotions. **AMF # 896-898, 974, 899-903, 912, 914-929, 932.** |
| 714. Mr. Briscoe acknowledges that the promotions he claims partners on Rivers' team received instead of him occurred after he resigned from Starbucks. <u>**PLF.'S DEP. 222:1-11.**</u> | Disputed Rivers herself testified that she supported the promotions of Dockery, Scruggs, Pusatier, and other Caucasians during Plaintiff's tenure. **AMF # 896** |
| 715. Mr. Briscoe acknowledges that the opportunities he claims went to other partners instead of him went to partners far more senior to him at Starbucks. <u>**PLF.'S DEP., 48:3-10; 144:13-147:2.**</u> | Undisputed but totally Irrelevant Starbucks had no policy that made "seniority" a factor in promotional considerations. **AMF # 1061** |
| 716. Rivers appointed Mr. Briscoe to the Disney Star Team in 2011. **RIVERS DECL. ¶ 23.** | Undisputed, and an illustration that Rivers recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This high profile and important leadership assignment is an exhibition that Plaintiff was a recognized |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| | outstanding performer. |
| 717.   Rivers appointed Mr. Briscoe to the Disney Star Team in 2012.<br><br>**RIVERS DECL. ¶ 23.** | Undisputed, and an illustration that Rivers  recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This  high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 718.   Rivers nominated Mr. Briscoe as DM of the Quarter in 2012.<br><br>**RIVERS DECL. ¶ 23.** | Undisputed, and an illustration that Rivers  recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This  high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 719.   Rivers nominated Mr. Briscoe as DM of the Quarter in 2013.<br><br>**RIVERS DECL. ¶ 23.** | Undisputed, and an illustration that Rivers  recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This  high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 720.   Rivers appointed Mr. Briscoe as | Undisputed, and an illustration that |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| Annual Operating Plan Pillar Lead in 2014.<br><br><br><br>**RIVERS DECL. ¶ 23.** | Rivers recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 721. Rivers selected Mr. Briscoe to highlight and tour one of his locations with the United States Leadership team in 2014.<br><br><br>**RIVERS DECL. ¶ 23.** | Undisputed, and an illustration that Rivers recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 722. Rivers appointed Mr. Briscoe as Annual Operating Plan Pillar Lead 2015 Our Coffee and Our Food, including Evenings and Refreshment (supporting peer DM).<br><br>**RIVERS DECL. ¶ 23.** | Undisputed, and an illustration that Rivers recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 723. Rivers selected Mr. Briscoe as highlighted in a partner appreciation week in Q2 of 2015 for specific support | Undisputed, and an illustration that Rivers recognized Plaintiff's excellence, in communication, leadership, |

| UNCONTROVERTED FACTS[13] | SUPPORTING EVIDENCE |
|---|---|
| of a senior leader visit.<br><br>**RIVERS DECL. ¶ 23.** | interpersonal skills and professionalism. This high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 724. Rivers selected Mr. Briscoe's USC location for a March 2015 tour with the United States Leadership team.<br><br>**RIVERS DECL. ¶ 23.** | Undisputed, and an illustration that Rivers recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 725. Starbucks has policies and procedures that specifically prohibit discrimination, harassment, and retaliation. Attached as Exhibit A are true and correct copies of these policies.<br><br>**ROGERS DECL. ¶ 5, EX. A.** | Undisputed, but Starbucks has allowed Rivers to discriminate against racial minorities (Nelson, Hernandez and Plaintiff) with impunity.<br>AMF 915-924; 949-952. |

## D.   PUNITIVE DAMAGES

ISSUE NO. 6: Plaintiff's punitive damages claim fails because he cannot establish by clear and convincing evidence that an officer, director, or managing agent of Starbucks acted with any malice, oppression or fraud towards him, acted with advance knowledge and disregard for his rights or safety, or authorized or ratified any fraudulent, oppressive, or malicious conduct towards him.

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
| --- | --- |
| 726.  Similar to a franchise, Starbucks licenses its brand and products to Licensed Stores run by other companies (Licensees), including, but not limited to, Vons, Ralphs, Marriott, and Disney.<br><br>**DECLARATION OF ANGELA M. RIVERS ("RIVERS DECL.") ¶ 6.** | Undisputed |
| 727. Licensees, sell Starbucks' products, and are responsible for managing their retail operations.<br><br>**RIVERS DECL. ¶ 6.** | Undisputed |
| 728.  In August 2011, Mr. Briscoe was interviewed and hired as a Licensed Store District Manager ("DM") by Angela Rivers ("Rivers"), Regional | Undisputed |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| Director.<br><br>**DECLARATION OF JYOTI MITTAL ("MITTAL DECL.") ¶ 3, EXHIBIT ("EX.") A[17] (DEPOSITION OF PLAINTIFF KEVIN BRISCOE ("PLF'S DEP."), 63:21-64:10); RIVERS DECL. ¶ 4.** | |
| 729.  Rivers was Mr. Briscoe's direct supervisor during his entire employment at Starbucks.<br><br>**RIVERS DECL. ¶ 4.** | Undisputed |
| 730. Mr. Briscoe was one of three African American DMs on Rivers' 12-person team, including Leah Bernard.<br><br>**RIVERS DECL. ¶ 4; PLF.'S DEP., 67:21-24, 148:18-149:3.** | Undisputed |
| 731. While employed by Starbucks, Mr. Briscoe was familiar with its policies against discrimination and retaliation as well as Starbucks' open door policy outlining procedures for | Undisputed |

[17] All further excerpts from Mr. Briscoe's deposition are attached as Exhibit A to the Declaration of Jyoti Mittal.

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
| --- | --- |
| reporting violations of company policies.<br><br>**PLF.'S DEP., 118:8-123:2, EX. 2; 129:25-130:3; 131:12-132:6, EX. 3; 132:7-25 EX. 4; 137:21-141:23, EX. 6; 271:4-6.** | |
| 732. As a DM, Mr. Briscoe was responsible for leading an assigned group of Licensed Store management teams within his district.<br><br>**RIVERS DECL. ¶ 6, EX. A.** | Undisputed |
| 733. As a DM Mr. Briscoe was responsible for assessing the overall operation of Licensed Stores, including ensuring Licensed Store compliance with Starbucks Experience standards.<br><br>**RIVERS DECL. ¶ 6, EX. A.** | Undisputed |
| 734. Communication skills are crucial to the DM position because District Managers regularly interface with Starbucks' Licensees and their employees. | Undisputed |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 6, EX. A.** | |
| 735.   Paramount to Starbucks' business model is communication with its partners, Licensees, and patrons.<br><br>**RIVERS DECL. ¶ 6; DECLARATION OF SARAH ROGERS ("ROGERS DECL.") ¶ 5, EX. A.; <u>PLF.'S DEP., 139:12-140:7, EX. 14</u>.** | Undisputed |
| 736.   Plaintiff acknowledged that communication was vital and important at Starbucks.<br><br><u>**PLF.'S DEP., 88:3-11**</u>. | Undisputed |
| 737.   On April 27, 2014, Mr. Briscoe applied for a Business Development Manager ("BDM") position in the Branded Solutions Department.<br><br>**RIVERS DECL. ¶ 9, EX. D.** | Undisputed |
| 738.   Prior to Mr. Briscoe's interview for the BDM position, Rivers notified Frank Sica ("Sica") and John Warmke ("Warmke"), Branded Solutions managers, regarding Mr. Briscoe's | Undisputed |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| candidacy.<br><br>**RIVERS DECL. ¶ 9, EX. D; DECLARATION OF JOHN WARMKE ("WARMKE DECL.") ¶ 4.** | |
| 739.  Mr. Briscoe interviewed with Kelly White ("White"), Senior Recruiter.<br><br>**WARMKE DECL. ¶ 6, EX. A.** | Undisputed |
| 740.   On May 27, 2014, White emailed her notes about Mr. Briscoe and Mr. Briscoe's resume to Warmke.<br><br>**WARMKE DECL. ¶ 6, EXS. A AND B.** | Undisputed |
| 741.  In her May 27, 2014, email to Warmke regarding Mr. Briscoe, Under the heading "Opportunities/Areas to probe further", White asked Warmke to "probe further on how this role fits into Kevin's overall career path.   His background is heavy in operations and he has not held a traditional sales role in his past." | Undisputed |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| **WARMKE DECL. ¶ 6, EX. A.** | |
| 742.  On June 3, 2014, Warmke telephonically interviewed Mr. Briscoe for the BDM position.<br><br>**WARMKE DECL. ¶ 7; <u>PLF.'S DEP., 253:10-16</u>.** | Undisputed |
| 743.  Warmke's took detailed notes of his interview of Mr. Briscoe<br><br>**WARMKE DECL. ¶ 7, EX. C.** | Objection:  the notes are redacted relative to the most important information relating to this fact.  Thus, Hearsay and Best Evidence Objections are valid. |
| 744.  Under the heading "Development Areas" in Warmke's notes regarding his interview with Mr. Briscoe, Warmke identifies the following items:<br>• "Strategic approach to market, segment, account [sic]<br>    ○ I was looking for candidates that could provide more insight and sales and/or development examples which may be a function of a lack of strategic selling experiences [] | **Disputed** as to the author of the notes for the reasons set out in No 18, above.  Otherwise, Plaintiff responds that the content of the note is correctly restated, thus: **Undisputed.** |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| o You have a very good background but was [sic] much more centered on the operational approach of execution selling as an operator. This is a good quality, but the stronger candidates were able to demonstrate success through much more strategic influence and experience, such as market research, targeting top decision makers and influencers, focus on strategic questioning that drove alignment to customer needs from a strategic or organizational level that creating mutual partnership or joint business planning initiatives.<br><br>o Kevin's experience is that he is working within an existing account structure, usually franchise model of operations and maintaining margin and | |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| cost. | |

- o The successes and sharing as it relates to selling, relationship management, and business development were centered on an operational approach or execution of telling the customer what they needed to be successful from the eyes of the operator.  Here's the menu, the POS, the space needed, etc.
- o He didn't speak to strategic sales and development approach and instead took a more operational approach to meeting costs and following an existing agreement model for sales.
  - Other candidates have been able to demonstrate success through market research, targeting top decision makers and influencers, focus on

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| strategic questioning that drove alignment to customer needs from a strategic or organizational level that creating mutual partnership or joint business planning initiatives.<br><br>• Listening to understand needs, focus on being concise.<br>    o There was a need to re-state several questions to re-focus Kevin's responses. He is very enthusiastic and wants to share his story, but several questions were focused on specifics.<br>        ▪ After asked further questions, the response often centered back on putting costs together, telling customer how it will work, specs, etc. and aligning on what they are willing to spend." | |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| **Warmke Decl. ¶ 7, Ex. C.** | |
| 745.   On June 4, 2014, Mr. Briscoe also telephonically met with Frank Sica, Mr. Warmke's supervisor, to discuss the BDM position. | Undisputed that Plaintiff had a very short telephone call with Sica, but, as Sica stated "…**this was not an interview from my perspective...**" **Sica also stated:** "John, I know you will share your complete feedback on Kevin with Angie…" |
| **WARMKE DECL. ¶ 8, EX. D; <u>PLF.'S DEP. 252:25-253:9</u>.** | **Defendant's Exhibit D** |
| 746.   Mr. Briscoe was not offered the BDM position.<br><br>**WARMKE DECL. ¶ 9; RIVERS DECL. ¶ 10.** | Undisputed, but it is also important that Briscoe was not given Feedback. |
| 747.   At Starbucks, it is customary for the managers of internal candidates to receive feedback from interviewers so that the managers can assist the partner's development<br><br>**WARMKE, DECL. ¶ 7, RIVERS** | **Undisputed,** but Defendant had a mandatory Post Interview Feedback Procedure that was to be followed within 24 hours of the interview, which was not followed relative to Plaintiff's pursuit of promotion:<br>a. that an Interviewer complete a Post-Interview "Feedback Form", see Plaintiff's Exhibit - 36, and<br>b. that the Interviewee be provided with |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| **DECL. ¶ 10.** | the Feedback. |
| 748.   Warmke provided his feedback to Mr. Briscoe's manager, Rivers.<br><br><br><br><br><br><br><br><br><br><br><br><br>**WARMKE   DECL.   ¶   7,   EX.   C; RIVERS DECL. ¶ 10.** | Disputed.<br>Post Interview Feedback Procedure that was to be followed within 24 hours of the interview, which was not followed relative to Plaintiff's pursuit of promotion:<br>a. that an Interviewer complete a Post-Interview "Feedback Form", see Plaintiff's Exhibit - 36, and<br>b. that the Interviewee be provided with the Feedback.<br>Plaintiff was never provided with any Feedback. |
| 749.   On June 4, 2014, Sica emailed Rivers a summary of his conversation with Mr. Briscoe.<br><br>**WARMKE   DECL.   ¶   8,   EX.   D; RIVERS DECL. ¶ 10.** | Undisputed but Irrelevant as it was not an Interview.<br>**Defendant's Exhibit D** |
| 750.   In   his   June   4,   2014,   email regarding Mr. Briscoe , Sica notes: "Kevin spoke for a majority of the 30 minutes and I found him to be . . . very operationally focused . . . . Although this was not an interview from my perspective | Undisputed, that this is an excerpt from Sica's email of June 4.<br>**Defendant's Exhibit D** |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| (naturally Kevin treated it as an interview), his descriptions and examples of a majority of his diverse career work experiences were operationally focused. During our brief connect, he did not articulate any sales and/or development examples which may be a function of a lack of strategic selling experiences or not enough time to dive deep." **WARMKE DECL.¶ 8, EX. D.** | |
| 751.  Prior to Mr. Briscoe's interview with Mr. Warmke for the BDM position they had met. **WARMKE DECL. ¶ 5.** | **Undisputed, but Immaterial**, because any such "meeting" was in an incidental group setting and with non-specific purposes. |
| 752.  Warmke found Mr. Briscoe to be professional. **WARMKE DECL. ¶ 5.** | Undisputed |
| 753.  Mr. Briscoe acknowledges that he has no reason to believe Warmke had a reason to dislike him. **PLF.'S DEP., 253:10-19; 254:2-4.** | Undisputed |
| 754.  The role of BDM was developed | Undisputed |

| **UNCONTROVERTED FACTS**[16] | **SUPPORTING EVIDENCE** |
|---|---|
| and went into effect in approximately late 2013, early 2013.<br><br>**WARMKE DECL. ¶ 3.** | |
| 755.  Warmke has hired an African American as a BDM in the past.<br><br>**WARMKE DECL. ¶ 3.** | Undisputed |
| 756.   Mr. Briscoe acknowledges that he has no reason to believe Frank Sica had a reason to dislike him.<br><br><u>**PLF.'S DEP., 253:24-254:1.**</u> | Undisputed |
| 757.  In  November  8,  2014,  Mr. Briscoe  applied  for  another  BDM position, but was not interviewed.<br><br>**ROGERS DECL. ¶ 21.** | Undisputed |
| 758.  Warmke  was  not  aware  of  Mr. Briscoe's        November        8,        2014, application for the other BDM position. | Disputed<br>Warmke was the hiring manager for the BDM position when Plaintiff applied on-line on November 8, 2014.  Relative to Plaintiff's application, the "status " is noted as "Starbucks Not Interested", with the only Starbuck employee identified being "Hiring Manager John Warmke". |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| **WARMKE DECL. ¶ 9.** | The Internal Recruiter could never make that decision without the Hiring manager.<br>Exhibit – 8;<br>AMF #1051 |
| 759. Rivers was not provided any details regarding any subsequent applications Mr. Briscoe made for other Starbucks positions.<br><br>**RIVERS DECL. ¶ 11.** | Disputed<br>Plaintiff personally told Rivers (and Rogers) that he had applied, and Rivers appeared upset, and told Plaintiff, "well I didn't know that you were going to do that."<br> AMF 928 and 929 |
| 760. Until this lawsuit, Rivers did not actually know whether he applied for other positions at Starbucks<br><br>**RIVERS DECL. ¶ 11.** | Disputed<br>Plaintiff personally told Rivers that he had applied, and she appeared upset, and told Plaintiff, "well I didn't know that you were going to do that."<br> AMF 928 and 929 |
| 761. Rivers had had no involvement in the hiring process for the Branded Solutions Department.<br><br>**RIVERS DECL. ¶ 10.** | Undisputed but **this fact accentuates Rivers' lack of support and assistance to Plaintiff,** as noted in ADF #912 |
| 762. Mr. Briscoe received District Manager Training at the beginning of his employment with Starbucks. | Undisputed |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 7.** | |
| 763.  When Mr. Briscoe completed his training, his District Manager Coach provided Rivers with a District Manager Assessment Guide. | Undisputed |
| **RIVERS DECL. ¶ 7.** | |
| 764.  In the District Manager Assessment Guide, Mr. Briscoe's Coach identified the following areas for Mr. Briscoe to improve on: (1) attention to detail; (2) interpersonal style issues that resulted in ineffective communication with others (i.e., he was vocally loud during several meetings); (3) the perception that he was focused on his own agenda; and, (4) making bad decisions (tardiness to three shifts of in-store training, late to one DM visit in District Manager Training, and cancelling a visit during District Manager Training | **Undisputed in part** to the extent that it states excerpts from Defendant's Exhibit – B; <br> **Disputed** to the extent that it ignores the fact that Coach Matt Scruggs made observations which note that Plaintiff was an effective communicator, stating, in part: <br> "Kevin has demonstrated ability to successfully communicate a clear and concise message both written and verbally…He clearly has demonstrated the interpersonal skill set, understanding of motivational needs of his audience, and the charismatic ability to be successful …" <br> **Defendant's Exhibit B** <br> Further, |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 7, EX. B.** | Plaintiff's 2013 first year evaluation contradicts the claims made in Nos.1, 2, 3 and 4.<br><br>**Exhibits 5 and 6**<br><br>**Rivers**, as **Regional Director** over Plaintiff evaluated Plaintiff as an effective and successful communicator and leader, and she assigned him to important **Lead District Manager** Assignments to allow his work products and assistance to be used by other District Managers in Rivers' Region.<br><br>**Exhibits- 5 and 6**<br><br>Rivers also noted that, "[Plaintiff] has built and maintained relationships with CO DMs [Company Operations District Managers], RDs [Regional Directors] and SMs [Store Managers] this year and has become a requested partner in CO meetings."<br><br>**Exhibits- 5 and 6** |
| 765. For the 2012 review period, Rivers rated Mr. Briscoe "Above Expectations" and identified the following opportunities for improvement: "[d]o more work around | Disputed to the extent that there is no component section for "improvement". The evaluation notes that Plaintiff was an effective and successful communicator, leader, and she assigned him to Lead |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| adjusting for his audience – tends to talk like he thinks and repeats himself rather than just adjusts; [p]eers sometimes wonder if he's listening; [s]hould continue to build strong and valuable 1st team relationships."<br><br><br><br><br><br>**RIVERS DECL. ¶ 8, EX. C; <u>PLF.'S DEP., 263:18-265:6, EX. 11</u>.** | District Manager Assignments which uses his work product and assistance for other District Managers in Rivers' Region.<br>**Exhibit- 5**<br>Rivers also noted that, "[Plaintiff] has built and maintained relationships with CO DMs [Company Operations District Managers], RDs [Regional Directors] and SMs [Store Managers] this year and has become a requested partner in CO meetings."<br>**Exhibit- 5** |
| 766.  Mr. Briscoe Acknowledges that he does not disagree with anything Rivers put in his evaluation for the 2012 review period.<br><br>**<u>PLF.'S DEP., 265: 3-6.</u>** | Undisputed |
| 767.  For the 2013 review period, Rivers rated Mr. Briscoe "Meets Expectations" and identified the following performance improvement opportunities:<br>Continued *focus on listening* for understanding rather than listening to | Disputed,<br>The evaluation does not contain a section for "Performance Improvement Opportunities," as suggested by this fact. Further, "opportunities" as used in the Form, are neither performance deficiencies or criticisms.  This same |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| respond. *Ensure you both understand and are understood. Communication is key to success.* Elevate store level issues where conflict or misunderstanding occurs. *Ensure all relevant facts are shared* and a clear picture is painted of problems without rounds of follow up questions required to fully understand situation. *Take time to ask questions to ensure understanding on all sides.* This will minimize opportunity to have integrity questioned. *Focus on team commitments* and execute in manner agreed to (or influence commitment). Once aligned execute in accord with agreement.

**RIVERS DECL. ¶ 8, EX. D; PLF.'S DEP., 265:7-266:10, EX. 12.** | Performance Appraisal noted a number of important accomplishments and significant assignments made to Plaintiff, recognizing his excellence. The assignment as District Manager to Defendant's **"model operations"** and its highest revenue generators **(LAX and USC), was a positive statement about Plaintiff's performance.** **AMF # 875-877; 881-891; 1048 and 1049** Plaintiff performed successfully as District Manager over Rivers' Region's most productive and prestigious locations. **AMF # 875-877; 881-891; 1048 and 1049** LAX **and** USC, both managed by Plaintiff, were the two most complex and highest revenue generating locations in Rivers' entire Region of Licensed Stores. **AMF # 875-877; 881-891** |
| 768. Mr. Briscoe Acknowledges that he does not disagree with anything Rivers put in his evaluation for the 2013 review period. | Undisputed |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| **PLF.'S DEP., 266: 8-10.** | |
| 769. On May 16, 2014, Rivers received a complaint about Mr. Briscoe from LAX Marriott. | Disputed<br><br>After Plaintiff visited and cited Marriott for Non-compliance (infractions for which there had been recurring citations at the operation),  Hoenecke called Plaintiff saying that Marriott's Manager responsible Marriott for the Starbucks Licensee had called him with complaints about Plaintiff, Plaintiff  immediately telephoned Rivers and reported that the Licensee called Hoenecke complaining because Marriott was out of product when Plaintiff visited and Plaintiff intended to cite Marriott for Non-compliance (reflecting unfavorably on the Marriott Manager).<br><br>AMF #  975-978<br><br>Rivers told Plaintiff that he handled the matter properly.<br><br>AMF #978<br><br>A District Manager for a Licensed Store had duties to protect the Starbucks Brand |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| | which he did by working with the Licensee cooperatively, but, when necessary, having to cite the Licensee for Non-Compliance, a dynamic which sometimes put the LSDM at odd with the Licensee and him/its on-site manager, and gave on-site managers (who were employees of the Licensee and not of Starbucks) motivation to complain about the LSDM. |
| **RIVERS DECL. ¶ 13.** | **AMF # 963-978** |
| 770. LAX Marriott complained to Rivers about an incident wherein a hotel guest complained to the front desk having witnessed Mr. Briscoe yell at a LAX Marriott's Licensed Store Manager, and make her cry. | Disputed<br><br>After Plaintiff visited and cited Marriott for Non-compliance (infractions for which there had been recurring citations at the operation),  Hoenecke called Plaintiff saying that Marriott's Manager responsible Marriott for the Starbucks Licensee had called him with complaints about Plaintiff, Plaintiff  immediately telephoned Rivers and reported that the Licensee called Hoenecke complaining because Marriott was out of product |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| | when Plaintiff visited and Plaintiff intended to cite Marriott for Non-compliance (reflecting unfavorably on the Marriott Manager). |
| | **AMF #  975-978** |
| | Rivers told Plaintiff that he handled the matter properly. |
| | **AMF #978** |
| | A District Manager for a Licensed Store had duties to protect the Starbucks Brand which he did by working with the Licensee cooperatively, but, when necessary, having to cite the Licensee for Non-Compliance, a dynamic which sometimes put the LSDM at odd with the Licensee and him/its on-site manager, and gave on-site managers (who were employees of the Licensee and not of Starbucks) motivation to complain about the LSDM. |
| **RIVERS DECL. ¶ 13.** | **AMF # 963-978** |
| 771.  LAX   Marriot   complained   to Rivers   that   when   it   discussed   the | Disputed<br>After Plaintiff visited and cited Marriott |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| incident with Mr. Briscoe, he refused to take responsibility, apologize, or acknowledge that he did anything wrong.<br><br><br>**RIVERS DECL. ¶ 13.** | for Non-compliance (infractions for which there had been recurring citations at the operation), Hoenecke called Plaintiff saying that Marriott's Manager responsible Marriott for the Starbucks Licensee had called him with complaints about Plaintiff, Plaintiff immediately telephoned Rivers and reported that the Licensee called Hoenecke complaining because Marriott was out of product when Plaintiff visited and Plaintiff intended to cite Marriott for Non-compliance (reflecting unfavorably on the Marriott Manager).<br>**AMF #  975-978**<br>Rivers told Plaintiff that he handled the matter properly.<br>**AMF #978**<br>A District Manager for a Licensed Store had duties to protect the Starbucks Brand which he did by working with the Licensee cooperatively, but, when necessary, having to cite the Licensee for Non-Compliance, a dynamic which sometimes put the LSDM at odd with the Licensee and him/its on-site manager, |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
|  | and gave on-site managers (who were employees of the Licensee and not of Starbucks) motivation to complain about the LSDM. **AMF # 963-978** |
| 772.   Mr. Briscoe did not disclose LAX Marriott incident to Rivers even though she regularly interacted with him after the incident.<br><br>**RIVERS DECL. ¶ 13; <u>PLF.'S DEP., 160:24-162:11</u>.** | Disputed<br>After Plaintiff visited and cited Marriott for Non-compliance (infractions for which there had been recurring citations at the operation),  Hoenecke called Plaintiff saying that Marriott's Manager responsible Marriott for the Starbucks Licensee had called him with complaints about Plaintiff, Plaintiff  immediately telephoned Rivers and reported that the Licensee called Hoenecke complaining because Marriott was out of product when Plaintiff visited and Plaintiff intended to cite Marriott for Non-compliance (reflecting unfavorably on the Marriott Manager).<br>**AMF #  975-978**<br>Rivers told Plaintiff that he handled the matter properly.<br>**AMF #978**<br>A District Manager for a Licensed Store |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| | had duties to protect the Starbucks Brand which he did by working with the Licensee cooperatively, but, when necessary, having to cite the Licensee for Non-Compliance, a dynamic which sometimes put the LSDM at odd with the Licensee and him/its on-site manager, and gave on-site managers (who were employees of the Licensee and not of Starbucks) motivation to complain about the LSDM. **AMF # 963-978** |
| 773. At the demand of Starbucks' third-party client, Rivers removed Mr. Briscoe from the LAX Marriott account. **Rivers Decl. ¶ 13; Warmke Decl. ¶ 10, Ex. E.** | Undisputed, but Defendant knew that Plaintiff did nothing wrong, as Rivers had stated to Plaintiff, and Defendant's high level management later learned that the Marriott manager later boasted that he did not like District Managers and joke of how he got rid of Plaintiff at the LAX Marriott (essentially for doing his job) **AMF #978 and 980** Rivers and Defendant owed the LSDM the duty to support and assist them including providing reasonable review, investigation and analysis of complaints |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| | in light of the dynamics for conflicts given the LSDM's need to cite Licensees for non-compliance and the motivation that could give for false or misleading claims and complaints. **AMF # 983** |
| 774.   On February 23, 2015, Licensee Ralphs complained to Rivers that Mr. Briscoe was "not consistent with what he [was] telling the kiosk managers." **Rivers Decl.  ¶ 15, Ex. F; Rogers Decl. ¶ 15.** | Undisputed but, Rivers and Defendant owed the LSDM the duty to support and assist them including providing reasonable review, investigation and analysis of complaints in light of the dynamics for conflicts given the LSDM's need to cite Licensees for non-compliance and the motivation that could give for false or misleading claims and complaints. **AMF # 983, AMF # 963-978** Plaintiff's criticisms by the Licensee's manager grew out of Plaintiff properly and correctly performing his duties and notifying the Licensee's manager know that he (Plaintiff) would have to issue citations for Non-compliance if the Licensee continued with staffing shortages because it adversely impacted |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| | customer service to Starbucks' customers and harmed the Starbucks Brand. **AMF # 984-986** |
| 775. On March 2, 2015, Rivers provided Mr. Briscoe feedback regarding the Ralphs complaint. **RIVERS DECL. ¶ 15, EX. G.** | Undisputed, but the Ralphs situation is as set out in response to UF # 49, above. |
| 776. On March 11, 2015, Vons complained to Rivers that it was forced to pay an employee to wait two hours for Mr. Briscoe who was late to a scheduled meeting. **RIVERS DECL. ¶ 16; ROGERS DECL. ¶ 15.** | Undisputed, but Plaintiff did nothing wrong. Plaintiff was abruptly caused to change his schedule to make for a new store opening at Residence Inn, about which he timely and promptly notified Rivers, and she agreed. AMF # 987, 994-995 |
| 777. Ms. Rivers coached Mr. Briscoe about his lack of communication with respect to this incident **RIVERS DECL. ¶ 16, EX. H.** | Undisputed |
| 778. On May 6, 2015, Licensee Vons complained to Rivers that Vons employees felt harassed by Mr. Briscoe because he sent multiple texts to hourly Licensee employees about buying | Disputed Plaintiff properly discharged his duties ensure that the Licensee was properly stocked with Starbucks products (Coffee, in this instance); there was no undue |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| coffee.<br><br><br><br><br><br><br><br><br><br>**RIVERS DECL. ¶ 19, EXS. J-L.** | pressure or "bullying", and Starbucks had no policy preventing LSDMs from texting Licensee managers (or responsible persons) in fulfillment of their duties. Plaintiff simply used the management tools provided by Defendant for monitoring product purchases by Licensees to predict their needs and ensure product was always on hand.<br>AMF 987-999 |
| 779. It is against Starbucks policy to text third-party Licensee employees on their personal cellular phones.<br><br><br><br><br><br><br><br><br><br><br><br><br><br>**RIVERS DECL. ¶ 19.** | Disputed<br>Plaintiff properly discharged his duties ensure that the Licensee was properly stocked with Starbucks products (Coffee, in this instance); there was no undue pressure or "bullying", and Starbucks had no policy preventing LSDMs from texting Licensee managers (or responsible persons) in fulfillment of their duties. Plaintiff simply used the management tools provided by Defendant for monitoring product purchases by Licensees to predict their needs and ensure product was always on hand. |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| | AMF 987-999 |
| 780.   On May 14, 2015, Rivers emailed Mr. Briscoe to coach him about the May 6th Vons complaint.<br><br>**RIVERS DECL. ¶ 19, EX. M.** | Undisputed, but,<br>Plaintiff properly discharged his duties ensure that the Licensee was properly stocked with Starbucks products (Coffee, in this instance); there was no undue pressure or "bullying", and Starbucks had no policy preventing LSDMs from texting Licensee managers (or responsible persons) in fulfillment of their duties.  Plaintiff simply used the management tools provided by Defendant for monitoring product purchases by Licensees to predict their needs and ensure product was always on hand.<br>AMF 987-999 |
| 781.  District Managers for Licensed Stores are responsible for certifying that baristas of new locations meet Starbucks' standards before the store is permitted to open.<br><br>**RIVERS DECL. ¶ 17.** | Undisputed. |
| 782.   If a store is not ready to open on a Licensee's preferred date it is the | Undisputed |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| District Manager's responsibility to escalate the issue to the Regional Manager.<br><br>**RIVERS DECL. ¶ 17.** | |
| 783. Because Mr. Briscoe failed to follow Starbucks procedure, Starbucks had to close the new Residence Inn location in order to retrain the Licensee employee baristas.<br><br><br><br><br><br><br><br><br><br>**RIVERS DECL. ¶ 17, EX. I.** | Disputed<br><br>Plaintiff did not fail to follow any Starbucks procedure in training the Baristas.  The claim that "Starbucks had to close the new Residence Inn location in order to retrain the Licensee employee baristas" is a **lie, verified by Sindy Lomas, the on-site Licensee Manager, who wrote to Rivers and others noting that the additional training for baristas would be, "in addition to operating during normal business hours."**<br>Exhibit – 25;<br>AMF 1000-1006 |
| 784. Mr. Briscoe refused to take responsibility for certifying the baristas. | Disputed<br><br>Plaintiff trained the baristas pursuant to Starbucks' policy and training procedure. Plaintiff did not fail to train the Baristas, causing them to performance inconsistent with expectations at |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 17.** | opening.  A combination of slower employees, nerves, novelty, a lot to learn, the transition from learning to application, the pressure of now, watchful eyes, and other factors, including the need for practice under live conditions.<br><br>AMF 1000-1006 |
| 785.   Mr.   Briscoe   believed   the deficiencies with the baristas existed because "the baristas that were there that day were handicapped baristas, meaning they had - - they were slower."<br><br>**PLF.'S DEP., 178:1-10.** | Disputed<br><br>Plaintiff was responsible for training the baristas, which he did in proper form pursuant to Starbucks' policy and training procedure. Plaintiff did not fail to train the Baristas, causing them to performance inconsistent with expectations at opening.  It was a combination of slower employees, nerves, novelty, a lot to learn, the transition from learning to application, the pressure of now, watchful eyes, and other factors, including the need for practice under live conditions.<br><br>AMF 1000-1006 |
| 786.   On July 23, 2014, Rivers coached Mr.   Briscoe   on   improving   his transparency and communication. | Disputed<br><br>Rivers harassed Plaintiff with this false and unsupportable claim. |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 22, EX. N .** | Plaintiff was a recognized Leader with excellent communication and people skills, and Defendant repeatedly tapped him for important leadership roles. <br> AMF # 881-891; |
| 787. On December 9, 2014, Rivers coached Mr. Briscoe regarding his tardiness to a meeting. <br><br> **RIVERS DECL. ¶ 22, EX. O.** | Disputed <br> Rivers harassed Plaintiff with this false and unsupportable claim. <br> Rivers' decision to make a late change in the meeting's scheduled start time created this situation. <br> AMF # 930,954 |
| 788. On February 11, 2015, Rivers coached Mr. Briscoe regarding his failure to notice whether exterior punch items were fixed at a Licensee location <br><br><br><br><br><br><br> **RIVERS DECL. ¶ 22, EX. P.** | Disputed <br> Rivers harassed Plaintiff with this false and unsupportable claim. <br> This relates to a "Construction issue for a new store under construction".  LSDM are Operational Employees whose duties, job descriptions and roles do not include managing or completing Construction Punch Lists at a Licensed Store. <br> AMF # 1055 |
| 789. On February 27, 2015, Mr. Briscoe provided Rivers improper sales for Terminal Two LAX locations during a period when the terminal was actually | Disputed <br> Rivers harassed Plaintiff with this false and unsupportable claim. <br> Defendant's Finance Department, for its |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| closed.<br><br>**RIVERS DECL. ¶ 22, EX. Q.** | own accounting purposes categorized a closed store as a remodel, resulting in an inaccurate reporting of revenues for a closed store at LAX.  It was Plaintiff who detected the accounting and questioned it, noting that the store, though closed, was budgeted for the entire year.<br>AMF # 1056 |
| 790. On April 21, 2015, Rivers coached Mr. Briscoe on his communication with Licensees<br><br>**RIVERS DECL. ¶ 22, EX. R.** | Disputed,<br>Rivers harassed Plaintiff with this false and unsupportable claim.  Plaintiff's communication skills were outstanding and were recognized by Defendant as worthy of Leadership Roles, and Rivers had told Plaintiff that he handled the Marriott situation properly, just the way that Scruggs (a Caucasian LSDM had handled a similar situation.)<br> AMF # 883-894<br>Even in 2015, Rivers made false claims about Plaintiff, but Defendant continued to select Plaintiff for important Leadership roles because of his excellent communication and result orientation.<br>AMF # 934-943; 945-946. |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| 791. On April 24, 2015, Rivers coached Mr. Briscoe regarding deficiencies at one of his stores.<br><br>**RIVERS DECL. ¶ 22, EX. S.** | Disputed<br><br>Rivers harassed Plaintiff with this false and unsupportable claim.   Plaintiff's stores were not deficient.  Rivers failed and refused to support Plaintiff when he did his job and cited Licensees for Non-Compliance, but she blamed Plaintiff if he did not cite them to enforce compliance.  (Plaintiff couldn't do anything right in Rivers' eyes after he started to seek promotion for his recognized leadership performance.)<br>AMF # 957-973; 975-1004 |
| 792.  On May 14, 2015, Mr. Briscoe provided Ms. Rivers monthly reports for the wrong time period.<br><br>**RIVERS DECL. ¶ 22, EX. T.** | **Disputed**<br><br>Rivers harassed Plaintiff with this false and unsupportable claim.  On a single occasion, Plaintiff handed Rivers one paper intending to give her another and Rivers abruptly ended her visit with Plaintiff.  A couple of minutes after Rivers walked away from Plaintiff, he discovered that he gave Rivers the wrong page and sent her an email correcting it.  Rivers refused to acknowledge Plaintiff's email, choosing instead to cite the incident as negative performance.  This |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| | incident was not noteworthy for performance.  Rivers did not treat her Caucasian subordinates this way.  AMF # 1040-1042; 896; 899 |
| 793.   On May 28, 2015, Rivers coached Mr. Briscoe regarding his failure to correspond with "key stakeholders."  **RIVERS DECL. ¶ 22, EX. U.** | Disputed  Rivers harassed Plaintiff with this false and unsupportable claim.  Rivers' claim not genuine because Plaintiff knew and understood the Starbuck business, was a Business Leader and an effective communicator whom Defendant tapped for a number of leadership roles (before he started to seek Promotion and Promotional Opportunities) in recognition of his quality performance.  AMF # 876-877; 883-894; |
| 794.   On June 5, 2015, Rivers coached Mr. Briscoe regarding errors he made in his sales sheet.  **RIVERS DECL. ¶22, EX. V.** | Disputed  Rivers harassed Plaintiff with this false and unsupportable claim.  Plaintiff's performance was Leadership quality and Rivers continued to select Plaintiff for high profile and important Leadership roles, in 2015.  AMF # 934-946 |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| | Special Leadership selections and assignments was indicative of Defendant's view of performance excellence.<br>AMF 891 |
| 795.   Most DMs on Rivers' team had a Personal Development Plan ("PDP") outlining their respective goals and aspirations at Starbucks, and strategies for obtaining such goals.<br><br>**RIVERS DECL. ¶ 14.** | Undisputed, but Plaintiff never had on. Plaintiff pursued promotion and solicited support and assistance, but none was given him.<br>AMF # 899-903; 906-913; 927-933; 1050-1053 |
| 796.   A Partner Resources Manager at Starbucks is the same role as a Human Resources Manager at other companies.<br><br>**ROGERS DECL. ¶ 2.** | Undisputed |
| 797.   On June 26, 2014, Mr. Briscoe, Rivers and Sarah Rogers ("Rogers"), the Partner Resources Manager working with Rivers' team, met to discuss Mr. Briscoe's development at Starbucks and Mr. Briscoe developing a PDP. | Undisputed |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| **ROGERS DECL. ¶ 7, EXS. B-C.** | |
| 798.  On September 12, 2014, Rogers emailed Mr. Briscoe additional resources to assist his development.<br><br>**ROGERS DECL. ¶ 8, EX. D.** | Disputed<br>Plaintiff denies that Rogers (or Rivers) ever tried to "assist his development". Plaintiff sent Rogers an email (copying Rivers) seeking specific types of information that was uniquely related to Starbucks would be particularly helpful in assisting him with promotional development, but neither Rogers nor Rivers ever responded.<br>Exhibit 10;<br>AMF # 1057 |
| 799.  In November 2014, Mr. Briscoe, Rivers and Rogers met again to discuss Mr. Briscoe's progress and to ensure a formal PDP was in place.<br><br>**ROGERS DECL. ¶ 9.** | Disputed<br>Plaintiff denies that Rogers (or Rivers) ever tried to "assist his development". Plaintiff sent Rogers an email (copying Rivers) seeking specific types of information that was uniquely related to Starbucks would be particularly helpful in assisting him with promotional development, but neither Rogers nor Rivers ever responded.<br>Exhibit 10;<br>AMF # 1057 |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| 800.  In November 2014, Mr. Briscoe had not completed his PDP.<br><br>**ROGERS DECL. ¶ 9.** | Disputed<br>Plaintiff denies that Rogers (or Rivers) ever tried to "assist his development", including assisting Plaintiff with completion of a PDP.  Plaintiff sent Rogers an email (copying Rivers) seeking specific types of information that was uniquely related to Starbucks would be particularly helpful in assisting him with promotional development, but neither Rogers nor Rivers ever responded.<br>Exhibit 10;<br>AMF # 1057 |
| 801.  On December 9, 2014, Rogers scheduled an in-person meeting with Rivers and Mr. Briscoe to facilitate communication between them, and again discuss Starbucks' concerns regarding Mr. Briscoe's communication style.<br><br>**ROGERS DECL. ¶ 10.** | Disputed<br>Plaintiff personally requested a meeting with Rogers to discuss what Plaintiff felt to be Race discrimination against him. Plaintiff Depo 277:6-278:14 |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
|  |  |
| 802. On December 17, 2014 Rivers emailed Rivers and Mr. Briscoe a summary of next steps for Mr. Briscoe's development and potential support tactics for him.<br><br>**ROGERS DECL. ¶ 13, EX. E.** | Disputed<br>It makes no sense that "Rivers emailed Rivers…"<br>Plaintiff denies that Rogers (or Rivers) ever tried to "assist his development", including assisting Plaintiff with completion of a PDP.  Plaintiff sent Rogers an email (copying Rivers) seeking specific types of information that was uniquely related to Starbucks would be particularly helpful in assisting him with promotional development, but neither Rogers nor Rivers ever responded.<br>**Exhibit 10;**<br>**AMF # 1057** |
| 803. Mr. Briscoe agreed to participate in a 360 Peer review which was completed in February 2015, which was designed to give him additional insight into how he was perceived by his peers/other Partners.<br><br>**PLF.'S  DEP.,  267:16-24;  ROGERS** | Undisputed that Plaintiff agreed to participate in a "360".<br>**Disputed** that the purpose or intent of the 360 or Plaintiff's agreement to participate in it was to be used as a performance evaluation  tool from which Defendant would selectively pick and choose anything that it perceived to be a negative and ignore all of the many |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| **DECL. ¶ 14, EXS. F-G.** | positives.<br><br>**AMF # 1007-1012**;<br><br>Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose<br><br>**UF # 79-83**<br><br>Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360.<br><br>**AMF # 1014-1030**<br><br>The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them.<br><br>**AMF # 1007-1012**<br><br>No LSDM other than Plaintiff was the subject of a 360 Survey.<br><br>**AMF # 1012** |
| 804.  A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe stop "[c]oming in with his present agenda for the conversation. At times he seems unwilling to hear | Undisputed that this is one comment in the "360".<br><br>**Disputed** that the comment is performance worthy.  The purpose and intent of the 360 to which Plaintiff |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| what the other person has said if it doesn't fit in with his pack of thinking." | agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. |
| **ROGERS DECL. ¶ 14, EX. G.** | **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose |
|  | **UF # 79-83** Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. |
|  | **AMF # 1014-1030** The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. |
|  | **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. |
|  | **AMF # 1012** |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| 805. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe stop "[w]orking while others are presenting."<br><br>**ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360".<br>**Disputed** that the comment is performance worthy.   The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments.<br>**AMF # 1007-1012**;<br>Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose<br>**UF # 79-83**<br>Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360.<br>**AMF # 1014-1030**<br>The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| | leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 806. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe stop "[s]peaking over others." **ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy. The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant. Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| | of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 807. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe stop "[a]cting superior to others." **ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy.  The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| | Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 808. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe stop "[s]aying that he is aligned with team commitments and not follow thru [sic] and/or do it 'his way' rather than staying aligned with the team." **ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy.  The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| | **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 809. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that "[w]hen [Mr. Briscoe] disagrees with RD [Rivers], at times it appears disrespectful." | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy.  The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| **ROGERS DECL. ¶ 14, EX. G.** | used as a performance evaluation tool for Defendant. Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 810.   A   reviewer   responding   to   Mr. | Undisputed that this is one comment in |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| Briscoe's 360 Peer Review described Mr. Briscoe as "[s]low, or unwilling, to adapt or conform with Team direction."<br><br>**ROGERS DECL. ¶ 14, EX. G.** | the "360".<br>**Disputed** that the comment is performance worthy.  The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments.<br>**AMF # 1007-1012;**<br>Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose<br>**UF # 79-83**<br>Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360.<br>**AMF # 1014-1030**<br>The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| | **AMF # 1007-1012** |
| | No LSDM other than Plaintiff was the subject of a 360 Survey. |
| | **AMF # 1012** |
| 811. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe stop "[t]elling stories in generalities vs. actual specific examples."<br><br>**ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". <br><br>**Disputed** that the comment is performance worthy.  The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. <br><br>**AMF # 1007-1012**; <br>Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose <br>**UF # 79-83** <br>Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. <br>**AMF # 1014-1030** <br>The 360 was an assessment by peers (not of Licensees with whom Plaintiff |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| | interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 812.  A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe start "[a]ctively listening more consistently." **ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy.   The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| | numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 813. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe start "[t]aking the time to listen to feedback of others." **ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy.   The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012;** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| | Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 814.  A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe, "[w]hen communicating take additional time to consider what you want the partner to feel as a result of your communication." | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy.  The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| **ROGERS DECL. ¶ 14, EX. G.** | Defendant. Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 815. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested | Undisputed that this is one comment in the "360". |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| that Mr. Briscoe start "[a]ctively listening when others are talking, sharing ideas, presenting, etc. Consider tone in communication may come across as 'aloof' or arrogant at times." | **Disputed** that the comment is performance worthy.  The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. |
| **ROGERS DECL. ¶ 14, EX. G.** | **AMF # 1007-1012**; |
| | Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose |
| | **UF # 79-83** |
| | Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. |
| | **AMF # 1014-1030** |
| | The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. |
| | **AMF # 1007-1012** |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| | No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 816. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe start "[b]eing more welcoming and generous."<br><br>**ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy.  The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. **AMF # 1014-1030** The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| | interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. **AMF # 1007-1012** No LSDM other than Plaintiff was the subject of a 360 Survey. **AMF # 1012** |
| 817. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe start "[l]istening to directions, be respectful of others skill sets and experience, be open minded to other ideas." <br><br> **ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360". **Disputed** that the comment is performance worthy.  The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments. **AMF # 1007-1012**; Defendant used the 360 solely as a tool against Plaintiff, which was never its intent or purpose **UF # 79-83** Defendant intentionally omitted the numerous positive comments (over 37) |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| | contained in the 360. |
| | **AMF # 1014-1030** |
| | The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. |
| | **AMF # 1007-1012** |
| | No LSDM other than Plaintiff was the subject of a 360 Survey. |
| | **AMF # 1012** |
| 818. A reviewer responding to Mr. Briscoe's 360 Peer Review suggested that Mr. Briscoe needs to "d]emonstrate professionalism in all work environments."<br><br>**ROGERS DECL. ¶ 14, EX. G.** | Undisputed that this is one comment in the "360".<br><br>**Disputed** that the comment is performance worthy.  The purpose and intent of the 360 to which Plaintiff agreed to participate was never to be used as a performance evaluation tool for Defendant.  Defendant has selectively picked and cited to anything that it can make appear to be negative and ignored all of the many positive comments.<br><br>**AMF # 1007-1012**;<br>Defendant used the 360 solely as a tool |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| | against Plaintiff, which was never its intent or purpose |
| | **UF # 79-83** |
| | Defendant intentionally omitted the numerous positive comments (over 37) contained in the 360. |
| | **AMF # 1014-1030** |
| | The 360 was an assessment by peers (not of Licensees with whom Plaintiff interacted more frequently) who only interacted with Plaintiff on an infrequent basis, and some of whom would envy Plaintiff's selection for important leadership roles as opposed to them. |
| | **AMF # 1007-1012** |
| | No LSDM other than Plaintiff was the subject of a 360 Survey. |
| | **AMF # 1012** |
| 819. Mr. Briscoe's response to the comments in his 360 review was he "absorbed them," but did not feel he needed to make adjustments based on the feedback.<br><br>**PLF.'S DEP., 268:19-269:15.** | Undisputed |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| 820.  Mr. Briscoe never drafted his PDP.<br><br><br>**PLF.'S DEP., 269:16-17; ROGERS DECL. ¶ 20.** | Undisputed |
| 821.  On March 30, 2015, Starbucks issued Mr. Briscoe a Performance Concerns and Expectations Memorandum ("March 30 Memo")<br><br><br>**PLF.'S DEP. 261:11-262:3, EX. 9; ROGERS DECL. ¶16, EX. J; RIVERS DECL. ¶ 18.** | Undisputed |
| 822.  On May 6, 2015, Rivers advised Heidi Sundquist ("Sundquist"), another Partner Resources Manager, about the May 6th Vons Complaint.<br><br>**RIVERS DECL. ¶ 19; DECLARATION OF HEIDI SUNDQUIST ("SUNDQUIST DECL.") ¶ 7, EX. A.** | Undisputed, but the "Von" complaint was for Plaintiff doing what he was duty-bound to do.<br>AMF # 987-999 |
| 823.  On May 12, 2015, Starbucks decided to place Mr. Briscoe on a | Undisputed, but Plaintiff Disputes that a "PIP" was proper, noting that Defendant |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| Performance Improvement Plan ("PIP")<br><br><br>**RIVERS DECL. ¶ 19, SUNDQUIST DECL. ¶ 7, EX. A, ¶ 8.** | continued to exhibit recognition of his excellent performance and Leadership by continuing to select and assign him to high profile and important leadership roles.<br>AMF # 934-946 |
| 824. Starbucks maintains policies and procedures for issuing a PIP including Performance Improvement Plan Best Practices, and the Performance Improvement Plan Template.<br><br>**SUNDQUIST DECL. ¶ 8, EXS. B-C.** | Undisputed |
| 825. On June 4, 2015, Rivers and Heidi Sundquist, issued Mr. Briscoe the PIP during an in-person meeting.<br><br>**PLF.'S DECL., 262:13-25; SUNDQUIST DECL. ¶ 9, EX. D; RIVERS DECL. ¶ 19.** | Undisputed, but the PIP was improper because it was supported by false claims by Rivers.<br>AMF # 874-946<br>Of 5 LSDM who are racial minorities, two have filed lawsuits, one filed internal claims alleging discrimination, and one has verbally reported feeling discriminated against by Rivers, who assists Caucasians with promotions and promotional opportunities, but never assisted Plaintiff or any other racial minority, before Plaintiff filed his |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| | lawsuit.<br>AMF # 896-898; 899-903; 915-924; 1050-1053 |
| 826.   On June 9, 2015, Mr. Briscoe had a meeting with Rivers and Sundquist wherein he provided his response to the PIP.<br><br>**SUNDQUIST DECL. ¶ 10, EX. E.** | Undisputed |
| 827.   Mr. Briscoe's June 9, 2015, response to the PIP demanded that Starbucks conduct an independent investigation into "unfair treatment and consciously biased actions and behaviors towards [him]" by Rivers.<br><br>**SUNDQUIST DECL. ¶ 10, EX. E.** | Undisputed |
| 828.   During the June 9, 2015, meeting, Mr. Briscoe told Rivers and Sundquist that he had recorded everything that was discussed at the meeting without our knowledge and/or consent.<br><br>**SUNDQUIST DECL. ¶ 10; RIVERS DECL. ¶ 20.** | Undisputed that Plaintiff disclosed to Rivers and Sundquist that he had recorded some 6-10 conversations at different times and offered to play the recordings for them to listen and hear the confirmation of his claims that Rivers was discriminating and retaliating against him once he began pursuing promotion.  They declined Plaintiff's |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| | offer to listen to the recordings and later told Plaintiff that the recordings were illegal, causing Plaintiff to believe that Defendant was saying that it did not want to hear his confirmatory recordings, and that the recordings were worthless. AMF # 1057 |
| 829.   During the June 9, 2015, meeting, Mr. Briscoe also told Rivers and Sundquist that in the past he recorded many of his conversations with us without our knowledge and/or consent.<br><br>**SUNDQUIST DECL. ¶ 10; RIVERS DECL. ¶ 20.** | Undisputed that Plaintiff disclosed to Rivers and Sundquist that he had recorded some 6-10 conversations at different times, and offered to play the recordings for them to listen and hear the confirmation of his claims that Rivers was discriminating and retaliating against him once he began pursuing promotion.  They declined Plaintiff's offer to listen to the recordings and later told Plaintiff that the recordings were illegal, causing Plaintiff to believe that Defendant was saying that it did not want to hear his confirmatory recordings, and that the recordings were worthless. AMF # 1057 |
| 830.  Mr. Briscoe also recorded his conversations with Rogers without her knowledge and consent. | Undisputed |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| **ROGERS DECL. ¶ 18.** | |
| 831.  The earliest Mr. Briscoe alleges he made any complaint about improper conduct at Starbucks was in December 2014.<br><br>**PLF.'S DEP., 277:6-278:6.** | Undisputed that Plaintiff alleged race discrimination to Defendant's HR Representative, December of 2014. |
| 832.  On June 12, 2015, Starbucks engaged an independent investigator to investigate Mr. Briscoe's claims.<br><br>**DECLARATION OF EMILY SCHULTZ ("SHULTZ DECL.") ¶ 2, EX. A; SUNDQUIST DECL. ¶ 12, EX. G.** | Undisputed |
| 833.  On June 10, 2015, Mr. Briscoe's PIP was put on hold pending the outcome of the investigation.<br><br>**SUNDQUIST DECL. ¶ 12, EX. G.** | Disputed<br>Plaintiff was blocked from pursuing any promotions or being considered for promotional opportunities, earning pay increases and bonuses, because the PIP is a bar to them.<br>AMF # 914, 950 |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
|  | Plaintiff was still being tapped assist Starbucks with important Leadership assignments requiring knowledge of the Business, excellent communication, analytical and leadership skills, at the same time that Rivers was claiming Plaintiff's performance was unacceptable (a contradiction). AMF # 934-946 |
| 834.  As part of her investigation into Mr. Briscoe's claims, the independent investigator conducted in-depth interviews of five witnesses.<br><br>**SHULTZ DECL. ¶ 3.** | Disputed as a recent fabrication. Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made. Plaintiff's Depo 244:15-245:2; 246:17-247:4 |
| 835.  As part of her investigation into Mr. Briscoe's claims, the independent investigator reviewed relevant documents provided by Starbucks including emails provided by Mr. Briscoe, Rivers, and Sundquist, and the documents attached to Mr. Briscoe's | Disputed as a recent fabrication. Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| June 9, 2015, complaint.<br><br>**SHULTZ DECL. ¶ 4.** | results being made.<br>Plaintiff's Depo 244:15-245:2; 246:17-247:4 |
| 836. The independent investigator completed her investigation on July 27, 2015.<br><br>**SHULTZ DECL. ¶ 10.** | Undisputed |
| 837. At the conclusion of her investigation, the independent investigator drafted an investigation report that detailed the findings of her investigation.<br><br>**SHULTZ DECL. ¶ 5.** | Disputed as a recent fabrication. Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made.<br>Plaintiff's Depo 244:15-245:2; 246:17-247:4 |
| 838. The independent investigator's report focused on Mr. Briscoe's allegations of unfair treatment and unfair labor practices, discrimination, harassment and "consciously biased actions and behaviors" by Rivers. | Disputed as a recent fabrication. Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made. |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| **SHULTZ DECL. ¶ 6.** | Plaintiff's Depo 244:15-245:2; 246:17-247:4 |
| 839.   The   independent   investigator determined Mr. Briscoe's claims against Rivers were unsubstantiated.<br><br><br>**SHULTZ DECL. ¶ 7.** | Disputed as a recent fabrication. Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made.<br>Plaintiff's Depo 244:15-245:2; 246:17-247:4 |
| 840.   The   independent   investigator determined:<br>"The facts do not show Ms. Rivers engaged in consciously biased actions and behaviors, discrimination or harassment toward Mr. Briscoe. Mr. Briscoe also did not identify race, gender or any other such category as the basis for the treatment. There is no indication Ms. Rivers treated him in a consciously biased way, or that she treated Mr. Briscoe differently than other DMs on her team."<br><br>**SHULTZ DECL. ¶ 7.A.** | Disputed as a recent fabrication. Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made.<br>Plaintiff's Depo 244:15-245:2; 246:17-247:4<br>Plaintiff identified race discrimination to S. Rogers at his one-on-one in December, 2014.<br>AMF # 1059 |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| 841. The independent investigator determined:<br><br>"The facts do not support Mr. Briscoe's claim of unfair treatment. DMs [] who Mr. Briscoe believes are favored by Ms. Rivers, are top performers and/or take advantage of the career development opportunities given by Ms. Rivers, unlike Mr. Briscoe. In addition, Ms. Rivers has given Mr. Briscoe a great deal of recognition and many opportunities for growth and development in his career at Starbucks."<br><br>**SHULTZ DECL. ¶ 7.B.** | Disputed as a recent fabrication. Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made.<br><br>Plaintiff's Depo 244:15-245:2; 246:17-247:4 |
| 842. The independent investigator determined "[t]he facts showed there was a legitimate basis for Mr. Briscoe's PIP" because:<br><br>• "At the request of Marriott, in May 2014 Ms. Rivers removed Mr. Briscoe from the Marriott account because of his improper handling of a non-compliance situation at one of its hotels and his failure to accept responsibility for the incident. | **Disputed** as a recent fabrication and false and unsupportable finding. Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made.<br><br>**Plaintiff's Depo 244:15-245:2; 246:17-247:4; 188:21-189:11;** |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| • Mr. Briscoe trained and certified licensed store employees as baristas at the Residence Inn for the New Store Opening (NSO). Ms. Rivers discovered those baristas could not ring up drinks and did not know how to make drinks correctly, and she wanted the store shutdown.<br><br>• Von's [sic] and Ralph's [sic] complained to Ms. Rivers about Mr. Briscoe, including that he "was a jerk" and he failed to attend scheduled meetings with them.<br><br>• Mr. Briscoe repeatedly provided inaccurate data to Ms. Rivers, including incorrect sales figures, even after they discussed the approach on a given topic and how it should be communicated.<br><br>• Despite extensive coaching by Ms. Rivers and PRM Sarah Rogers, Mr. Briscoe failed to accept responsibility for his actions, did not improve in the areas Ms. Rivers coached him about, he was not self-aware and he did not incorporate the | Plaintiff was told by Rivers that he did nothing wrong at Marriott and that his situation was similar to that of Matt Scruggs (Caucasian).  Scruggs was assisted by Rivers with promotion. **AMF # 975-983;** Rivers lied about the entire Residence Inn situation, including her claim that the store had to shut down. **AMF # 1000-1006;** As to Vons, Rivers lied about Plaintiff for merely doing his job of monitoring and making certain that the Licensee was compliant with Coffee (product) Availability, as he was required to do. Rivers lied claiming there was a "Starbuck Policy" prohibiting texting to a cell phone. **AMF # 987-999** Plaintiff's performance remained excellent throughout his employment as supported by his performance evaluations (Exhibits - 5 and 6), his revenue generation constituting one-third of Rivers' Region's revenues which had 10 to 12 District Managers in the Region |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| feedback they provided."<br><br><br>**SHULTZ DECL. ¶ 8.** | (Exhibit- 3), an Plaintiff's continued selection for high profile assignments and important Leadership roles, right through to his separation in 2015.<br>**AMF # 881-891; 934-946** |
| 843.  The  independent  investigator recommended  that  Starbucks  reinstate the PIP.<br><br><br>**SHULTZ DECL. ¶ 9.** | **Disputed** as a recent fabrication and false and unsupportable finding. Plaintiff was told by Shultz that the investigation was complete and that Starbucks would be getting in touch with Plaintiff, but no one ever did and this SJ is the first time that Plaintiff has seen or heard any claim about the contents of the results being made.<br>**Plaintiff's Depo 244:15-245:2; 246:17-247:4: 188:21-189:11;**<br>Plaintiff was told by Rivers that he did nothing wrong at Marriott and that his situation was similar to that of Matt Scruggs (Caucasian).  Scruggs was assisted by Rivers with promotion.<br>**AMF # 975-983;**<br>Rivers lied about the entire Residence Inn situation, including her claim that the store had to shut down.<br>**AMF # 1000-1006;** |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| | As to Vons, Rivers lied about Plaintiff for merely doing his job of monitoring and making certain that the Licensee was compliant with Coffee (product) Availability, as he was required to do. Rivers lied claiming there was a "Starbuck Policy" prohibiting texting to a cell phone. **AMF # 987-999** Plaintiff's performance remained excellent throughout his employment as supported by his performance evaluations (Exhibits - 5 and 6), his revenue generation constituting one-third of Rivers' Region's revenues which had 10 to 12 District Managers in the Region (Exhibit- 3), an Plaintiff's continued selection for high profile assignments and important Leadership roles, right through to his separation in 2015. **AMF # 881-891; 934-946** |
| 844.  On July 20, 2015, Mr. Briscoe resigned from his employment with Starbucks.<br><br>**SUNDQUIST DECL. ¶ 20, EX. H.** | Undisputed that Plaintiff resigned because Rivers was constantly attacking him with false performance claims and suggesting that he couldn't do anything right, couldn't do emails, food |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
|  | warming…couldn't do anything, (when all the while, Rivers was assigning him to high profile and very important Leadership roles in recognition of his outstanding performance),  and Defendant was doing nothing to address Plaintiff's complaints of race discrimination, except to allow Rivers to retaliate against him. **Plaintiff's Depo 188:21-189:11; UF # 136-144(below).** |
| 845.  At  the  time  of  Mr.  Briscoe's resignation, he had been offered, and had  accepted,  a  job  at  Jack  in  the  Box Inc. **PLF.'S    DEP.  206:12-15;  209:6-10; 309:24-310:9, EX. 45.** | Undisputed |
| 846.  Mr.  Briscoe's  starting  salary  at Jack in the Box Inc. was $120,000 per annum (not inclusive of bonuses). **PLF.'S    DEP.,    302:13-15;    309:24-310:9, EX. 45.** | Undisputed |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| 847.  At the time of his resignation from Starbucks, Mr. Briscoe's annual salary at Starbucks was approximately $95,963.64 per annum (not including performance bonuses).<br><br><br>**ROGERS DECL. ¶ 22.** | Undisputed, but Plaintiff's bonus potential (quarterly payments rather than annually), stock and benefits were superior at Starbucks, and Starbucks as a Brand was Plaintiff's preferred career path.  Plaintiff took meaningful cut in salary compensation to leave his job at Burger King to accept the Starbucks position, because of the upside career and earnings potential and because he wanted to leave "fast food".  Also, at Starbucks, Plaintiff was in a "ready for promotion" posture, with four year of background and Plaintiff had begun making contact with License Stores VP for the United Kingdom.  At Jack in the Box, Plaintiff had to start from scratch. AMF # 1060 |
| 848.  Mr.    Briscoe's    discrimination claims are based solely on the conduct of Rivers.<br><br><br>**PLF.'S DEP., 143:15-21.** | Undisputed |
| 849.  With respect to whether Mr. Briscoe's    belief    that    Rivers discriminated   against   was   based   on | Undisputed in part, but Plaintiff also testified:<br>Plaintiff testified that he was well |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| something specific, Mr. Briscoe acknowledged: "I don't know. I asked that question myself and couldn't get an understanding why I started getting this treatment. So I don't know why." | accepted by Rivers as long as he stayed in his place and did not try to advance, but that Rivers intentionally and discriminatorily tried to hold him back when he sought promotion like the Caucasians on Rivers team, and that race was the reason. |
| **PLF.'S DEP., 144:7-12.** | **Plaintiff's Depo 306:8-307:10**<br>Plaintiff also testified as follows:<br>Q. Do you think it was because of your race?<br>A. I do.<br>Q. Why?<br>A. I do. Other employees that were non-black weren't being treated the way that I was being treated.<br>…<br>Q. Who specifically are you referring to?<br>A. Barb Holdgrafer, Deanna Pusatier, Kevin Dockery, Tammy Hereford, Ashley Larson, Erica Hernandez.<br>Q. Anybody else?<br>A. Donna Hernandez.<br>**Plaintiff's Depo 144:13-23.** |
| 850.  With respect to his belief that | Plaintiff testified that he believed that |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| Rivers discriminated against him, Plaintiff acknowledged he "do[esn't] know why things changed . . . I asked that question myself and couldn't get an understanding why I started getting this treatment.  So I don't know why."  **PLF.'S DEP., 144:7-12.** | Rivers was discriminating against him and that he reported same to Rogers as early as December, 2014  **Plaintiff's Depo 144:13-23; 277:6-278:2;**  Plaintiff testified that he was accepted and credited by Rivers as long as he stayed in his place and did not try to advance, but that Rivers intentionally and discriminatorily tried to hold him back when he sought promotion like the Caucasians on Rivers team, and race was the reason.  **Plaintiff's Depo 306:8-307:10** |
| 851.  Mr.  Briscoe acknowledged he does not know who at Starbucks actually issued, approved, or drafted the PIP.  **PLF.'S DEP., 263:6-17.** | Undisputed but Irrelevant because, Plaintiff knows Rivers supervised his work activities and that Rivers made numerous the false claims against him which support the PIP.  AMF # 904-933; 949-952; 974-1007; 1048-1049; |
| 852.   The decision to issue the PIP was actually made in consultation with Partner Resources personnel, not Rivers alone. | Undisputed but Irrelevant because, Plaintiff knows Rivers supervised his work activities and that Rivers made the false claims against him which support |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| **SUNDQUIST DECL. ¶ 7, EX. A.** | the PIP.<br><br>AMF # 904-933; 949-952; 974-1007; 1048-1049; |
| 853. Mr. Briscoe acknowledges his retaliation claim is based on the discriminatory actions he claims happened to him.<br><br>**PLF.'S DEP., 144:7-12; 214:21-215:14.** | Plaintiff testified that Rivers was constantly attacking him with false performance claims and suggesting that he couldn't do anything right, couldn't do emails, warm food, send a text message, check to see if Licensees were stocked with product, ask Licensees to comply with Starbucks' standards…couldn't do anything, (when all the while, Rivers was assigning him to high profile and very important Leadership roles in recognition of his outstanding performance), and Defendant was doing nothing to address Plaintiff's complaints of race discrimination, except to allow Rivers to retaliate against him. **Plaintiff's Depo 188:21-189:11; UF # 136-144(below).** |
| 854. Rivers has no hiring authority outside of her team. | Undisputed, but she could support and assist District Managers on her team who sought promotion,  and she had supported and assisted Caucasian District |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| **RIVERS DECL. ¶ 10; MITTAL DECL. ¶ 4, EX. B[18] (DEPOSITION OF ANGELA RIVERS ("RIVERS' DEP."), 105:23-106:5.** | Managers promote, but did not support and assist Plaintiff or other racial minorities during Plaintiff's tenure. AMF # 896-898, 974, 899-903, 912, 914-929, 932. |
| 855.  Rivers did not know Mr. Briscoe had applied for a subsequent BDM position until this lawsuit was filed.<br><br>**RIVERS DECL. ¶ 11.** | Disputed<br>Plaintiff personally told Rivers that he had again applied for the BDM position, and she appeared upset with Plaintiff , and told him: "well I didn't know that you were going to do that."<br> AMF 928 and 929 |
| 856.  Mr. Briscoe acknowledged that Leah Bernard, one of the seven partners he claims received preferential treatment from Rivers, is African American.<br><br>**PLF.'S DEP., 33:7-35:11, 67:23-24; RIVERS DECL. ¶ 4.** | **Undisputed** that L. Bernard is an African American.<br>**Disputed** that Bernard was the recipient of any preferential treatment before Plaintiff's allegations of discrimination and filing of a legal action.  Bernard has been the beneficiary of claims against Rivers by Plaintiff and other racial minorities.  Rivers provided no promotional support and/or assistance to racial minorities on her team during Plaintiff's tenure. |

---

[18] All further excerpts from Ms. Rivers' deposition are attached as Exhibit B to the Declaration of Jyoti Mittal.

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| | **AMF # 896-898, 974, 899-903, 912, 914-929, 932.** Rivers assisted Caucasians with promotions and promotional opportunities, but she never assisted any racial minority with promotions or promotional opportunity during Plaintiff's tenure. **AMF # 896-899** |
| 857.  Mr. Briscoe claims partners on Rivers' team received opportunities he did not, including "elevation," promotion and/or additional responsibilities. **PLF.'S DEP., 33:7-35:11; 35:24-39:6; 150:13-152:25; 221:15-223:16.** | Undisputed |
| 858.  Mr. Briscoe acknowledges he did not apply for the positions he claims partners on Rivers' team received instead of him. **PLF.'S DEP., 221:15-223:16.** | **Undisputed, but** Rivers did not support or assist Plaintiff in his promotional efforts; she actively blocked Plaintiff from pursuit of the positions for which he applied; and she refused to offer assistance when Plaintiff requested it. **AMF # 912, 925-929;** Rivers also used PIPs to block other |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| | racial minorities on her team from promoting, while she supported and assisted Caucasians in obtaining promotions. **AMF # 896-898, 974, 899-903, 912, 914-929, 932.** |
| 859. Mr. Briscoe acknowledges that the promotions he claims partners on Rivers' team received instead of him occurred after he resigned from Starbucks.<br><br>**PLF.'S DEP. 222:1-11.** | Disputed<br>Rivers herself testified that she supported the promotions of Dockery, Scruggs, Pusatier, and other Caucasians during Plaintiff's tenure. **AMF # 896** |
| 860. Mr. Briscoe acknowledges that the opportunities he claims went to other partners instead of him went to partners far more senior to him at Starbucks.<br><br>**PLF.'S DEP., 48:3-10; 144:13-147:2.** | Undisputed but totally Irrelevant Starbucks had no policy that made "seniority" a factor in promotional considerations. **AMF # 1061** |
| 861. Rivers appointed Mr. Briscoe to the Disney Star Team in 2011.<br><br>**RIVERS DECL. ¶ 23.** | Undisputed, and an illustration that Rivers recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This high profile and important leadership assignment is an exhibition that Plaintiff was a recognized |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| | outstanding performer. |
| 862.   Rivers appointed Mr. Briscoe to the Disney Star Team in 2012.<br><br>**RIVERS DECL. ¶ 23.** | Undisputed, and an illustration that Rivers  recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This  high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 863.   Rivers nominated Mr. Briscoe as DM of the Quarter in 2012.<br><br>**RIVERS DECL. ¶ 23.** | Undisputed, and an illustration that Rivers  recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This  high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 864.   Rivers nominated Mr. Briscoe as DM of the Quarter in 2013.<br><br>**RIVERS DECL. ¶ 23.** | Undisputed, and an illustration that Rivers  recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This  high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 865.   Rivers appointed Mr. Briscoe as | Undisputed, and an illustration that |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| Annual Operating Plan Pillar Lead in 2014.<br><br><br><br>**RIVERS DECL. ¶ 23.** | Rivers recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 866. Rivers selected Mr. Briscoe to highlight and tour one of his locations with the United States Leadership team in 2014.<br><br><br>**RIVERS DECL. ¶ 23.** | Undisputed, and an illustration that Rivers recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 867. Rivers appointed Mr. Briscoe as Annual Operating Plan Pillar Lead 2015 Our Coffee and Our Food, including Evenings and Refreshment (supporting peer DM).<br><br>**RIVERS DECL. ¶ 23.** | Undisputed, and an illustration that Rivers recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 868. Rivers selected Mr. Briscoe as highlighted in a partner appreciation week in Q2 of 2015 for specific support | Undisputed, and an illustration that Rivers recognized Plaintiff's excellence, in communication, leadership, |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| of a senior leader visit.<br><br>**RIVERS DECL. ¶ 23.** | interpersonal skills and professionalism. This high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 869. Rivers selected Mr. Briscoe's USC location for a March 2015 tour with the United States Leadership team.<br><br>**RIVERS DECL. ¶ 23.** | Undisputed, and an illustration that Rivers recognized Plaintiff's excellence, in communication, leadership, interpersonal skills and professionalism. This high profile and important leadership assignment is an exhibition that Plaintiff was a recognized outstanding performer. |
| 870. Starbucks has policies and procedures that specifically prohibit discrimination, harassment, and retaliation. Attached as Exhibit A are true and correct copies of these policies.<br><br>**ROGERS DECL. ¶ 5, EX. A.** | Undisputed, but Starbucks has allowed Rivers to discriminate against racial minorities (Nelson, Hernandez and Plaintiff) with impunity.<br>AMF 915-924; 949-952. |
| 871. Regional Directors, such as Angela Rivers, are not officers or directors of Starbucks, do not have any power to manage high level corporate affairs, and have no authority to influence or affect corporate policy. | Disputed<br>Rivers clearly made and/or influenced Corporate Policy.<br>UF #54; Rivers' Dec ¶ 19.<br>Rivers stated in her declaration and Defendant asserted it as a fact for the |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| **SUNDQUIST DECL. ¶ 4; RIVERS DECL. ¶ 3.** | purpose of this SJ that: "It is against Starbucks Policy to text third party Licensee employees on their personal cellular phones." UF #54; Rivers' Dec ¶ 19. Plaintiff knows that there was no Starbucks Policy that prohibited a District Manager from "text[ing] third party Licensee employees on their personal cellular phones." AMF # 987 Rivers alone formulated and without notice or announcement enforced this so called "Starbucks' Policy" against Plaintiff. UF #54; Rivers' Dec ¶ 19. Rivers managed an entire District and a large number of Starbuck's Managers who, themselves managed geographical Districts. AMF # 879 |
| 872. As a Partner Resources Manager, Rogers was not an officer or director of Starbucks, did not have any power to manage high level corporate affairs, and had no authority to influence | Disputed Rivers clearly made and/or influenced Corporate Policy. UF #54; Rivers' Dec ¶ 19. Rivers stated in her declaration and |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| or affect corporate policy<br><br>**ROGERS DECL. ¶ 4.** | Defendant asserted it as a fact for the purpose of this SJ that: "It is against Starbucks Policy to text third party Licensee employees on their personal cellular phones."<br>UF #54; Rivers' Dec ¶ 19.<br>Plaintiff knows that there was no Starbucks Policy that prohibited a District Manager from "text[ing] third party Licensee employees on their personal cellular phones."<br>AMF # 987<br>Rivers alone formulated and without notice or announcement enforced this so called "Starbucks' Policy" against Plaintiff.<br>UF #54; Rivers' Dec ¶ 19.<br>Rivers managed an entire District and a large number of Starbuck's Managers who, themselves managed geographical Districts.<br>AMF # 879 |
| 873.   As a Partner Resources Manager, Sundquist was not an officer or director of Starbucks, did not have any power to manage high level corporate affairs, and | Disputed<br>Rivers clearly made and/or influenced Corporate Policy.<br>UF #54; Rivers' Dec ¶ 19. |

| UNCONTROVERTED FACTS[16] | SUPPORTING EVIDENCE |
|---|---|
| had no authority to influence or affect corporate policy.<br><br>**SUNDQUIST DECL. ¶ 3.** | Rivers stated in her declaration and Defendant asserted it as a fact for the purpose of this SJ that:  "It is against Starbucks Policy to text third party Licensee employees on their personal cellular phones."<br>UF #54; Rivers' Dec ¶ 19.<br>Plaintiff knows that there was no Starbucks Policy that prohibited a District Manager from "text[ing] third party Licensee employees on their personal cellular phones."<br>AMF # 987<br>Rivers alone formulated and without notice or announcement enforced this so called "Starbucks' Policy" against Plaintiff.<br>UF #54; Rivers' Dec ¶ 19.<br>Rivers managed an entire District and a large number of Starbuck's Managers who, themselves managed geographical Districts.<br>AMF # 879 |

## CONCLUSIONS OF LAW

Based on the foregoing Uncontroverted Facts, the following Conclusions of

1

2

Law should be made:

3

4

5

6

7

8

9

10

11

12

13

14

     1.    Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file…show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56.  A claim has no merit if a defendant demonstrates that one or more of the elements of a cause of action cannot be established.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once a defendant makes such a showing, the burden shifts to the plaintiff to show that a "genuine issue[] of material fact" exists by "produc[ing] at least some significant probative evidence tending to support the complaint." *Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 959, 963 (9th Cir. 1990).  A plaintiff may not rely upon the mere allegations in the pleadings to show that a genuine issue exists, but must offer "specific facts showing that there is a genuine issue for trial." *Id.* at 322.

15

**PLAINTIFF'S RESPONSE TO CONCLUSION OF LAW NO. 1:**

16

17

18

19

20

21

22

23

24

25

26

     This is a correct general statement of the law but it is **empty** because it does not exhibit or suggest an application of the facts to it. Plaintiff is at a loss for how to meaningfully respond, except to quote other general statements of law.  The fact is that burdened with the duty to demonstrate that one of more elements of any or all the causes of action cannot be established, Defendant has failed to do so.  For that reason alone, the Summary Judgment motion should be denied.  As detailed above and in Plaintiff's Additional Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment, there are significant material facts in dispute that preclude summary judgment or partial summary judgment. Plaintiff has established genuine disputes of material fact as to each claim. Plaintiff has presented "specific facts showing that there is a genuine issue for trial" as to all causes of action.

27

28

     2.    Courts analyze discrimination claims under a three-step burden shifting

framework.  To succeed on a claim of discrimination, a plaintiff must first establish a *prima facie* case of discrimination by showing (1) he is a member of a protected category; (2) he was performing competently in the position he held; (3) he suffered an adverse employment action; and (4) the circumstances suggest a discriminatory motive for the adverse employment action.  *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 355 (2000); *Douglas v. Anderson*, 656 F.2d 528, 531 (9th Cir. 1981).

### **PLAINTIFF'S RESPONSE TO CONCLUSION OF LAW NO. 2:**

This is a correct general statement of the law but it is **empty** because it does not exhibit or suggest an application of the facts to it. Plaintiff is at a loss for how to meaningfully respond, except to quote other general statements of law.  The fact is that burdened with the duty to demonstrate that one of more elements of any or all the causes of action cannot be established, Defendant has failed to do so.  For that reason alone, the Summary Judgment motion should be denied.  As detailed above and in Plaintiff's Additional Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment, there are significant material facts in dispute that preclude summary judgment or partial summary judgment. Plaintiff has established genuine disputes of material fact as to each claim. Plaintiff has presented "specific facts showing that there is a genuine issue for trial" as to all causes of action.

Further, while the elements of a *prima facie* case of unlawful discrimination vary depending on the circumstances, generally, in order to prove discrimination the employee must first present evidence showing that: (a) the employee was a member of a protected class;  (b) the employee was qualified for the position sought or was competently performing in the position; (c) plaintiff suffered an adverse employment action; (d) the action taken against the employee occurred under circumstances suggesting a discriminatory motive (e.g., persons outside the protected class were treated more favorably with respect to the terms, benefits or privileges of employment).  *Guz v. Bechtel National, Inc.*, 24 Cal.4th 317, 356 (2000).

1

2    The analysis under this framework is elastic and not rigid to take into account

3    different factual situations rather than just a failure to hire, termination or failure to

4    promote types of cases.  *Guz, supra*, 24 Cal.4th at 367.

5    Plaintiff has presented specific facts establishing genuine disputes of material

6    fact as to elements (b), (c) and (d) of the prima face case,  for jury determination.

7

8    3.    Only once a plaintiff has established the elements of a *prima facie* case

9    does the burden shift to the employer to articulate a legitimate, non-discriminatory

10   reason for the adverse action.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792,

11   802-05 (1973); *Horn v. Cushman & Wakefield Western Inc.*, 72 Cal. App. 4th 798,

12   805-06 (1999).  The plaintiff is then faced with the burden to prove by substantial

13   evidence—***and not by speculation***—that the legitimate reason proffered by the

14   employer was not its true reason, but was merely a pretext for discrimination.

15   *McDonnell Douglas Corp.*, 411 U.S. at 802-05.  At all times, the plaintiff retains the

16   burden of persuading the trier-of-fact that he was subjected to discrimination.  *Id.;*

17   *Guz*, 24 Cal. 4th at 356.

18   **PLAINTIFF'S RESPONSE TO CONCLUSION OF LAW NO. 3:**

19   This is a correct general statement of the law but it is **empty** because it does not

20   exhibit or suggest an application of the facts to it. Plaintiff is at a loss for how to

21   meaningfully respond, except to quote other general statements of law.  The fact is

22   that burdened with the duty to demonstrate that one of more elements of any or all the

23   causes of action cannot be established, Defendant has failed to do so.  For that reason

24   alone, the Summary Judgment motion should be denied.  As detailed above and in

25   Plaintiff's Additional Statement of Material Facts in Opposition to Defendant's

26   Motion for Summary Judgment, there are significant material facts in dispute that

27   preclude summary judgment or partial summary judgment. Plaintiff has established

28   genuine disputes of material fact as to each claim. Plaintiff has presented "specific

facts showing that there is a genuine issue for trial" as to all causes of action.

Moreover, Defendant's attempt to apply "the burden of persuading the trier-of-fact" to SJ evaluation is misplaced.  Here, Plaintiff's burden was to establish the existence of material disputes of facts relative to the claims warranting jury determination.  Plaintiff has met that burden.

4.     To meet this initial burden the plaintiff must "produce evidence that, taken as a whole, permits a rational inference that intentional discrimination was a *substantial* motivating factor in the employer's actions toward the plaintiff." *Horsford v. Bd. of Tr. of Cal. State Univ.*, 132 Cal. App. 4th 359, 377 (2005) (emphasis added).

**PLAINTIFF'S RESPONSE TO CONCLUSION OF LAW NO. 4:**

This is a correct general statement of the law but it is **empty** because it does not exhibit or suggest an application of the facts to it. Plaintiff is at a loss for how to meaningfully respond, except to quote other general statements of law.  The fact is that burdened with the duty to demonstrate that one of more elements of any or all the causes of action cannot be established, Defendant has failed to do so.  For that reason alone, the Summary Judgment motion should be denied.  As detailed above and in Plaintiff's Additional Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment, there are significant material facts in dispute that preclude summary judgment or partial summary judgment. Plaintiff has established genuine disputes of material fact as to each claim. Plaintiff has presented "specific facts showing that there is a genuine issue for trial" as to all causes of action.

Moreover, Defendant's attempt to apply "the burden of persuading the trier-of-fact" to SJ evaluation is misplaced.  Here, Plaintiff's burden was to establish the existence of material disputes of facts relative to the claims warranting jury determination.  Plaintiff has met that burden.

5.      Under the Fair Employment and Housing Act ("FEHA"), an "adverse employment action" must materially affect the terms, conditions or privileges of employment.  *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1050-52 (2005).  "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation."  *Thomas v. Dept. of Corr.*, 77 Cal. App. 4th 507, 511 (2000) (citing *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)).   An adverse employment action "must be more disruptive than a mere inconvenience or an *alteration of job responsibilities*."   *Id.* at 511 (emphasis added).  "A change that is merely contrary to the employee's interests or not to the employee's liking is insufficient."  *Akers v. Cnty of San Diego*, 95 Cal. App. 4th 1441, 1445 (2002).

**PLAINTIFF'S RESPONSE TO CONCLUSION OF LAW NO. 5**

This is a correct general statement of the law but it is **empty** because it does not exhibit or suggest an application of the facts to it. Plaintiff is at a loss for how to meaningfully respond, except to quote other general statements of law.  The fact is that burdened with the duty to demonstrate that one of more elements of any or all the causes of action cannot be established, Defendant has failed to do so.  For that reason alone, the Summary Judgment motion should be denied.  As detailed above and in Plaintiff's Additional Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment, there are significant material facts in dispute that preclude summary judgment or partial summary judgment. Plaintiff has established genuine disputes of material fact as to each claim. Plaintiff has presented "specific facts showing that there is a genuine issue for trial" as to all causes of action.

In the instant case, Plaintiff (and other racial minorities (Nelson, Black and

Hernandez, Hispanic) were discriminated against was denied promotional opportunities by Rivers who falsified claims to support career blocking PIPs which she issued to the racial minorities.  Rivers, by her own testimony admitted that she assisted Caucasians but, before Plaintiff's lawsuit, could not identify a single racial minority whom she had assisted with promotion.  Plaintiff surrendered a higher paying job to re-brand himself and join Starbucks and, attributable to discriminatory and retaliatory treatment, was forced to resign.  Plaintiff was credited as being a model employee appointed to Leadership Roles and high profile and important assignments, but when he sought equal treatment promotionally, he was treated as a "N…." who has overstepped his bounds.  Take what I give you, but don't ask for anything, seemed to be Rivers' attitude toward racial minorities, including Plaintiff, supported by Defendant.

6.     In a claim for race discrimination based on the plaintiff not getting a job, the plaintiff must show he applied for the job, was qualified, and that after his rejection the position remained open and the employer continued to seek applications from persons of the plaintiff's qualifications.  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981) ("The plaintiff must prove by a preponderance of the evidence that she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination."); *McDonnell Douglas Corp.*, 411 U.S. at 802 (holding that in a claim for racial discrimination, the plaintiff must show "that he applied and was qualified for a job for which the employer was seeking applicants" and "that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications").

**PLAINTIFF'S RESPONSE TO CONCLUSION OF LAW NO. 6**

This is a correct general statement of the law but it is **empty** because it does not

1
2
3
4
5
6
7
8
9
10
11

exhibit or suggest an application of the facts to it. Plaintiff is at a loss for how to meaningfully respond, except to quote other general statements of law.  The fact is that burdened with the duty to demonstrate that one of more elements of any or all the causes of action cannot be established, Defendant has failed to do so.  For that reason alone, the Summary Judgment motion should be denied.  As detailed above and in Plaintiff's Additional Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment, there are significant material facts in dispute that preclude summary judgment or partial summary judgment. Plaintiff has established genuine disputes of material fact as to each claim. Plaintiff has presented "specific facts showing that there is a genuine issue for trial" as to all causes of action.

12
13
14
15
16
17
18
19
20
21
22
23
24

In the instant case, Plaintiff (and other racial minorities (Nelson, Black and Hernandez, Hispanic) were discriminated against was denied promotional opportunities by Rivers who falsified claims to support career blocking PIPs which she issued to the racial minorities.  Rivers, by her own testimony admitted that she assisted Caucasians but, before Plaintiff's lawsuit, could not identify a single racial minority whom she had assisted with promotion.  Plaintiff surrendered a higher paying job to re-brand himself and join Starbucks and, attributable to discriminatory and retaliatory treatment, was forced to resign.  Plaintiff was credited as being a model employee appointed to Leadership Roles and high profile and important assignments, but when he sought equal treatment promotionally, he was treated as a "N…." who has overstepped his bounds.  Take what I give you, but don't ask for anything, seemed to be Rivers' attitude toward racial minorities, including Plaintiff, supported by Defendant.

25
26
27
28

7.    Denial of a position, or a later interview in a department is not an adverse action unless the plaintiff can show the denial had "substantial and material adverse effect on the terms and conditions" of his employment.  *Akers*, 95 Cal. App. 4th at

1445; *Thomas*, 77 Cal. App. 4th at 511 (requiring a "substantial and detrimental effect" on employment); *Watts v. Kroger Co.*, 170 F.3d 505, 511-12 (5th Cir. 1999) ("[E]mployment actions are not adverse where pay, benefits, and level of responsibility remain the same.").

## PLAINTIFF'S RESPONSE TO CONCLUSION OF LAW NO. 7

This is a correct general statement of the law but it is **empty** because it does not exhibit or suggest an application of the facts to it. Plaintiff is at a loss for how to meaningfully respond, except to quote other general statements of law. The fact is that burdened with the duty to demonstrate that one of more elements of any or all the causes of action cannot be established, Defendant has failed to do so. For that reason alone, the Summary Judgment motion should be denied. As detailed above and in Plaintiff's Additional Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment, there are significant material facts in dispute that preclude summary judgment or partial summary judgment. Plaintiff has established genuine disputes of material fact as to each claim. Plaintiff has presented "specific facts showing that there is a genuine issue for trial" as to all causes of action.

In the instant case, Plaintiff (and other racial minorities (Nelson, Black and Hernandez, Hispanic) were discriminated against was denied promotional opportunities by Rivers who falsified claims to support career blocking PIPs which she issued to the racial minorities. Rivers, by her own testimony admitted that she assisted some 6 Caucasians with promotions but, before Plaintiff's lawsuit, could not identify a single racial minority whom she had assisted with promotion. Plaintiff surrendered a higher paying job to re-brand himself and join Starbucks and, attributable to discriminatory and retaliatory treatment, was forced to resign. Plaintiff was credited as being a model employee appointed to Leadership Roles and high profile and important assignments, but when he sought equal treatment promotionally, he was treated as a "N...." who has overstepped his bounds. Take what I give you,

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

but don't ask for anything, seemed to be Rivers' attitude toward racial minorities, including Plaintiff, supported by Defendant.

8.      Additionally, a written warning or negative review does not rise to the level of an adverse employment action because it has no "effect on the terms and conditions" of employment.  *See McRae v. Department of Corrections & Rehabilitation,* 142 Cal. App. 4th 377, 392 (2006) (holding that a letter of instruction did not rise to the level of an adverse employment action).  Specifically, courts hold "[e]mployers need to be able to manage employees without fear that routine employment decisions, or attempts at improving employee performance, will lead to litigation." *Id.* at 387.  Accordingly, the PIP was not an adverse employment action.  *This is especially true given that it was suspended within one day upon Mr. Briscoe's request for an independent investigation and, therefore, never implemented against Mr. Briscoe*.  [SUF]  *Kortan v. Cal. Youth Authority,* 5 F. Supp. 2d 843, 853 (C.D. Cal. 1998), *aff'd*, 217 F.3d 1104 (9th Cir. 2000) (When plaintiff has not articulated a tangible, negative, change in the terms and conditions of her employment resulting from the PIP, plaintiff cannot establish adverse employment action element of *prima facie* case).

**PLAINTIFF'S RESPONSE TO CONCLUSION OF LAW NO. 8** This is a correct general statement of the law but it is **empty** because it does not exhibit or suggest an application of the facts to it. Plaintiff is at a loss for how to meaningfully respond, except to quote other general statements of law.  The fact is that burdened with the duty to demonstrate that one of more elements of any or all the causes of action cannot be established, Defendant has failed to do so.  For that reason alone, the Summary Judgment motion should be denied.  As detailed above and in  Plaintiff's Additional Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment, there are significant material facts in dispute that preclude summary judgment or partial summary

judgment. Plaintiff has established genuine disputes of material fact as to each claim. Plaintiff has presented "specific facts showing that there is a genuine issue for trial" as to all causes of action.

In the instant case, Plaintiff (and other racial minorities (Nelson, Black and Hernandez, Hispanic) were discriminated against was denied promotional opportunities by Rivers who falsified claims to support career blocking PIPs which she issued to the racial minorities. Rivers, by her own testimony admitted that she assisted some 6 Caucasians with promotions, but, before Plaintiff's lawsuit, could not identify a single racial minority whom she had assisted with promotion. Plaintiff surrendered a higher paying job to re-brand himself and join Starbucks and, attributable to discriminatory and retaliatory treatment, was forced to resign. Plaintiff was credited as being a model employee appointed to Leadership Roles and high profile and important assignments, but when he sought equal treatment promotionally, he was treated as a "N…." who has overstepped his bounds. Take what I give you, but don't ask for anything, seemed to be Rivers' attitude toward racial minorities, including Plaintiff, supported by Defendant.


9.    In order to prove that voluntary resignation was an adverse employment action, a plaintiff must prove he was constructively discharged because the employer "either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of [her] resignation that a reasonable employer would realize that a reasonable person in [her] position would be compelled to resign." *Turner v. Anheuser-Busch, Inc.*, 7 Cal. 4th 1238, 1251 (1994).

## PLAINTIFF'S RESPONSE TO CONCLUSION OF LAW NO. 9

This is a correct general statement of the law but it is **empty** because it does not exhibit or suggest an application of the facts to it. Plaintiff is at a loss for how to meaningfully respond, except to quote other general statements of law. The fact is

that burdened with the duty to demonstrate that one of more elements of any or all the causes of action cannot be established, Defendant has failed to do so.  For that reason alone, the Summary Judgment motion should be denied.  As detailed above and in Plaintiff's Additional Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment, there are significant material facts in dispute that preclude summary judgment or partial summary judgment. Plaintiff has established genuine disputes of material fact as to each claim. Plaintiff has presented "specific facts showing that there is a genuine issue for trial" as to all causes of action.

In the instant case, Plaintiff (and other racial minorities (Nelson, Black and Hernandez, Hispanic) were discriminated against was denied promotional opportunities by Rivers who falsified claims to support career blocking PIPs which she issued to the racial minorities.  Rivers, by her own testimony admitted that she assisted some 6 Caucasians with promotions but, before Plaintiff's lawsuit, could not identify a single racial minority whom she had assisted with promotion.  Plaintiff surrendered a higher paying job to re-brand himself and join Starbucks and, attributable to discriminatory and retaliatory treatment, was forced to resign.  Plaintiff was credited as being a model employee appointed to Leadership Roles and high profile and important assignments, but when he sought equal treatment promotionally, he was treated as a "N…." who has overstepped his bounds.  Take what I give you, but don't ask for anything, seemed to be Rivers' attitude toward racial minorities, including Plaintiff, supported by Defendant.

10.    To demonstrate a legitimate nondiscriminatory reason for employment decisions, the employer need only show evidence of the reason for its actions. *Foster v. Arcata Assocs., Inc.*, 772 F.2d 1453, 1459 (9th Cir. 1985) (overruled on other grounds by, *Kennedy v. Allied Mutual Ins. Co.*, 952 F.2d 262 (9th Cir.1991)).  In conducting this inquiry, the question is not whether the decision was based on correct

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

assumptions, but whether the employer reasonably believed its reasons and validly exercised its business judgment. *Guz,* 24 Cal. 4th at 358.  The employer's reasons need not meet the approval of a judge or jury, as long as the decision was not discriminatory.  *Douglas*, 656 F. 2d at 534.

### **PLAINTIFF'S RESPONSE TO CONCLUSION OF LAW NO. 1O**

This is a correct general statement of the law but it is **empty** because it does not exhibit or suggest an application of the facts to it. Plaintiff is at a loss for how to meaningfully respond, except to quote other general statements of law.  The fact is that burdened with the duty to demonstrate that one of more elements of any or all the causes of action cannot be established, Defendant has failed to do so.  For that reason alone, the Summary Judgment motion should be denied.  As detailed above and in Plaintiff's Additional Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment, there are significant material facts in dispute that preclude summary judgment or partial summary judgment. Plaintiff has established genuine disputes of material fact as to each claim. Plaintiff has presented "specific facts showing that there is a genuine issue for trial" as to all causes of action.

In the instant case, Plaintiff (and other racial minorities (Nelson, Black and Hernandez, Hispanic) were discriminated against was denied promotional opportunities by Rivers who falsified claims to support career blocking PIPs which she issued to the racial minorities.  Rivers, by her own testimony admitted that she assisted some 6 Caucasians with promotions but, before Plaintiff's lawsuit, could not identify a single racial minority whom she had assisted with promotion.  Plaintiff surrendered a higher paying job to re-brand himself and join Starbucks and, attributable to discriminatory and retaliatory treatment, was forced to resign. Plaintiff was credited as being a model employee appointed to Leadership Roles and high profile and important assignments, but when he sought equal treatment promotionally, he was treated as a "N…." who has overstepped his bounds.  Take what I give you,

but don't ask for anything, seemed to be Rivers' attitude toward racial minorities, including Plaintiff, supported by Defendant.


11.     It is well established that an employer may exercise business judgment in making personnel decisions, which the courts should not second-guess. *See Sada v. Robert F. Kennedy Med. Cntr.*, 56 Cal. App. 4th 138, 155 (1997) (*citing Mateo-Woodrum v. Fresno Commty. Hosp. & Med. Cntr.*, 221 Cal. App. 3d 1169, 1184-85 (1990)).

## PLAINTIFF'S RESPONSE TO CONCLUSION OF LAW NO. 11

This is a correct general statement of the law but it is **empty** because it does not exhibit or suggest an application of the facts to it. Plaintiff is at a loss for how to meaningfully respond, except to quote other general statements of law.  This concept has absolutely no application to the facts of this case.  The fact is that burdened with the duty to demonstrate that one of more elements of any or all the causes of action cannot be established, Defendant has failed to do so.  For that reason alone, the Summary Judgment motion should be denied.  As detailed above and in  Plaintiff's Additional Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment, there are significant material facts in dispute that preclude summary judgment or partial summary judgment. Plaintiff has established genuine disputes of material fact as to each claim. Plaintiff has presented "specific facts showing that there is a genuine issue for trial" as to all causes of action.

In the instant case, Plaintiff (and other racial minorities (Nelson, Black and Hernandez, Hispanic) were  discriminated  against  was  denied  promotional opportunities by Rivers who falsified claims to support career blocking PIPs which she issued to the racial minorities.  Rivers, by her own testimony admitted that she assisted some 6 Caucasians with promotions but, before Plaintiff's lawsuit, could not identify a single racial minority whom she had assisted with promotion.  Plaintiff

surrendered a higher paying job to re-brand himself and join Starbucks and, attributable to discriminatory and retaliatory treatment, was forced to resign. Plaintiff was credited as being a model employee appointed to Leadership Roles and high profile and important assignments, but when he sought equal treatment promotionally, he was treated as a "N…." who has overstepped his bounds. Take what I give you, but don't ask for anything, seemed to be Rivers' attitude toward racial minorities, including Plaintiff, supported by Defendant.

12.   To rebut an employer's legitimate, non-discriminatory reasons for decisions regarding a plaintiff's employment, the plaintiff must prove that the employer's proffered reason was not genuine, and rather just a "cover-up" for discrimination. *See McDonnell Douglas Corp.*, 411 U.S. at 805. To survive summary judgment, Mr. Briscoe "must produce '***specific, substantial evidence of pretext***.'" *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890 (9th Cir. 1994) (citation omitted) (emphasis added); *Horn*, 72 Cal. App. at 807. Protestations of discriminatory motive and intent, without substantial evidence, are inadequate to meet the burden of this prong and cannot create an issue of fact. *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983); *Martin v. Lockheed Missiles & Space Co.*, 29 Cal. App. 4th 1724, 735 (1994) (speculation of discrimination is not "substantial responsive evidence"). An issue of fact cannot be created by mere speculation and conjecture. *Horn*, 72 Cal. App. 4th at 807.

## PLAINTIFF'S RESPONSE TO CONCLUSION OF LAW NO. 12

This is a correct general statement of the law but it is **empty** because it does not exhibit or suggest an application of the facts to it. Plaintiff is at a loss for how to meaningfully respond, except to quote other general statements of law.  The fact is that burdened with the duty to demonstrate that one of more elements of any or all the causes of action cannot be established, Defendant has failed to do so.  For that reason

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

alone, the Summary Judgment motion should be denied.  As detailed above and in Plaintiff's Additional Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment, there are significant material facts in dispute that preclude summary judgment or partial summary judgment. Plaintiff has established genuine disputes of material fact as to each claim. Plaintiff has presented "specific facts showing that there is a genuine issue for trial" as to all causes of action.

In the instant case, Plaintiff (and other racial minorities (Nelson, Black and Hernandez, Hispanic) were discriminated against was denied promotional opportunities by Rivers who falsified claims to support career blocking PIPs which she issued to the racial minorities.  Rivers, by her own testimony admitted that she assisted some 6 Caucasians with promotions but, before Plaintiff's lawsuit, could not identify a single racial minority whom she had assisted with promotion.  Plaintiff surrendered a higher paying job to re-brand himself and join Starbucks and, attributable to discriminatory and retaliatory treatment, was forced to resign.  Plaintiff was credited as being a model employee appointed to Leadership Roles and high profile and important assignments, but when he sought equal treatment promotionally, he was treated as a "N…." who has overstepped his bounds.  Take what I give you, but don't ask for anything, seemed to be Rivers' attitude toward racial minorities, including Plaintiff, supported by Defendant.


13.   The standard is well-settled an employee ***does not*** meet his burden to rebut an employer's non-discriminatory basis for its employment decision by showing "that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Arteaga v. Brinks, Inc.*, 163 Cal. App. 4th 327, 343 (2008).  FEHA "does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules." *Id*. at 344;

1
2
3
4
5
6
7
8
9
10

*King v. United Parcel Svc.*, 152 Cal. App. 4th 426, 433 (2007) (whether plaintiff actually did commit a policy violation "does not matter ... as long as [the employer] honestly believed she did"); *see also, Carter v. Escondido Union High School Dist.*, 148 Cal.App.4th 922, 929 (2007) ("An employer may discharge an at-will employee for no reason, or for an arbitrary or irrational reason . . . ."). A "plaintiff's evidence must relate to the motivation of the decision-makers to prove, by ***nonspeculative*** evidence, an ***actual causal link*** between prohibited motivation and termination." *King,* 152 Cal. App. 4th at 433-34 (emphasis added) (citing *Saelzler v. Advanced Grp. 400*, 25 Cal. 4th 763, 774 (2001)).

11

## PLAINTIFF'S RESPONSE TO CONCLUSION OF LAW NO. 13:

12
13
14
15
16
17
18
19
20
21
22

This is a correct general statement of the law but it is **empty** because it does not exhibit or suggest an application of the facts to it. Plaintiff is at a loss for how to meaningfully respond, except to quote other general statements of law.  The fact is that burdened with the duty to demonstrate that one of more elements of any or all the causes of action cannot be established, Defendant has failed to do so.  For that reason alone, the Summary Judgment motion should be denied.  As detailed above and in Plaintiff's Additional Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment, there are significant material facts in dispute that preclude summary judgment or partial summary judgment. Plaintiff has established genuine disputes of material fact as to each claim. Plaintiff has presented "specific facts showing that there is a genuine issue for trial" as to all causes of action.

23
24
25
26
27
28

In the instant case, Plaintiff (and other racial minorities (Nelson, Black and Hernandez, Hispanic) were   discriminated   against   was   denied   promotional opportunities by Rivers who falsified claims to support career blocking PIPs which she issued to the racial minorities.  Rivers, by her own testimony admitted that she assisted some 6 Caucasians with promotions but, before Plaintiff's lawsuit, could not identify a single racial minority whom she had assisted with promotion.  Plaintiff

surrendered a higher paying job to re-brand himself and join Starbucks and, attributable to discriminatory and retaliatory treatment, was forced to resign. Plaintiff was credited as being a model employee appointed to Leadership Roles and high profile and important assignments, but when he sought equal treatment promotionally, he was treated as a "N…." who has overstepped his bounds. Take what I give you, but don't ask for anything, seemed to be Rivers' attitude toward racial minorities, including Plaintiff, supported by Defendant.

14.   Mere speculation is insufficient to create an issue of fact sufficient to defeat summary judgment. *See Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996).

**PLAINTIFF'S RESPONSE TO CONCLUSION OF LAW NO. 14:**

This is a correct general statement of the law but it is **empty** because it does not exhibit or suggest an application of the facts to it. Plaintiff is at a loss for how to meaningfully respond, except to quote other general statements of law. The fact is that burdened with the duty to demonstrate that one of more elements of any or all the causes of action cannot be established, Defendant has failed to do so. For that reason alone, the Summary Judgment motion should be denied. As detailed above and in Plaintiff's Additional Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment, there are significant material facts in dispute that preclude summary judgment or partial summary judgment. Plaintiff has established genuine disputes of material fact as to each claim. Plaintiff has presented "specific facts showing that there is a genuine issue for trial" as to all causes of action.

In the instant case, Plaintiff (and other racial minorities (Nelson, Black and Hernandez, Hispanic) were discriminated against was denied promotional opportunities by Rivers who falsified claims to support career blocking PIPs which she issued to the racial minorities. Rivers, by her own testimony admitted that she

assisted some 6 Caucasians with promotions but, before Plaintiff's lawsuit, could not identify a single racial minority whom she had assisted with promotion.   Plaintiff surrendered a higher paying job to re-brand himself and join Starbucks and, attributable to discriminatory and retaliatory treatment, was forced to resign.   Plaintiff was credited as being a model employee appointed to Leadership Roles and high profile and important assignments, but when he sought equal treatment promotionally, he was treated as a "N…." who has overstepped his bounds.   Take what I give you, but don't ask for anything, seemed to be Rivers' attitude toward racial minorities, including Plaintiff, supported by Defendant.

15.     The burden of avoiding summary judgment is particularly difficult where – as here –the same person was responsible for both the allegedly adverse act, as well as favorable acts.   "Where the same actor is responsible for both the hiring and firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive."   *Horn*, 72 Cal. App. 4th at 809; *Nazir v. United Airlines, Inc.*, 178 Cal. App. 4th 243, 272-73 (2009).   From the standpoint of the discriminator, it "hardly makes sense to hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job."   *Horn*, 72 Cal. App. 4th at 809, *citing Proud v. Stone* , 945 F.2d 796, 797 (4th Cir. 1991);   *accord, West v. Bechtel Corp.*, 96 Cal. App. 4th 966, 980-981 (2002) (applying the "same actor" rule); *Slakin v. Univ. of* Redlands, 88 Cal. App. 4th 1147, 1158 (2001) (granting summary judgment on discrimination claim where dean of school previously supported plaintiff's tenure bid); *Coghlan v. American Seafoods Co.,* LLC, 413 F.3d 1090, 1096-97 (9th Cir. 2005) (strong inference of no discrimination where person who demoted plaintiff was the same person who promoted him earlier).   The "compelling nature of the inference arising from [the "same actor" rule makes] cases involving this situation amenable to resolution at an early stage."   *Proud*, 945 F.2d at 797-798.

## PLAINTIFF'S RESPONSE TO CONCLUSION OF LAW NO. 15

This is a correct general statement of the law but it is **empty** because it does not exhibit or suggest an application of the facts to it. Plaintiff is at a loss for how to meaningfully respond, except to quote other general statements of law.  The fact is that burdened with the duty to demonstrate that one of more elements of any or all the causes of action cannot be established, Defendant has failed to do so.  For that reason alone, the Summary Judgment motion should be denied.  As detailed above and in Plaintiff's Additional Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment, there are significant material facts in dispute that preclude summary judgment or partial summary judgment. Plaintiff has established genuine disputes of material fact as to each claim. Plaintiff has presented "specific facts showing that there is a genuine issue for trial" as to all causes of action.

In the instant case, Plaintiff (and other racial minorities (Nelson, Black and Hernandez, Hispanic) were discriminated against was denied promotional opportunities by Rivers who falsified claims to support career blocking PIPs which she issued to the racial minorities.  Rivers, by her own testimony admitted that she assisted some 6 Caucasians with promotions but, before Plaintiff's lawsuit, could not identify a single racial minority whom she had assisted with promotion.  Plaintiff surrendered a higher paying job to re-brand himself and join Starbucks and, attributable to discriminatory and retaliatory treatment, was forced to resign.  Plaintiff was credited as being a model employee appointed to Leadership Roles and high profile and important assignments, but when he sought equal treatment promotionally, he was treated as a "N…." who has overstepped his bounds.  Take what I give you, but don't ask for anything, seemed to be Rivers' attitude toward racial minorities, including Plaintiff, supported by Defendant.

16.   Like a discrimination claim, once the employee establishes a *prima facie*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

case for retaliation, the burden shifts to the employer to articulate some legitimate, non-retaliatory reason for the adverse employment decision. *Morgan v. Regents of Univ. of Calif.*, 88 Cal. App. 4th 52, 68-69 (2000). Once the employer meets this burden, the employee must then prove by a preponderance of the evidence that the employer's reasons are pretext for retaliation or that a discriminatory reason more likely motivated the employer's action. *Id.* However, a suspicion of improper motives, based primarily on conjecture and speculation, are insufficient to carry the retaliation burden. *Martin*, 29 Cal. App. 4th at 1735; *Kerr v. Rose*, 216 Cal. App. 3d 1551, 1563-64 (1990), superseded on other grounds.

## **PLAINTIFF'S RESPONSE TO CONCLUSION OF LAW NO. 16**

This is a correct general statement of the law but it is **empty** because it does not exhibit or suggest an application of the facts to it. Plaintiff is at a loss for how to meaningfully respond, except to quote other general statements of law.  The fact is that burdened with the duty to demonstrate that one of more elements of any or all the causes of action cannot be established, Defendant has failed to do so.  For that reason alone, the Summary Judgment motion should be denied.  As detailed above and in Plaintiff's Additional Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment, there are significant material facts in dispute that preclude summary judgment or partial summary judgment. Plaintiff has established genuine disputes of material fact as to each claim. Plaintiff has presented "specific facts showing that there is a genuine issue for trial" as to all causes of action.

In the instant case, Plaintiff (and other racial minorities (Nelson, Black and Hernandez, Hispanic) were discriminated against was denied promotional opportunities by Rivers who falsified claims to support career blocking PIPs which she issued to the racial minorities.  Rivers, by her own testimony admitted that she assisted some 6 Caucasians with promotions but, before Plaintiff's lawsuit, could not identify a single racial minority whom she had assisted with promotion.  Plaintiff

1

2

3

4

5

6

7

8

9

surrendered a higher paying job to re-brand himself and join Starbucks and, attributable to discriminatory and retaliatory treatment, was forced to resign.  Plaintiff was credited as being a model employee appointed to Leadership Roles and high profile and important assignments, but when he sought equal treatment promotionally, he was treated as a "N…." who has overstepped his bounds.  Take what I give you, but don't ask for anything, seemed to be Rivers' attitude toward racial minorities, including Plaintiff, supported by Defendant.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

17.    To prove retaliation under the FEHA, a plaintiff must show: (1) he engaged in a protected activity; (2) he experienced an adverse employment action; and (3) there was a *causal link* between his protected activity and the adverse employment action.  *Guthrey v. State of Calif.*, 63 Cal. App. 4th 1108, 1125 (1998).  In order to survive summary judgment, it is not sufficient for a plaintiff to simply claim he engaged in protected activity and, thereafter, suffered an adverse employment action. *Morgan*, 88 Cal. App. 4th at 69; *Kortan*, 5 F. Supp. 2d at 853 ("The mere fact that an employee has made a complaint does not create the inference that everything that happens thereafter is a result of that complaint."); *see also Mazalin v. Safeway, Inc.*, 2012 U.S. Dist. LEXIS 16305, at *33 (E.D. Cal. Feb. 8, 2012) (retaliation claim failed because the plaintiff could not establish she would not have been terminated "but for" her protected activity, but rather, "defendant terminated her employment because she violated store policy").  A plaintiff must also demonstrate his participation in the protected activity *caused* the adverse employment action.  *Id.*  To show the requisite causal link, the plaintiff "must present evidence sufficient to raise the inference that [his] protected activity was the ***likely*** reason for the adverse action." *Cohen v. Fred Meyer, Inc.*, 686 F. 2d 793, 796 (9th Cir. 1982) (citing *Hagans v. Andrus*, 651 F.2d 622, 626 (9th Cir. 1981)) (emphasis added).

**PLAINTIFF'S RESPONSE TO CONCLUSION OF LAW NO. 17**

This is a correct general statement of the law but it is **empty** because it does not exhibit or suggest an application of the facts to it. Plaintiff is at a loss for how to meaningfully respond, except to quote other general statements of law.  The fact is that burdened with the duty to demonstrate that one of more elements of any or all the causes of action cannot be established, Defendant has failed to do so.  For that reason alone, the Summary Judgment motion should be denied.  As detailed above and in Plaintiff's Additional Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment, there are significant material facts in dispute that preclude summary judgment or partial summary judgment. Plaintiff has established genuine disputes of material fact as to each claim. Plaintiff has presented "specific facts showing that there is a genuine issue for trial" as to all causes of action.

In the instant case, Plaintiff (and other racial minorities (Nelson, Black and Hernandez, Hispanic) were discriminated against was denied promotional opportunities by Rivers who falsified claims to support career blocking PIPs which she issued to the racial minorities.  Rivers, by her own testimony admitted that she assisted some 6 Caucasians with promotions but, before Plaintiff's lawsuit, could not identify a single racial minority whom she had assisted with promotion.  Plaintiff surrendered a higher paying job to re-brand himself and join Starbucks and, attributable to discriminatory and retaliatory treatment, was forced to resign.  Plaintiff was credited as being a model employee appointed to Leadership Roles and high profile and important assignments, but when he sought equal treatment promotionally, he was treated as a "N…." who has overstepped his bounds.  Take what I give you, but don't ask for anything, seemed to be Rivers' attitude toward racial minorities, including Plaintiff, supported by Defendant.

Plaintiff has put forth facts and evidence supporting that Rivers' actions were clearly false and willful, and that other higher management persons had reason to know that her actions were likely motivated by race and retaliation for Plaintiff's

pursuit of equal treatment to that given Caucasian employees relative to promotion. Plaintiff was getting the praise and the high quality assignments, but not the promotional opportunities and benefits that should have been accorded.  Rivers acted willfully and intentionally to block his path.   Defendants knew that Marriott's Manager, by his own boastful admissions embarked upon a plan to have Starbucks remove Plaintiff, and Defendant not only failed to support Plaintiff, but maliciously continued to act and charge that Plaintiff had done something wrong. (see, Hoenecke's Dec).  Moreover, Defendant cannot explain how it can contend that Plaintiff was a terrible and non-compliant employee with poor communications skills, and reconcile it with the fact that it continued to assign him to important high profile and Leadership Roles.


18.     An employer can rebut a *prima facie* case of retaliation by offering legitimate, non-retaliatory reasons for its actions. S*ee  Flait v. N. Am. Watch Corp.*, 3 Cal. App. 4th 467, 479, at (1992), *reh'g denied and opinion modified* (Mar. 5, 1992); *Clark*, 6 Cal. App. 4th at 664.  When a legitimate, non-retaliatory reasons exists for an employer's actions, the burden reverts to the plaintiff Briscoe to prove pretext.  *Akers*, 95 Cal. App. 4th at 1453.  The plaintiff must present both ***specific*** and ***substantial*** evidence rebutting the employer's explanations.  *Horn,* 72 Cal. App. 4th at 807.

**PLAINTIFF'S RESPONSE TO CONCLUSION OF LAW NO. 18**

This is a correct general statement of the law but it is **empty** because it does not exhibit or suggest an application of the facts to it. Plaintiff is at a loss for how to meaningfully respond, except to quote other general statements of law.  The fact is that burdened with the duty to demonstrate that one of more elements of any or all the causes of action cannot be established, Defendant has failed to do so.  For that reason alone, the Summary Judgment motion should be denied.  As detailed above and in

1

2

3

4

5

6

Plaintiff's Additional Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment, there are significant material facts in dispute that preclude summary judgment or partial summary judgment. Plaintiff has established genuine disputes of material fact as to each claim. Plaintiff has presented "specific facts showing that there is a genuine issue for trial" as to all causes of action.

7

8

9

10

11

12

13

14

15

16

17

18

19

In the instant case, Plaintiff (and other racial minorities (Nelson, Black and Hernandez, Hispanic) were discriminated against was denied promotional opportunities by Rivers who falsified claims to support career blocking PIPs which she issued to the racial minorities.  Rivers, by her own testimony admitted that she assisted some 6 Caucasians with promotions but, before Plaintiff's lawsuit, could not identify a single racial minority whom she had assisted with promotion.  Plaintiff surrendered a higher paying job to re-brand himself and join Starbucks and, attributable to discriminatory and retaliatory treatment, was forced to resign.  Plaintiff was credited as being a model employee appointed to Leadership Roles and high profile and important assignments, but when he sought equal treatment promotionally, he was treated as a "N…." who has overstepped his bounds.  Take what I give you, but don't ask for anything, seemed to be Rivers' attitude toward racial minorities, including Plaintiff, supported by Defendant.

20

21

22

23

24

25

26

27

19.    Temporal proximity does not, without more, establish that an employer's proffered reasons are pretextual.  *See McRae*, 142 Cal. App. 4th at 388.    Mere sequence is not enough.  *Chen v. County of Orange*, 96 Cal. App. 4th 926, 931 (2002) (allowing mere sequence as the basis for a retaliation claim "would be the classic logical fallacy of 'post hoc ergo prompter hoc' (after the fact, therefore because of the fact)").

28

**PLAINTIFF'S RESPONSE TO CONCLUSION OF LAW NO. 19**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

This is a correct general statement of the law but it is **empty** because it does not exhibit or suggest an application of the facts to it. Plaintiff is at a loss for how to meaningfully respond, except to quote other general statements of law.  The fact is that burdened with the duty to demonstrate that one of more elements of any or all the causes of action cannot be established, Defendant has failed to do so.  For that reason alone, the Summary Judgment motion should be denied.  As detailed above and in Plaintiff's Additional Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment, there are significant material facts in dispute that preclude summary judgment or partial summary judgment. Plaintiff has established genuine disputes of material fact as to each claim. Plaintiff has presented "specific facts showing that there is a genuine issue for trial" as to all causes of action.

In the instant case, Plaintiff (and other racial minorities (Nelson, Black and Hernandez, Hispanic) were discriminated against was denied promotional opportunities by Rivers who falsified claims to support career blocking PIPs which she issued to the racial minorities.  Rivers, by her own testimony admitted that she assisted some 6 Caucasians with promotions but, before Plaintiff's lawsuit, could not identify a single racial minority whom she had assisted with promotion.  Plaintiff surrendered a higher paying job to re-brand himself and join Starbucks and, attributable to discriminatory and retaliatory treatment, was forced to resign.  Plaintiff was credited as being a model employee appointed to Leadership Roles and high profile and important assignments, but when he sought equal treatment promotionally, he was treated as a "N…." who has overstepped his bounds.  Take what I give you, but don't ask for anything, seemed to be Rivers' attitude toward racial minorities, including Plaintiff, supported by Defendant.

Plaintiff has put forth facts and evidence supporting that Rivers' actions were clearly false and willful, and that other higher management persons had reason to know that her actions were likely motivated by race and retaliation for Plaintiff's

pursuit of equal treatment to that given Caucasian employees relative to promotion. Plaintiff was getting the praise and the high quality assignments, but not the promotional opportunities and benefits that should have been accorded. Rivers acted willfully and intentionally to block his path. Defendants knew that Marriott's Manager, by his own boastful admissions embarked upon a plan to have Starbucks remove Plaintiff, and Defendant not only failed to support Plaintiff, but maliciously continued to act and charge that Plaintiff had done something wrong. (see, Hoenecke's Dec). Moreover, Defendant cannot explain how it can contend that Plaintiff was a terrible and non-compliant employee with poor communications skills, and reconcile it with the fact that it continued to assign him to important high profile and Leadership Roles.

20.    A plaintiff may not assert a wrongful termination in violation of public policy claim as a fallback to a statutory claim where the underlying statutory claim itself fails. *TRW, Inc. v. Super. Ct.*, 25 Cal. App. 4th 1834 (1994) (finding that no cause of action for wrongful termination in violation of public policy was stated where the employer did not violate the constitutional or statutory provision asserted as the basis for the claim); *Jennings v. Marralle*, 8 Cal. 4th 121, 135 (1984) (noting that no claim for violation of public policy exists against employers who have not violated the law).

**PLAINTIFF'S RESPONSE TO CONCLUSION OF LAW NO. 20**

This is a correct general statement of the law but it is **empty** because it does not exhibit or suggest an application of the facts to it. Plaintiff is at a loss for how to meaningfully respond, except to quote other general statements of law. The fact is that burdened with the duty to demonstrate that one of more elements of any or all the

causes of action cannot be established, Defendant has failed to do so.  For that reason alone, the Summary Judgment motion should be denied.  As detailed above and in Plaintiff's Additional Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment, there are significant material facts in dispute that preclude summary judgment or partial summary judgment. Plaintiff has established genuine disputes of material fact as to each claim. Plaintiff has presented "specific facts showing that there is a genuine issue for trial" as to all causes of action.

In the instant case, Plaintiff (and other racial minorities (Nelson, Black and Hernandez, Hispanic) were discriminated against was denied promotional opportunities by Rivers who falsified claims to support career blocking PIPs which she issued to the racial minorities.  Rivers, by her own testimony admitted that she assisted some 6 Caucasians with promotions but, before Plaintiff's lawsuit, could not identify a single racial minority whom she had assisted with promotion.  Plaintiff surrendered a higher paying job to re-brand himself and join Starbucks and, attributable to discriminatory and retaliatory treatment, was forced to resign.  Plaintiff was credited as being a model employee appointed to Leadership Roles and high profile and important assignments, but when he sought equal treatment promotionally, he was treated as a "N…." who has overstepped his bounds.  Take what I give you, but don't ask for anything, seemed to be Rivers' attitude toward racial minorities, including Plaintiff, supported by Defendant.

Plaintiff has put forth facts and evidence supporting that Rivers' actions were clearly false and willful, and that other higher management persons had reason to know that her actions were likely motivated by race and retaliation for Plaintiff's pursuit of equal treatment to that given Caucasian employees relative to promotion.  Plaintiff was getting the praise and the high quality assignments, but not the promotional opportunities and benefits that should have been accorded.  Rivers acted willfully and intentionally to block his path.  Defendants knew that Marriott's

Manager, by his own boastful admissions embarked upon a plan to have Starbucks remove Plaintiff, and Defendant not only failed to support Plaintiff, but maliciously continued to act and charge that Plaintiff had done something wrong. (see, Hoenecke's Dec). Moreover, Defendant cannot explain how it can contend that Plaintiff was a terrible and non-compliant employee with poor communications skills, and reconcile it with the fact that it continued to assign him to important high profile and Leadership Roles.

21. "Punitive damages are proper only when the tortious conduct rises to levels of extreme indifference … a level which decent citizens should not have to tolerate." *Tomaselli v. Transamerica Ins*., 25 Cal. App. 4th 1269, 1287 (1994). To state a claim for punitive damages, Mr. Briscoe must prove "by clear and convincing evidence" that Starbucks acted with malice and oppression *through one of its officers, directors, or managing agents*. Cal. Civ. Code § 3294(b). "Managing agents" are "employees who exercise substantial independent authority and judgment over decisions that ultimately determine corporate policy." *White v. Ultramar, Inc.,* 21 Cal.4th 563, 573 (1999). "Corporate policy" is comprised of "the general principles which guide a corporation, or rules intended to be followed consistently over time in corporate operations." *Cruz v. Homebase*, 83 Cal.App.4th 160, 165 (2000).

### PLAINTIFF'S RESPONSE TO CONCLUSION OF LAW NO. 21

This is a correct general statement of the law but it is **empty** because it does not exhibit or suggest an application of the facts to it. Plaintiff is at a loss for how to meaningfully respond, except to quote other general statements of law. The fact is that burdened with the duty to demonstrate that one of more elements of any or all the causes of action cannot be established, Defendant has failed to do so. For that reason alone, the Summary Judgment motion should be denied. As detailed above and in

Plaintiff's Additional Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment, there are significant material facts in dispute that preclude summary judgment or partial summary judgment. Plaintiff has established genuine disputes of material fact as to each claim. Plaintiff has presented "specific facts showing that there is a genuine issue for trial" as to all causes of action.

In the instant case, Plaintiff (and other racial minorities (Nelson, Black and Hernandez, Hispanic) were discriminated against was denied promotional opportunities by Rivers who falsified claims to support career blocking PIPs which she issued to the racial minorities.  Rivers, by her own testimony admitted that she assisted some 6 Caucasians with promotions but, before Plaintiff's lawsuit, could not identify a single racial minority whom she had assisted with promotion.  Plaintiff surrendered a higher paying job to re-brand himself and join Starbucks and, attributable to discriminatory and retaliatory treatment, was forced to resign.  Plaintiff was credited as being a model employee appointed to Leadership Roles and high profile and important assignments, but when he sought equal treatment promotionally, he was treated as a "N…." who has overstepped his bounds.  Take what I give you, but don't ask for anything, seemed to be Rivers' attitude toward racial minorities, including Plaintiff, supported by Defendant.

Plaintiff has put forth facts and evidence supporting that Rivers' actions were clearly false and willful, and that other higher management persons had reason to know that her actions were likely motivated by race and retaliation for Plaintiff's pursuit of equal treatment to that given Caucasian employees relative to promotion. Plaintiff was getting the praise and the high quality assignments, but not the promotional opportunities and benefits that should have been accorded.  Rivers acted willfully and intentionally to block his path.  Defendants knew that Marriott's Manager, by his own boastful admissions embarked upon a plan to have Starbucks remove Plaintiff, and Defendant not only failed to support Plaintiff, but maliciously

continued to act and charge that Plaintiff had done something wrong. (see, Hoenecke's Dec). Moreover, Defendant cannot explain how it can contend that Plaintiff was a terrible and non-compliant employee with poor communications skills, and reconcile it with the fact that it continued to assign him to important high profile and Leadership Roles.

22. Mere supervisory status is insufficient to establish that an employee is a "managing agent" for punitive damages purposes. *Kelly-Zurian v. Wohl Shoe Co.*, 22 Cal. App. 4th 397, 421-22 (1994). In the instant matter, the only person Mr. Briscoe identified as having engaged in allegedly discriminatory or retaliatory acts is Rivers. [SUF.] Rivers was not an officer or director and did not hold a position with the requisite discretionary authority over corporate policies to qualify them as a managing agent. [SUF]; *White*, 21 Cal. 4th at 577.

**PLAINTIFF'S RESPONSE TO CONCLUSION OF LAW NO. 22**

This is a correct general statement of the law but it is **empty** because it does not exhibit or suggest an application of the facts to it. Plaintiff is at a loss for how to meaningfully respond, except to quote other general statements of law. The fact is that burdened with the duty to demonstrate that one of more elements of any or all the causes of action cannot be established, Defendant has failed to do so. For that reason alone, the Summary Judgment motion should be denied. As detailed above and in Plaintiff's Additional Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment, there are significant material facts in dispute that preclude summary judgment or partial summary judgment. Plaintiff has established genuine disputes of material fact as to each claim. Plaintiff has presented "specific facts showing that there is a genuine issue for trial" as to all causes of action.

In the instant case, Plaintiff (and other racial minorities (Nelson, Black and Hernandez, Hispanic) were discriminated against was denied promotional

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

opportunities by Rivers who falsified claims to support career blocking PIPs which she issued to the racial minorities.  Rivers, by her own testimony admitted that she assisted some 6 Caucasians with promotions but, before Plaintiff's lawsuit, could not identify a single racial minority whom she had assisted with promotion.  Plaintiff surrendered a higher paying job to re-brand himself and join Starbucks and, attributable to discriminatory and retaliatory treatment, was forced to resign.  Plaintiff was credited as being a model employee appointed to Leadership Roles and high profile and important assignments, but when he sought equal treatment promotionally, he was treated as a "N…." who has overstepped his bounds.  Take what I give you, but don't ask for anything, seemed to be Rivers' attitude toward racial minorities, including Plaintiff, supported by Defendant.

Plaintiff has put forth facts and evidence supporting that Rivers' actions were clearly false and willful, and that other higher management persons had reason to know that her actions were likely motivated by race and retaliation for Plaintiff's pursuit of equal treatment to that given Caucasian employees relative to promotion. Plaintiff was getting the praise and the high quality assignments, but not the promotional opportunities and benefits that should have been accorded.  Rivers acted willfully and intentionally to block his path.  Defendants knew that Marriott's Manager, by his own boastful admissions embarked upon a plan to have Starbucks remove Plaintiff, and Defendant not only failed to support Plaintiff, but maliciously continued to act and charge that Plaintiff had done something wrong. (see, Hoenecke's Dec).  Moreover, Defendant cannot explain how it can contend that Plaintiff was a terrible and non-compliant employee with poor communications skills, and reconcile it with the fact that it continued to assign him to important high profile and Leadership Roles.

23.    If a plaintiff can establish an officer, director, or managing agent engaged

1
2
3
4
5
6
7
8
9

in alleged improper conduct or authorized or ratified such conduct, he still must prove they acted with the requisite fraud, oppression, or malice in regards his employment and, therefore, will be unable to make a claim for punitive damages. CAL. CIV. CODE § 3294(a).   Even when finding liability on the underlying claims, courts have held punitive damages are not recoverable where the employer's conduct does not meet the level of egregiousness required to warrant the award of punitive damages.  *See Real v. Continental Group, Inc.*, 627 F. Supp. 434 (N.D. Cal. 1986) (no punitive damages even when court found that company willfully discriminated against employee).

10

**PLAINTIFF'S RESPONSE TO CONCLUSION OF LAW NO. 23**

11
12
13

This is a correct general statement of the law but it is **empty** because it does not exhibit or suggest an application of the facts to it. Plaintiff is at a loss for how to meaningfully respond, except to quote other general statements of law.

14
15
16
17
18
19
20
21

Clearly Rivers is alleged to be a managing agent, with authority and control over a very large region and with managerial and supervisory authority over a large number of District Managers who, themselves have significant territories of responsibility. Moreover, by pronouncing in her Declaration to this HONARABLE COURT that it was Against Starbucks' Policy for A LSDM to Text a Licensee on His/Her Cellular Phone, Rivers established that she formulates (makes), announces, and implements Starbucks' Policy (if only for the purposes of Defendant's SJ), and Starbucks has condoned and adopted here actions in this regard.

22
23
24
25
26
27
28

The fact is that burdened with the duty to demonstrate that one of more elements of any or all the causes of action cannot be established, Defendant has failed to do so.  For that reason alone, the Summary Judgment motion should be denied.  As detailed above and in  Plaintiff's Additional Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment, there are significant material facts in dispute that preclude summary judgment or partial summary judgment. Plaintiff has established genuine disputes of material fact as to each claim. Plaintiff has presented

"specific facts showing that there is a genuine issue for trial" as to all causes of action. In the instant case, Plaintiff (and other racial minorities (Nelson, Black and Hernandez, Hispanic) were discriminated against was denied promotional opportunities by Rivers who falsified claims to support career blocking PIPs which she issued to the racial minorities.  Rivers, by her own testimony admitted that she assisted some 6 Caucasians with promotions but, before

Plaintiff's lawsuit, could not identify a single racial minority whom she had assisted with promotion.  Plaintiff surrendered a higher paying job to re-brand himself and join Starbucks and, attributable to discriminatory and retaliatory treatment, was forced to resign.  Plaintiff was credited as being a model employee appointed to Leadership Roles and high profile and important assignments, but when he sought equal treatment promotionally, he was treated as a "N…." who has overstepped his bounds.  Take what I give you, but don't ask for anything, seemed to be Rivers' attitude toward racial minorities, including Plaintiff, supported by Defendant.

Plaintiff has put forth facts and evidence supporting that Rivers' actions were clearly false and willful, and that other higher management persons had reason to know that her actions were likely motivated by race and retaliation for Plaintiff's pursuit of equal treatment to that given Caucasian employees relative to promotion. Plaintiff was getting the praise and the high quality assignments, but not the promotional opportunities and benefits that should have been accorded.  Rivers acted willfully and intentionally to block his path.  Defendants knew that Marriott's Manager, by his own boastful admissions embarked upon a plan to have Starbucks remove Plaintiff, and Defendant not only failed to support Plaintiff, but maliciously continued to act and charge that Plaintiff had done something wrong. (see, Hoenecke's Dec).  Moreover, Defendant cannot explain how it can contend that Plaintiff was a terrible and non-compliant employee with poor communications skills, and reconcile it with the fact that it continued to assign him to important high profile and Leadership

Rules.

The law does not support a mere shield that was not implemented in good faith because it was not activated in Plaintiff's case.  Plaintiff's claim for punitive damages is viable because material disputes of facts exists relative to whether Starbucks acted with fraud, malice or oppression.  Plaintiff has presented disputed issues of material fact whether the discrimination on the basis of race was in disregard of .

Punitive damages are available under *Civil Code* section 3294"where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, . . ." Malice under *Civil Code* section 3294 includes "despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights . . . of others." (Subd. (2)(1).)  The adjective "despicable" used in section 3294 refers to "circumstances that are 'base,' 'vile,' or 'contemptible.' "*Cloud v. Casey*, 76 Cal. App.4th 895 (1999) [citing, *College Hospital Inc. v. Superior Court*, 8 Cal.4th 704, 725 (1994)].  Favoring Caucasian employees over African American employees for promotion is an act in conscious disregard of the rights of others. The law will not support an empty shield against liability; if an employer does not enforce the policies it has in place, then having a written policy does not shield an employer against liability for punitive damages.

24.   The California Supreme Court holds an employer's written policy specifically forbidding the discrimination, harassment or other unlawful conduct "may operate to limit corporate liability for punitive damages, as long as the employer implements the written policy in good faith." *White*, 21 Cal. 4th at 568, fn. 2; *see Kolstad v. American Dental Ass'n*, 527 US 526, 541-43 (1999) (employer's adoption and implementation of written policy against workplace discrimination may shield it from punitive damages liability for discriminatory acts by its managers).  The conduct must be so mean, vile, base, or contemptible that it would be looked down on and

despised by reasonable people."  CACI No. 3945.

**PLAINTIFF'S RESPONSE TO CONCLUSION OF LAW NO. 24:**

This is a correct general statement of the law but it is **empty** because it does not exhibit or suggest an application of the facts to it. Plaintiff is at a loss for how to meaningfully respond, except to quote other general statements of law.

Clearly Rivers is alleged to be a managing agent, with authority and control over a very large region and with managerial and supervisory authority over a large number of District Managers who, themselves have significant territories of responsibility.  Moreover, by pronouncing in her Declaration to this HONARABLE COURT that it was Against Starbucks' Policy for A LSDM to Text a Licensee on His/Her Cellular Phone, Rivers established that she formulates (makes), announces, and implements Starbucks' Policy (if only for the purposes of Defendant's SJ), and Starbucks has condoned and adopted here actions in this regard.

The fact is that burdened with the duty to demonstrate that one of more elements of any or all the causes of action cannot be established, Defendant has failed to do so.  For that reason alone, the Summary Judgment motion should be denied.  As detailed above and in  Plaintiff's Additional Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment, there are significant material facts in dispute that preclude summary judgment or partial summary judgment. Plaintiff has established genuine disputes of material fact as to each claim. Plaintiff has presented "specific facts showing that there is a genuine issue for trial" as to all causes of action.

In the instant case, Plaintiff (and other racial minorities (Nelson, Black and Hernandez, Hispanic) were discriminated against was denied promotional opportunities by Rivers who falsified claims to support career blocking PIPs which she issued to the racial minorities.  Rivers, by her own testimony admitted that she assisted some 6 Caucasians with promotions but, before Plaintiff's lawsuit, could not identify a single racial minority whom she had assisted with promotion.  Plaintiff

surrendered a higher paying job to re-brand himself and join Starbucks and, attributable to discriminatory and retaliatory treatment, was forced to resign. Plaintiff was credited as being a model employee appointed to Leadership Roles and high profile and important assignments, but when he sought equal treatment promotionally, he was treated as a "N…." who has overstepped his bounds. Take what I give you, but don't ask for anything, seemed to be Rivers' attitude toward racial minorities, including Plaintiff, supported by Defendant.

Plaintiff has put forth facts and evidence supporting that Rivers' actions were clearly false and willful, and that other higher management persons had reason to know that her actions were likely motivated by race and retaliation for Plaintiff's pursuit of equal treatment to that given Caucasian employees relative to promotion. Plaintiff was getting the praise and the high quality assignments, but not the promotional opportunities and benefits that should have been accorded. Rivers acted willfully and intentionally to block his path. Defendants knew that Marriott's Manager, by his own boastful admissions embarked upon a plan to have Starbucks remove Plaintiff, and Defendant not only failed to support Plaintiff, but maliciously continued to act and charge that Plaintiff had done something wrong. (see, Hoenecke's Dec). Moreover, Defendant cannot explain how it can contend that Plaintiff was a terrible and non-compliant employee with poor communications skills, and reconcile it with the fact that it continued to assign him to important high profile and Leadership Roles.

The law does not support a mere shield that was not implemented in good faith because it was not activated in Plaintiff's case. Plaintiff's claim for punitive damages is viable because material disputes of facts exists relative to whether Starbucks acted with fraud, malice or oppression. Plaintiff has presented disputed issues of material fact whether the discrimination on the basis of race was in disregard of .

Punitive damages are available under *Civil Code* section 3294"where it is

1

2

3   proven by clear and convincing evidence that the defendant has been guilty of

4   oppression, fraud, or malice, . . ." Malice under *Civil Code* section 3294 includes

5   "despicable conduct which is carried on by the defendant with a willful and conscious

6   disregard of the rights . . . of others." (Subd. (2)(1).)   The adjective "despicable" used

7   in section 3294 refers to "circumstances that are 'base,' 'vile,' or 'contemptible.' "*Cloud

8   v. Casey*, 76 Cal. App.4th 895 (1999) [citing, *College Hospital Inc. v. Superior Court*,

9   8 Cal.4th 704, 725 (1994)].   Favoring Caucasian employees over African American

10  employees for promotion is an act in conscious disregard of the rights of others.

11  The law will not support an empty shield against liability; if an employer does not

12  enforce the policies it has in place, then having a written policy does not shield an

13  employer against liability for punitive damages.

14

15

16            **/s/Alvin L. Pittman____**

17            Alvin L. Pittman

18

19

20

21

22

23

24

25

26

27

28